

Eddie T. Johnson
Superintendent
Chicago Police Department
3510 S. Michigan Avenue
Chicago, Illinois 60653

January 19, 2017

**Re: Use of Force Training**

Dear Superintendent Johnson:

Pursuant to the Municipal Code of Chicago Section 2-78-130, the Chief Administrator of the Civilian Office of Police Accountability (COPA) is empowered and has a duty to make recommendations to the Superintendent of the Chicago Police Department (the Department). To fulfill the mission, as outlined in Section 4.4.2 of COPA's Rules and Regulations (effective September 15, 2017), the Chief Administrator may make recommendations that are intended to promote best practices in policing, to address specific gaps in policy and training, or to improve the integrity and transparency of the Department's operations and performance.

**Recommendations**

The enclosed report provides greater detail regarding COPA's recommendations. In short, COPA recommends that the Department continually evaluate its training to determine if the Department's approach to training its members comports with its policies. Second, COPA recommends that the Department ensure that its trainers are adequately and substantively trained in adult learning and training technique. Third, the Department should review how it assigns members to the Academy for developing and implementing training. Finally, COPA recommends that the Department train on

how use of force incidents are evaluated and investigated by its own Force Review Unit and COPA, so that all members can know what standards the Department, the City, and its residents evaluate them by. COPA can offer training to Chicago Police Academy staff on how COPA investigates and evaluates use of force incidents.

Thank you for your time and consideration of these issues. We respectfully request a response to these recommendations within 60 days, or by March 19, 2018. COPA will publish this letter and the Department's response, if any, on the COPA website after the 60-day response time has passed.

Respectfully,

*Patricia Banks*

Patricia Banks
*Interim Chief Administrator*

# City of Chicago

# Civilian Office of Police Accountability



# Policy Brief: Use of Force Training

**January 19, 2017**

I.     **Executive Summary**

Pursuant to MCC §2-78-120, the Civilian Office of Police Accountability (COPA) is empowered to make recommendations to the Chicago Police Department (the Department) regarding its training, practices, policies, and programs.

Over 30 COPA staff attended the Department's Use of Force training in October 2017, aimed to train members on the revised Use of Force polices. Throughout the course, COPA staff identified several issues that merit recommendations.

First, COPA recommends that the Department continually evaluate its training to determine if the Department's approach to training its members comports with its policies. Second, COPA recommends that the Department ensure that its trainers are adequately and substantively trained in adult learning and training techniques. Third, the Department should review how it assigns members to the Academy for developing and implementing training. Finally, COPA recommends that the Department train on how use of force incidents are evaluated and investigated by its own Force Review Unit and COPA, so that all members can know what standards the Department, the City, and its residents evaluate them by. COPA can offer training to Chicago Police Academy staff on how COPA investigates and evaluates use of force incidents.

II.    **CPD Use of Force Four-Hour Training**

In response to the Department of Justice's (DOJ) investigation of the Chicago Police Department in December 2015, the Department conducted a review of its Use of Force policies and trainings. The Department's process was iterative and included two public comment periods, numerous small-group discussions, and dozens of community meetings and presentations. Two critical outcomes from the Department's review were a new Use of Force policy suite and a new four-hour training on the policy for all Department members, which was implemented prior to the policy suite's effective dates.

Over 30 COPA investigative, policy, and leadership staff attended the four-hour training at the Academy along with Department recruits. Attending the Department's training is a key component of COPA's investigative work as it helps us to properly account for how Department members are trained when we are conducting our investigations and developing our findings and recommendations for each investigation. Thus, COPA was grateful to attend the training and hopes to continue to attend the Department's trainings in the future. Nonetheless, aspects of the new use of force training raised the following concerns.

a. Overall Training Concerns

Over the summer, COPA leadership attended a "Train the Trainer" session for the Chicago Police Academy trainers tasked with implementing the new Use of Force training. During this session, COPA leadership believed that the training provided by the Department was conducive to adult learning. Similar to the applied training that is the subject of this report, the Department used videos to present various scenarios involving uses of force by law enforcement. In the "Train the Trainer" session, attendees engaged in discussions and analyses of each scenario; the discussions prompted attendees to define terms, to discuss the issues that arose, and to debate whether the incidents depicted were within the Department's new Use of Force policy. During this session, trainers created an environment by which attendees could critically analyze each scenario and the issues that arose.

In the training that COPA staff attended at the Chicago Police Academy, COPA did not benefit from the type of exchange and analyses provided by the "Train the Trainer" session. In particular, the applied training COPA staff attended lacked a substantive discussion regarding whether certain uses of force were within policy or were outside of policy and, perhaps most importantly, how COPA and the Department analyze use of force incidents.

There may be many reasons for these differences, but one potential reason merits additional consideration: lack of ongoing quality management of training content and delivery. COPA staff attended the final week of Use of Force training. We understand that doing repetitive trainings can lead to burnout and fatigue. However, the significant differences noted between the "Train the Trainer" session and the applied training raise questions about the overarching quality management of the Department's training.

Another concern is the training approach, namely the paramilitary nature within the Academy. Recruits must adhere to a set of conduct, including deferring to authority and supervisors (e.g., saying, "Good afternoon, ma'am" and replying "Yes, sir" in classes). This mode may work well for some types of training, especially if trainees are similarly situated (e.g., all supervisory staff or all beat officers), but it appeared to inhibit robust discussion, including reasonable disagreement with the analysis and potential outcomes of use of force cases. This mode of training made some approaches particularly concerning, like the use of rhetorical questions and the lack of analysis for use of force scenarios (discussed in further detail below).

b. "The Same Standard"

When the revised Use of Force policy suite was made public, one of the central messages from top Department officials was that the new policies were substantively different than the

previous policies and that those differences mattered. First Deputy Kevin Navarro stated the following in an email on October 16, 2017 (the day after the new policy became effective):

> *While there are many incremental changes compared to the policy it replaces, I would like to highlight some of the more significant changes within this policy, this includes: Identifying the sanctity of human life as the Department's highest priority and the use of de-escalation tactics whenever possible. In situations where these tactics are ineffective, the use of force must be objectively reasonable, necessary, and proportional to the situation.*

We commend the Department on training its members and its recruits prior to implementing such a significant policy change. Effective training not only assists members in implementing the Department's goals but also in establishing norms and culture. In this case, effective training could have aided in establishing a new culture, especially concerning sanctity of life and force mitigation.

However, certain rhetoric used by trainers during the Use of Force training worked to undermine the Department's message of changing the culture around use of force incidents. For instance, Department trainers made statements to the effect of, "the previous policy contained the same standard but it was less clearly defined" and that the new policy was "not a drastic overhaul." In addition, a trainer stated that members were not expected to memorize the new use of force policy. These types of comments from the trainers may give the impression that the course doesn't contain critical, new information and that the lessons aren't important. Minimizing the changes serves to undercut the stated purpose of the training in the first place.

Moreover, the manner in which the training was delivered could have promoted the message that the Department did not need to change how officers approach use of force incidents. The trainers did not mention the DOJ investigation and findings letter at all in some trainings and rarely in others. It is important to note that the federal government stated that the Department engages in a pattern and practice of violating Chicagoan's constitutional rights. Given the DOJ investigation and subsequent report, the Mayor's Police Accountability Task Force (PATF) report, and numerous outcries from civil society, the overall tone of the training was inconsistent with the significance of the change highlighted in such reports.

  c. Specific Rhetorical Concerns

The trainers made some seemingly informal comments that raised some concern. For example, when addressing the "Code of Silence" one trainer stated, "In my 20 years, I haven't seen it." This response to a substantive, department-wide issue noted in both the PATF report and the DOJ findings letter, may have created an environment in which the issue of honesty, transparency, and full disclosure could not be discussed.

In another example, a trainer stated that misconduct was a matter of "bad apples" in the Department. However, this statement is not supported by the findings set forth in the DOJ letter. In fact, the DOJ specifically highlights that,

> [t]he uses of excessive force we identified were not aberrational. Our holistic review of this information, combined with our investigation of CPD's training, supervision, accountability, and other systems, give us reasonable cause to believe that the unreasonable force we identified amounts to a pattern or practice of unlawful conduct.[1]

In addition, the trainers asked questions such as, "You guys got it?" and "Understand?" to gauge the effectiveness of the training. Such rhetorical questions do not meaningfully assess whether trainees understand the concepts being taught. Best practices for adult learning strongly encourage that trainers conduct a pre- and a post-training assessment of the knowledge gained in a training environment. This allows for the trainers to determine whether the training modality should be changed, modified, or strengthened.

 a. Lack of Force Analysis

The training contained four videos of different uses of force and prompted trainees to respond at various points to specific topics. The trainers did not discuss how those videos comported with the Department's new Use of Force policies and, most importantly, how those types of incidents would be reviewed and investigated to determine if uses of force were within or outside of policy. The only reference point offered in the discussion on whether certain conduct in a video was within or outside of policy was a simple percentage taken from a survey of the Department members who had taken the course previously. This is problematic for a number of reasons, but perhaps most importantly because the DOJ stated that they:

> found reasonable cause to believe that CPD has engaged in a pattern or practice of unreasonable force in violation of the Fourth Amendment and that the deficiencies in CPD's training, supervision, accountability, and other systems have contributed to that pattern or practice. CPD has not provided officers with adequate guidance to understand how and when they may use force, or how to safely and effectively control and resolve encounters to reduce the need to use force. CPD often does not appropriately supervise officers to identify dangerous tactics or behaviors that may indicate officers need additional training or other intervention. CPD also does not

---

[1] United States Department of Justice. Investigation of the Chicago Police Department. January 13, 2017. Accessed December 21, 2017. https://www.justice.gov/opa/file/925846/download

review its force practices as a whole to identify problematic trends or patterns that endanger officers and others.[2]

The Department's reliance on a non-scientific survey of Department members deprives recruits of the critical analysis and in-depth discussion regarding use of force incidents that COPA staff found so valuable in the "Train the Trainer" session. The lack of additional viewpoints also deprives recruits of a thorough understanding of how their uses of force will be analyzed and reviewed both internally by the Department and externally by the Department's oversight agencies.

    b.  Subjective beliefs

The trainers' placed potentially misleading emphasis on a subjective standard for analyzing a use of force – namely, emphasizing that the officer's own belief regarding her or his safety was tantamount in determining whether the use of force was within policy. The concern with this emphasis is that the officer's subjective belief is considered only as one of the many factors included in the analysis of the totality of circumstances of the incident. Thus, even if an officer has a sincerely held subjective belief, but that subjective belief is objectively unreasonable given the totality of the circumstances, and thus fails to meet the legal and policy-based threshold for use of force, that force is still outside of policy.

By omitting the analytical and legal framework by which use of force is evaluated, the training missed a valuable opportunity to address some of the fundamental concerns raised in the DOJ report. It is critical to note that department members' use of force will be judged in an objective manner, and the Department should provide its members with the analytical toolkit to understand how their force will be investigated and analyzed.

    c.  Problematic behavior unaddressed

During the training a few concerning (and potentially unconstitutional) actions unrelated to the application of force were displayed in the example videos. Many of these issues went unaddressed by trainers. One example includes a video of a "Consensual Encounter" that quickly turns into an investigatory stop. In discussing the use of force that resulted from the investigatory stop, the trainers never articulated the Constitutional standard that law enforcement must meet in order to conduct the investigatory stop to begin with. Instead, the trainer stated that, "in order to stop someone, you have to articulate why."

---

[2] United States Department of Justice. Investigation of the Chicago Police Department. January 13, 2017. Accessed December 21, 2017. https://www.justice.gov/opa/file/925846/download

*Terry v. Ohio* provides that "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[3] Thus, an investigating officer's reasonable, articulable suspicion for the stop must be present before the stop (or "intrusion"), not developed after to justify the reason for the stop itself. Thus, while the training member's statement doesn't necessarily run afoul of the *Terry* standard, it is misleading because it does not include the complete *Terry* standard. We hold that a central component of conducting constitutional stops requires that officers conduct an analysis before they take action, not merely provide a post-hoc justification.

    d. De-escalation of minimized importance

The Department's policy change is centered on de-escalation and force mitigation principles, yet de-escalation appeared to be of minimized importance during the training. The training provided minimal discussion of the reasons and tools for de-escalation and force mitigation. This lack is of particular concern for recruits who may not have developed a toolkit of de-escalation techniques or conflict resolution strategies from prior experiences or training.

    **III.    Recommendations**

Considering the Department is in the process of hiring new officers, and the Department's plan to require eight additional hours of scenario-based use of force in-service training for its members, it is imperative that the Department ensures its training does not replicate the above concerns we noted, reflects best practices, and is consistent and effective.

    1. Training Evaluation

COPA recommends that the Department continually evaluate its training to determine if the Department's approach for training its members comports with its own policies and with how COPA conducts investigations and determines findings. COPA further recommends that the Department evaluate the efficacy of its quality management controls for all training.

In addition, we recommend that the Department should, whenever possible, identify and address all problematic behavior (such as that described in this policy report) shown in training. When problematic behavior goes unaddressed, trainees (and especially recruits, who COPA was trained with) may assume the Department implicitly supports that behavior. This is especially important when the behavior relates to conducting constitutional stops – a fundamental aspect of policing and one that defines most citizens' interactions with the police.

---

[3] *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

2. Training and Assignment of Academy Staff

COPA recommends that the Department ensures that its trainers are adequately and substantively trained in adult learning and training techniques. Effective, consistent training for adult learners requires a specific skillset. While many Department members have experience that can benefit recruits, being a member of the Department doesn't necessarily equip someone with all the necessary skills to effectively train adult learners. Thus, the Department should develop, implement, and review the performance of a robust "Train the Trainers" program for all its trainers. This program should emphasize key skill sets for training adult learners.

Similarly, the Department should review and, if applicable, change how it assigns members to teach in the Academy. Academy instructors should have excellent pedagogical skills and should have demonstrated their commitment to uphold the Department's core values, Rules, directives, and procedures. Moreover, Academy instructors should be continually trained, monitored, reviewed, and assessed to ensure that they deliver content in an effective, consistent, objective, and accurate manner.

3. Train on Analysis and Investigation

The Department should ensure that trainings describe accurately and clearly why uses of force are within or outside of policy. The Department should also review its other trainings related to use of force and ensure that it includes sound legal and administrative analysis of use of force, including an analysis of the totality of the circumstances and how the preponderance standard contributes to the analysis of the use of force in administrative investigations. The Department should ensure that its training appropriately describes the differences between a sincerely held subjective belief and the objective reasonableness standard for uses of force.

COPA recommends that the Department train on how use of force incidents are evaluated and investigated by its own Force Review Unit and COPA, so that all members can know what standards the Department and COPA evaluate them by. This will increase the transparency of the Department's review process and COPA's investigative approach. This explanation would promote procedural justice and legitimacy internally. Moreover, this will allow members a more comprehensive, analytical framework to understand how administrative investigations consider the totality of circumstances and weigh available evidence. COPA can offer training to CPD Academy staff on how COPA investigates and evaluates use of force incidents.

**IV.   Conclusion**

In conclusion, COPA took much away from the Department's training, and we provide this letter to aid in supporting the Department's push towards reform and improved training.