# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

STATE OF ILLINOIS,

        Plaintiff,

    v.

CITY OF CHICAGO,

        Defendant.

Case No. 17-cv-6260

Judge Robert M. Dow, Jr.

## INDEPENDENT MONITORING REPORT 2

The Independent Monitor Margaret A. Hickey and the Independent Monitoring Team submit the attached Independent Monitoring Report 2.

Dated June 18, 2020

/s/Margaret A. Hickey
Margaret A. Hickey
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL  60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
mhickey@schiffhardin.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that, on June 18, 2020, she caused a true and correct copy of the foregoing **Independent Monitoring Report 2** to be filed electronically with the Court's CM/ECF system, which caused an electronic copy of this filing to be served on counsel of record.

/s/Margaret A. Hickey
Margaret A. Hickey
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL  60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
mhickey@schiffhardin.com



# INDEPENDENT MONITORING REPORT 2

*Reporting Period September 1, 2019, through February 29, 2020*

June 18, 2020

# Monitoring Under the Consent Decree

In August 2017, the Office of the Illinois Attorney General (OAG) sued the City of Chicago (City) in federal court regarding civil rights abuses by the Chicago Police Department (CPD). The lawsuit led to a consent decree, effective March 1, 2019.[1] The same day, the Court appointed Maggie Hickey as the Independent Monitor. Ms. Hickey leads the Independent Monitoring Team, which monitors the City of Chicago's progress in meeting the consent decree's requirements.

This is our second monitoring report, which includes our assessments of the City's compliance efforts from September 1, 2019, through February 29, 2020.

We are filing this report as Chicago and the country are in the midst of a pandemic, an economic crisis, and a social justice movement. These developments have challenged our city; the City's entities, including the CPD, the Civilian Office of Police Accountability, the Chicago Police Board, the City Office of the Inspector General; and our Chicago communities. Because the reporting period ended on February 29, 2020, we completed our compliance assessments and our first draft of this report before these events. Specifically, we submitted our draft report to the City and the OAG, collectively "the Parties," on March 30, 2020, per ¶¶661–65.[2]

Nonetheless, three days earlier, on March 27, 2020, after an unopposed motion by the City, the Court entered an extension order.[3] The extension order stated that "all the future obligations and deadlines under the Consent Decree, including those for the City of Chicago, State of Illinois, and Independent Monitor, [are] extended for the longer of 30 days or the time period the COVID-19 Executive Order No. 8 issued by the Governor of the State of Illinois remains in effect." Because Executive Order No. 8 expired on May 29, 2020, the City and the OAG then had 15 days to respond before we could file the final draft. In addition to providing preliminary feedback during the extension period, the OAG provided its final response on June 5, 2020, and the City provided its response on June 13, 2020, per ¶663. *See* Attachments A and B, respectively.[4]

On May 25, 2020, the nation watched George Floyd die under the knee of a police officer in Minneapolis, Minnesota. Communities across the country, including Chi-

---

[1] For more information on the consent decree, see the Background section below. *See also Independent Monitoring Team Website*, https://cpdmonitoringteam.com/.

[2] For convenience to the Parties, the IMT also provided a second draft on June 2, 2020, shortly after the extension ended on May 29, 2020.

[3] *See Order Regarding the Extension of Consent Decree Obligation Deadlines* (March 27, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/04/2020_03_27-Order-Regarding-the-Extension-of-Consent-Decree-Obligation-De....pdf.

[4] We have considered those comments and made appropriate changes (¶663). Where necessary, we have included clarifying comments in the footnotes of this report.

cago, responded—and in many areas and ways continue to respond—with protests and civil unrest. *See, e.g.*, ¶163 and 509 (referring to protected First Amendment activity, including lawful demonstrations and protected speech).

Many of these protests have called for varying forms of increased police accountability and reform. And many of these calls for action include or relate to requirements across the consent decree. These include, for example, the following consent-decree requirements for the CPD and other City entities, in numerical order:

- Prominently displaying arrestee rights and allowing arrestees "to make a phone call as soon as practicable" (¶¶30–31);

- Creating "opportunities to encourage officer, supervisory, and district performance on furthering community partnerships," "effective use of de-escalation," and "implementing community-oriented crime prevention strategies" (¶48; *see also* ¶375).

- Prohibiting "officers from using race, ethnicity, color, national origin, ancestry, religion, disability, gender, gender identity, sexual orientation, immigration status, homeless status, marital status, parental status, military discharge status, financial status, or lawful source of income when making routine or spontaneous law enforcement decisions, except when such information is part of a specific subject description" (¶55; *see also* ¶54);

- Committing "to exploring diversion programs, resources, and alternatives to arrest for individuals in crisis" (¶86);

- Requiring "all officers [to] receive in-service training, every three years, regarding responding to individuals in crisis that is adequate in quality, quantity, and scope for officers to demonstrate competence in the subject matter" (¶126; *see also* ¶¶85 and 88);[5]

- Designing, implementing, and maintaining the "CPD's use of force policies and training, supervision, and accountability systems" so that CPD members

  o "act at all times in a manner consistent with the sanctity of human life;"

  o "act at all times with a high degree of ethics, professionalism, and respect for the public;"

---

[5] Paragraph 85 also states that the "The use of trauma-informed crisis intervention techniques to respond appropriately to individuals in crisis will help CPD officers reduce the need to use force, improve safety in police interactions with individuals in crisis, promote the connection of individuals in crisis to the healthcare and available community-based service systems, and decrease unnecessary criminal justice involvement for individuals in crisis."

- o "use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible;"

- o "use sound tactics to eliminate the need to use force or reduce the amount of force that is needed;"

- o "only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances;"

- o "only use force for a lawful purpose and not to punish or retaliate;"

- o "continually assess the situation and modify the use of force as circumstances change and in ways that are consistent with officer safety, including stopping the use of force when it is no longer necessary;"

- o "truthfully and completely report all reportable instances of force used;"

- o "promptly report any use of force that is excessive or otherwise in violation of policy;"

- o "are held accountable, consistent with complaint and disciplinary policies, for use of force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances, or that otherwise violates law or policy;" and

- o "act in a manner that promotes trust between CPD and the communities it serves" (¶156; *see also* ¶¶157, 160–62, 164, and 183);

- Prohibiting CPD officers "from using force as punishment or retaliation, such as using force to punish or retaliate against a person for fleeing, resisting arrest, insulting an officer, or engaging in protected First Amendment activity (e.g., lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct)" (¶163);

- Prohibiting the use of "deadly force except in circumstances where there is an imminent threat of death or great bodily harm to an officer or another person" which does not include when "a person is a threat only to himself or herself or to property" (¶165);

- Immediately requesting "appropriate medical aid for injured persons or persons who claim they are injured" after "a use of force, once the scene is safe and as soon as practicable" (¶173);

- Requiring "CPD officers to provide life-saving aid consistent with their [Law Enforcement Medical and Rescue Training] to injured persons as soon as it is safe and feasible to do so until medical professionals arrive" (¶175);

- Requiring officers to "recognize and act upon the duty to intervene on the subject's behalf when another officer is using excessive force" (¶176; *see also* ¶59);

- Requiring that "CPD officers must generally not use force against a person who is handcuffed or otherwise restrained or otherwise restrained" (¶177);

- Prohibiting CPD officers "from using carotid artery restraints or chokeholds (or other maneuvers for applying direct pressure on a windpipe or airway, i.e., the front of the neck, with the intention of reducing the intake of air) unless deadly force is authorized" (¶178);

- Requiring that all "reportable uses of force by CPD members must be reviewed by CPD supervisors" (¶229);

- Requiring that "pre-service and in-service training must provide officers with knowledge of policies and laws regulating the use of force; equip officers with tactics and skills, including de-escalation techniques, to prevent or reduce the need to use force or, when force must be used, to use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and ensure appropriate supervision and accountability" (¶243; *see also* (¶246; *see also*, ¶¶246 (annual use of force training), 248 (pre-service promotional supervisory training), and 266));

- Requiring that supervisors to "establish and enforce the expectation that members under their command perform their duties in a manner that . . . is consistent with the principles of procedural justice, de-escalation, impartial policing, and community policing;" "provide leadership, guidance, mentoring, direction, and support to members under their command to promote improved performance and professional development;" and "lead efforts to ensure that members under their command are working actively to engage the community and promote public trust and safety" (¶352);

- Determining whether "members who have experienced a duty-related traumatic incident have attended the mandatory counseling sessions and have completed the Traumatic Incident Stress Management Program" (¶411); and

- Creating a "computerized relational database that will be used to collect, maintain, integrate, analyze, visualize, and retrieve data for each CPD officer," including "all reportable uses of force;" "all arrests by CPD personnel;" "all injuries to and deaths of persons in CPD custody;" "all injuries and deaths resulting from conduct by CPD personnel;" "all vehicle pursuits and traffic collisions involving CPD equipment or personnel;" "all misconduct complaints and investigations involving CPD officers, including the disposition of each allegation;" "all civil or administrative claims initiated against the City or CPD, or CPD officers

for job-related conduct;" "all criminal proceedings initiated against a CPD of-
ficer, which CPD will require officers to report;" "all instances in which CPD is
notified that a court has made a negative credibility determination regarding a
CPD officer;" "instances in which CPD learns through the Cook County State's
Attorney's Office that an affirmative finding was made during the course of a
criminal proceeding that a CPD member was untruthful;" "all instances in
which CPD learns through the Cook County State's Attorney Office, the United
States Attorney's Office for the Northern District of Illinois, or other prosecu-
torial authority that prosecution was declined based in whole or in part on
concerns about a CPD officer's credibility;" "disciplinary history for all CPD
members;" "all violations of CPD's body-worn and in-car camera policies;" "all
awards and commendations received by CPD officers;" "training history;" and
"rank, assignment, and transfer history" (¶587).

These and other related consent decree requirements have various deadlines
throughout the City's implementation of the consent decree.[6] Our Monitoring Plan
for Year One included many of the paragraphs above.[7] *See, e.g.*, ¶¶160–64, 173,
176–78, 183, 229, 272, 334, 411, and 425.[8] As a result, this report, our second
semiannual monitoring report, provides updated assessments on the City's pro-
gress toward meeting many of those requirements before February 29, 2020—
before the tragic death of George Floyd and the responding protests and unrest.

With the recent protests and unrest, there has also been a rise in related law en-
forcement activities that span issues covered by the consent decree. Paragraph
665 of the consent decree permits the Independent Monitor to "prepare written
reports on any issue or set of issues covered by" the consent decree. In accordance
with the consent decree and its commitment to accountability and transparency,
the IMT will prepare a special report on the City's and the CPD's response to the
recent protests and civil unrest. In preparing the report, we will seek direct input
from a variety of sources—including members of Chicago's communities, the CPD,
the Civilian Office of Police Accountability (COPA), and other City entities.[9]

It is our hope that the current national discourse and momentum on police ac-
countability and reform will inspire the City and its entities to continue the reforms

---

[6]  "The City will endeavor to achieve full and effective compliance within five years of the Effec-
   tive Date[, March 1, 2019]." ¶714.

[7]  The IMT's Monitoring Plan for Year One is available on the IMT's website. *See Reports*, IMT
   (May 30, 2019), https://cpdmonitoringteam.com/reports/.

[8]  We will assess compliance with many of the other paragraphs in Year Two, which will be re-
   flected in our forthcoming Monitoring Plan for Year Two. Per ¶652, we provided a draft of our
   Monitoring Plan for Year Two to the Parties on May 15, 2020. After we receive their feedback,
   we will provide the final draft to the Court and the public.

[9]  Under ¶667, the Independent Monitoring Team will also coordinate and confer with the Office
   of Inspector General for the City of Chicago.

it has made and make more expedient progress on the reforms it has yet to implement. The IMT remains steadfast in its commitment to fairly monitor and assess the City's compliance with the requirements of the consent decree and to deliver technical assistance to assist the City whenever requested.

Paragraph 2 of the consent decree sets out the overall purpose of the consent decree, which has guided and will continue to guide our monitoring efforts:

> **2.** *The State, the City, and the Chicago Police Department . . . are committed to constitutional and effective law enforcement. In furtherance of this commitment, the Parties enter into this Agreement to ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety. In addition, this Agreement seeks to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely. This Agreement requires changes in the areas of community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotions; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management.*[10]

---

[10]    As reflected above, we cite the relevant paragraphs of the consent decree throughout this Independent Monitoring Report. The consent decree is available on the Office of the Illinois Attorney General's consent-decree website. *See Resources*, CHICAGO POLICE CONSENT DECREE ("Consent Decree Approved by the Court on January 31, 2019"), http://chicagopoliceconsentdecree.org/resources/.

## Table of Contents

Executive Summary ............................................................... 1

Roadmap ............................................................................ 12

Introduction ....................................................................... 13

Compliance Activities and Assessments ............................. 18

    I.      Community Policing .......................................... 46

    II.     Impartial Policing .............................................. 84

    III.    Crisis Intervention ........................................... 117

    IV.    Use of Force ..................................................... 152

    V.      Recruitment, Hiring & Promotions ................. 240

    VI.    Training ............................................................ 246

    VII.   Supervision ...................................................... 266

    VIII.  Officer Wellness and Support .......................... 279

    IX.    Accountability and Transparency .................... 301

    X.      Data Collection, Analysis & Management ........ 391

    XI.    Other Relevant Agreements ........................... 411

Conclusion and Looking Ahead to
Independent Monitoring Report 3 .................................. 415

Attachment A.
Office of the Illinois Attorney General Comments ........... 416

Attachment B. City of Chicago Comments ....................... 428

\*\*\*

Readers of the electronic pdf can click sections above to jump to the corresponding sections of the report.

# Executive Summary

As the Independent Monitoring Team (IMT), we assess the City of Chicago's (the City's) compliance with the requirements of the consent decree. Specifically, we assess how all relevant City entities—including the Chicago Police Department (CPD); the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General (OIG), including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC)—are complying with the consent decree.[11] In May 2019, we filed the Monitoring Plan for Year One, which outlined the projected monitoring efforts under the consent decree for Year One (March 1, 2019, through February 29, 2020).[12] On November 15, 2019, we filed our Independent Monitoring Report 1, which detailed monitoring efforts during the first reporting period (from March 1, 2019, through August 31, 2019).[13]

This is Independent Monitoring Report 2. Here, we discuss our monitoring efforts during the second reporting period, from September 1, 2019, through February 29, 2020. The report includes, among other things required by the consent decree, the following:

- an updated compliance or status assessment from the first reporting period;

- a compliance or status assessment for each new paragraph we identified for this reporting period in our Monitoring Plan;

- a summary of the principal achievements and challenges facing the City's ability to comply with the consent decree; and

- an updated projection of upcoming work for the City, the Office of the Illinois Attorney General (OAG), and the Independent Monitoring Team (¶661).

The semiannual reports—of which this is the second—give us the opportunity to update the Court and the public about the City's compliance efforts. The consent decree generally prevents the IMT from making any public statements or issuing findings regarding any non-public information or materials outside of these reports (*see* ¶672). Because the consent decree will be in effect for a minimum of

---

[11]   As a party to the consent decree, the City is ultimately responsible for compliance. Unless otherwise specified, our references to the City frequently include its relevant entities.

[12]   The IMT's Monitoring Plan for Year One is available on the IMT's website. *See Reports*, IMT (May 30, 2019), https://cpdmonitoringteam.com/reports/.

[13]   The Independent Monitoring Report 1 is available on the IMT's website. *See Reports*, IMT (May 30, 2019), https://cpdmonitoringteam.com/reports/.

five years, this is the second of at least 10 semiannual Independent Monitoring Reports.[14]

We also note that the consent decree is a complex document that resulted from long and substantive negotiations between the City and the OAG. Throughout the reporting period, and in this report, we have aimed to address the nuances of the agreement accurately and fairly.

The consent decree itself contains some tensions that we address in both our monitoring efforts and this report. For example, there is—and likely will continue to be—a tension between the City's need to make compliance efforts quickly and the need to ensure that its efforts are effective and sustainable. Because the consent decree prioritizes both goals, we do too. We recognize that if the City rushes to meet a deadline by creating a policy without, for example, the requisite community involvement, then that may have the unintended effect of delaying the date the City reaches full compliance if the City must re-engage the community, re-draft the policy, and potentially re-train personnel. We have attempted to address this tension in our analysis for each relevant paragraph in this report. For this reason, we recommend that readers read this report in full and do not take sections of the report out of context.

We know that many readers will be most interested in learning where the IMT has found the City, the CPD, and the other relevant entities to be in compliance or out of compliance with the consent decree. In short, the City did not meet many of the consent-decree requirements within the deadlines set by the City and the OAG and approved by the Court during this reporting period. Much work remains to be done, but we acknowledge some hard work that many people contributed throughout the reporting period. We look forward to continued improvement during the next reporting period.

In reviewing this report, it is important to keep in mind three clarifications regarding the scope and significance of our compliance assessments.

First, this report represents a snapshot of the City's compliance efforts from September 1, 2019, through February 29, 2020. It does not reflect all the efforts from

---

[14]  As referenced above, we provided a draft of this report to the City and the OAG on March 30, 2020, as required by ¶¶661–65. Three days earlier, on March 27, 2020, after an unopposed motion by the City, the Court entered an extension order in response to COVID-19. The OAG provided preliminary feedback during the Court's COVID-19 extension. For convenience to the Parties, the IMT provided a second draft on June 2, 2020, shortly after the extension ended on May 29, 2020. Per ¶663, the OAG and the City then provided written responses on June 5, 2020, and June 13, 2020, respectively. *See* Attachment A (OAG comments) and Attachment B (City comments). We have considered those comments and made appropriate changes to this report (¶663). Where necessary, we have included clarifying comments in the footnotes of this report.

City, the CPD, or the other relevant City entities to date. While we report on the compliance efforts within defined six-month reporting periods (¶661), we stress that work is ongoing by the City, its relevant entities, the OAG, and the IMT. In some cases, relevant City entities have continued to develop policies and train personnel after February 29, 2020, and before the date of this report. We have not assessed those efforts in this report. We will do so in the monitoring report for the third reporting period (March 1, 2020, through August 31, 2020).

Second, we assess compliance at three levels: (1) Preliminary, (2) Secondary, and (3) Full. The consent decree requires the City and its entities to reach Full compliance and maintain that compliance for one to two years. *See* ¶¶714–15. These compliance levels allow us to share our assessments of the City's progress throughout the life of the consent decree with the City, its relevant entities, the OAG, and the public. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) trained personnel on that policy, and (3) successfully implemented the reform in practice. There are, however, many paragraphs that do not include policy or training elements. In those circumstances, the three levels may follow a different trajectory, such as (1) whether the City or its relevant entities have established the framework and provided the resources to achieve the reform, (2) whether the City or relevant entities have effectively communicated the reform to relevant personnel, and (3) whether the City or relevant entity has appropriately implemented the reform.

Third, because of the nuances of each specific requirement and level of compliance, the City and its relevant entities must provide the IMT with records and data—in a timely manner—to establish each level of compliance during the applicable reporting period.

This point is critical. Under the consent decree, the City is not technically in compliance with any of the requirements of the consent decree until the IMT is satisfied that the City provided sufficient proof to the IMT that the City, the CPD, or its other relevant entities are in compliance. Even if the City has made significant efforts toward complying with a requirement—which in many cases it has—the City still has the additional burden of providing the IMT and the OAG with sufficient proof of its effort and allowing sufficient time for review.

## Major Developments and Challenges Impacting Compliance

The City and its entities faced distinct challenges before February 29, 2020, the end of the second reporting period. We provide more details in the "The City of Chicago's Principal Achievements and Challenges" section below, where we note a few of the major changes, challenges, and events that impacted our compliance assessments throughout the second reporting period.

First, in early November 2019, Charlie Beck, former Chief of the Los Angeles Police Department, became the Interim Superintendent after former Superintendent Eddie Johnson's abrupt departure.[15] Interim Superintendent Beck quickly took a commanding presence and provided additional support by making organizational changes to support the reform efforts.[16]

Any change in leadership, however, can disrupt efforts during transition periods, and the search for a new Superintendent lasted for most of the second reporting period, from November 2019 through April 2020. After the end of the reporting period, in April 2020, David Brown was appointed and sworn in as the Superintendent.[17] Since then, Superintendent Brown has committed to the CPD's efforts toward police reform. In his first report to the Chicago Police Board, Superintendent introduced himself with his commitment to the consent decree:

> It's been quite a welcome. And I hit the ground running. It's been quite a welcome with the pace, but I feel very confident that this fine department will prove itself something to be proud of through its reform by meeting the standards of the Consent Decree. We're well on our way to improving meeting the deadlines.[18]

While Superintendent Brown was not the Superintendent during the second reporting period—and thus, his leadership is not reflected in this report—we look forward to continuing to work with him in the third reporting period.

Second, the CPD continues to struggle to conduct meaningful community engagement. In our first report, we raised concerns about the CPD's lack of community engagement during its policy development processes, and our concerns remained during the second reporting period. The Coalition (¶669) also raised with the IMT, the OAG, the City, and the CPD significant concerns regarding the CPD's approaches to community engagement.

---

[15] *See Press Release: Mayor Lightfoot Announces Appointment of Charlie Beck as Interim Police Superintendent*, OFFICE OF THE MAYOR (November 8, 2019), https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2019/november/AppointmentCharlieBeck.html.

[16] *See News Release - CPD Announces Transformative Organizational Plan to Maximize Resources, Prioritize Reform and Move More than 1,100 Officers Closer To City Streets*, CHICAGO POLICE DEPARTMENT (January 30, 2020), https://home.chicagopolice.org/cpd-announces-new-organization-for-command-plan/ (including organizational charts).

[17] *See, e.g.*, City Council, *Summary of Reports of the Committee on Public Safety, April 20, 2020 Meeting* (April 22, 2020) (appointing David Brown), http://media.legistar.com/chic/meetings/A115E220-7D7E-491D-A077-9BD5F2EF2F5F/Summary%20of%20Reports%20April%2022%202020.pdf.

[18] *See Chicago Police Board Meeting Transcript* (May 21, 2020), https://www.chicago.gov/content/dam/city/depts/cpb/PubMtgMinutes/PubMtgTranscript05212020.pdf.

Third, the IMT was unable to fully assess compliance within the second reporting period, because the City and the CPD, in particular, struggled to provide materials to the IMT and the OAG in a timely fashion. We noted similar concerns in our first monitoring report. Similar to the first reporting period, the City and the CPD again produced a significant portion of their compliance materials in the last two weeks and, specifically, on the last two days of the second reporting period. This limited our ability to review the materials and provide necessary follow-up comments and questions to fully understand and verify compliance efforts.

Nevertheless, the IMT would rather receive materials late in the reporting period than not at all. In some ways, the City and CPD showed improvement from the first reporting period: We received more records regarding a wider range of topic areas, and received many records earlier in the reporting period than we did last time. Likewise, in many cases, the City and the CPD were more candid and transparent about their processes and provided earlier drafts of their materials to facilitate discussion and help the Parties to the consent decree (the City and the OAG) and the IMT deliberate more efficiently.

In other ways, the large, late record production was worse than in the first reporting period, because it is less clear why the records were produced late in this period. In the second reporting period, the City and the CPD did not have to spend as many resources developing the groundwork for the monitoring process as they did in the first reporting period. Moreover, some materials appeared to have been created and ready to produce much earlier in the reporting period. Because we did not receive them until the end of the reporting period, we did not have the opportunity to discuss or provide input about the materials before the end of the reporting period.

Because some of these materials required follow-up and because the consent decree requires the IMT to produce a draft of this report within 30 days after the reporting period, we were unable to consider all the materials we received in the large data production at the end of the reporting period in our compliance assessments in this report. We hope that this will encourage increased transparency and dialogue—along with more timely record productions—in the third reporting period and over the course of the remainder of the consent decree.

Finally, several public events and incidents dominated the news coverage in Chicago and informed and shaped many of the community's interactions with the City, the CPD, the OAG, and the IMT. While the COVID-19 pandemic began to dominate news coverage toward the end of the reporting period, it did not impact consent

decree efforts during the second reporting period, which ended on February 29, 2020. The pandemic did, however, delay the review and the filing of this report.[19]

Other news events were directly related to the consent decree efforts during the reporting period. These included the following:

- The planned retirement and subsequent termination of former Superintendent Eddie Johnson;[20]

- Proposed changes to the selection process for new CPD superintendents (*i.e.*, the proposed Grassroots Alliance for Police Accountability legislation);[21]

- Litigation and arbitration developments between the City and various collective bargaining groups;[22]

- Litigation regarding alleged officer misconduct, including erroneous search warrants and gang databases;[23]

- Police officer injuries and suicides;[24] and

- Several high-profile officer-involved shootings.[25]

---

[19] *See Defendant's Unopposed Motion to Extend Consent Decree Obligation Deadlines*, 17-cv-06260, Doc. #830 (March 26, 2020), *available at* https://cpdmonitoringteam.com/wp-content/uploads/2020/04/2020_03_27-Order-Regarding-the-Extension-of-Consent-Decree-Obligation-De....pdf.

[20] *See Press Release: Statement from Mayor Lightfoot on Eddie Johnson*, OFFICE OF THE MAYOR (December 2, 2019), https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2019/december/StatementEddieJohnson.html.

[21] *See Grassroots Alliance for Police Accountability*, GAPA, http://chicagogapa.org/.

[22] *See, e.g.*, Amanda Vinicky, *Chicago Police Consent Decree Approaches 1-Year Anniversary*, WTTW (February 27, 2020), https://news.wttw.com/2020/02/27/chicago-police-consent-decree-approaches-1-year-anniversary.

[23] *See, e.g.*, Dave Savini, *'Please Do Not Shoot Me:' Body Camera Shows Chicago Police Officers Interrogating, Pointing Guns At Innocent Children During Wrong Raid*, CBS CHICAGO (February 6, 2020), https://chicago.cbslocal.com/2020/02/06/wrong-raid-chicago-police-guns-pointed-at-children/. *See also* Annie Sweeney and John Byrne, *Chicago police announce new gang database as leaders hope to answer questions of accuracy and fairness*, CHICAGO TRIBUNE (February 26, 2020), https://www.chicagotribune.com/news/breaking/ct-chicago-police-gang-database-overhaul-react-20200226-gisz55rytzbsdkyy4kmbb4jrou-story.html.

[24] *See, e.g.*, Erik Runge, Tonya Francisco, Courtney Gousman, WGN Web Desk, *Chicago officer recovering after gunman shoots him in the hand*, WGN 9 (January 29, 2020), https://wgntv.com/news/chicago-police-officer-wounded-in-shooting/; David Struett, *Off-duty Chicago cop found dead in what police say was a suicide on the Northwest Side*, CHICAGO SUN-TIMES (September 16, 2019), https://chicago.suntimes.com/2019/9/16/20869927/chicago-police-suicide-bunker-hill-forest-preserve.

[25] *See e.g.*, *Case Portal (Firearm Discharge)*, CIVILIAN OFFICE OF POLICE ACCOUNTABILITY, https://www.chicagocopa.org/data-cases/case-portal/ (Firearm Discharge).

As noted above, the IMT is generally prohibited from making public statements or issuing findings without the Parties' approval (¶672). Nonetheless, the IMT follows Chicago policing and related news closely to stay current on public-facing issues, especially news regarding the consent decree. This also helps us monitor some of the issues affecting the relationships between the Chicago communities and the Chicago Police Department and other relevant City entities, which are paramount to the health and safety of the people of Chicago.

## Compliance Assessments and Deadlines

At the end of the first reporting period, August 31, 2019, we assessed the City's compliance with 67 paragraphs and found that the City achieved at least Preliminary compliance with 15 paragraphs. This meant that the City did not demonstrate compliance—and therefore was not in compliance—with the remaining 52 paragraphs, or the other requirements of the consent decree.

At the end of the second reporting period, we assessed 230 paragraphs, including 129 paragraphs with deadlines in Year One.[26] The other 101 paragraphs, or "foundational paragraphs," do not specifically have deadlines in Year One but involve foundational policy and practice requirements that are fundamental to the success of the consent decree.[27]

As reflected in Figure 1 below, we found that the City achieved at least Preliminary compliance with 48 paragraphs with deadlines in Year One. We also found the City reached at least Preliminary compliance with 13 foundational paragraphs in Year One. While the IMT provides compliance statuses for all foundational paragraphs, the IMT prioritized the paragraphs with explicit deadlines, and as a result, the other foundational paragraphs are still under assessment. For these foundational paragraphs, we provide an updates on the compliance status within each corresponding section of the report.

---

[26] Some of these paragraphs do not explicitly have deadlines, but in our Monitoring Plan for Year One, we originally combined some paragraphs with other paragraphs that have deadlines in Year One. *See Reports*, IMT (May 30, 2019), https://cpdmonitoringteam.com/reports/. To clearly address the requirements in each paragraph, we have separated our assessments in this report, but for clarity and consistency with the agreements with the Parties, we have continued to assess these paragraphs separately as paragraphs with deadlines. These paragraphs do not, however, relate to met or missed deadlines, unless the language of the consent decree requires it.

[27] The IMT selected these paragraphs after consulting with the Parties during the development of the IMT's Monitoring Plan for Year One. *See Reports*, IMT (May 30, 2019), https://cpdmonitoringteam.com/reports/. We provide more thorough explanation of these paragraphs in other sections of this report. *See* Paragraphs with Deadlines and Foundational Paragraphs without Deadlines.

**Figure 1:**   Compliance Status at the End of the Year One (February 29, 2020)
All Paragraphs in Year One: 230



**First Reporting Period**
Paragraphs with Any Level of Compliance (13)
Assessed Paragraphs that are Not in Compliance (37)
Foundational Paragraphs Under Assessment (65)

**Second Reporting Period (Year One Total)**[28]
Paragraphs with Any Level of Compliance (61)
Assessed Paragraphs that are Not in Compliance (81)
Foundational Paragraphs Under Assessment (88)

Compliance with some paragraphs in the consent decree demands more effort than compliance with others. The number of requirements—and the amount of work that is necessary under each requirement—can vary drastically across paragraphs, topic areas, and reporting periods. Moreover, some of the paragraphs that have requirements in the second reporting period also include requirements that do not apply until later reporting periods. As a result, we have either not assessed or not finished assessing some of the requirements in the paragraphs relevant to the second reporting period.

The City and the OAG also agreed to specific deadlines to ensure that the City was making significant efforts to comply with the consent decree in a timely manner. Many of these deadlines were in Year One of the consent decree. At the end of the first reporting period, the City met 13 of the 50 agreed-upon deadlines. While the City missed 37 deadlines, the City met four of the underlying requirements after the deadline but before the end of the reporting period.

At the end of the second reporting period, as reflected in Figure 2 below, the IMT determined that the City met 22 of the 74 agreed-upon deadlines in the second reporting period. While the City missed 52 deadlines, the City met four of the underlying requirements of those paragraphs before the end of the reporting period.

Figure 2: Deadlines in the Second Reporting Period: 73 Paragraphs (74 Deadlines)



Met Deadline (22)
Missed Deadline (52)

Met by February 29, 2020 (+4) (26)

In sum, the City and the CPD did not meet most of the deadlines and compliance obligations in the second reporting period or in Year One, as a whole. At the end of each reporting period, we will continue to update the Court and the public on

---

[28]   As referenced above, the compliance status at the end of the second reporting period is included in the compliance status at the end of Year One, because in addition to new paragraphs, we assessed all paragraphs in the first reporting period in the second reporting period.

whether the City has met the deadlines in the corresponding reporting period and whether the City has caught up by achieving the benchmarks of missed deadlines from previous reporting periods.

Figure 3 shows that, of all the consent-decree paragraphs with deadlines in this second reporting period, we determined that the City reached Preliminary compliance with 42 paragraphs and Secondary compliance with 6 paragraphs. The City did not achieve Full compliance for any paragraphs, which we anticipated based on our observations in the first reporting period and the scope of these requirements. The City did not reach any level of compliance for the remaining 81 paragraphs with deadlines in Year One.

Figure 3:     Compliance Status at the End of the Second Reporting Period (February 29, 2020) Consent Decree Paragraphs with Deadlines in the Second Reporting Period: 129



Paragraphs in Preliminary Compliance (42)
Paragraphs in Preliminary and Secondary Compliance (6)
Paragraphs in Full Compliance (0)
Paragraphs that are Not in Compliance (81)
(*including under assessment*)

Figure 4 shows that, of all the foundational paragraphs in this second reporting period, we determined that the City reached Preliminary compliance for 13 paragraphs. Based on the evidence we reviewed, the IMT did not find the City in Secondary compliance with any of the foundational paragraphs. The City did not achieve Full compliance for any foundational paragraphs either, which we also anticipated. This left 88 foundational paragraphs, which are still under assessment.

Figure 4:     Compliance Status at the End of the Second Reporting Period (February 29, 2020) Foundational Paragraphs in the Second Reporting Period: 101

Paragraphs in Preliminary Compliance (11)
Paragraphs in Preliminary and Secondary Compliance (0)
Paragraphs in Full Compliance (0)
Foundational Paragraphs Under Assessment (88)

The second reporting period concludes the first year of the consent decree. For this reason, we have included several charts on the following pages, including a summary of compliance in Year One. *See* Figures 5, 6, 7, and 8.

As we finish Year One of this long-term project, we are prepared to lean into challenges ahead. In our next semiannual report, we will continue to assess and report on the paragraphs in the Monitoring Plan for Year One, as well as assess and report on the paragraphs included in our forthcoming Monitoring Plan for Year Two.[29]

---

[29] Per ¶652, we provided a draft of our Monitoring Plan for Year Two to the Parties on May 15, 2020. After we receive their feedback, we will provide the final draft to the Court.

# Consent Decree Compliance – Year One

**Figure 5:** Compliance Status at the End of the Year One (February 29, 2020)
Consent Decree Paragraphs with Deadlines: 129



**First Reporting Period**
Paragraphs with Any Level of Compliance (13)
Paragraphs with Deadlines that are Not in Compliance (37)
*(including under assessment)*

**Second Reporting Period (Year One Total)[30]**
Paragraphs with Any Level of Compliance (48)
Paragraphs with Deadlines that are Not in Compliance (81)
*(including under assessment)*

**Figure 6:** Compliance Status at the End of the Year One (February 29, 2020)
Foundational Paragraphs: 98



**First Reporting Period**
Paragraphs with Any Level of Compliance (0)
Foundational Paragraphs Under Assessment (65)

**Second Reporting Period (Year One Total)**
Paragraphs with Any Level of Compliance (13)
Foundational Paragraphs Under Assessment (88)

## Figure 7: Total Consent Decree Paragraphs with Deadlines



**First Reporting Period Deadlines**
Met Deadline (13)
Missed Deadline (37)

Met Underlying Requirement (+4) (17)
by August 31, 2019

**Second Reporting Period Deadlines**
Met Deadline (22)
Missed Deadline (52)

Met Underlying Requirement (+4) (26)
by February 29, 2020

**Year One Deadlines**
Met Deadline (35)
Missed Deadline (89)

Met Underlying Requirement (+20) (55)
by February 29, 2020

---

[30] As referenced above, the compliance status at the end of the second reporting period is included in the compliance status at the end of Year One, because in addition to new paragraphs, we assessed all paragraphs in the first reporting period in the second reporting period.

Figure 8: Summary of Compliance in Year One

| Topic Area | Preliminary Compliance | Secondary Compliance | Full Compliance |
|---|---|---|---|
| Community Policing | 13, 15, 18, 43, 44, 46 | 13 | |
| Impartial Policing | 65, 66, 67 | | |
| Crisis Intervention | 99, 116, 128, 129, 130, 131, 132, 142 | 142 | |
| Use of Force | 164, 167, 168, 170, 173, 176, 181, 185, 188, 189, 190, 191, 192, 193, 196, 212, 215, 222, 226, 229, 231 | 170, 188 | |
| Recruitment, Hiring & Promotion | 263 | | |
| Training | 270, 271, 320(a & b), 339 | 339 | |
| Supervision | 348, 360, 364, 368 | | |
| Officer Wellness & Support | 387, 391, 401, 406, 409, 411 | | |
| Accountability & Transparency | 498, 525, 532, 533, 538, 558, 563, 565 | 565 | |
| Data Collection, Analysis & Management | | | |
| **Totals** | **61 paragraphs** | **6 paragraphs** | **0 paragraphs** |

# Roadmap

We wrote this report to be as accessible and readable as possible. This report is long because the compliance efforts in the second reporting period required significant attention. As the IMT's monitoring efforts continue and we address more requirements, the monitoring reports will also continue to grow in length. For this reason, we have provided the following roadmap to help readers understand what they can expect from each section of this report.

We begin this report with an **Introduction** section that provides background about the consent decree and the IMT. This section will help those who have not read or would like to reacquaint themselves with the background information from our previous report and Monitoring Plan.

The next section, **Compliance Activities and Assessments**, provides the following information regarding the second reporting period:

❖ An overview of the IMT's assessment process and priorities for the second reporting period, including deadlines and foundational paragraphs;

❖ A summary of the IMT's activities;

❖ A summary of the City's achievements and challenges; and

❖ For each topic of the consent decree, a summary of relevant compliance efforts, a more specific analysis for each consent-decree paragraph with a deadline before March 2020, and if applicable, a summary of efforts regarding the corresponding foundational paragraphs that do not have specific deadlines.

Finally, the last section, **Conclusion and Looking Ahead to Independent Monitoring Report 3**, provides concluding remarks and a projection of the upcoming work by the IMT, the OAG, the City, the CPD, COPA, the OIG, the Chicago Police Board, the OEMC, and the City's other relevant entities in the third reporting period.

# Introduction

This is the Independent Monitoring Team's second semiannual Independent Monitoring Report.[31] The report provides the IMT's monitoring activities and findings for the second reporting period—from September 1, 2019, through February 29, 2020. In May 2019, the IMT outlined its efforts in its public Monitoring Plan for Year One.[32]

Specifically, consistent with the requirements of the consent decree, we address the following information throughout the sections of this report:

❖ The IMT's efforts during the reporting period;

❖ A description of each consent-decree requirement that applied during the reporting period;

❖ The IMT's compliance findings for each corresponding requirement;

❖ A summary of the principal challenges facing the City's ability to achieve complete compliance with the consent decree;

❖ The IMT's corresponding recommendations regarding the City's future efforts to achieve compliance; and

❖ A projection of the IMT's, the OAG's, and the City's upcoming work during the next reporting period (September 1, 2019, through February 29, 2020).

This is the second monitoring report of many. Per ¶661 of the consent decree, the IMT will continue to issue semiannual reports until the consent decree ends—once the City has reached full and effective compliance for one to two years. *See* ¶¶693 and 714–15.

## Background: The Chicago Police Consent Decree

In December 2015, the U.S. Attorney General launched a broad civil rights investigation into the CPD's policing practices. The U.S. Department of Justice released

---

[31] We provided a draft of this report to the Parties to the consent decree on March 30, 2020, as required by ¶¶661–65. Per ¶663, the OAG and the City provided written responses, which are attached to this report as Attachment A and Attachment B, respectively. We have considered those comments and made appropriate changes to this report per ¶663.

[32] The IMT's Monitoring Plan for Year One is available on the IMT's website. *See Reports*, IMT (May 30, 2019), https://cpdmonitoringteam.com/reports/. We also note that the City filed its second semiannual status report (¶680) with the Court on March 5, 2020 (five days after the deadline). *See The City of Chicago's Semiannual Status Report* (March 5, 2020).

the results of its investigation in January 2017, finding a longstanding, pervasive "pattern or practice" of civil rights abuses by the CPD.[33] Two separate class-action lawsuits followed: *Campbell v. City of Chicago* and *Communities United v. City of Chicago*.[34]

In August 2017, the OAG sued the City in federal court, seeking a consent decree that would address the DOJ's findings and recommendations. The case was assigned to federal Judge Robert M. Dow, Jr. The OAG then sought input from community members and Chicago police officers and negotiated the consent decree with the City.

In March 2018, the Parties to the consent decree (the OAG and the City) entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the consent decree ('the Coalition')." The Coalition "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits."[35]

The OAG and the City then sought proposals for an Independent Monitoring Team (IMT) after posting a draft consent decree on the Chicago Police Consent Decree website.[36] Judge Dow approved and signed a modified version of the consent decree on January 31, 2019. The consent decree requires action by the CPD and many other City entities. On March 1, 2019, the effective date of the consent decree, and after a competitive selection process, Judge Dow appointed Maggie Hickey, a partner in the Schiff Hardin law firm, as the Independent Monitor. Ms. Hickey, as the Independent Monitor, reports directly to Judge Dow.[37]

---

[33] DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, *available at* http://chicagopolice consentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-PO-LICE-DEPTREPORT.pdf.

[34] *See Campbell v. Chicago*, N.D. Ill. Case No. 17-cv-4467 (June 14, 2017), and *Communities United v. Chicago*, N.D. Ill. Case No. 17-cv-7151 (October 4, 2017).

[35] *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

[36] More information about the IMT selection process is available on this website, which the OAG maintains. *See Independent Monitor*, CHICAGO POLICE CONSENT DECREE, http://chicagopolice consentdecree.org/independent-monitor/. Other resources, including consent decree documents, court filings, and reports, are also available on this website. *See Resources*, CHICAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/resources/.

[37] Judge Dow also appointed Judge David H. Coar, Ret., as a special master. As special master, Judge Coar is not a member of the IMT, but he "help[s] facilitate dialogue and assist the [OAG], the City, and other stakeholders in resolving issues that could delay progress toward implementation of the consent decree." About, CHICAGO POLICE CONSENT DECREE, http://chicagopolice consentdecree.org/about/. As the special master, Judge Coar also reports directly to Judge Dow.

# The Independent Monitoring Team

As the IMT, we (1) monitor the City's, the CPD's, and other relevant City entities' progress in meeting the consent decree's requirements and (2) offer assistance to the City, the CPD, and other relevant City entities as they implement the changes that the consent decree requires.

Monitor Maggie Hickey and Deputy Monitors Chief Rodney Monroe, Ret., and Dr. James "Chip" Coldren, Jr. lead the IMT. The IMT's eight Associate Monitors, in turn, oversee the 10 topic areas of the consent decree. Our legal team, analysts, subject matter experts, Community Engagement Team, and community survey staff provide support in several ways: by reaching out to and engaging with Chicago communities; by providing general administrative support; and by collecting and analyzing policies, procedures, laws, and data, including conducting observations and interviews and writing reports.

Our full organizational chart is in Figure 9, on the next page, and our team structure is in Figure 10 on the following page.

Figure 9. Organizational Chart



## Figure 10. Independent Monitoring Team Members

| Monitoring Team Leadership | | |
|---|---|---|
| Monitor | | Maggie Hickey |
| Deputy Monitor | | Rodney Monroe |
| Deputy Monitor | | James R. "Chip" Coldren |

| Associate Monitors | | |
|---|---|---|
| Community Policing | | Stephen Rickman |
| Impartial Policing | | Dennis Rosenbaum |
| Crisis Intervention | | Julie Solomon |
| Use of Force | | Paul Evans |
| Recruitment, Hiring, and Promotion | | Theron Bowman |
| Training | | Theron Bowman |
| Supervision | | Kathleen O'Toole |
| Officer Wellness and Support | | Kathleen O'Toole |
| Accountability and Transparency | | Harold Medlock |
| Data Collection, Analysis and Management | | Scott Decker |

| Community Engagement Team | | |
|---|---|---|
| Subject Matter Expert, Analyst, and Support Staff | | Tom Christoff |
| Member | | Joe Hoereth |
| Subject Matter Expert | | Meghan Maury |
| Member | | Laura McElroy |
| Member | | Elena Quintana |
| Member (also Associate Monitor for Community Policing) | | Stephen Rickman |
| Member | | Sodiqa Williams |
| Community Surveys | | Joe Hoereth & Other Experts |

| Subject Matter Experts and Legal Team | | |
|---|---|---|
| Project Director | | Laura Kunard |
| Attorney | | Derek Barella |
| Attorney | | Kirstie Brenson |
| Officer Wellness and Support | | Brandi Burque |
| Crisis Intervention and Data Collection, Analysis, and Management | | Tom Christoff |
| Attorney | | Meredith DeCarlo |
| Use of Force and Data Collection, Analysis, and Management | | Terry Gainer |
| Attorney | | Ariel Hairston |
| Community Policing and Crisis Intervention | | Bruce Johnson |
| Training | | Blake McClelland |
| Accountability and Transparency | | Laura McElroy |
| Use of Force | | Denise Rodriguez |
| Community Policing | | Hildy Saizow |
| Attorney | | Anthony-Ray Sepulveda |
| Supervision and Recruitment, Hiring, and Promotion | | Tom Woodmansee |

| Monitoring Team Support | | |
|---|---|---|
| Analyst for Solomon and Decker | | Tom Christoff |
| Project Manager, Analyst for Evans | | Vivian Elliot |
| Analyst for Rickman and O'Toole | | Tammy Felix |
| Deputy Project Manager, Analyst for Bowman | | Keri Richardson |
| Analyst for Rosenbaum and Medlock | | Christopher Sun |

# Compliance Activities and Assessments

This section provides an overview of compliance efforts for the second reporting period. We begin by explaining our priorities for the second reporting period that we described in our Monitoring Plan for Year One. We include an overview of the assessment process, the deadlines within the second reporting period, and the foundational paragraphs. We then provide summaries for the period, including summaries of our activities and of the City's achievements and challenges. Finally, we summarize the relevant compliance efforts for each topic area of the consent decree; provide a more specific analysis for each consent-decree paragraph with a deadline before September 2019; and if applicable, summarize efforts regarding foundational paragraphs that do not have specific deadlines.

## Assessing Compliance

Overall, and in accordance with ¶¶642, 661, and 662, the IMT assesses how the City, the CPD, and other City entities comply with each paragraph of the consent decree in three successive levels: **(1) Preliminary compliance**, **(2) Secondary compliance**, and **(3) Full compliance**. The CPD and other City entities will not be "in compliance" with a requirement until they reach Full compliance for the requisite length of time required by the consent decree—either one or two years (¶714). We will assess the City's compliance on all appropriate levels for the paragraphs presented in this report.

❖ **Preliminary compliance** refers principally to the development of acceptable policies and procedures that conform to best practices (as defined in ¶730) and incorporate requirements into policy (¶642). The IMT assesses the development of policies, procedures, rules, and regulations reasonably designed to achieve compliance. To attain Preliminary compliance, the City must have policies and procedures designed to guide officers, City employees, supervisors, and managers performing the tasks outlined in the consent decree. These policies and procedures must include appropriate enforcement and accountability mechanisms, reflect the consent decree's requirements, comply with best practices for effective policing policy, and demonstrate the City and its relevant entities' ability to build effective training and compliance.

❖ **Secondary compliance** refers principally to the development and implementation of acceptable and professional training strategies (¶642). Those strategies must convey the changes in policies and procedures that were established when we determined Preliminary compliance. Secondary compliance also refers to creating effective supervisory, managerial, and executive practices designed to implement policies and procedures as written (¶730). The IMT reviews and assesses the City's documentation—including reports, disciplinary

records, remands to retraining, follow-up, and even revisions to policies, as necessary—to ensure that the policies developed in the first stage of compliance are known to, understood by, and important to line, supervisory, and managerial levels of the City and the CPD. The IMT assesses whether there are training, supervision, audit, and inspection procedures and protocols designed to achieve, maintain, and monitor the performance required by the consent decree.

❖ **Full compliance** refers to adherence to policies within day-to-day operations (¶642). Full compliance requires that personnel, sergeants, lieutenants, captains, command staff, and relevant City personnel routinely hold each other accountable for compliance. In other words, the City must "own" and enforce its policies and training. The IMT will assess whether the City's day-to-day operations follow directives, policies, and training requirements. When measuring Full compliance, we will note whether supervisors notice, correct, and oversee officer behavior and whether appropriate corrections occur in the routine course of business. In this phase, we will review whether compliance is reflected in routine business documents, demonstrating that reforms are being institutionalized. In addition, we will determine whether all levels of the chain of command ensure consistent and transparent compliance.

These levels of compliance guide the IMT in its review of all paragraphs in the consent decree. The IMT understands, however, that the three compliance levels apply differently to various paragraphs. For example, a paragraph that requires a certain type of training does not necessarily include a policy component. In these instances, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. To reach and sustain Full compliance, however, the City may still need to create a policy to ensure that it provides training consistently, as appropriate.

Throughout this report, we provide our compliance assessments and descriptions of the status of current compliance based on efforts within the second reporting period. Under the consent decree, the City, the CPD, and other relevant City entities are not in any level of compliance until we find that they have met a level of compliance. As a result, a finding that the City is not in compliance with a requirement does not mean that the City has not made efforts—even significant efforts—to achieve compliance toward that requirement.

## Second Reporting Period Priorities

We set out our priorities for the second reporting period in our Monitoring Plan for Year One.[38] Specifically, we prioritized (1) the paragraphs in the consent decree with a deadline before February 29, 2020, and (2) foundational requirements agreed to by the Parties to the consent decree (the City and the OAG) and the IMT, regardless of whether the consent decree established a deadline for these paragraphs. Most of the paragraphs in these two categories contain requirements for the CPD.

These two categories of priorities, however, do not fully describe all our efforts in the first two reporting periods. While we monitored the compliance efforts that corresponded with the paragraphs above, some paragraph deadlines fall after the second reporting period but still required the City and its entities to take steps during the second reporting period.[39] Likewise, many of our efforts are ongoing—regardless of deadlines—but are too premature to report here.

Thus, the IMT and the Parties have engaged in compliance and monitoring efforts in addition to those described in this report.

## Paragraphs with Deadlines

In our first two monitoring reports, we have assessed all paragraphs with deadlines before March 1, 2020. All deadlines are based on the consent decree. The City and the OAG agreed to these deadlines. The IMT did not—and cannot—unilaterally create deadlines for the second reporting period, nor for any other reporting period.[40]

---

[38] The IMT's Monitoring Plan for Year One is available on the IMT's website. *See Reports*, IMT (May 30, 2019), https://cpdmonitoringteam.com/reports/. Given the varying workloads of separate departments and personnel, the City and its relevant entities may make compliance efforts earlier than anticipated. When appropriate, we may also assess those efforts in our monitoring reports earlier than anticipated.

[39] The consent decree contains over 500 paragraphs with requirements, including those with deadlines in the third reporting period. Per ¶652, we provided a draft of our Monitoring Plan for Year Two to the Parties on May 15, 2020, which will include our priorities for the third and fourth reporting periods. We will provide the final draft of the Monitoring Plan for Year Two to the Court and the public after receiving feedback from the Parties.

[40] The Monitoring Plan is based on the consent decree. It is worth noting, however, that during the development of the Monitoring Plan, the City and the OAG disagreed about whether a series of paragraphs had requirements in Year One. Through further discussions and negotiations, the IMT and the Parties agreed to exclude some of these paragraphs in the Monitoring Plan but to include others, such as ¶¶222–35 and 569. The City and the OAG may continue to disagree regarding the interpretation of some aspects of the consent decree, but the City and the OAG agreed to the paragraphs and deadlines in the Monitoring Plan. Similar negotiations will likely occur for the Monitoring Plan for Year Two. After Year Three, however, the IMT "will

## Foundational Paragraphs without Deadlines

Many paragraphs in the consent decree do not contain deadlines. After consulting with the Parties, the IMT has begun to assess some paragraphs that do not have deadlines in the first and second reporting periods. These paragraphs involve foundational policy and practice requirements that are fundamental to the success of the consent decree. The IMT is in the process of assessing compliance with many of these paragraphs to the extent that the requirements of the foundational paragraphs overlap with the requirements of paragraphs with specific deadlines above.

While foundational paragraphs for Year One are spread across the consent decree, the foundational paragraphs we assessed in the first reporting period were concentrated in two sections: (1) Use of Force and (2) Accountability and Transparency.

First, the Use of Force section requires the CPD and relevant City entities to develop policies and practices and provide appropriate training regarding de-escalation, anti-retaliation, the reasonableness of force, deadly force, fleeing subjects, vehicle operation, requests for medical aid, intervention against excessive force, chokeholds, and weapons policies. Because the City has already adopted policies regarding many of these subjects, we began our assessment in those areas.

Second, the Accountability and Transparency section requires that, for example, the City make "best efforts" to comply with areas of the consent decree that are not directly under the control of the City or the CPD. As in the Use of Force section, the Accountability and Transparency section requires the CPD and relevant City entities to develop policies, training, and practices regarding complaints and corresponding investigations, recordkeeping, notifications, referrals, reports, and policy reforms. Because the City has also adopted policies regarding many of these areas, we began our assessment in those areas.

In the second reporting period, we have continued to monitor these foundational paragraphs, and we have added our assessment of foundational paragraphs in the following sections: Impartial Policing; Training; Supervision; Officer Wellness and Support; and Data Collection, Analysis, and Management. We also added a foundational paragraph regarding "other relevant agreements." *See* ¶711.

---

conduct a comprehensive assessment to determine whether and to what extent the City and CPD are in compliance with [the consent decree], whether the outcomes intended by [the consent decree] are being achieved, and whether any modifications to [the consent decree] are necessary in light of changed circumstances or unanticipated impact (or lack of impact) of the requirements." ¶657. During this assessment, the IMT will be able to assess whether the City is on course to fulfill the consent decree by maintaining full compliance for requirements for one to two years by the end of Year Five. *See* ¶714–15.

As in our first report, we provide compliance statuses for the foundational paragraphs. If the City or its relevant entities took sufficient steps toward compliance, we have provided our compliance assessment here.

## The IMT's Methodologies during the Reporting Period

While most of this report addresses the City's efforts to meet the consent decree's requirements, the following subsection details the IMT's methodologies and activities in the second reporting period (September 1, 2019, through February 29, 2020). We summarize many of our efforts in Figure 11 below.

Figure 11: IMT Activities (September 1, 2019, through February 29)

| | |
|---|---|
| 6.5K+ | Independent Monitoring Team Hours Worked |
| 5 | Independent Monitoring Team Formal Site Visits |
| 130+ | Meetings with CPD, COPA, OIG, Police Board, or OEMC |
| 44 | Hours of CPD and COPA Training Observed |
| 100+ | Conference Calls by Consent Decree Topic Area |
| 35K+ | Pages of Documents Reviewed |
| 11 | Meetings with CPD Superintendent(s) |
| 48+ | Meetings with the Parties |

During the first reporting period, the City; the CPD; the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General (OIG), including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC) worked to create and maintain consistent and open lines of communications.

Building upon the efforts made in the first reporting period, these communications continued throughout the second reporting period. The communications included regularly scheduled in-person meetings (¶668), and regular teleconferences for each consent decree topic area. We expanded information sharing by using additional or improved secure data-sharing systems. The IMT also continued to provide significant technical assistance (¶656), as requested.

Specifically, we met repeatedly with the CPD, COPA, the OIG, Police Board, and the OEMC; conducted five formal site visits; observed over 44 hours of training; and reviewed over 34,000 pages, as detailed in the chart above.[41]

A significant portion of our conversations involved discussing our methodologies for assessing the City's compliance with the consent decree. For the IMT, these discussions highlighted the importance of maintaining flexibility in our methodologies throughout the monitoring process. This flexibility will ensure that our monitoring efforts continue to meet both the letter and spirit of the consent decree as the Parties and the IMT develop necessary information, learn from previous efforts, and confront unanticipated hurdles. *See, e.g.*, ¶717. Changed circumstances, for example, may require the IMT to consider fewer, more, or alternative sources of information. As a result, our methodologies may adjust based on ongoing consultation with the Parties, as we continue to identify and consider new information and data that is relevant to the consent decree.

The Parties and the IMT agreed that the most efficient path forward was for the IMT to supplement its methodologies with additional specificity in this report. This will allow the IMT to address the Parties' comments and concerns, such as the rationale behind certain jointly assessed paragraphs, in context with the IMT's summaries of monitoring efforts and compliance assessments. As a result, where appropriate, we have provided additional specificity for the applicable levels of compliance for each corresponding paragraph in this report and anticipate corresponding monitoring efforts in the upcoming reporting period. As discussed with the Parties, we focused on adding specificity for (1) paragraphs that require or will require quantitative analysis and (2) paragraphs where corresponding efforts by the City and the City's relevant entities warrant assessment under operational compliance in the third reporting period.

Finally, in addition to these efforts, we continued to adhere to several specific and ongoing requirements of the consent decree. Figure 12, below, summarizes our compliance with the consent decree's deadlines for the IMT in the second reporting period.

---

[41] The OAG has engaged in much of the same work and provided separate feedback to the City and the CPD.

Figure 12: Consent Decree Deadlines for the IMT in the Second Reporting Period

| ¶s | Requirement | Deadline | Second Reporting Period Deadlines | Met or Missed |
|---|---|---|---|---|
| 627–37 | Review of CPD Policies and Procedures | Various, Ongoing | Corresponds with policy deadlines | Met (ongoing) |
| 638–41 | Review of Implementation Plans and Training Materials | Various, Ongoing | Corresponds with plan and training deadlines | Met (ongoing) |
| 642–44 | Compliance Reviews and Audits | Various, Ongoing | Will occur during each reporting period | Met (ongoing) |
| 645–51 | Community Surveys | 180 Days (and every two years) | August 28, 2019 | Missed (*see below*) |
| 652–55 | Monitoring Plan and Review Methodology | 90 Days (and every year) | May 30, 2019; draft by May 15, 2019 | Met (ongoing) |
| 656 | Technical Assistance and Recommendations | Ongoing | Ongoing | Met (ongoing) |
| 667 | Coordination with the Office of Inspector General | Ongoing | Ongoing | Met (ongoing) |
| 668 | Maintain Regular Contact with the Parties | Ongoing | Monthly | Met (ongoing) |
| 669 | Monitor will Participate in Meetings with the Coalition | Quarterly | Quarterly | Met (ongoing) |
| 670–71 | Communication with the Parties, Collective Bargaining Representatives, and the Public | Ongoing | Ongoing | Met (ongoing) |

# Community Survey

The consent decree requires the Independent Monitoring Team (IMT) to "conduct reliable, representative, and comprehensive surveys of a broad cross section of members of the Chicago community" (¶645). The surveys must cover several important topics, such as "perceptions of CPD's services, trustworthiness, community engagement, effectiveness, responsiveness, handling of misconduct complaints and investigations, and interactions with members of the Chicago community" (¶646). The IMT completed data collection for our first community survey, and we are currently analyzing the results.[42] We will provide a special report to fully explain the survey results soon.

Here, we will introduce our methodology and the sample size and demographic characteristics (or sample "yield"). The University of Illinois at Chicago's Institute for Policy and Civic Engagement led the survey effort. With input from the Parties and assistance from the University of Chicago's National Opinion Research Center

---

[42] The IMT's first survey was due August 28, 2019. We missed this deadline for several reasons, which we detailed in our first independent monitoring report.

(NORC), the IMT designed the survey methodology and questionnaire with input from the Parties and the Coalition (*see* ¶669). NORC fielded the survey from November 2019 through February 2020 and delivered the response data to the IMT in early March for analysis.

The following list sets out our approach to carrying out the survey:

- A random sample of Chicago residents was sent invitations to participate in the survey. This is a standard approach that social scientists use to reduce bias and improve the accuracy of results.

- The initial goal was to have 1,000 randomly selected Chicago residents, ages 18 and up, complete the survey. Large random samples provide more accurate results (lower measurement error) and allow us to analyze population subgroups.

- In the end, more than 1,300 Chicago residents responded to the survey. Over 1,000 responded as part of the "general population sample" of all Chicagoans ages 18 and up, and over 300 responded as part of the "supplemental sample" of Black males ages 18 to 25—the group most frequently stopped by the CPD, according to the CPD's data. Everyone who responded to the survey answered the same survey questions.

- The 15-minute questionnaire included a maximum of 98 questions—depending on how certain questions were answered.[43] These questions measured perceptions of and satisfaction with CPD effectiveness; community engagement and responsiveness; trustworthiness; misconduct complaints and investigations; interactions with members of Chicago communities; reform efforts; and performance overall. People who had a recent interaction with a CPD officer were also asked to share their perspectives on that interaction.

- Respondents completed the survey online or by telephone, in English or Spanish, and those who completed the survey were provided with a $10 cash-equivalent incentive.

The consent decree requires that the survey be repeated in 2021 and then every two years while the decree is in effect. (¶645). We will use the results of the first survey to serve as the baseline for comparison to future surveys.

---

[43] None of the respondents answered all 98 possible questions. Respondents answered a minimum of 79 questions, but many respondents were asked additional follow-up questions based on their responses. Regardless of the number of questions answered, the median response time was 15 minutes.

## The IMT's Community Engagement Team Activities

The IMT's Community Engagement Team plays a critical role by monitoring levels of trust and sentiment among the stakeholders to the consent decree. The IMT's Community Engagement Team includes experienced Chicago community members, experts in police-community relations, lawyers, and academic scholars. These members work together to meaningfully engage Chicago's communities and ensure that community members participate throughout the monitoring process. The Community Engagement Team also works closely with the Monitor, Deputy Monitors, and Associate Monitors to assess the community component of compliance with the consent decree.

The IMT's Community Engagement Team's work is vital to create sustainable change at the City and the CPD and to measure compliance with specific policy, training, and procedural changes required by the consent decree. The City and the CPD do not function effectively when they lack trust from the communities they serve. In its 2017 report, the DOJ found that the impacts of the "CPD's pattern or practice of unreasonable force fall heaviest on predominantly black and Latino neighborhoods."[44] The DOJ also found that people in many neighborhoods in Chicago lack confidence that "their police force cares about them and has not abandoned them, regardless of where they live or the color of their skin."[45]

Effective policing requires both (1) procedural and cultural change and (2) improved relationships between the City and the CPD and the communities they serve. The Community Engagement Team encourages improved relationships based on respect, trust, and partnership. These relationships will also be strengthened by transparency and accountability.

The IMT's Community Engagement Team performs two key tasks regarding the consent decree monitoring process: (1) gathering input from Chicago residents about their concerns about CPD policies and practices, and (2) providing information to the Chicago community about the IMT's activities and findings.

In February 2020, for example, we convened a community meeting in Humboldt Park to explain the consent decree and the IMT's and the Coalition's role (¶670). *See* Figure 13, below. Specifically, this meeting was organized by our Community Engagement Team and led by Independent Monitor Maggie Hickey. The meeting also featured significant involvement by members of the Coalition (¶669).

---

[44] DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-POLICE-DEPT-REPORT.pdf.

[45] *Id.* at 15.

Figure 13: IMT Quarterly Community Meeting Flyer



Throughout this reporting period, the Community Engagement Team attended many community meetings across Chicago, including meetings with the Coalition, community-based organizations, and CPD beat meetings. We summarize many of the Community Engagement Team's efforts in Figure 14 below.

Figure 14: IMT Community Engagement Efforts



## Get Involved

The Community Engagement Team works diligently to connect with neighborhoods, community groups, religious organizations, activists, advocates, and residents across the city. The Community Engagement Team encourages community members to participate in meetings and to promote these sessions through their networks. We regularly update the Community Involvement section of the IMT website with details on upcoming community meetings and events. If your neighborhood or community group would like to invite a Community Engagement Team member to a meeting, please email us at contact@cpdmonitoringteam.com or fill out a feedback form on our website (https://cpdmonitoringteam.com/feedback-form/).

We encourage community members to provide input on CPD policy. When the CPD modifies or creates applicable policies, it will post them on its website so that community members can provide input: https://home.chicagopolice.org/.

Community members can also participate in the monitoring process in the following ways:

❖ Attend any of our public meetings listed on our website;
❖ Complete an input form on our website; and
❖ Reach out to the IMT or members of our Community Engagement Team (see below).

## Contact the Independent Monitoring Team

Community members can reach out to the entire IMT via email (contact@cpdmonitoringteam.com) and also contact individual members of our Community Engagement Team:

❖ Sodiqa Williams (Sodiqa.Williams@cpdmonitoringteam.com),

❖ Joe Hoereth (Joe.Hoereth@cpdmonitoringteam.com), and

❖ Elena Quintana (Elena.Quitana@cpdmonitoringteam.com).

Learn more at the Contact Us page on our website (https://cpdmonitoringteam.com/contact-us/).

Community members can also use the Feedback Form on our website to provide input (https://cpdmonitoringteam.com/feedback-form/).

# The City of Chicago's Principal Achievements and Challenges

In our first reporting period, per ¶661, we summarized the "principal challenges or concerns related to the City's achieving full and effective compliance with this Agreement." As we indicated then, many of these challenges cannot be resolved quickly and require long term investments. In this section, we provide updates on these challenges, the City's efforts to address them, and new achievements and challenges that emerged in the second reporting period.

Independent of ¶661's requirement that the IMT, we also believe it is appropriate to summarize the City's principal challenges—both expected and unexpected—to present an accurate assessment of the City's reform progress. We do not discuss these challenges to provide excuses or undue criticism. Instead, we highlight various hurdles to compliance for the City, its relevant entities, the OAG, the IMT, and the community, in order to identify solutions, provide recommendations, plan for improvements, and ultimately, help the City reach compliance.

With that in mind, in the following subsections, we discuss the City's principal achievements and ongoing challenges. We set them out in the following interrelated areas (presented in the order that is easiest to follow, rather than in the order of the magnitude of each challenge):

❖ Administration and Logistics

❖ Staffing

❖ Data

❖ Record Productions

❖ CPD Policy and Plan Review

❖ Review Procedures for the Civilian Office of Police Accountability

❖ CPD's Community Engagement

❖ Officer-Involved Incident Investigations

As explained further below, many of these challenges continued to impact the City's progress during the second reporting period. As a result, the City, its relevant entities, and when applicable, the IMT and the OAG must continue to work through methods of solving or otherwise mitigating these challenges.

## Administration and Logistics

The City and the CPD continued to experience administrative and logistical challenges during the second reporting period. To reach compliance with the consent decree, the City and the CPD must provide the IMT with sufficient evidence that they are making reforms. The CPD must also show that it has appropriate procedures that will effectuate timely and sustainable compliance. As explained further below, the consent decree requires the CPD to meaningfully include the IMT and the OAG in the policy review and approval process. This requirement, in turn, required the CPD to revamp the way that it has historically drafted policies. The new process requires the City and the CPD to spend additional time and effort to research, address, and present each reform. While this process started in the first reporting period, the City and the CPD continued to identify and work through issues in the second reporting period.

Moreover, in the first reporting period, the City, the CPD, the OAG, and the IMT worked to set up various methods of securely sharing compliance materials. In total, the City, the CPD, the OAG, and the IMT use more than seven programs to share records and data. Each of these programs has different features and therefore a different learning curve.

In many ways, these efforts continued in the second reporting period, as we worked to identify and resolve issues, update systems, and incorporate new ones. Some access issues continued in the second reporting period. While the City, the OAG, and the IMT made progress toward the end of the reporting period, these efforts are ongoing, and the IMT continues to investigate ways to improve access and make the process more efficient.

## Staffing

During the first reporting period, the IMT identified several staffing and resource needs. In late January 2020, Interim Superintendent Charlie Beck made significant changes to the CPD organizational chart. These changes, in part, place responsibilities for the consent decree's reform efforts throughout the CPD's leadership.[46] While these changes are in their infancy, the IMT appreciates the CPD's holistic efforts to institutionalize reform.

Many of the City's and CPD's efforts and achievements in the first reporting period continued into the second reporting period. The City Department of Law, along

---

[46] *See News Release - CPD Announces Transformative Organizational Plan to Maximize Resources, Prioritize Reform and Move More than 1,100 Officers Closer To City Streets*, CHICAGO POLICE DEPARTMENT (January 30, 2020), https://home.chicagopolice.org/cpd-announces-new-organization-for-command-plan/ (including organizational charts).

with the CPD's Office of Constitutional Policing and Reform, the Legal Affairs Division, and the Research and Development Division (¶¶677–78), continued to be fully engaged in the monitoring process. The City and the CPD also maintained regular channels of communication with the IMT and the OAG and continued dialogue, problem-solving, and brainstorming about requirements and challenges regarding the paragraphs of the consent decree.

We recognize that City and CPD resources are limited. As referenced above, the City and the CPD have already added many resources to their compliance efforts.

In our first report, we recommended that the City and the CPD increase resources and staffing to various departments. In response, the CPD increased staffing in the following departments:

❖ **The Research and Development Division.** The Research and Development Division frequently works with the IMT to develop compliance documents and policies. As a result, increases in staffing in this department reduced bottlenecking with limited personnel.

❖ **The Force Review Unit.** As discussed further in the Use of Force section below, the Force Review Unit is critical to several consent-decree requirements. The CPD agreed that the workload of this department was greater than the department's capacity and increased staff in the second reporting period.

Before COVID-19, many of these staffing increases appeared to have already begun to increase efficiency for the City's compliance efforts. To the extent that ongoing challenges continue based on limited resources and staff, we reiterate the need for increased resources and staffing in the following departments:

❖ **The Legal Affairs Division.** The Legal Affairs Division and the Research and Development Division must frequently work with the IMT to provide compliance documents, policies, and efforts. Specifically, the Legal Affairs Division reviews every document that the IMT receives. As a result, despite productive interactions with the personnel in these departments and the quality of their work, high-priority items may continue to become bottlenecked with limited personnel.

❖ **Training Division.** The CPD's Training Division is, in many ways, at the heart of many consent-decree requirements. The CPD is among the largest police departments in the country, and training personnel requires a massive effort. Our discussions with CPD personnel regarding training efforts, records, and plans strongly suggest that the Training Division needs additional support.

❖ **Crisis Intervention Teams.** While many of the requirements regarding Crisis Intervention do not apply until later reporting periods, the consent decree requires significant efforts regarding the Crisis Intervention Teams in the immediate future. The CPD has recently added staff to the Crisis Intervention Teams, but several of our meetings and site visits suggest that the Crisis Intervention Teams would benefit from additional staff.

## Data

The IMT needs complete and verifiable data to assess compliance across all areas of the consent decree. To effectively identify and resolve existing and upcoming challenges, the City must maintain, track, and analyze data. For this reason, the City, the CPD, and the OAG engaged in data discussions early and often. Based on these discussions, there is universal agreement that the CPD has a long way to go to meet the data requirements of the consent decree.

During the first reporting period, the IMT learned that the CPD had serious challenges with recording, analyzing, and communicating data. The organization maintains and manages data from over 100 different data systems and databases, which have developed and grown in complexity over time. In some cases, the CPD created these systems or databases independently of each other and on an ad hoc basis. The IMT made several data requests that have required the CPD to take on significant resources and hours to build systems that can organize and internally verify that data. At this stage, data management, data utilization, and data reporting at the CPD is a labor-intensive, complex, and sometimes frustrating process.

The CPD continued its efforts and made progress in the second reporting period, as reflected in the Data Collection, Analysis, and Management section.

But challenges continue. While there have been lessons learned from data usage, the CPD still does not have a consistent system for auditing and validating its data systems or correcting and upgrading those systems based on regular audits. That is not to say that the CPD is not maintaining, assessing, and correcting data system problems on a regular basis; it is just not doing so based on a regular audit process. This situation is further complicated and becomes additionally burdensome because of the research, analysis, and data collection demands created by the consent decree.

In short, the CPD does not currently have the data resources and systems in place to meet the demands of the consent decree. Toward the end of this reporting period, the IMT became aware that the CPD is reorganizing several facets of its data management systems. We hope that the reorganization is effective. The IMT will continue to work with the City and the CPD to ensure that these efforts continue.

## Record Productions

As referenced above, for the City and the CPD to comply with the consent decree, the IMT must see evidence of the City's and the CPD's compliance efforts. The record production process required significant efforts in the second reporting period.

In the first reporting period, there was not sufficient overlap between the records that the IMT requested and those that the City provided. There was also concern at the City and the CPD that their work to meet the record requests would, due to limited resources, compete with other the compliance efforts. For these and other reasons, there was significant delay between the IMT's and the OAG's first sets of requests and the City's responsive productions.

In the second reporting period, the City, the CPD, and the other relevant entities worked to provide records more quickly. Their efforts, however, created some new challenges, particularly for the CPD.

First, as we noted in our first independent monitoring report, the City and the CPD, in particular, struggled to provide materials to the IMT and the OAG in a timely fashion. In the second reporting period, one of the CPD's attempted solutions appeared to create additional problems. For instance, there were several incidents in the second reporting period when the CPD provided records "informally"— without legal review or clarification—by directly emailing a member of the IMT or by attaching records to a calendar item.

As a result, the CPD sent several records to the IMT that should not have been sent. Some of these records contained privileged information and others were simply the wrong drafts. While the IMT appreciates the CPD's improved candor and cooperation, these errors created unnecessary confusion regarding compliance records and delivery dates.[47]

Second, there were also instances when the CPD did not provide new or revised materials to the IMT or the OAG, as required. This was caused by, at least in part, the large amount of work required by the CPD and its departments and the struggle to communicate those efforts consistently within and across departments and with the IMT and the OAG. When the IMT pointed out these issues, the City and the CPD began sending the IMT monthly summaries of all revised policies for each month to ensure that no consent-decree-related policies are changed without the

---

[47] The City and the CPD are aware of this issue, which also created additional administrative difficulties for them. In March 2020, after the end of the second reporting period, the City and the CPD worked together to create a new streamlined protocol to collect, review, and produce materials.

requisite level of input from the IMT, OAG, or the community. It is also worth noting that these issues occurred before the CPD major organizational changes in late January 2020.

Third, and more importantly, the City and the CPD again produced a significant portion of materials in the last two weeks and on the last two days of the reporting period. This late production limited our ability to review the materials and provide necessary follow-up comments and questions to fully understand and verify compliance efforts.

Of course, we prefer that the City provide records on the last few days of the reporting period rather than not provide the records at all. Still, the IMT cannot fully assess and report on records when the City provides a significant amount of records at the last minute. Even if the IMT could fully address all those records and write this report within 30 days, meaningful monitoring efforts frequently require the IMT to, after reviewing records, follow-up with relevant questions, concerns, and additional requests for relevant records.

The IMT appreciates how difficult it is to accurately interpret requests and identify and gather records throughout the entities and their departments. We also understand that it takes a great deal of work to review records for privilege, organize those records in a clear and understandable structure, and provide those records in various formats.

And, in some ways, there was improvement from the first reporting period: We received more records, regarding a wider range of topic areas, and received many records earlier in the reporting period than last time. Likewise, in many cases, the City and the CPD were more candid and transparent about their processes and provided earlier drafts of their efforts to facilitate discussion and help the Parties to the consent decree (the City and the OAG) and the IMT deliberate more efficiently.

But in other ways, the large late records production was worse than in the first reporting period. Since many of the administrative and logistical systems were put in place in the first reporting period, it is not clear that why the delays occurred again. Moreover, some materials appeared to have been created and ready to produce much earlier in the reporting period, but the IMT was not alerted to that fact or given the opportunity to have dialogue about the materials before the end of the reporting period.

Because some of these materials required necessary follow-up and because the IMT must produce a draft of this report within 30 days after the end of the reporting period, materials that the IMT may ultimately have deemed compliant could not be comprehensively reviewed and discussed during this reporting period.

There were significant challenges in the second reporting period that further affected the IMT's efforts to assess compliance. In total, the City provided the IMT with over 2,400 records in the second reporting period, which included over 34,000 pages. Many of the records were provided to the IMT within the last two weeks of the reporting period (over 1330 records (around 16,500 pages), or over 54%) with a significant amount of those records coming on the last two days, Friday, February 28, and Saturday, February 29, 2020 (over 400 records (around 6,000 pages), or about 16%).

Since the beginning of the reporting period, the IMT, the OAG, and the City have regularly communicated regarding requests and productions. The City and the CPD have also assured the IMT and the OAG that they have made internal changes to make the process more efficient, and we note that we have seen significant improvement in the City's response times and the clarity of those responses. We look forward to creating additional efficiencies, as members of the IMT and the corresponding personnel at the City's relevant entities continue to work together.

## CPD Policy and Plan Review

> 632. The Parties and the Monitor will work collaboratively and cooperatively to establish and adhere to a schedule that ensures policies and procedures required by this Agreement are reviewed adequately, efficiently, and expeditiously.

The City and the CPD continued to appropriately focus on developing optimal policies and plans during this reporting period. The IMT believes that strong policing policies provide the foundation for implementing and sustaining best practices (as defined in ¶730) with transparency and accountability. We are encouraged by the City's, the CPD's, and the other relevant entities' willingness to collaborate with the IMT regarding their policies.

Because of the significant policy review efforts from the City, the CPD, other relevant City entities, and the OAG, it is important to clarify how this process works. The consent decree outlines the policy review process in ¶¶626–37 and the plan-review process in ¶¶638-41.[1] Some policies, however, require the CPD to obtain community input while they development of new or revised policies. *See, e.g.*, ¶¶52 and 160. For policy review, the City and the CPD must consult with the IMT and the OAG to develop the necessary policy or revision. The City and the CPD must then provide the IMT with the new or revised policy at least 30 days before the policy is scheduled to go into effect (¶¶627–28). The IMT and the OAG then have 30 days to comment, with a possible 15-day extension (¶¶627–28). The City, the CPD, the OAG, and the IMT then have *at least* 30 days to resolve comments. If we are unable to come to a timely agreement, an entity may submit a formal ob-

jection, which triggers a "workout period" (¶630). The entities then have an additional 30 days to resolve the issue before one of the Parties brings the issue to Judge Dow to resolve (¶630). On the other hand, when the IMT and the OAG provide a "no objection" notice, then when applicable, the City and the CPD will post the new or revised policy for public comment for a minimum of 15 days (¶633). The entities will then review and consider the public comments and agree to any changes before the City and the CPD finalize the policy (¶633).

In our first report, we noted that the review process would be more efficient if the City and the CPD consulted more with the IMT while they developed policies. There was much more consultation among the IMT and the Parties during the second reporting period. As a result, the City and the CPD began to develop compliant policies, curricula, and plans with input from the IMT or the OAG.

On the other hand, the IMT and the OAG still saw many revisions or new policies for the first time when the City provided them for review 30 days before the implementation date. This late notice required the IMT and the OAG to review policies for the first time after the City and the CPD completed the full draft, without the consultation period described in the consent decree (¶627). The delay resulted in an extended review period to ensure that the CPD created lasting change and avoided having to reissue and retrain CPD members on non-compliant policies.

Overall, during the second reporting period, the IMT, the CPD, and the OAG spent significant time working through policies and procedures. In addition to the over 35 CPD records the IMT reviewed and commented on for the first reporting period, the City submitted more than 60 new CPD records for review and comment in the second reporting period. As with the record productions, the City provided some of these records at or near the end of the reporting period on February 29, 2020. Likewise, the IMT and the OAG have also provided the City with several "no objection" notices since the end of the reporting period.[48] Figure 15 below details the policies, plans, and curricula that the City and the CPD submitted to the IMT during this reporting period.

Figure 15: CPD Policies, Plans, and Training Received and Reviewed by the IMT (from September 1, 2019, through February 29, 2020)

| 1 | Use of Force Dashboards (multiple drafts) |
|---|---|
| 2 | Monitor Communications Directive (multiple drafts) |
| 3 | Monitor Visitation Report (multiple drafts) |
| 4 | Complaint and Disciplinary Procedures (G08-01) |
| 5 | Officer Wellness Needs Assessment |
| 6 | Department Vehicles (U02-01) |
| 7 | Arrestee Rights Awareness Policies |

---

[48]   ¶¶626–44.

Figure 15: CPD Policies, Plans, and Training Received and Reviewed by the IMT
(from September 1, 2019, through February 29, 2020)

| 8 | Processing of Juveniles and Minors Under Department Control (S06-04) |
| 9 | Command Channel Review Lesson Plan for Exempt Members |
| 10 | Command Channel Review Training Slide Deck for Exempt Members |
| 11 | Central Management System Training Guide |
| 12 | Firearm Owners Identification Card (FOID) Roll Call Training |
| 13 | Accountability Sergeants Policy |
| 14 | Bureau of Internal Affairs In-Service Training Plan |
| 15 | Chaplains Unit SOP (multiple drafts) |
| 16 | In-Service Use of Force Training Lesson Plan |
| 17 | In-Service Use of Force Course Presentation (multiple drafts) |
| 18 | Draft 2020 Use of Force Training Outline |
| 19 | Draft Custodial Escort and Custody Training materials |
| 20 | ILETSB Training Curriculum for Custodial Escort and Custody of High-Risk Committed Persons |
| 21 | 2020 Education and Training Division Training Plan |
| 22 | Bureau of Internal Affairs Unit Directive No. 2019-U005, Initiation, Intake, and Assignment of Log Investigations |
| 23 | Bureau of Internal Affairs Command Channel Review and Central Management System Training, Exempt - Quiz, Question, and Answer |
| 24 | Command Channel Review Advocate Team 2019 |
| 25 | Training Oversight Committee (S11-11) |
| 26 | Department Directives System (G01-03) |
| 27 | Firearms Owner's Identification Card (FOID) Requirements for Sworn Department Members (E01-17) |
| 28 | Unity of Command and Span of Control Schedule - Pilot Program |
| 29 | Preliminary Investigations (G04-01) |
| 30 | Crime Victim Assistance (S02-01-03) |
| 31 | Field Arrest Procedures (G06-01-01) |
| 32 | Situational Decision-Making Training |
| 33 | Instructor's Academy Reinforcement Materials and Instructor Development Day Materials |
| 34 | School Resource Officer Training |
| 35 | Limited English Proficiency (S02-01-05) |
| 36 | Hate Crimes and Related Incidents Motivated by Bias or Hate |
| 37 | Methodology for Tracking Demographics for Misdemeanors and Administrative Notice of Ordinance Violation |
| 38 | Sample Administrative Closure Letter |
| 39 | Non-Disciplinary Intervention Program (S08-01-08) |
| 40 | Initiation Report Template |
| 41 | Accountability Dashboard |
| 42 | Crisis Intervention Team Refresher Training |

Figure 15: CPD Policies, Plans, and Training Received and Reviewed by the IMT
(from September 1, 2019, through February 29, 2020)

| 43 | 2020 Use of Force Pre-Test |
| 44 | Crisis Intervention Team Policies (multiple drafts) |
| 45 | Pre-Service Promotional Training |
| 46 | Force Review Unit Firearm Pointing Incident Review Training |
| 47 | Log Number Investigation Conflict Certification |
| 48 | Prohibition on Retaliation |
| 49 | Specific Responsibilities Regarding Allegations of Misconduct |
| 50 | Bureau of Internal Affairs Investigator and Accountability Sergeant Basic Training Course Description |
| 51 | Bureau of Internal Affairs Investigator and Accountability Sergeant Basic Training Schedule |
| 52 | Bureau of Internal Affairs Resource Materials |
| 53 | Officer Support Plan |
| 54 | Returning Service Officers (ETD S.O. 19-04) |
| 55 | Incident Scene Management Card |
| 56 | Force Review Unit (SOP 2019-002) |
| 57 | Office of Community Policing: Community Drive Approaches to Crime Reduction Bureau Strategic Plans |
| 58 | Community Drive Approaches to Crime Reduction Bureau Strategic Plans |
| 59 | Community Input Engagements |
| 60 | CPAP Meetings |
| 61 | DAC Reimbursement Guidelines |
| 62 | Neighborhood Policing – Problem Solving Procedure |
| 63 | Neighborhood Policing – Collaboration with Strategic Decision Support Centers |
| 64 | Neighborhood Policing – Violent Incident Follow-Ups |
| 65 | Community Drive Approaches to Crime Reduction District Strategic Plans |
| 66 | District Domestic Violence Subcommittees |
| 67 | Foreign Visitors |
| 68 | Hate Crimes – Response, Reporting, Investigating and Outreach |
| 69 | Honor Guard |
| 70 | Performance Management |
| 71 | Ride-Along Program |
| 72 | Interactions with Transgender, Intersex, and Gender-Nonconforming (TIGN) Individuals |
| 73 | Prohibition of Sexual Misconduct |
| 74 | Crisis Intervention Team Officer Implementation Plan |
| 75 | Performance Recognition System |
| 76 | Supervisory Responsibilities |
| 77 | Training Needs Assessment SOP |

Figure 15: CPD Policies, Plans, and Training Received and Reviewed by the IMT (from September 1, 2019, through February 29, 2020)

| Key: General Order (G); Special Order (S); Standard Operating Procedure (SOP); Uniform and Property (U) |
| --- |

This chart does not include all policies, plans, curricula, or other records that the City has submitted to the IMT during this reporting period. We included only records that the IMT commented on, either as required by the consent decree or for technical assistance.

## Review Procedures for the Civilian Office of Police Accountability and other City entities other than the CPD

Based on differing interpretations of the language in the consent decree, the Parties disagreed regarding whether relevant City entities other than the CPD were required to follow the same review process for policies, plans, and training materials. *See* ¶627–41. As a result, the Parties and the IMT met with Judge Dow and agreed to a stipulation that provides the IMT and the OAG with the opportunity to review COPA policies and procedures before they are implemented.[49] COPA, the OAG, and the IMT began to follow this review process in the second reporting period.

As reflected in Figure 16 below, COPA provided the IMT and the OAG with 27 records for review and comment in the second reporting period.[50]

Figure 16: COPA Policies and Training Received and Reviewed by the IMT (from September 1, 2019, through February 29, 2020)

| 1 | COPA Introduction to Officer-Involved Shooting/Death Investigations Training Presentation (review of template) |
| --- | --- |
| 2 | COPA Introduction to Officer-Involved Shooting/Death Investigations Training Draft Lesson Plan (review of template) |
| 3 | COPA Introduction to the City of Chicago Training Presentation (review of template) |
| 4 | COPA Introduction to the City of Chicago Training Draft Lesson Plan (review of template) |
| 5 | 1.3.8, Civil and Criminal Complaint Review |

---

[49] *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020), *available at* https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for.._.pdf. The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[50] As reflected our first report, the IMT provided technical assistance for COPA regarding some of these materials, and others, during the first reporting period.

Case: 1:22-cv-06246 Document #: 3542 Filed: 06/18/2022 Page 51 of 459 PageID #:6785

Figure 16:        COPA Policies and Training Received and Reviewed by the IMT
(from September 1, 2019, through February 29, 2020)

| 6 | 3.1.2(b), COPA Interviews |
|---|---|
| 7 | 3.1.10, Major Incident Responses |
| 8 | 3.4.3, PCRIA Compliance |
| 9 | 3.4.4, Compelled Statements |
| 10 | 3.1.2, Fact Gathering |
| 11 | 3.1.2(a), Training and Disciplinary Records |
| 12 | 3.1.3, Final Summary Report |
| 13 | 3.1.9, Investigative File Maintenance |
| 14 | 3.2.1, Disciplinary Recommendations |
| 15 | 3.3.2, Timeliness Benchmarks |
| 16 | Appendix, Request for Extension of Investigation |
| 17 | 2.1.2, Transparency Initiatives |
| 18 | 3.1.4, Affidavits and Affidavit Overrides |
| 19 | New draft guideline, Video Release Guidelines: Roles and Responsibilities |
| 20 | 3.3.1, Quality Assurance |
| 21 | 3.1.5, Pattern or Practice Investigations |
| 22 | 3.1.6, Employee Use of CLEAR and Column CMS Systems |
| 23 | 3.1.7, Ballistic Vest |
| 24 | 3.1.8, COPA Vests and Hats |
| 25 | 3.2.2, Recommendations Regarding Officer Powers |
| 26 | 3.4.1, Superintendent Non-Concurrence |
| 27 | 3.4.2, Medical Records and HIPAA Compliance |
| Key: General Order (G); Special Order (S); Standard Operating Procedure (SOP); Uniform and Property (U) | |

We look forward to our continued efforts with COPA and to its upcoming community engagement efforts during the coming reporting period.

As reflected in Figure 17 below, other City entities also produced several materials to the IMT for review and comment in the second reporting period.

Figure 17: Other Entity Policies and Training Received and Reviewed by the IMT
(from September 1, 2019, through February 29, 2020)

| # | Entity | Record |
|---|---|---|
| 1 | Chicago Police Board | Superintendent Position Posting |
| 2 | Chicago Police Board | Data about Police Board decisions |
| 3 | Office of Emergency Management and Communications (OEMC) | Language Access Training |
| 4 | City of Chicago | Crisis Intervention Plan |
| Key: General Order (G); Special Order (S); Standard Operating Procedure (SOP); Uniform and Property (U) | | |

The Parties continue to disagree about the required review procedures for these entities. We look forward to continuing to work with the Parties to reach a mutually beneficial solution for the review processes involving other relevant entities, including the Police Board.

## CPD's Community Engagement

As in the first reporting period, we continued to have concerns about the CPD's efforts and approach to engaging the community during the second reporting period. In our first report period, we raised concerns about the CPD's lack of community engagement during its policy development procedures. Those concerns continued through the second reporting period. The Coalition also raised significant concerns regarding community engagement to the IMT, the OAG, the City, and the CPD.

In the second reporting period, the City and the CPD dedicated significant efforts to engaging the community in their policy development. The CPD increased the use of public-facing data and materials. The CPD made several changes and updates to its website to improve accessibility.[51] The City also held four "Community Conversations" in February to address groups of policies:

- Tuesday, February 4, 2020, from 6:00 PM to 9:00 PM, at Truman College Cafeteria (1145 W. Wilson Ave.);

- Wednesday, February 5, 2020, from 6:00 PM to 9:00 PM, at Kennedy King College – The Great Hall (740 W. 63rd St.);

- Thursday, February 6, 2020, from 6:00 PM to 9:00 PM, at JLM Abundant Life Center (2622 W. Jackson Blvd.); and

- Saturday, February 8, 2020, from 10:00 AM to 1:00 PM, at Daley College (7500 S. Pulaski Road).

We continue to recommend that the CPD establish consistent procedures for garnering community member and community stakeholder input into policy development early and throughout the process. The CPD has initiated this effort by beginning to establish a series of working groups. Though that effort is still in its initial

---

[51] *See, e.g.*, *Policy Review Forum*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/policy-review/. Nonetheless, we continued to hear from some community members that there are difficulties navigating the CPD's website. Policies continue to be difficult to locate via the search engine, and searching for key words can yield unexpected results. Because the consent decree—and effective policing—require community involvement, we believe that dedicating sufficient resources to ensure the CPD's website is more user friendly would be worthwhile.

stages, the City and the CPD are prioritizing these working groups based on feedback they learned from community surveys.

The CPD and the Coalition (*see* ¶669) have also agreed to co-chair these working groups and recently started holding monthly meetings to work out logistics regarding these working groups.

Currently, opportunities for community input continue to occur late in the policy development process during public comment phases. Allowing community input at the later stages of the policy development process effectively disenfranchises Chicago community members and prevents them from providing input and comments in the formative stages of the policy development process. In response to the IMT's suggestions, the CPD continued to further develop and refine a new process that allows for community input earlier on in the policy development process. The IMT reviewed and commented on several versions of materials in this evolving process and continues to work with the CPD on improving its community engagement processes.

Relatedly, throughout this reporting period the IMT heard feedback from a wide variety of community members, including members of the Coalition, about the CPD's efforts regarding community engagement generally. We heard from many community members that CPD could improve its engagement through small steps, beginning with greeting community members on the street and having a conversation (as one community member said: "It starts with a hello."). Others seek improved policy engagement and continue to express concern about (1) the lack of third-party (*i.e.*, non-CPD) meeting facilitators at CPD-sponsored meetings and (2) the number of CPD members present at meetings (some in full uniform), which can be intimidating for some. Others feel that community engagement is a two-way street and that officers should attend meetings that the CPD is not organizing or hosting, including community block parties and school sporting events.

In December 2019, for example, the Coalition wrote to the City to comment on the City's policies on community engagement. The Coalition also expressed the importance of creating relationships with the community:

> The CPD would benefit from this outreach both because it can better address how its policies have impacted specific groups, but also because it is an opportunity for developing meaningful relationships with these communities.

We will continue to monitor and prioritize the City and the CPD's ongoing efforts in this area.

## Officer-Involved Incident Investigations

In our first report, we encouraged City entities, such as the CPD and COPA, to connect and reconcile their policies and approaches. We emphasized, for example, the importance of consistency between the CPD's Bureau of Internal Affairs and COPA's polices on how they investigate officer-involved shootings, a critical facet of the City's accountability structure. In the second reporting period, we attended the first open meeting between leadership in the Bureau of Internal Affairs and COPA. Leadership of both entities have continued to meet and confer regularly throughout the second reporting period. While these entities continue to operate independently of each other—and continue to view investigations from different perspectives—these meetings have led to identifying logistical hurdles and finding common-sense solutions. These efforts are particularly important for reforming the investigations of officer-involved shootings.

For example, the Police and Community Relations Improvement Act (PCRIA), 50 ILCS 727/1-10, includes requirements for investigations of officer-involved deaths.[52] Among other things, PCRIA requires officer-involved death investigations to be "conducted by at least 2 investigators, or an entity or agency comprised of at least 2 investigators, one of whom is the lead investigator." *See* 50 ILCS 727/1-10(b). The lead investigator "shall be a person certified by the Illinois Law Enforcement Training Standards Board (ILETSB) as a Lead Homicide Investigator, or similar training approved by the [ILETSB] or the Department of State Police, or similar training provided at an [ILETSB] certified school." *Id*. PCRIA also provides that the investigators who are involved in the investigation cannot be employed by the same law enforcement agency that employs the officer who is the subject of the investigation. *Id*.

In comparison, the Municipal Code of Chicago authorizes COPA to "conduct investigations into all incidents of an 'officer-involved death'" as defined in the PCRIA statute.[53] While COPA investigators complete ILETSB Homicide Investigator training, they cannot be certified as Lead Homicide Investigators by the ILETSB because they are not sworn officers. Currently, COPA's investigations into officer-involved death investigations are "administrative"—and cannot result in criminal penalties—and the CPD's Bureau of Internal Affairs, a law enforcement agency, conducts

---

[52] The PCRIA statute defines "Officer-involved death" as "any death of an individual that results directly from an action or directly from an intentional omission . . . of a law enforcement officer while the officer is on duty, or otherwise acting within the scope of his or her employment, or while the officer is off duty, but performing activities that are within the scope of his or her law enforcement duties." 50 ILCS 727/1-5.

[53] *See* M.C.C. § 2-78-120(e).

any criminal investigations of officer-involved deaths. As a result, there is wide dis-agreement regarding whether COPA's administrative investigations comply with PCRIA.

The consent decree adds further requirements regarding officer-involved shoot-ings, including emphasizing that "[c]riminal investigations into the actions of any CPD member relating to any 'officer-involved death' will comply with" PCRIA (¶492).

Given the importance of civilian oversight and independent oversight of these in-vestigations, the City, the CPD, COPA, various other government entities, and the IMT believe that these investigative structures would benefit from additional changes. The City and the CPD have been actively working toward PCRIA compli-ance and improving the investigative structure, in general. The City and the CPD have approached other municipal law enforcement agencies, suburban task forces, and the Illinois State Police to see if any of these entities would conduct Chicago's officer-involved death investigations—as many of them do for other Illi-nois municipalities. Due to concerns regarding resources, response times, and scale, these entities have thus far declined to do so.

The IMT, the OAG, the CPD, COPA, and the City have convened a working group led by Deputy Mayor for Public Safety Susan Lee to find a way to bring the City into compliance with PCRIA and the consent decree. The working group has so far been productive in exploring alternative means of PCRIA compliance and has involved the Governor's Office in these discussions.

In the meantime, the CPD has issued temporary General Order 03-06, *Officer In-volved Death Investigations*, with the understanding that the CPD will need to re-vise this order once the PCRIA question has been solved. General Order 03-06 cur-rently provides that COPA will "have jurisdiction and conduct investigations into all incidents of an officer-involved death as defined by and consistent with" PCRIA.

# I. Community Policing

## Guiding Principles

The IMT assessed whether the City complied with applicable Community Policing paragraphs in accordance with the consent decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **8.** *Strong community partnerships and frequent positive interactions between police and members of the public make policing safer and more effective, and increase public confidence in law enforcement. Moreover, these partnerships allow police to effectively engage with the public in problem-solving techniques, which include the proactive identification and analysis of issues in order to develop solutions and evaluate outcomes.*

> **9.** *To build and promote public trust and confidence in CPD and ensure constitutional and effective policing, officer and public safety, and sustainability of reforms, the City and CPD will integrate a community policing philosophy into CPD operations that promotes organizational strategies that support the systematic use of community partnerships and problem-solving techniques.*

> **10.** *CPD will ensure that its community policing philosophy is a core component of its provision of police services, crime reduction strategies and tactics, training, management, resource deployment, and accountability systems. All CPD members will be responsible for furthering this philosophy and employing the principles of community policing, which include trust and legitimacy; community engagement; community partnerships; problem-solving; and the collaboration of CPD, City agencies, and members of the community to promote public safety.*

> **11.** *The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest.*

# Summary of Compliance Assessments

During this reporting period, the City and the CPD made progress in the Community Policing section of the consent decree by soliciting community feedback regarding district-level crime reduction strategies and drafting certain policies that align with consent decree requirements. In this section, we explain the City's and the CPD's progress toward achieving compliance.

By the end of the second reporting period, the CPD and the City shared updated project plans, draft policies, and notes from various community engagement activities. The CPD also made significant progress toward (1) implementing more Community Policing Advisory Panel's (CPAP's) recommendations; (2) reconsidering the qualifications, roles, and responsibilities of School Resource Officers; and (3) building a performance management assessment framework that tracks levels of community trust and community perceptions of safety in all police districts.

In sum, the IMT assessed the City's compliance with 14 of the consent decree's Community Policing paragraphs (¶¶13–15, 18, 20, 32, 39–40, and 42–47). We assessed five of these paragraphs in the first reporting period (¶¶13, 18, 39–40, and 44), finding that the City and the CPD met Preliminary compliance for three paragraphs (¶¶13, 18, and 44).

In the second reporting period, we have determined that the City and the CPD moved into Preliminary compliance for three paragraphs with requirements in Year One (¶¶15, 43, and 46), maintained Preliminary compliance for two paragraphs (¶¶18 and 44), and moved into Secondary compliance for one paragraph (¶13). Thus, the City failed to reach Preliminary compliance for eight paragraphs (¶¶14, 20, 32, 39–40, 42, 45, and 47). *See* Figure 18 below.

**Figure 18:**    Compliance Status at the End of the Second Reporting Period (February 29, 2020) for Community Policing Paragraphs with Requirements in Year One



At the end of the second reporting period, the IMT determined that the City met deadlines for two of the newly assessed paragraphs (¶¶43 and 46), but missed deadlines for seven paragraphs (¶¶14, 15, 20, 32 (two deadlines), 42, 45, and 47). The City met an additional underlying requirement before the end of the reporting period (¶15). *See* Figure 19 below.

Figure 19: Total Community Policing Deadlines in the Second Reporting Period: 10



# Community Policing: ¶13

*13.* *In 2017, the Superintendent accepted CPAP's recommendations, and CPD began to implement some of the recommendations, namely, the creation of the Office of Community Policing, which reports directly to the Superintendent and is responsible for overseeing the implementation of CPD's community policing efforts. CPD will, within 90 days of the Effective Date, develop a plan, including a timeline, for implementing CPAP's recommendations, consistent with the requirements set forth in this Agreement.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* **(first reporting period)** |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

This reporting period, the IMT finds that the City and the CPD maintained Preliminary compliance and met Secondary compliance for ¶13.

In the first reporting period, the City and the CPD missed the ¶13 deadline but ultimately met Preliminary compliance because it developed a plan, including a timeline, for implementing the CPAP's recommendations. The CPD's CPAP plan aligned with the CPAP recommendations. The CPD organized the CPAP plan around various areas, including community partnerships; restorative justice; youth outreach; community policing strategies; annual strategy review and feedback; quarterly reports; community policing staffing and training; selection of Chicago Alternative Policing Strategy (CAPS) officers; coordination of City services; victims' resources; and community policing evaluations. These projects and their identified tasks also overlap with actions that the City must implement for other consent decree paragraphs.

To determine whether the CPD met Secondary compliance with ¶13, the IMT reviewed the CPD's implementation plan methods to assess whether effective managerial practices are in place to ensure meaningful implementation of the CPAP recommendations. To complete our assessment, we reviewed the CPD's draft standard operating procedure regarding CPAP meetings (CPAP Meetings SOP), records reflecting the CPD's efforts to follow the CPAP recommendations, and the CPD's implementation plan.

According to the draft CPAP Meetings SOP, the CPD plans to hold bi-monthly meetings to monitor and provide updates on CPAP recommendations and to coordinate

information for the quarterly implementation reports that the CPD provides to community stakeholders and the general public.

During the January 2020 site visit, the CPD briefed the IMT on its CPAP recommendation implementation progress. The CPD also provided the IMT with its updated CPAP plan. The CPD's consent decree compliance efforts capture most of the CPD responses to CPAP recommendations. We noticed that the CPD adjusted implementation timelines on some tasks, often related to delayed project start dates.

The CPD notes that one of the CPAP's recommendations was to provide quarterly updates on progress in implementing CPAP recommendations. In response to this recommendation, the CPD produces a quarterly report that provides more detail on its CPAP Plan progress.

As of January 2020, the CPD reports that it has completed 63 of its CPAP tasks and that 85 tasks are in progress, noting some delays in the CPD's initial implementation timelines. Highlights from this reporting period include the following:

- Hosted the 2nd Annual Youth Community Leaders Awards Ceremony, honoring 350 young people for their community service;

- Developed and administered an in-depth classroom and field problem-solving curriculum to District Coordination Officers;

- Completed the 2019 Clean Cycle, a CPD coordination effort;

- Conducted training on trauma-informed services for domestic violence liaison officers;

- Implemented roll-call trainings on identifying strangulation symptoms for all three watches in each district;

- Held meetings with community partners to assess the Peer Jury Program; and

- Created a formalized process to match service providers with crime victims.

Based on our review of the CPD's CPAP plan implementation efforts and the draft CPAP Meetings SOP, we believe that the CPD has demonstrated effective oversight of progress in implementing the CPAP recommendations. As such, we find that the CPD maintains Preliminary compliance and met Secondary compliance.

As we continue to monitor the CPD's compliance with ¶13, we will evaluate CPD's progress toward implementing the remaining CPAP recommendations, including assessing the CPAP's ability to ensure the CPD is progressing appropriately and timely. To the extent training is necessary to complete CPAP plan tasks, we will

review the quality of the relevant training material. Furthermore, in our review of future quarterly reports, we will assess the CPD's efforts to accurately capture status updates and their challenges, if any, in implementing the CPAP recommendations.

# Community Policing: ¶14

**14.** *Within 180 days of the Effective Date, CPD will review and, to the extent necessary, revise all relevant policies to clearly delineate the duties and responsibilities of the Office of Community Policing and any other offices or entities that report to the Office of Community Policing.*

**Compliance Progress**          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| Deadline: | August 28, 2019 | ☐ Met | ☑ Missed |
|---|---|---|---|

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD missed ¶14's deadline to review and revise all relevant policies regarding the Office of Community Policing. The IMT finds that the CPD has not met Preliminary compliance because (1) many of those draft policies require further revisions and (2) the CPD has not completed its review of the other relevant Office of Community Policing policies. According to the CPD, it is developing or revising **51** standard operating procedures (SOPs) to provide more details regarding the Office of Community Policing.

To assess whether the CPD met Preliminary compliance with ¶14, we reviewed 15 draft policies that the CPD produced as delineating the Office of Community Policing's duties and responsibilities. We reviewed whether these policies clearly delineate the Office of Community Policing's duties and responsibilities.

During the IMT's January 2020 site visit, the CPD briefed the IMT on Office of Community Policing operations. In February, the CPD provided its 15 draft SOPs regarding the Office of Community Policing. While the SOPs articulate the duties and responsibilities of the Office of Community Policing, we have substantive concerns regarding some of the specific instructions in the SOPs. For example, the IMT has concerns that the CPD's community engagement activities, outlined in several of these draft SOPs, do not provide meaningful and targeted community input, especially from marginalized groups. Furthermore, we encourage the CPD to revise the SOPs that direct the review process for the community crime reduction strategies to ensure the review is robust and recorded for transparency.

In addition to the 15 policies, the CPD provided the following two documents: (1) the Office of Community Policing's (unofficial) Role Descriptions and Responsibilities and (2) a spreadsheet tracking the development status for each Office of Community Policing-related directive. The IMT reviewed the CPD's spreadsheet, which

lists each directive's development status (including, priority level, assigned person-nel, progress, and draft due dates).

In attempting to manage workload challenges, the CPD has prioritized completion of the following SOPs:

- Peer Jury (S02-03-05);
- Community Engagement Management System (CEMS) (S09-08-3 and S09-08-04);
- Youth District Advisory Council;
- Explorers;
- Victim Assistance (S02-01-03 and S12-08); and
- District Advisory Committees (S02-03-01).

The CPD has not assigned or initiated work on the other directives that the CPD has deemed medium or low priority. And the CPD did not provide a timeline for review and revision for those directives.

The CPD did not meet the deadline for ¶14 and has not yet achieved Preliminary compliance for this paragraph. In the next reporting period, the IMT will continue to assess the CPD's progress on these policy additions and revisions to determine whether the relevant policies are substantively complete.

# Community Policing: ¶15

*15. With the assistance of the Office of the Community Policing, CPD will ensure its command staff develops crime reduction and problem-solving strategies that are consistent with the principles of community policing. To achieve this outcome, CPD will: a. within 180 days of the Effective Date, provide CPD's command staff methods and guidance, in writing, for ensuring that department-wide and district-level crime reduction strategies are consistent with the principles of community policing; b. require CPD's command staff to review department-wide and district-level crime reduction strategies implemented under their command, as appropriate, in order to ensure they incorporate problem-solving techniques and are consistent with the principles of community policing; and c. designate the Deputy Chief of the Office of Community Policing to review and provide written feedback on implemented department-wide and district level crime reduction strategies, excluding operational strategies that are determined on a day-to-day or short term basis, to ensure they are community oriented and consistent with the principles of community policing.*

---

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**              August 28, 2019          ☐ **Met**   ☑ **Missed**

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**       *Not in Compliance*
**Full:**                 *Not in Compliance*

During this reporting period, the City and the CPD met Preliminary compliance with this paragraph. The IMT did not receive sufficient evidence that the CPD provided the command staff with community policing principles guidance for department-wide crime reduction strategies within six-months of the consent decree's effective date, as required. As such, the CPD missed this paragraph's deadline.

In determining Preliminary compliance, we assessed whether the methods, guidance, and requirements provided to CPD staff were complete, compared to best practices and our experiences. We also assessed who should receive such guidance and whether they reviewed the guidance. Finally, we considered whether the CPD designated the Deputy Chief of the Office of Community Policing to review the implemented strategies.

During the reporting period, the IMT examined the CPD's development documents for its crime reduction strategies; the developed district and bureau crime reduction and problem-solving strategies; its community policing principles guidance; evidence of command staff review of district-wide strategies; and documents evidencing the Deputy Chief's review of the strategies. The IMT also reviewed and commented on relevant CPD policies, following the extensive review process described in the consent decree (¶¶626–41).

Before the CPD developed its district-wide and department-wide crime reduction strategies, it provided guidance regarding community policing principles to command staff. We received sufficient evidence that the CPD provided district-wide guidance before the August 2019 deadline, but we did not receive sufficient evidence that the CPD provided department-wide guidance within the August 2019 deadline. Specifically, the CPD provided district-wide guidance in an August 2019 briefing to District Commanders and staff. The briefing also included 2018 planning outcomes, timelines for the next planning cycle, templates for planning documents, and quarterly reporting requirements. The CPD has also articulated guidance for command staff to review department-wide strategies. The CPD developed a policy outlining the Office of Community Policing Deputy Chief's review of and feedback on department-wide and district-level strategies. During this reporting period, the CPD also provided evidence that command staff followed the guidance in the preparation of the current district strategies. While the 2019 review timeline is unclear from the CPD's records, the CPD's record-keeping for its 2020 strategies development was much clearer.

Based on the provided guidance, the CPD has developed district-wide crime strategies for each of its 22 districts and posted those strategies on its public-facing website.[54] These plans follow a standard format and include two sections: Problem-Solving on Crime Reduction Priorities and Community Engagement Goals.

The first section of each district strategy identifies crime reduction priorities that the CPD determined, in part, through community conversations. These priorities cover a range of criminal activity, including robberies, gun violence, narcotic sales, prostitution, and gang activity. Mitigation tactics, actions, and community resources are identified for each mission. The second section addresses community engagement goals by identifying them and then listing activities associated with goal achievement. Examples of community engagement goals found in these strategies included "Getting To Know Your Beat Officer," "Expanding Youth Programs," and "Deepen Relationships with the Senior Population." The CPD plans to update the strategies each year and to include reports on progress made in previously identified goals.

---

[54] *See District Strategic Plan*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/office-of-community-policing/district-strategic-plans/.

Similarly, the CPD developed strategic plans for four bureaus with city-wide responsibilities: the Bureau of Detectives, the Bureau of Organized Crime, the Bureau of Organizational Development, and the Bureau of Internal Affairs. The CPD asserts that the four bureau strategic plans reflect the CPD's efforts to create department-wide crime reduction strategies. Compared to the district plans, the bureau plans used a more straightforward format with goals and activities and were not subject to the same community input process. The bureau plan's community engagement process includes having bureau representatives attend district community conversations sessions as observers. From these observations, the bureau representatives are supposed to glean community members' sentiments as they relate to department-wide crime reduction strategies. The bureaus reportedly incorporate those sentiments into draft bureau strategic plans, which are reviewed by the District Advisory Committees and the Deputy Chief of the Office of Community Policing.

The IMT acknowledges a need for the CPD to improve the strategy development and review process for both district-wide and department-wide strategies. The IMT finds that the district strategic plans are generally a set of action-items developed around a set of crime reduction priorities, which the CPD established through a collaborative process. The CPD's problem-solving focus and emphasis on community engagement align with community policing principles. However, the plans lack a strategic approach, an understanding and analysis of collateral impact, and any correlation between the districts' strategic plans and the bureaus' strategic plans. Furthermore, we are concerned that the review process is not sufficiently transparent to provide assurances that the review is thorough.

With an understanding that the IMT will continue to work with the CPD to finetune the CPD's strategies' development and review process, the IMT concludes that the CPD has achieved Preliminary compliance with this paragraph. The IMT assigns Preliminary compliance because the CPD (1) developed and provided command staff with complete community policing guidance to inform the strategic plan development process, (2) ensured that the appropriate staff reviewed such guidance, and (3) provided documents reflecting command staff review and the Office of Community Policing Deputy Chief's review of the developed strategic plans.

In the next reporting period, the IMT will assess the CPD's efforts to improve the quality of this development process, including a more "strategic focus" that better connects proposed activities to the overarching department-wide and district-level goals. The IMT also encourages the CPD to develop a more robust recording of the review process so that the CPD can review prior years' outcomes. The CPD may also consider requiring the district Commanders and Deputy Chief for the Office of Community Policing to consult with interested community stakeholders to seek more effective ways to garner community input for strategy development and review, especially from those groups most impacted by police services.

# Community Policing: ¶18

*18. The City will establish and coordinate regular meetings, at minimum quarterly, with representatives from City departments, sister agencies, and CPD to collaborate on developing strategies for leveraging City resources to effectively and comprehensively address issues that impact the community's sense of safety, security and well-being. The City departments and agencies will include, but not be limited to, the Department of Streets and Sanitation, the Department of Buildings, the Chicago Fire Department, the Department of Business Affairs and Consumer Protection, the Department of Planning and Development, the Office of Emergency Management and Communication People with Disabilities, the Department of Public Health, the Department of Family and Support Services, the Chicago Public Schools, the Chicago Housing Authority, and the Chicago Park District. If after two years the City concludes that less frequent meetings would be more effective, it may propose an alternative schedule subject to Monitor approval.*

## Compliance Progress  (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| Deadline: | Quarterly | ✓ Met | ☐ Missed |
|---|---|---|---|

| | |
|---|---|
| **Preliminary:** | *In Compliance (first reporting period)* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The IMT finds that the City maintained Preliminary compliance because, during this reporting period, the City held two "cabinet meetings" to develop strategies for leveraging City resources to address issues that impact the community's sense of safety, security, and well-being. The IMT has determined that the City has not yet met Secondary compliance with ¶18.

In the first reporting period, the City provided the IMT with a summary of its activities regarding regular meetings with representatives from City departments. According to the summary, the purpose of these community safety focused cabinet meetings was to coordinate the delivery of services to best leverage resources and enhance community safety. We found that the City demonstrated that City departments are working collaboratively to face challenges that require meaningful participation by multiple agencies.

To evaluate the City's efforts toward Secondary compliance with ¶18, the IMT reviewed whether these specially designated cabinet meetings include quality collaboration between the entities to develop strategies for leveraging City resources.

Specifically, the IMT reviewed cabinet meetings' agendas, notes, and information provided by the Mayor's Office to determine whether the agencies were examining (1) the actions assigned during the previous meetings, (2) the agencies progress towards implementing the tasks, and (3) assigning new action-items.

During the second reporting period, the Mayor's Office reported that it hosted two cabinet meetings: the first on October 3, 2019 and the second on January 27, 2020. The City provided the IMT with agendas for both meetings and a summary of the January meeting. The City did not provide meeting minutes for either of the meetings. Although we did not receive attendance records for the two meetings, the City reported that the following departments and agencies participated in those cabinet meetings:

- The Mayor's Office;
- The CPD;
- The Chicago Fire Department;
- The Chicago Public Schools;
- The Office of Emergency Management and Communications;
- The Department of Family and Support Services;
- The Department of Business Affairs and Consumer Protection;
- The Department of Buildings;
- The Department of Streets and Sanitation;
- The Department of Public Health;
- The Department Planning and Development;
- The Mayor's Office of People with Disabilities;
- The Chicago Transit Authority;
- The Chicago Housing Authority; and
- The Chicago Park District.

The October 3, 2019, agenda items included discussions regarding poverty reduction, commercial corridors, the 2020 budget, and public-safety updates. The Mayor's Office described the January meeting as primarily involving a presentation by the CPD on survey data collected by a technology-driven survey provider that administers surveys using multiple platforms, including social media, websites, and other free applications. The survey's data highlighted trust concerns and crimes that residents fear the most.

It is difficult for the IMT to assess the City entities' efforts to develop strategies to effectively and comprehensively address issues that impact the community's sense of safety. The agendas and summaries merely provide us with the topics discussed during the cabinet meetings. Without meeting minutes, we are unable to assess the quality of collaboration, resulting action-items, and the follow-up of action-items from earlier meetings.

For future meetings, the IMT looks forward to reviewing improved documentation, including meeting minutes, confirmation of attendees, action-items, and updates on responses to prior action-items. Most importantly, these meetings should reflect efforts to leverage City resources to address public safety issues as required by this paragraph.

# Community Policing: ¶20

**20.** *Within 180 days of the Effective Date, CPD will develop and institute a policy prohibiting the transport of individuals with the intent to display or leave them in locations where known rivals or enemies live or congregate.*

**Compliance Progress** (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:** August 28, 2019 ☐ **Met** ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In this reporting period, the City and the CPD missed the deadline for ¶20 but developed a draft policy, which, in part, includes language that addresses requirements for this paragraph. However, the CPD has not met Preliminary compliance because the draft policy has not been finalized.

To evaluate Preliminary compliance with ¶20, the IMT reviewed the CPD's policy following the policy review process described in the consent decree (¶¶626–41). Specifically, the IMT reviewed "Preliminary Investigations" general order's (G04-01's) provision prohibiting CPD members from transporting individuals with the intent to display or leave them in locations where known rivals or enemies live or congregate.

G04-01 relates to multiple consent decree paragraphs, and the IMT provided comments regarding the policy's adherence to consent decree paragraphs beyond ¶20. The CPD is working to incorporate our feedback and will provide a revised draft for our review. As such, the CPD has not implemented the policy.

Although the policy contains language that complies with the requirements of this paragraph, we find that the CPD fails to achieve Preliminary compliance because the CPD has not implemented the policy.

In the next reporting period, we will monitor the CPD's efforts to ensure G04-01 moves forward in the policy review process. Once the CPD implements G04-01, we will monitor CPD members' adherence to the new policy requirement and examine the CPD's ability to track its members' transport practices. We will also canvas the community and review community complaints regarding this prohibited practice to glean additional information regarding the CPD's efforts to comply with this paragraph.

# Community Policing: ¶32

*32. Within 180 days of the Effective Date, CPD will review and revise its current policies relating to youth and children and, within 365 days, will revise its training, as necessary, to ensure that CPD provides officers with guidance on developmentally appropriate responses to, and interactions with, youth and children, consistent with the provisions of this Agreement and as permitted by law.*

## Compliance Progress
(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | | | |
|---|---|---|---|
| **Deadline:** | August 28, 2019 | ☐ **Met** | ☑ **Missed** |
| | February 29, 2019 | ☐ **Met** | ☑ **Missed** |

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

During this reporting period, the City and the CPD missed the ¶32 deadlines—and has not met Preliminary compliance—because (1) it has not completed its review and revision of each policy regarding youth and children and (2) it did not provide any evidence showing its efforts to revise the requisite trainings.

To evaluate Preliminary compliance with ¶32, the IMT reviewed one CPD policy that relates to youth and children according to the policy review process described in the consent decree (¶¶626–41).

Upon the IMT's request, the CPD provided a list of its youth-related policies still requiring revision. During the January 2020 site visit, the CPD briefed the IMT on its progress in updating and revising those policies. The IMT also observed a Mayor's Youth Diversion Advisory Council meeting during the same visit.

Before the end of the second reporting period, the City and the CPD followed the review process under the consent decree to implement one of the requisite policies. Specifically, after receiving feedback from the IMT and the OAG and posting the policy for public comment for 15 days on its website, the CPD issued the new Processing of Juveniles and Minors Under Departmental Control policy (S06-04) on February 28, 2020.[55] We reviewed S06-04 drafts and provided initial comments

---

[55] *See Processing of Juveniles and Minors under Department Control* (S06-04), CHICAGO POLICE DEPARTMENT (February 28, 2020), http://directives.chicagopolice.org/directives/data/a7a57be2-12c31445-ca112-c329-5f0053d940bf80d8.pdf?hl=true. *See also* Processing Juveniles Policy Draft (for public comment), https://home.chicagopolice.org/policy-review/processing-juveniles-policy-draft/.

in October. Our main concern was the ambiguity surrounding whom CPD members must notify when a CPD member takes a juvenile into custody. On December 18, 2019, the CPD produced a revised S06-04, which clarifies CPD members' obligation to contact the juvenile's parents or other guardians in the event of a juvenile arrest and provides assurances of notification of rights of counsel. On January 31, 2020, we submitted a no-objection notice regarding that revised S06-04 to move forward in the review process.

In addition to S04-06, the CPD identified 14 other youth-related policies still under review for possible revisions:

- General Order G01-01 (Vision, Mission Statement and Core Values);
- General Order G01-02 (Human Rights and Human Resources);
- General Order G01-03 (Department Directives System);
- Special Order S02-03 (Community Relationships Strategy);
- Special Order S02-03-01 (Beat Committee Meetings and District Advisory Committee);
- Special Order S02-03-05 (Peer Jury Program);
- Special Order S02-03-06 (Drug Abuse Resistance Education);
- Special Order S02-03-07 (Gang Resistance Education and Training);
- Special Order S02-03-11 (Officer Friendly Program);
- Special Order S02-03-12 (Bridging the Divide Program);
- Special Order S02-04-07 (Chicago Recovery Alliance Needle Program);
- Special Order S04-14 (Citing Traffic Violations and Attending Traffic Court);
- Special Order S04-22 (Municipal Administrative Hearings); and
- Department Notice 18-03 (Narcotics Arrest Diversion Program).

The CPD failed to meet the 180-day deadline for these reviews. Furthermore, the CPD has not provided a timeline for the completion of its review and revision of the additional youth-related policies. The CPD reported that it is in the process of soliciting community and stakeholder feedback before conducting a comprehensive review and revision of policies regarding officer interactions with youth. Specifically, the CPD also indicates plans in the next reporting period to convene a community and stakeholder working group to help develop policies addressing youth interactions.

In the next reporting period, the IMT will continue to assess the CPD's review and revision of policies relating to youth and children—especially its engagement of community members in that process. The IMT will also evaluate whether the CPD revised its training to ensure it guides officers on developmentally appropriate responses in interactions with youth.

# Community Policing: ¶¶39–40

**39.** *Before the 2019-2020 school year begins, in consultation with CPS and considering input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders, CPD will develop and implement screening criteria to ensure that all officers assigned to work in CPS schools have the qualifications, skills, and abilities necessary to work safely and effectively with students, parents and guardians, and school personnel. Only CPD officers who satisfy the screening criteria will be assigned to work in CPS schools.*

**40.** *Before the 2019-2020 school year begins, in consultation with CPS and considering input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders, CPD will develop a policy that clearly defines the role of officers assigned to work in CPS schools. This policy will be reviewed by the Monitor by the end of 2019. Any suggested revisions by the Monitor that are adopted by CPD will be implemented by CPD before the 2020-2021 school year. The policy will reflect best practices and will include, but not be limited to: a. the duties, responsibilities, and appropriate actions of officers assigned to work in CPS schools and school personnel, including an express prohibition on the administration of school discipline by CPD officers; b. selection criteria for officers assigned to work in CPS schools; c. the requirement that officers assigned to work in CPS school receive initial and refresher training; and d. the collection, analysis, and use of data regarding CPD activities in CPS schools.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not In Compliance* |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not In Compliance* |

The IMT finds that the City and the CPD have not met Preliminary compliance with these paragraphs. The CPD continues to refine its School Resource Officer policy regarding selection criteria and roles and responsibilities for School Resource Officers (S04-01-02). We acknowledge that the CPD developed the criteria and policy before the 2019–2020 school year. However, S04-01-02 does not adequately reflect the requirements of ¶¶39–40.

In the previous reporting period, the CPD drafted S04-01-02, which the IMT reviewed and commented on. However, before we reviewed the policy, the CPD had to fill the School Resource Officer positions for the 2019–2020 school year. As part of the CPD's policy revision process, it held a series of community meetings soliciting input from community members and stakeholders about the selection criteria for and roles and responsibilities of the School Resource Officers.

Nonetheless, the CPD had to rely on a version of S04-01-02 that had not been reviewed by the IMT. These paragraphs anticipated such timing, providing that the S04-01-02 review process would occur after the start of the 2019–2020 school year. The CPD required all School Resource Officers to reapply. The CPD then evaluated each applicant for placement using the selection criteria and processes articulated in S04-01-02.

Considering the organization of these paragraphs and the start date for the 2019-2020 school year, the policy review period described in the consent decree (¶¶626–41) occurred after the CPD implemented S04-01-02. Therefore, instead of relying on the ¶¶626–41 process to determine Preliminary compliance, the IMT reviewed whether the CPD has addressed the specific requirements of these paragraphs, including (1) considering the requisite community input and (2) developing and implementing the requisite screening criteria and policy that aligns with national standards. The IMT reviewed whether the officers who are assigned to work in Chicago Public Schools (CPS) met the proposed screening criteria.

In the second reporting period, the IMT attended community listening sessions covering School Resource Officers and reviewed the CPD's documentation from those sessions. The IMT also reviewed national standards for selecting School Resource Officers, an Inspector General report on School Resource Officers in the CPS, and the U.S. Department of Justice Office of Community Oriented Policing Services publication concerning best practices.[56] The IMT also consulted with School Resource Officer experts from the National Association of School Resource Officers (NASRO). For the 2019–2020 school year, NASRO trained the CPD School Resource Officers.

The IMT also met with the CPS's and CPD's executive staff to discuss the current criteria. During this meeting, the IMT recommended changes moving forward and provided other policy considerations. The IMT visited a Chicago public school and met with the school's principal, School Resource Officers, and other school personnel about the School Resource Officer program.

---

[56] Fran Sterling, *Beyond the Badge: Profile of a School Resource Officer. A guide for school communities*, Community Oriented Policing Services, U.S. Department of Justice, https://cops.usdoj.gov/RIC/Publications/cops-p357-pub.pdf.

Additionally, the IMT reviewed documentation provided by the CPD describing the CPD's School Resource Officer selection process for the 2019–2020 school year. The CPD's documents included application packages and decision memoranda from a sampling of districts. The application packages included work history, disciplinary history, education history, other relevant experience, awards, and a brief statement of interest. Furthermore, the IMT reviewed the CPS's school principal guidance, School Resource Officer training, and plans for facilitating more coordination between CPS and the CPD.

Through our assessment, we learned that the CPD's School Resource Officer placement process begins with interested members submitting a "To-From Subject Report," which includes a statement discussing why they feel they meet the criteria and why they are interested in the assignment. They also submitted a recent résumé. The CPD then reviewed the applicants' medical absence history, work history, awards and commendations, police activity reports, and disciplinary history. The District Commanders ultimately made the decision based on each applicant's application package. The District Commanders also ensured the assignment of a supervising officer. Although required to coordinate with the CPS in the selection of the School Resource Officers, the City provided limited documentation of such coordination.

Figure 20 below depicts a summary of the number of School Resource Officer applications received and the number assigned to schools, by district. In total, there were 207 applicants and 187 people selected, which represents 87% of the applicant pool.

| Figure 20 | Summary of School Resource Officer Applications and Assignments | | |
|---|---|---|---|
| **District** | **#Applied** | **#Selected** | **Percentage Selected** |
| District 001 | 4 | 4 | 100% |
| District 002 | 12 | 12 | 100% |
| District 003 | 10 | 10 | 100% |
| District 004 | 13 | 9 | 69% |
| District 005 | 12 | 10 | 83% |
| District 006 | 17 | 13 | 76% |
| District 007 | 13 | 13 | 100% |
| District 008 | 10 | 10 | 100% |
| District 009 | 12 | 11 | 92% |
| District 010 | 8 | 8 | 100% |
| District 011 | 12 | 12 | 100% |
| District 012 | 15 | 12 | 80% |
| District 013 | 3 | 1 | 33% |
| District 014 | 9 | 8 | 89% |
| District 015 | 8 | 6 | 75% |
| District 016 | 10 | 10 | 100% |

| Figure 20 | Summary of School Resource Officer Applications and Assignments | | |
|---|---|---|---|
| **District** | **#Applied** | **#Selected** | **Percentage Selected** |
| District 017 | 0 | 0 | None |
| District 018 | 6 | 4 | 67% |
| District 019 | 8 | 8 | 100% |
| District 020 | 6 | 6 | 100% |
| District 021 | 7 | 4 | 57% |
| District 022 | 12 | 10 | 83% |
| **Totals** | **207** | **181** | **87%** |

The IMT reviewed a random sample of the application packages. The IMT found that the packages included complete applicant information generally sufficient to determine whether the applicant met the selection criteria. The documentation also included the Area Deputy Chief and the District Commander's approvals. But, again, the CPD offered minimal evidence regarding coordination or consultation with CPS officials in the selection of School Resource Officers. However, the CPD reports that it sent applicant résumé to CPS principals, but as previously noted, we received no record of those correspondences.

The lack of coordination between the CPD and CPS in selecting School Resource Officers is concerning. Community input, best practice standards, and the Inspector General's Report on School Resource Officers point to a need for more consultation. The practice of merely sending a résumé to a principal with no follow-up to capture and record any feedback does not represent coordination or consultation.

The IMT urges the CPD to improve its School Resource Officer selection process by encouraging joint reviews and signoffs on School Resource Officers assigned to CPS schools. Our interviews with School Resource Officers revealed disparities among schools regarding School Resource Officers' relationship with their assigned schools' principals. Coordinating with school principals during the selection process may help strengthen these relationships.

The IMT acknowledges the recent increase in CPS and CPD coordination and the plans for enhancing the collaboration between them. For example, the CPD reported sharing School Resource Officer applications, including résumés, with secondary school principals in January and working jointly with CPS to promote participation in planned community conversations regarding School Resource Officers and other relevant CPD policies. The IMT also acknowledges the CPD's efforts to provide more specific guidance to its principals regarding their work with School Resource Officers, as evidenced by the January 2020 CPS School Resource Officer Updates and Training Webinar for Principals.

Another critical component that the CPD evaluates when selecting a School Resource Officer is the applicant's disciplinary history. We reviewed the disciplinary history of a proportion of these applicants.

Figure 21 below provides a summary of the disciplinary histories of 25 School Resource Officers from three randomly selected police districts. Overall, applicants demonstrated minimal or no serious sustained complaints. However, for two of the applicants, the nature of the sustained complaints and the fact that they occurred within the last four years may raise concerns and do not reflect the best practice standard of minimal or no disciplinary history.

The sustained complaints included "neglect of duty," "behavior unbecoming of an officer," and "conducting two improper (illegal) searches." We acknowledge that these complaints may not disqualify an applicant under the CPD's current screening criteria. However, we encourage the CPD to revise its School Resource Officer policy to adopt an "excellent" standard and limit disciplinary histories to minimal or no sustained complaints. With a higher disciplinary history threshold, the IMT suggests that the CPD consider making exceptions if there is written justification agreed to at the Deputy Chief level.

| Figure 21 | | | Summary of School Resource Officer Disciplinary Histories |
|---|---|---|---|
| District | #CRs | #SPARs | Disciplinary Action |
| 001 | 0 | 0 | |
| 001 | 0 | 0 | |
| 001 | 0 | 0 | |
| 002 | 0 | 0 | |
| 002 | 0 | 0 | |
| 002 | 0 | 0 | |
| 002 | 0 | 3 | 2 Reprimands (Improper search)<br>1 No Disciplinary Action (Misuse of equipment) |
| 002 | 0 | 0 | |
| 002 | 0 | 0 | |
| 002 | 0 | 0 | |
| 002 | 0 | 0 | |
| 002 | 0 | 1 | 1 Reprimand (Illinois license plates and/or City vehicle sticker violation) |
| 002 | 1 | 0 | 1 Reprimand (Neglect of duty/conduct unbecoming. Officer filed a grievance, action ultimately reduced to written reprimand) |
| 002 | 0 | 1 | Equipment violation (One-day suspension) |
| 002 | 0 | 0 | |
| 008 | 0 | 0 | |
| 008 | 0 | 1 | Reprimand – Indebtedness to the City |
| 008 | 0 | 0 | |

| District | #CRs | #SPARs | Disciplinary Action |
|----------|------|--------|---------------------|
| Figure 21 | | | Summary of School Resource Officer Disciplinary Histories |
| 008 | 0 | 0 | |
| 008 | 0 | 0 | |
| 008 | 0 | 0 | |
| 008 | 0 | 0 | |
| 008 | 0 | 0 | |
| 008 | 0 | 0 | |
| 008 | 0 | 0 | |

Regarding our review of S04-01-02, we provided the CPD with numerous considerations, including adding the requirement that applicants complete training regarding de-escalation, youth crisis intervention, and implicit bias. The IMT also recommended a three-year experience threshold without exception and School Resource Officer participation in school safety planning. And, as mentioned, we encouraged the CPD to adopt an "excellent" disciplinary standard, which limits disciplinary histories to minimal or no sustained complaints.

The CPD incorporated many of our recommendations into an updated February 2020 version of S04-01-02. However, the CPD did not include two critical recommendations: (1) the application of the "triad model" and (2) the "excellent" disciplinary standard. The CPD explains that changing the disciplinary standard may be an issue requiring negotiations related to the collective bargaining agreements. As we move forward, we will continue our conversations with the CPD regarding our concerns regarding the current disciplinary history threshold.

The CPD did not inform us of a similar issue regarding our triad model comment. The triad model dictates that, in addition to the law enforcement role, School Resource Officers should serve in counselor and lecturer capacities within schools. The triad model is currently the best practice standard. NASRO's training also reflects community interests in having School Resource Officers serve in these expanded roles. With the expanded roles, officers could lecture secondary school students on police services, such as what to do when stopped by police and the importance of reporting domestic violence or addressing bullying. Officers could also engage in basic counseling when appropriate, which may help identify serious mental health issues and referrals for services. Such proactive activities may also pay huge dividends in reshaping the image of the CPD and provide a foundation for enhancing trust between young Chicagoans and the CPD officers who swore to serve and protect them. The triad model represents a shift from School Resource Officers in primarily a law enforcement role to a more student-support role, adding value to having School Resource Officers in the schools.

The IMT understands the CPD's and CPS's reticence in having School Resource Officers in this expanded role. If adopted, the CPD may need to adjust CPD qualifications and expand the applicant pool by providing incentives for officers to apply for and be selected for this assignment. Paragraph 40 articulates that the policy should reflect best practices—not just meet minimal standards—and the triad model for School Resource Officers represent today's best practice. Thus, the IMT strongly encourages the CPD to revisit its position and consider instituting the expanded role for School Resource Officers.

Still, the IMT is encouraged by the CPS guidance that promotes principals' efforts to leverage School Resource Officers for student support and community participation, including off-duty volunteering in school activities, meeting with student voice committees, attending focus groups with students, participating in crisis/safety audits, and connecting students to CPD resources. This guidance represents an expanded role more aligned with national standards and best practices.

Ultimately, however, the IMT concludes that the CPD has not met Preliminary compliance for these paragraphs. We recognize the investments that the CPD has made in re-tooling its School Resource Officer program. Still, before the CPD can reach Preliminary compliance, it must address our outstanding concerns regarding the selection criteria and roles and responsibilities for School Resource Officers and implement a School Resource Officer policy, which would address these paragraphs' requirements. Because ¶¶39–40 are written to require these activities before the 2019–2020 school year, we will discuss with the Parties how the City and the CPD can do to reach compliance moving forward.

# Community Policing: ¶42

*42. CPD officers assigned to work in CPS schools will receive specialized initial and annual refresher training that is adequate in quality, quantity, scope, and type, and that addresses subjects including, but not limited to: a. school-based legal topics; b. cultural competency; c. problem-solving; d. the use of de-escalation techniques, use of restorative approaches, and available community resources and alternative response options; e. youth development; f. crisis intervention; g. disability and special education issues; and h. methods and strategies that create positive interactions with specific student groups such as those with limited English proficiency, who are LGBTQI, or are experiencing homelessness.*

*The training will be developed and delivered in accordance with the requirements of the Training section of this Agreement.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          February 29, 2020          ☐ **Met**   ☑ **Missed**

**Preliminary:**          *Not in Compliance*
**Secondary:**          *Not in Compliance*
**Full:**          *Not in Compliance*

The IMT finds that the City and the CPD have not met Preliminary compliance with ¶42 because we have identified gaps in the initial training curriculum, which affected the adequacy of the training's quality and scope. We acknowledge that the CPD's School Resource Officers and Investigations at Chicago Public Schools directive (S04-01-02) provides that School Resource Officers and their supervisors will receive specialized initial and annual refresher training. The CPD also provided the initial training before the 2019–2020 school year, but we cannot determine Preliminary compliance until the training aligns with this paragraph's requirements. During the reporting period, we did not assess the CPD's compliance with the refresher-training requirement because the CPD is not required to provide the refresher training until after the second reporting period.

To assess Preliminary compliance, the IMT reviewed the implementation of the School Resource Officer training to determine its alignment with this paragraph and the CPD's ability to administer the training effectively.

During the second reporting period, we observed the 40-hour training delivered by the National Association of School Resource Officers (NASRO) to CPD School Resource Officers and their Sergeants in August 2019. The IMT carefully reviewed

the NASRO provided curriculum, including source documents, and spent considerable time discussing curriculum and other departments with NASRO leaders and trainers. The IMT also met with the CPD officials overseeing the training and held numerous informal discussions with School Resource Officers attending the training. The IMT did not receive participant evaluation data. The IMT reviewed supplemental training curriculum developed and delivered by the CPS, which covered topics like restorative justice and the CPS code of ethics. The IMT also reviewed notes from community listening sessions to identify themes and to confirm whether the CPD incorporated those themes into training materials.

The IMT believes both the NASRO-provided training (which the CPD and CPS supplemented for their purposes) and the materials submitted by the CPD for the proposed new curriculum address most of the consent decree School Resource Officer training requirements and largely align with community and stakeholder input on School Resource Officer training content. For example, community members often asked for positive non-enforcement engagement with students, specialized approaches in interacting with students with disabilities, and sensitivity to the needs of marginalized groups. These concerns were all addressed in the NASRO curriculum and lesson plans and, to some extent, are reflected in the proposed training materials. Furthermore, the NASRO training reflects best practice with its emphasis on the triad model of School Resource Officers in law enforcement, educator, and mentor/counselor roles. The educator/lecturer role and the mentor/ counseling role were only minimally reflected in the training materials submitted by the CPD.

Still, the IMT has some concerns with the initial training's quality and scope. Specifically, the IMT observed training classes with over 70 students. The large class size impeded the trainer's ability to use scenario-based exercises and behavioral rehearsal. This impediment diminished the training's quality. The IMT expects that future trainings will have smaller class sizes so that trainers can facilitate scenario-based exercises and behavioral rehearsal techniques. The IMT also has concerns about the processes in place to evaluate the training's effectiveness. Regardless of the scope of the training, the IMT provided specific comments on the CPD's training materials to help develop a more Chicago specific and comprehensive School Resource Officer training program for the 2020–2021 school year. The IMT recommended that the upcoming training incorporate:

- More emphasis on understanding the sensitivities of the various ethnic and social groups that have high levels of contact with the CPD;

- Greater emphasis on de-escalation and crisis intervention methods;

- The expanded roles: lecturer/educator and mentor/counselor role as currently provided through the NASRO training;

- Additional emphasis on restorative justice concepts (currently addressed in the CPS supplemental training);

- Additional emphasis on the CPS student code of ethics (currently addressed in the CPS supplemental training);

- Additional discussion of the CPD/CPS memorandum of understanding, emphasizing the agreed-upon roles and responsibilities of the CPD School Resource Officers (currently addressed in the CPS supplemental training); and

- Pre-arrest options that are available to School Resource Officers.

The IMT also recommended that all School Resource Officers be required to complete the CPD's Crisis Intervention Training for Youth and implicit-bias training before their placement in schools. The CPD has begun developing the refresher training and provided the IMT with an outline for the proposed eight-hour annual refresher course. The CPD anticipates completing the refresher training curriculum for IMT review during the next reporting period. Furthermore, the CPD hopes to finalize and implement the revised initial School Resource Officer training by summer 2021.

In sum, the IMT concludes that the CPD has not met Preliminary compliance with this paragraph because the initial training does not adequately cover the breadth of required subjects and the lack of sufficient scenario-based exercises affected the training's overall quality. We acknowledge that the CPD is considering our comments, which address the training's shortcomings, and the community members' feedback in its efforts to revise the initial training and develop the annual refresher training. In the next reporting period, the IMT will assess the CPD's progress in implementing a revised initial training course and developing the annual refresher curriculum. Furthermore, the IMT will observe CPD's implementation of these trainings and assess the CPD's efforts to evaluate the effectiveness of both trainings.

# Community Policing: ¶43

*43. The curricula, lesson plans, and course material used in initial training provided before the 2019-2020 school year will be reviewed by the Monitor by the end of 2019. Any suggested revisions by the Monitor that are adopted by CPD will be implemented by CPD before the 2020-2021 school year.*

| Compliance Progress | (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020) |
|---|---|

**Deadline:**      December 31, 2019      ✓ **Met**   ☐ **Missed**

**Preliminary:**   *In Compliance* (NEW)
**Secondary:**    *Not in Compliance*
**Full:**         *Not in Compliance*

The City and the CPD met Preliminary compliance for ¶43. To determine Preliminary compliance, we assessed whether the CPD provided the initial training's materials for our review before the end of 2019. On December 17, 2019, the CPD provided the IMT with the 2019–2020 School Resource Officer training materials, including curricula, lesson plans, and course materials. The CPD's timing did not provide sufficient time for the training material review process described in ¶641. However, the IMT completed its review of those materials and provided initial comments on December 31, 2019. And on January 16, 2020, we supplemented our initial feedback. Because the CPD submitted the 2019–2020 training materials for review, the IMT concludes that the CPD met Preliminary compliance. (For a discussion of our substantive review of the 2019–2020 training materials, please refer to our compliance assessment of ¶42, above.)

The CPD is currently considering the IMT's comments regarding the 2019–2020 training as it develops its 2020–2021 school year. In the next reporting period, the IMT will review the 2020–2021 SRO training materials to determine if the CPD incorporated our suggested revisions into the materials.

# Community Policing: ¶44

**44.** *Before the 2019-2020 school year begins, CPD will undertake best efforts to enter into a memorandum of understanding with CPS, to clearly delineate authority and specify procedures for CPD officer interactions with students while on school grounds, consistent with the law, best practices, and this Agreement.*

**Compliance Progress**  (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* **(first reporting period)** |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The IMT finds that the City and the CPD maintained Preliminary compliance but have not yet achieved Secondary compliance with this paragraph. The CPD and the CPS drafted a memorandum of understanding (MOU) that is consistent with the School Resource Officer policy.

In the previous reporting period, before the 2019–2020 school year, the CPD and CPS negotiated and implemented a MOU. It is worth noting, however, that this 2019 MOU did not completely align with the CPD's School Resource Officer policy, which the CPD continues to develop.

To evaluate Secondary compliance with ¶44, the IMT assessed whether the CPD took best efforts to clearly delineate authority and procedures for CPD officers' interactions with students that are consistent with law, best practices, and the consent decree. The IMT also assessed the CPD's training development, implementation, and evaluation regarding the MOU (¶286).

During this reporting period, the IMT attended a meeting with CPS and CPD staff to discuss revisions to the 2019 MOU. The IMT also reviewed NASRO literature regarding best practices for MOUs. The IMT reviewed the revised MOU and believes it delegates authority and specifies many procedures for CPD officer interactions with students.[57] Specifically, the revised MOU addresses the 2019 MOU's inconsistency with the CPD's School Resource Officer policy. The IMT also suggested that the CPD incorporate additional coverage of the MOU in its School Resource Officer training materials.

The IMT finds that the revised MOU delineates authority for the School Resource Officer program. The authority primarily rests with the CPD, but the CPD will consult with the CPS. Consistent with the School Resource Officer policy, the MOU

---

[57] While the MOU itself suggests a start date of January 2020, the CPD has not provided the IMT with a signed version to confirm this start date.

prohibits School Resource Officer involvement in school disciplinary actions. The MOU authorizes School Resource Officers to respond to emergencies, participate in meetings with school officials, and take enforcement actions as required to maintain student and staff safety. However, the MOU lacks specifics regarding the CPD and the CPS consultation process and procedures regarding CPD officers' interactions with students generally. For example, a procedure that may require CPS consultation—handling complaints against School Resource Officers—is not specified in the revised MOU.

The IMT concludes that the MOU is viable. Furthermore, we acknowledge that the CPD and CPS are meeting regularly to transform the School Resource Officer program to align it better with national best practice and community vision. Because the MOU could benefit from more precise and specific procedures regarding CPD officers' interactions with students, specifically the consultation processes and the complaint process, the IMT finds that the CPD has not met Secondary compliance.

Again, we acknowledge that the revised MOU addresses the previous MOU's inconsistency with the CPD's School Resource Officer policy. However, in the next reporting period, the IMT will continue to assess whether the CPD and CPS update the MOU to clearly specify procedures regarding the CPD officers' interactions with students, primarily focusing on the memorialization of the CPD/CPS consultation process and complaint process. Furthermore, the IMT will evaluate whether the CPD incorporates additional coverage of the MOU in its School Resource Officer training materials.

# Community Policing: ¶45

*45. By January 1, 2020, and annually thereafter, District Commanders will review their district's policing strategies, with input from the District Advisory Committees and the Office of Community Policing, to ensure the strategies are consistent with the principles of community policing. This review will include, but not be limited to: a. reviewing available district resources and personnel assignments; b. identifying methods to support their district's ability to effectively problem-solve, including collaborating with City departments, services, and sister agencies; and c. identifying district-level CPD members, as needed, to assist members of the community with access to police and City services, including community members who have experienced previous challenges, such as LGBTQI individuals, religious minorities, immigrants, individuals with disabilities, individuals in crisis, homeless individuals, and survivors of sexual assault and domestic violence.*

---

**Compliance Progress**                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**              January 1, 2020          ☐ **Met**   ☑ **Missed**

**Preliminary:**              *Not in Compliance*
**Secondary:**              *Not in Compliance*
**Full:**              *Not in Compliance*

The IMT finds that the City and the CPD have not met Preliminary compliance with ¶45. We could not conclude from the CPD's records that the District Commanders' review of their district community policing strategic plans included a review of their district's available resources and personnel assignments. Similarly, we could not determine from the records whether the District Commanders identified district-level members who could assist members of marginalized communities in gaining access to CPD and City services, as needed.

To determine Preliminary compliance with ¶45, we assessed whether the District Commanders reviewed their district's policing strategies to ensure they are consistent with community policing principles. Our assessment included reviewing the district policing strategies and plans' development documents to discern whether the District Commander reviewed each component listed in this paragraph.

Specifically, the IMT reviewed the district community policing strategic plans that the CPD described in its "Community-Driven Approaches to Crime Reduction Strategic District Plan" standard operating procedure, which are available on the CPD

website. The CPD provided the IMT with written approvals from the District Advisory Committees, which the IMT reviewed. The IMT also evaluated the written approvals from the District Commanders and the Deputy Chief of the Office of Community Policing's review schedule. The IMT examined the Office of Community Policing feedback on the draft plans. The records suggest that the Office of Community Policing provided substantive comments for districts to consider. We could not glean from these records how much meaningful consultation occurred between the District Commanders, the District Advisory Committee, and the Office of Community Policing.

We could determine, however, that the CPD developed these plans with some community input, which reflects community policing principles. But the plans and supporting documents do not reflect a review of available resources and personnel assignments to ensure the districts can implement their plans. Furthermore, the CPD did not provide documentation indicating the process for identifying CPD members to assist community members from marginalized communities in gaining access to CPD and City services.

Furthermore, the IMT believes there are likely other district- and city-wide policing practices, approaches, plans, and tactics that are not captured in the plans. The CPD has not identified any additional strategies that may respond to this paragraph's requirements, but if any others exist, the IMT invites the CPD to share them with us.

In sum, the IMT concludes that the CPD has not met the requirements of this paragraph and is not in Preliminary compliance because the District Commanders did not review their district's personnel assignments and available resources, and the District Commanders did not identify district-level CPD members who could help marginalized groups gain access to CPD and City services.

In the next reporting period, the IMT expects a more detailed report of District Commanders' review of their district's community policing strategic plans. Specifically, the CPD should record the collaboration between the District Commanders, the District Advisory Committee, and the Office of Community Policing. The records should reflect the review and analysis of districts' available resources and personnel assignments. Furthermore, the records should reveal the District Commanders' process for identifying CPD district-level members who can help marginalized groups gain access to CPD and City services.

# Community Policing: ¶46

**46.** *Within 180 days of the Effective Date, and as appropriate thereafter, CPD will solicit, consider, and respond to input, feedback, and recommendations from the community in each district about its policing efforts and strategies. Such practices may include, but are not limited to, direct surveys, community meetings, beat community meetings, and engagement through social media. CPD will identify strategies for soliciting input from individuals that reflect a broad cross section of the community each district serves.*

## Compliance Progress                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          August 28, 2019          ✓ Met     ☐ Missed

**Preliminary:**       *In Compliance* (NEW)
**Secondary:**         *Not in Compliance*
**Full:**              *Not in Compliance*

The IMT finds that the City and the CPD have met Preliminary compliance with ¶46. Specifically, the CPD implemented a multi-faceted engagement approach within the six-month deadline. The IMT acknowledges, however, that the community engagement efforts are a work in progress and require ongoing improvements and refinements.

In assessing Preliminary compliance with ¶46, the IMT reviewed whether the CPD had meaningfully solicited, considered, and responded to community input as required.

During this reporting period, the IMT reviewed documentation of the CPD's efforts to solicit input from community members about each district's policing efforts and strategies, including notes from community conversations sessions, evidence of beat community meetings, and related social media activity. The IMT reviewed CPD notes and data from community conversations provided by the CPD and IMT members who observed several of these sessions. The IMT also reviewed CPD performance management data and data collection processes, which included a data collection effort that surveys a sample of roughly 200 residents per district every month. The IMT examined the CPD Community Engagement Management System (CEMS) and other related background information. The IMT also reviewed the CPD's 2020 plans to solicit district-wide community input.

The CPD is putting together a robust community information gathering infrastructure that will have the capacity to engage community members and stakeholders

using a range of communication, assessment, and data gathering tools. The community input vehicles include the more typical advisory bodies and beat meetings but have also been expanded now to include a series of community meetings in each district often using the World Café format to gather community input on crime reduction priorities, community engagement goals, and select CPD revised and new policies.

The CPD hosted a total of 44 community meetings called "Community Conversations," giving residents in each district an opportunity to provide input on their district's community-driven crime reduction plan. Each district held two meetings, the first to identify crime reduction priorities and community engagement goals. District staff then took input from these sessions to formulate a draft plan overview, which was presented at the second meeting. District staff then took community feedback from these meetings to develop a final draft to share with their District Advisory Committee and Office of Community Policing and CPD executive leadership.

The first sessions had an average attendance of about 60 residents, and the second sessions saw that attendance fall to an average of about 40 residents. The IMT observed several of these sessions and validated participation levels. IMT observers also reported (1) unevenness in facilitator effectiveness, (2) some residents discomfort with the visible presence of armed officers, (3) a lack of attendance from young Chicagoans, and (4) a lack of attendance from Chicagoans from marginalized communities most impacted by police services. The CPD acknowledges areas where they can improve the effectiveness of these meetings. Moving forward, the CPD will take the following steps:

- The CPD will significantly expand the scope of training, offering the training to a broader set of stakeholders; and

- The CPD will continue establishing stakeholder working groups to provide additional consultation and input opportunities on policies with high interest and impact.

The CPD, through its Elucd district-level surveys, is tracking trust levels and community perceptions of safety on a monthly basis.[58] These surveys use social media platforms to ascertain views, but they may not reach methodological thresholds of more traditional sampling approaches. Nevertheless, they are used as indicators of sentiment and provide meaningful trend data. As part of this process, the CPD is also tracking other relevant metrics, including crime trends, complaint data, foot patrol activity, and school visitations. The CPD has also established CEMS, a comprehensive tracking system for non-enforcement contacts, including meetings attendance, purpose, participation, whether sign-in sheets were collected, and, in

---

[58]   *See* ELUCD, https://elucd.com/.

some instances, outcomes. The CPD is also in the process of expanding social media platforms for greater use to convey information and solicit feedback.

Nonetheless, the CPD continues to struggle in reaching and soliciting input from a broad cross-section of community members, especially groups who have been most adversely impacted by CPD practices. For example, data provided by the CPD on the age of attendees at community conversations reveal that the preponderance of attendees are older and young people are underrepresented. To enhance a broad cross-section of community engagement, the CPD may need to employ specific approaches for outreach to marginalized groups and others, like younger community members.

In sum, the CPD has met Preliminary compliance with ¶46 because of the CPD's multi-faceted approach, which includes (1) 44 community conversations for developing district-wide strategies, (2) additional sessions to ascertain community input on CPD consent decree related policy requirements, (3) surveys in each of the 22 districts, (4) working groups to help develop and revise certain policies, and (5) ongoing Beat meetings throughout the districts. However, the IMT acknowledges a need for the CPD to continue to improve and refine these community engagement strategies and approaches.

In the next reporting period, the IMT will assess the CPD's continued efforts to refine its community engagement process, including (1) more targeted outreach to community stakeholders representing marginalized groups often adversely impacted by police services, (2) improved design of community input sessions, and (3) greater use of working groups comprised of interested community stakeholders. The IMT will also monitor stakeholder and staff training relating to community engagement processes. The IMT continues to review whether the CPD considers and responds to the community input derived from these various engagement tools. Such review includes assessing the crime reduction strategies for both district-wide and department-wide strategies to ensure community members' sentiments are reflected.

# Community Policing: ¶47

*47.* *Within 180 days of the Effective Date, CPD will develop pro-cedures to annually evaluate the effectiveness of the Depart-ment's efforts and strategies for building community partner-ships and using problem-solving techniques aimed at reducing crime and improving quality of life. CPD will determine any nec-essary adjustments based on its annual evaluation.*

## Compliance Progress                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          August 28, 2019          ☐ **Met**   ☑ **Missed**

**Preliminary:**          *Not in Compliance*
**Secondary:**          *Not in Compliance*
**Full:**          *Not in Compliance*

The IMT concludes that the City and the CPD have not met Preliminary compliance with this paragraph because the standard operating procedure governing its per-formance management assessment process has not been finalized for implemen-tation.

To assess Preliminary compliance, the IMT determined whether the CPD devel-oped procedures to address this paragraph's requirements. Specifically, the IMT reviewed a draft of the Office of Community Policing Performance Management standard operating procedure. Additionally, the IMT reviewed Performance Man-agement Briefing materials from September 17, October 30, and December 17, 2019, which included a range of assessment data. The IMT participated in an on-site briefing that covered the performance management team's operations and challenges.

Within the Office of Community Policing, the Performance Management team em-ploys a performance management process that measures, manages, and reports on community-participation data. The performance management process tracks police performance by district, and its reporting cycle occurs monthly. The CPD has made significant investments in a system that tracks an array of metrics, including the following:

- Survey data on perceptions of community trust of CPD;

- Engagement levels (*e.g.*, community meetings);

- Community Concern data (issues raised by residents at CPD meetings);

- Strategic Plan Progress (focus metrics tied to strategy goals);

- Events usage trends (foot patrols, positive resident interaction);

- Crime complaints;

- Shooting incidents;

- Calls for Service; and

- Radio Assignments Pending.

Each month, the CPD performance management group analyzes and reports data to the District Commanders, area commands, and executive staff to help inform district-level and City-wide decision-making. Those receiving the data can use it to make tactical and staffing adjustments. The Office of Community Policing and command staff also use this data to (1) identify deviations in perceptions of trust across districts, (2) measure progress and identify areas needing greater attention, (3) assess progress in achieving goals in each district plan, (4) assess district volume, nature, and attendance levels of community meeting and events, and (5) track district use of patrols and school visitations.

The monthly reports include trend analysis and identify data anomalies that require the CPD's interpretation and response. For example, the CPD used performance management survey data to report that community trust scores increased the most in Districts 7, 6, and 11 between November 2018 and November 2019, while other districts saw their trust score decrease during that same period. The CPD reported that street and traffic issues continue as the most significant community feedback category. The CPD also uses this system to track community participation in community conversions meetings.

The IMT concludes that the CPD has not met Preliminary compliance with this paragraph. The CPD Performance Management standard operating procedure provides a framework to capture information that the CPD can use to evaluate the effectiveness of its efforts and strategies for building community partnerships and using problem-solving techniques aimed at reducing crime and improve quality of life, but the CPD has not finalized the procedure.

In the next reporting period, the IMT is expecting that the CPD will finalize the performance management standard operating procedure after the consent decree review period is complete. Furthermore, the IMT expects the CPD will continue evolving the performance management process, increasing its capacity for granularity in its measurement. The IMT is especially interested in using this tool to assess better the effectiveness and impact of district level and city-wide specific policing practices, such as foot patrols, partnerships with community-based organizations, and saturation patrols. The performance process outlined in the standard

operating procedure should produce descriptive data. However, whether the process is a useful evaluation tool remains unclear. The system may need some augmentation in how it analyzes and configures data to make a better determination of effectiveness. As the CPD makes adjustments to the process, we will review its efforts to effectively train CPD members on the performance management process.

# II. Impartial Policing

## Guiding Principles

The IMT assessed compliance with applicable Impartial Policing paragraphs in accordance with the consent decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **49.** The Parties agree that policing fairly, with courtesy and dignity, and without bias is central to promoting broad community engagement, fostering public confidence in CPD, and building partnerships between law enforcement and members of the Chicago community that support the effective delivery of police services.

> **50.** In conducting its activities, CPD will provide police services to all members of the public without bias and will treat all persons with the courtesy and dignity which is inherently due every person as a human being without reference to stereotype based on race, color, ethnicity, religion, homeless status, national origin, immigration status, gender identity or expression, sexual orientation, socio-economic class, age, disability, incarceration status, or criminal history.

> **51.** CPD will ensure its members have clear policy, training, and supervisory direction in order to provide police services in a manner that promotes community trust of its policing efforts and ensures equal protection of the law to all individuals.

# Summary of Compliance Assessments

In the second reporting period, the City and the CPD made progress in the development and revision of certain policies regarding impartial policing. The CPD did significant background work on other policies.

Moreover, the CPD initiated the multi-stage process of engaging the community in the development of impartial policing policies. Community engagement efforts are critical across the Impartial Policing section of the consent decree. Compliance during the second reporting period required high-quality, targeted community engagement around impartial policing topics, per ¶52:

> In developing or revising policies and training referenced in this section, CPD will seek input from members of the community and community-based organizations with relevant knowledge and experience through community engagement efforts.

Because community engagement is crucial, and because effective community engagement was a primary obstacle to compliance during this reporting, we provide an overview of community engagement efforts in this summary.

In January of 2020, the CPD informed us that all policies pertaining to impartial policing would be developed according to the new policy on community engagement for policy development, using the "open space technology" meeting format.[59] Accordingly, the CPD held four "Community Conversations" in February 2020. These open forums, which community members to comment on pre-selected topics, represent one component of the multi-faceted engagement process.

The strategy used in these Community Conversations raised the following concerns regarding engagement with marginalized groups:

1. Although the CPD has made a good-faith effort to reach out to the community via social media, the extent to which the groups identified in ¶53 were represented at these gatherings is unknown due to lack of record-keeping, and some of the participants were personal invitees of police officers.

2. Instead of scheduling the meetings throughout a few months and providing sufficient notice to community members to allow for ample attendance, the CPD scheduled all four meetings for the month of February (a month marked by unideal weather and traveling conditions) and provided only short notice of

---

[59] "Open Space Technology" describes a meeting style used to productively engage all attendees. *See* https://openspaceworld.org/wp2/what-is/.

the Community Conversations to the public. These actions may have pre-vented a large subsection of community members from attending.

3.  The CPD sought to cover too many topics—as many as 14 topics in each meet-ing—which prevented in-depth discussion of any one subject and limited the community's ability to participate in multiple topics.

4.  The meetings' breakout sessions did not provide a safe environment for com-munity members to express their true feelings, especially those with negative police experiences. For example, participants had difficulty determining who was a police officer and who was a community member (given that some CPD officers were in plain clothes), and some community members also objected to the presence of armed police officers as intimidating. Furthermore, the breakout discussion groups did not focus on policy review or specific issues in the directives.

5.  Police officers, who represented a significant number of those in attendance, were not restricted from talking during the roundtable discussions, and some-times did not remain neutral. This could have the effect of discouraging com-munity members who had adverse opinions from speaking up during the meet-ings.

6.  The compilation of community feedback from these Community Conversations was not coherent—the 343-page Excel sheet was difficult to read and did not provide the community or the IMT with easily accessible information.

Overall, we acknowledge the Community Conversations as a good-faith effort by the CPD, but they were generally unable to produce in-depth, experience-based community feedback on the Impartial Policing paragraphs. The upcoming stake-holder working groups should serve as a better vehicle for achieving this objective, although the presence and role of police officers in working group meetings will need to be more carefully designed.[60]

According to the CPD, it conducted some outreach activity with specific groups, such as the deaf and hearing-impaired community. However, the CPD has not kept the IMT informed about these events, before or after their occurrence. We have requested meeting documentation (*e.g.*, attendee lists, agendas, minutes, or notes), but the CPD provided only partial responses—and at the very end of the reporting period. As a result, the IMT is unable to assess the nature, extent, and quality of these community engagement events.

---

[60]  A working group refers to a small group of community members and stakeholders that have a particular interest or expertise in a policy subject matter.

The IMT encourages the CPD and the City to keep us informed of meetings, events, or initiatives where relevant information is discussed. We also suggest the CPD and the City share with us the results of these efforts, as reflected in meeting notes or other documents. By providing us with this information, we will be able to better assess the events and include this information in our compliance assessments.

Additionally, some community groups—including Coalition members—remain concerned that meetings run by the police, regardless of size, will be problematic. Because of this concern, those community groups have begun to organize their own meetings to gather targeted input from marginalized groups. Some groups have also expressed concern about not being engaged by the CPD at the front end and not being treated as equal partners in the community engagement process. Thus, we encourage the CPD and the City to support these non-CPD efforts and work to overcome these perceptions.

In sum, the IMT assessed the City's compliance with 13 of the consent decree's Impartial Policing paragraphs with deadlines in Year One (¶¶58, 60, 61, 63–71, and 76) and three foundational paragraphs (¶¶53, 72, and 74). We assessed one of these paragraphs in the first reporting period (¶58), finding that the City and the CPD did not meet Preliminary compliance.

In the second reporting period, we have determined that the City moved into Preliminary compliance for three paragraphs with deadlines in Year One (¶¶65–67). Thus, the City failed to reach Preliminary compliance in the remaining 10 paragraphs with deadlines in Year One (¶¶58, 60, 61, 63–64, 68–71, and 76). *See* Figure 22 below.

Figure 22:    Compliance Status at the End of the Second Reporting Period (February 29, 2020) for Impartial Policing Paragraphs with Deadlines in Year One



The City had 12 new deadlines in the second reporting period. The IMT determined that the City met deadlines for one new paragraph (¶65) but missed the other 11 new deadlines (¶¶60–61, 63–64, 66–71, and 76). The City met two additional underlying requirements before the end of the reporting period (¶66–67). *See* Figure 23 below.

Figure 23:    Total Impartial Policing Deadlines in the Second Reporting Period: 12



Finally, the City did not reach Preliminary compliance for any of the three foundational paragraphs (¶¶53, 72, and 74). *See* Figure 24 below.

Figure 24:    Compliance Status at the End of the Second Reporting Period (February 29, 2020) for Foundational Paragraphs in the Impartial Policing Section

Paragraphs in Compliance (**Preliminary** or **Secondary**)    (0)
Foundational Paragraphs that are Under Assessment    (3)

# Impartial Policing: ¶58

> **58.** *Within 90 days of the Effective Date, CPD will clarify in policy that CPD officers will permit members of the public to photograph and record CPD officers in the performance of their law enforcement duties in a public place, or in circumstances in which the officer has no reasonable expectation of privacy. The policy will also provide that officers may take reasonable action to maintain safety and control, secure crime scenes and accident sites, protect the integrity and confidentiality of investigations, and protect the safety of officers or others.*

## Compliance Progress                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

As in the first reporting period, the IMT finds that the City and the CPD have not met Preliminary compliance with ¶58 because the CPD did not provide community members with a meaningful opportunity to provide feedback regarding the CPD's efforts to comply with this paragraph's requirements.

During the previous reporting period, on August 21, 2019, we provided comments regarding CPD General Order 02-01, *Human Rights and Human Resources*, which is a broad policy that covers many paragraphs, including ¶58. We requested that the CPD revise the directive after seeking the community's input.

On September 25, 2019, the CPD received feedback on G02-01 from members of the *Communities United* plaintiffs, including the Community Renewal Society, Next Steps, ONE Northside, Equip for Equality, and the ACLU.[61] This feedback included a number of strong recommendations relevant to other paragraphs (*e.g.*, ¶¶50, 53, 55, 56, 59, 64, 68, and 69), but did not include recommendations regarding ¶58.

In February 2020, the CPD began its community engagement strategy with a series of "Community Conversations." To help community members with limited English proficiency gain access to G02-01 during the Community Conversations, the CPD provided translated versions of the directive. Such accessibility efforts are a step in the right direction but do not go far enough regarding this paragraph. While

---

[61] The *Communities United* plaintiffs are part of the Coalition. *See* ¶669.

these meetings were organized, the topic of photographing or recording CPD officers was not one of the 14 topics on the agenda.

Furthermore, we have not received a revised version of G02-01 that reflects the recommendations by the IMT, the OAG, or members of the community. Until the CPD engages the community regarding ¶58 and provides a revised policy that is responsive to previously identified concerns, we cannot find the CPD in Preliminary compliance for this paragraph.

Moving forward, the CPD should engage the community on the requirements of ¶58 specifically. The IMT will observe and review records reflecting the CPD's engagement, including the CPD's outreach methods, meetings, and follow-up. Once we can confirm that the CPD engaged the community regarding this paragraph and incorporated the comments it receives from various stakeholders, we will monitor its efforts to incorporate the policy changes into applicable trainings.

# Impartial Policing: ¶60

**60.** *Within 365 days of the Effective Date, CPD will develop and implement a policy guiding officers' interactions with members of religious communities. The policy will include, but not be limited to, instruction on interacting and searching individuals with garments or coverings of religious significance.*

---

**Compliance Progress**                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**            February 29, 2020          ☐ **Met**   ☑ **Missed**

**Preliminary:**        *Not in Compliance*
**Secondary:**         *Not in Compliance*
**Full:**                   *Not in Compliance*

The IMT finds that the City and the CPD have not met Preliminary compliance because the CPD has not developed a policy guiding officers' interactions with members of religious communities.

Having no policy to review during this reporting period, the IMT focused on the CPD's efforts to engage the community regarding the requirements in ¶60, including the CPD's outreach methods; meetings and interactions; problem-solving and decision-making efforts; and follow-up.

Before the consent decree, the CPD did not have a policy that focused specifically on interactions with members of religious communities. As such, this paragraph requires the CPD to develop a new directive. The CPD initiated its community engagement process to begin the development process. One of the 14 topics discussed during the February 2020 "Community Conversations" was "Interactions with Faith-based Communities." One suggestion from the Community Conversations was instituting community-sponsored sports or activities that include the police—although the CPD will need to assess the merits of any suggestions they receive.

While the Community Conversations format has generated some information, we await the CPD's effort to create a working group with faith-based communities. During this process, we encourage the CPD to pay particular attention to members of religious communities who have been the victims of hate crimes, including the Muslim and Jewish communities. In the next reporting period, we will focus particularly on the CPD's incorporation of the community feedback in the new directive.

## Impartial Policing: ¶61

**61.** *Within 180 days of the Effective Date, CPD will review and, as necessary, revise its policies guiding CPD members' interactions with transgender, intersex, and gender nonconforming individuals, including protocols for arrests, pat downs and searches, transportation, and detention, in order to ensure that, at a minimum: a. terms are properly defined; b. CPD members address individuals, using the names, pronouns, and titles of respect appropriate to the individual's gender identity as expressed or clarified by the individual; c. CPD members refer to individuals in documentation by the name and gender identity as expressed or clarified by the individual, in addition to the information provided on the individual's government-issued identification; d. where same-sex pat downs or searches are required by law or CPD policy, CPD members will respect the gender identity as expressed or clarified by the individual and not rely on proof of the individual's gender identity, such as an identification card, except when a pat down is immediately necessary and waiting for an officer of the same gender would compromise officer or public safety; e. absent exigent circumstances, a transgender, intersex, or gender nonconforming individual is not transported or detained with individuals of a different gender, and that when determining the gender of that individual, CPD members will respect the gender identity as expressed or clarified by the individual and not rely on proof of the individual's gender identity, such as an identification card; and f. CPD members are prohibited from inquiring about intimate details of an individual's anatomy, or medical history, except as necessary to serve a valid law enforcement purpose.*

### Compliance Progress    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**    August 28, 2019    ☐ **Met**    ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The IMT finds that the City and the CPD have not met Preliminary compliance with ¶61, because the CPD has not completed revising its policy guiding CPD members' interactions with transgender, intersex, and gender nonconforming individuals and did not give the IMT or the OAG a meaningful opportunity to review the current draft policy.

Specifically, we have reviewed earlier drafts that the CPD provided to community groups and the community groups' feedback regarding those drafts, but the CPD did not formally provide us with its draft policy until 24 hours before the end of the review period. This did not provide adequate time for the IMT to review the current draft. Therefore, in assessing compliance, the IMT focused on assessing the CPD's community engagement efforts regarding this paragraph, including the CPD's outreach methods; meetings and interactions; problem-solving and decision-making efforts; and follow-up.

After the IMT reached out to LGBTQI community advocates and requested evidence of community engagement from the City and the CPD, we learned that members of the LGBTQI community have been seeking major changes to the CPD policy and training since 2017. In April of 2018, a group of eight organizations who advocate for the LGBTQI community submitted a detailed set of recommendations to improve the CPD's 2016 General Order G02-01-03, *Interactions with Transgender, Intersex, and Gender Nonconforming (TIGN) Individuals* (last revised in 2016). Up until the last six months, many of the advocate groups' recommendations had gone largely unaddressed.

After more than a year of inaction by the CPD, on June 12, 2019, this same group of eight organizations resubmitted their recommendations on G02-01-03 and requested a meeting. Two months later, the CPD responded with revisions to G02-01-03—a revision not shared with IMT—and then agreed to a meeting on September 19, 2019, three months after the original meeting request.

In response to an IMT request, the City provided meeting notes from the September meeting between the Mayor's Office, the CPD, and community advocates. The advocates continued to press for additional changes in the policy insisting that the CPD respect the gender identity expressed by each individual.

On Friday, February 28, 2020, one day before the end of the IMR-2 reporting period, the City provided a revised draft of G02-01-03 (but without revisions highlighted) and notes from prior meetings. This draft will be reviewed by the IMT according to the review timeline outlined in ¶¶627–37, which requires, among other things, a 15-day public comment period. Given the late submission, the CPD could not have finished the review process and implemented a revised, compliant policy in the second reporting period.

In sum, although the CPD was initially slow to engage with the LGBTQI community, the extent and quality of input from advocates have been exemplary since the Mayor's Office has become involved. Advocates for the transgender, intersex, and gender nonconforming (TIGN) community have submitted detailed recommendations on the CPD's current policy. The CPD has been responsive to most of the recommendations from one TIGN working group, although some issues remain to be negotiated. The most critical unresolved issues include where to house detainees

waiting for a court appearance (central or local facilities) and whether, for safety purposes, TIGN detainees will be given the option of being in a cell alone or with men or with women. This working group is planning to make site visits to assess the limitations of the current facilities.

We acknowledge that the CPD has held "Community Conversations" on TIGN issues, but as discussed in the Summary of Compliance Assessments section, above, this format is not likely to attract those individuals who have had the least positive experiences with the CPD. As such, we commend the TIGN working group for facilitating focus groups with those most affected, without the CPD's input.

The input and feedback from the TIGN working group facilitated by the Mayor's Office, with extensive expertise, could be a community engagement model for other protected classes, as defined in the Impartial Policing section of the consent decree.

On the other hand, the abundance of community engagement for ¶61 has unveiled other problems. On August 29, 2019, another group of seven LGBTQI advocacy organizations (led by the Barnard Center for Research on Women) provided a comprehensive set of recommendations relevant to ¶¶61 and 63. To date, this group has received no feedback from the City or the CPD other than an acknowledgment of receipt from the City's Law Department. In November of 2019, the IMT encouraged the City and the CPD to address the input from each major stakeholder group and that they resolve any differences between the various stakeholders' feedback.

Moving forward, to achieve Preliminary compliance, the City and the CPD would need to: (1) make a concerted effort to respond to the recommendations of all relevant advocacy and service groups; (2) give the IMT and OAG the opportunity to review the draft policy; and (3) then provide a reasonable response to the recommendations.

# Impartial Policing: ¶63

**63.** *Within 180 days of the Effective Date, CPD will develop and implement a policy that prohibits sexual misconduct by CPD members. The policy will be consistent with best practices and applicable law and will provide definitions of various types of sexual offenses, including those that are not criminal in nature.*

| Compliance Progress | (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020) |
|---|---|

**Deadline:**  August 28, 2019  ☐ Met  ☑ **Missed**

**Preliminary:**  *Not in Compliance*
**Secondary:**  *Not in Compliance*
**Full:**  *Not in Compliance*

The IMT finds that the City and the CPD have not met Preliminary compliance with ¶63. The CPD submitted its first draft of General Order G08-05, *Prohibition of Sexual Misconduct*, 24-hours before the close of the second reporting period. To our knowledge, the policy still lacks community input and has not been reviewed by anyone outside of the CPD. The City and the CPD provided G08-05 too late in the reporting period for the IMT, the OAG, or the community to meaningfully review within the second reporting period.

During this reporting period, the IMT primarily focused on assessing the CPD's community engagement efforts because the draft policy was not timely provided for meaningful assessment. During the third reporting period, we will review the recently provided draft and the underlying research that the CPD relied on when drafting the policy.

The CPD has sought community engagement by including sexual misconduct as one of 14 topics covered during the CPD's "Community Conversations." However, as previously discussed, the IMT's observations indicate that many of the participants at these tables were CPD officers, which may have made it difficult for any victims to feel comfortable discussing their experiences. An alternative, like the working group format, is needed to engage the relevant community on this topic. The CPD explains that it has begun a community and stakeholder working group to address this paragraph, but we are waiting for records reflecting the working groups' membership and scheduled meetings.

The Coalition informed us that, during the consent decree negotiations, they offered guiding principles and recommendations about sexual misconduct. And on August 29, 2019, the CPD received a 26-page memorandum from a different group of seven advocacy groups that included a detailed draft policy on sexual misconduct, as well as a draft policy on interactions with TIGN individuals. To our

knowledge, the CPD has not responded to, or otherwise communicated with, these organizations.

Because the CPD—during this reporting period—has not officially responded to the groups that submitted recommendations regarding the sexual misconduct, and because the newly provided policy could not have been reviewed by the community, the OAG, or the IMT in the second reporting period, we find that the CPD has not met Preliminary compliance.[62]

We recognize that coordinating and responding to diverse and sometimes conflicting recommendations from multiple stakeholders can be very challenging. Moving forward, we will continue with the policy review process and monitor the CPD's targeted community engagement, including outreach methods; meetings; interactions; incorporation of feedback; and follow-up.

---

[62] The City provided a draft policy to the Coalition for review after the end of the reporting period. *See* City Comments, Attachment B.

# Impartial Policing: ¶64

**64.** *Within 180 days of the Effective Date, CPD will review and, to the extent necessary, revise its language access policy to provide meaningful access to CPD programs and services for individuals who have a limited ability to speak, read, write, or understand English. CPD will ensure that its language access policy provides timely and meaningful access to police services for individuals with limited English proficiency ("LEP"). CPD will also require that qualified and Department-authorized interpreters are used in accordance with CPD policy, including for the provision of Miranda warnings. CPD will publish its language access policy on its website and, consistent with the requirements of Paragraph 28 of the Community Policing section of this Agreement, make the policy available to community-based groups serving LEP communities in Chicago.*

---

**Compliance Progress**       (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**       August 28, 2019       ☐ **Met**   ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The IMT finds that the City and the CPD have not met Preliminary compliance with ¶64 because the CPD has not finished revising its language access policy.

To assess Preliminary compliance, we reviewed the CPD's revised draft of its language access policy, Special Order S02-01-05, *Limited English Proficiency* (LEP); related documents; and the CPD's community engagement efforts regarding S02-01-05.

During this reporting period, we provided comments regarding the LEP policy. These comments asked the CPD to, among other things, (1) not restrict LEP services to incidents involving police reports; (2) provide clarity on the process of certifying Department-Authorized interpreters; (3) narrow the circumstances where non-authorized interpreters can be used; (4) use independent interpreters when investigating complaints against the CPD; and (5) take a systematic approach to translating specific policies into non-English languages. We also encourage more engagement of LEP communities in the policy development and policy review process, along with documentation of these efforts.

"Limited English Proficiency and Language Access" was one of the 14 topics covered during the "Community Conversations," but a working group or focus group

with LEP individuals and experts is needed to obtain adequate community input. As noted by community members, CPD officers need greater awareness of, and access to, the Language Line interpreting phone number.

Moving forward, we will assess whether the CPD incorporates our feedback and the community input into a revised LEP policy. After the CPD implements a policy sufficient to address this paragraph's requirements, we will monitor the CPD's training regarding the new policy. Furthermore, we will review the CPD's efforts to ensure the policy is available to community-based groups serving LEP communities.

# Impartial Policing: ¶65

**65.** *Within 180 days of the Effective Date, the City will designate a language access coordinator who will coordinate with CPD and review CPD's compliance with its language access policy and Section 2-40 of the Municipal Code of Chicago. The City's language access coordinator will assess the effectiveness and efficiency of CPD's policies on an ongoing basis and will report to the Superintendent or his or her designee any recommendations to revise policy, if necessary.*

---

**Compliance Progress**  (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| Deadline: | August 28, 2019 | ✓ Met | ☐ Missed |

| | |
|---|---|
| Preliminary: | *In Compliance* (NEW) |
| Secondary: | *Not in Compliance* |
| Full: | *Not in Compliance* |

The IMT finds that the City has met Preliminary compliance regarding this paragraph. On August 6, 2019, the Mayor's Office designated the Director of the Office of New Americans, Nubia Willman, as the City's Language Access Coordinator.

To determine if the City met Preliminary compliance with ¶65, we assessed whether the City filled the language access coordinator position with a qualified candidate. During this reporting period, the City provided (1) Ms. Willman's résumé; (2) the Director of the Office of New Americans job description; and (3) a Mayor's Office press release, dated July 25, 2019, which publicly announced Ms. Willman's appointment. Ms. Willman's appears well qualified for the job given her experience with Legal Aid Chicago's Immigration Project and other relevant experiences.

As Director of the Office of New Americans, however, Ms. Willman has many responsibilities beyond serving as the City's Language Access Coordinator. Our understanding is that the CPD is seeking its own language access coordinator, similar to other City agencies, to assist Ms. Willman with the functions required by ¶65 pertaining exclusively to the CPD.

Late in the reporting period, we received a copy of a letter from Ms. Willman to Interim Superintendent Charlie Beck, describing the work she has done in response to ¶65. This letter indicates that she has been meeting regularly with members of the CPD since July of 2019 and has been "assessing the effectiveness and efficiency of CPD's current policies and protocols around language access." However, the IMT has no documentation of these meetings or her assessment other than what appears in this letter. We are aware of the *Language Access Toolkit* that

she provided (*see* our assessment of ¶67 below), but we have not received anything substantial regarding coordination or assessment of the CPD's policies and programs.

We find that the City's designation of Ms. Willman satisfies the first part of ¶65 and that the City met Preliminary compliance. Moving forward, we will monitor the designee's ability to assess the effectiveness and efficiency of the CPD's policies, to coordinate with the CPD, and to review the CPD's compliance with its Limited English Proficiency policy and Section 2-40 of the Municipal Code.

# Impartial Policing: ¶66

*66. Within 365 days of the Effective Date, OEMC will provide training to its police communication supervisors, call-takers, and dispatchers (collectively, "tele-communicators") that is adequate in quality, quantity, type, and scope, and that addresses procedures consistent with CPD policy for responding to calls requiring language access services.*

## Compliance Progress      (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**      February 29, 2020      ☐ **Met**    ☑ **Missed**

**Preliminary:**      *In Compliance* (NEW)
**Secondary:**      *Not in Compliance*
**Full:**      *Not in Compliance*

The IMT finds that the City and the OEMC met Preliminary compliance with the requirements of ¶66. While the OEMC created the requisite training notice, the City and the OEMC failed to meet the deadline because we did not receive sufficient evidence that OEMC tele-communicators received the training.

On February 6, 2020, the OEMC provided the IMT with Training Notice No. TNG 19-004, *Limited English Proficiency*, which outlined the procedure for call takers and dispatchers when interacting with persons with limited English proficiency (LEP). This training went into effect on March 19, 2019, but is based on the CPD's current policy, S02-01-05, which has yet to be revised based on feedback from the IMT, the OAG, and the community. There is minimal overlap, but no real inconsistency between the current policy and the Training Notice. The Training Notice focuses primarily on how call takers should respond to LEP callers but not on how dispatchers should respond to CPD units seeking assistance. We recommend additional clarity for the latter. Also, we note that the Language Line (a phone line to which LEP callers are referred) does not list Arabic as one of the five languages immediately available by push button, even though it is one of four languages required for translation of CPD policies.

Because the OEMC has prepared a Training Notice that seeks to be responsive to the needs of the LEP community and because this Training Notice is largely consistent with the CPD's current Limited Language Proficiency policy, we find the City in Preliminary compliance. To remain in compliance, we expect that the OEMC will revise its training based on awaited revisions to policy S02-01-05. Revisions to the OMEC's Training Notice will also need to incorporate feedback from the IMT, the OAG, and relevant community stakeholders. Moving forward, we will also assess the OEMC's implementation and evaluation of the training outlined in the Training Notice.

# Impartial Policing: ¶67

> **67.** *Within 180 days of the Effective Date, and as necessary thereafter, CPD will translate its language access policy into any non-English language spoken by a limited or non-English proficient population that constitutes 5% or 10,000 individuals, whichever is less, in Chicago, as outlined in Section 2-40-020 of the Chicago Municipal Code. CPD will publish translated versions of its language access policy on its website.*

### Compliance Progress (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:** August 28, 2019 ☐ **Met** ☑ **Missed**

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not in Compliance*
**Full:** *Not in Compliance*

The IMT finds that the City and the CPD achieved Preliminary compliance with the requirements of ¶67. The CPD missed the August 28, 2019 deadline, but has since translated Special Order S02-01-05, *Limited English Proficiency* (LEP)—the CPD's current language access policy—to provide access to community members with limited English proficiency.

The CPD translated its current policy into four additional languages: Arabic, Chinese, Polish, and Spanish. The CPD used the *City of Chicago's Language Access Toolkit* by the Office of New Americans and Office of Community Engagement to guide this decision. These LEP populations have been described as meeting the requirement of the Language Access Ordinance and the consent decree (*i.e.,* comprising 5% of the Chicago population or 10,000 people, whichever is less).

During the second reporting period, as noted in our assessment of ¶64 above, we reviewed the current S02-01-05 (effective Nov 15, 2019), but have not received a second draft for review. In addition to our earlier comments, we note here that the current version does not specifically address the translation requirements defined in ¶67.

In addition to translating S02-01-05, ¶67 requires the CPD to publish these translations on its website. The four translations can be found on the CPD's website, but they are buried within the "Community Conversations on Policy" section. The translations should be easily accessible to those with limited English proficiency. This also applies to other policies and documents as well, where non-English versions are not easily accessible.

Although S02-01-05 requires revision, we find that the CPD is in Preliminary compliance with ¶67 for translating and publishing this policy. After the CPD completes the consent decree review process regarding S02-01-05, to remain in compliance, the CPD needs to translate the updated policy again for appropriate LEP populations. We also expect that the CPD will provide data from the American Community Survey, Census Bureau, or other sources to confirm that the languages selected for translation represent all groups that currently comprise 5% of Chicago's population or 10,000 individuals, whichever is less.

# Impartial Policing: ¶68

**68.** *Before January 1, 2020, CPD will review and, to the extent necessary, revise its policies and practices for ensuring effective communication and meaningful access to CPD programs, services, and activities for individuals with physical, mental, or developmental disabilities. These policies will identify specific procedures and responsibilities applicable to circumstances in which CPD officers encounter persons with intellectual or developmental disabilities, autism, dementia, blindness, deafness, hearing loss, and mobility disabilities, including, but not limited to: a. properly defining terms related to individuals with disabilities and the disability community; b. providing reasonable accommodations, to the extent safe and feasible, in order to facilitate CPD officer encounters with individuals with a disability; c. the arrest and transport of individuals with disabilities or who require the assistance of ambulatory devices; and d. using qualified and Department-authorized interpreters, consistent with CPD policy, to communicate with people who are deaf, hard of hearing, or who have a speech impairment, including for the provision of Miranda warnings.*

## Compliance Progress
(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| Deadline: | January 1, 2020 | ☐ Met | ☑ Missed |
|---|---|---|---|

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The IMT finds that the City and the CPD have not met Preliminary compliance regarding this paragraph because the CPD has not revised its policies for ensuring effective communication and meaningful access to CPD services for individuals with physical, mental, or developmental disabilities.

The CPD began engaging the community for input to inform its revisions to the current S02-01-01, *People with Disabilities*. However, we have not received a revised draft of the policy, nor have we received any details regarding the review process of the other directives that address interactions with people with disabilities. As such, our assessment during this period focuses primarily on CPD's community engagement efforts.

One of the 14 topics covered at the "Community Conversations" in February was "people with disabilities." During the Community Conversations, community members recommended that CPD officers get to know people with disabilities so

that they can better understand and respond to them. They also recommended more training on implicit bias to avoid stereotyping. Again, the Community Conversations format is a good starting point, but it did not allow for a discussion of the CPD's response to specific disabilities (*e.g.*, autism, hearing impaired, Alzheimer's disease, diabetes, etc.) or create a safe space for feedback.

The CPD reports that it is involved in more targeted engagement activities, a working group co-led by the Mayor's Office on Disabilities, but we have not yet received any details.

Considering the CPD has not completed its review and revision of all policies related to individuals with disabilities, we find that the CPD has not met any level of compliance.

During the next reporting period, we will review the revised S02-01-01 and monitor the CPD's efforts to review and revise the remaining policies related to ensuring effective communication and meaningful access to CPD services, programs, and activities for individuals with physical, mental, or developmental disabilities. We will be particularly concerned with the CPD's effort to engage relevant communities with lived experiences and incorporate their feedback.

# Impartial Policing: ¶69

> **69.** *Before January 1, 2020, CPD will develop a training bulletin that provides CPD members guidance on interactions with people with disabilities, including: a. recognizing and responding to conduct or behavior that is related to an individual's disability, including qualifying medical conditions such as Alzheimer's disease and diabetes; b. providing effective communication and minimizing barriers to communication, including by incorporating sign language and other modes of communication used by people who are deaf, hard of hearing, or who have a speech impairment during police-community interactions; c. attending to the specific needs of individuals with disabilities, such as mobility devices, prosthetics, and service animals; and d. recognizing and responding to identified abuse, neglect, or exploitation of individuals with disabilities, including making any notifications required by CPD policy or the law.*

## Compliance Progress  (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**   January 1, 2020   ☐ **Met**   ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The IMT finds that the City and the CPD have not met Preliminary compliance regarding this paragraph because they have not developed a training bulletin that provides CPD members with guidance on interactions with people with disabilities.

Without a training bulletin for us to review, our assessment focuses primarily on the CPD's community engagement efforts regarding the training bulletin development. The CPD has conducted outreach to some stakeholder groups, including the Anixter Center and members of deaf and hearing-impaired communities.[63] The CPD has provided community partners with current directives and training materials for review. However, the CPD has not provided any details to the IMT about meetings or specific feedback. Without such details, we are unable to comment on the adequacy of these engagement activities.

The CPD expects to produce several training bulletins to address different disabilities. We have been informed that training bulletins on responding to individuals with autism and responding to deaf or hearing-impaired individuals have been drafted. Other bulletins under consideration include addressing individuals with

---

[63]   *See* ANIXTER CENTER, https://anixter.org/.

Alzheimer's disease and diabetes. However, much of this work will require input and development from the still-to-be-filled ADA Liaison position, discussed below in our assessment of ¶70. During the next period, we will review any finalized training bulletins and any documentation of community input and feedback to ensure that the bulletins comply with this paragraph and reflects the community's feedback.

## Impartial Policing: ¶70

**70.** *Within 180 days of the Effective Date, CPD will designate at least one member as an Americans with Disabilities Act ("ADA") liaison who will coordinate CPD's efforts to comply with the ADA and: a. regularly review the effectiveness and efficiency of CPD's policies and training as they relate to individuals with disabilities and report to the Superintendent, or his or her designee, any recommended revisions, if necessary, to ensure compliance with the law and this Agreement; b. serve as a resource to assist CPD members in providing meaningful access to police services for individuals with disabilities; and c. act as a liaison between CPD and individuals with disabilities.*

---

**Compliance Progress**                          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | | |
|---|---|---|
| **Deadline:** | August 28, 2019 | ☐ **Met**   ☑ **Missed** |

**Preliminary:**     *Not in Compliance*
**Secondary:**       *Not in Compliance*
**Full:**            *Not in Compliance*

The IMT finds that the City and the CPD have not met Preliminary compliance regarding ¶70 because the CPD has not designated an ADA liaison.

During this reporting period, we reviewed the CPD's efforts to fill the ADA liaison position. We also assessed whether the CPD's efforts are sufficient to ensure that the CPD designates someone qualified to review the effectiveness and efficiency of its policies and training; serve as a resource to assist CPD members in providing meaningful access to policies services for individuals and disabilities; and act as a liaison between the CPD and individuals with disabilities.

The CPD did not request input from the IMT regarding the ADA liaison job description or search process, but they sought input from representatives for some members of the Coalition, including Equip for Equality, a nonprofit group that advocates for people with disabilities.[64] *See* ¶669. To solicit applications, the CPD posted the position with the job title "Americans with Disabilities Act (ADA) Compliance Officer" on December 13, 2019. The City received many applications before the period to submit applications ended on January 10, 2020.

People from a group of organizations that advocate for people with disabilities will provide input on qualifications, expertise, and experience appropriate for this po-

---

[64]    *See* EQUIP FOR EQUALITY, https://www.equipforequality.org/.

sition. Once the ADA Compliance Officer is hired (presumably during the third re-porting period), this person is expected to play an important role in reviewing pol-icy and training on disabilities—thus, helping the CPD respond to ¶68 and ¶69. Although this has been a time consuming process (due to City regulations for hiring civilians), we support the CPD's decision to hire a civilian with specific expertise and experience for the ADA Compliance Officer position, rather than follow a com-mon practice of transferring sworn officers to support positions.

Notwithstanding the CPD's progress toward hiring an ADA liaison, we find that the CPD did not meet Preliminary compliance because the position remains unfilled. Moving forward we will monitor whether the CPD selects someone with the ap-propriate qualifications, expertise, and experience. After the CPD designates the ADA liaison, we will monitor the liaison's ability to perform the responsibilities de-lineated in this paragraph.

# Impartial Policing: ¶71

**71.** *Within 180 days of the Effective Date, CPD will develop a policy for transporting arrested or detained individuals that requires CPD officers to notify OEMC of the start and end of a transport and whether the individual is a juvenile or adult.*

**Compliance Progress**          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          August 28, 2019          ☐ **Met**    ☑ **Missed**

**Preliminary:**          *Not in Compliance*
**Secondary:**          *Not in Compliance*
**Full:**          *Not in Compliance*

The IMT finds that the City and the CPD have not met Preliminary compliance regarding ¶71. While the CPD incorporated the requirement that CPD officers must notify the OEMC of the start and end of a transport and whether the person is a juvenile or adult, the relevant policy is still under revision.

During this reporting period, the IMT reviewed revised drafts of several CPD transport policies. In general, the language added to Section IV.A.11 of General 04-01, *Preliminary Investigations,* and Section II.B of General Order 06-01-01, *Field Arrest Procedures*, is sufficient to meet the requirement of notifying the OEMC, as required by ¶71. However, additional changes to these policies are needed to satisfy the requirements of other paragraphs within the consent decree, and therefore, Preliminary compliance for ¶71 awaits these changes.

In the next reporting period, we will monitor the CPD's progress toward finalizing the Preliminary Investigations and Field Arrest Procedures directives, ensuring that the final drafts still incorporate this paragraph's notice requirement. Once the CPD finalizes these directives, we will assess the CPD's effort to incorporate this paragraph's notice requirements into applicable trainings.

# Impartial Policing: ¶76

**76.** *By January 1, 2020, CPD will review and, to the extent necessary, revise its policies and procedures to ensure that allegations and complaints of hate crimes, as defined by federal, state, and local law, are comprehensively investigated.*

**Compliance Progress**            (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**            January 1, 2020            ☐ **Met**   ☑ **Missed**

**Preliminary:**        *Not in Compliance*
**Secondary:**         *Not in Compliance*
**Full:**                    *Not in Compliance*

The IMT finds that the City and the CPD have not met Preliminary compliance for this paragraph because the revised General Order G04-06, *Hate Crimes*, has not been finalized.

During the reporting period, we reviewed a draft version of G04-06. We provided comments, which the CPD is currently reviewing. The IMT suggestions included the following: give more attention to procedural justice (*i.e.*, investigators treating victims without bias and with respect) and clarify the roles and responsibilities of investigators and supervisors when responding to hate crimes and preparing reports.

We also assessed the CPD's community engagement efforts. The CPD sought community feedback at its "Community Conversations" in February 2020. "Response to Hate Crimes" was one of the 14 topics. During the Community Conversations, community members asked the CPD to be more sensitive to victims of hate crimes, ask questions, learn the terminology, and learn how to speak with TIGN individuals (*e.g.*, avoid "deadnaming").

We are pleased that the CPD is planning to convene a stakeholder working group on hate and bias crimes where the CPD can obtain feedback from experts and those with lived experience. During the next reporting period, we will assess the CPD's efforts to engage the working group and incorporate the feedback received during Community Conversations, meetings with the working group, and feedback received from the IMT and the OAG. Once the CPD finalizes the policy, we will assess the CPD's progress toward training its members on the new policy.

# Impartial Policing: Foundational Paragraphs

As noted in the Monitoring Plan for Year One, the IMT has identified several "foundational paragraphs" within the Impartial Policing section of the consent decree: ¶¶53, 72, and 74.

\*\*\*

## Consent Decree ¶53

> **53.** CPD will, consistent with this Agreement, ensure that its policies and practices prohibit discrimination on the basis of any protected class under federal, state, and local law, including race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military status, source of income, credit history, criminal record, or criminal history. CPD's policies and practices will prohibit retaliation consistent with Section 6-101 of the Illinois Human Rights Act (eff. Jan. 1, 2015) and Section 2-160-100 of the Municipal Code of Chicago (amended Oct. 11, 2017).

## Compliance Status

Paragraph 53 goes to the heart of the consent decree and captures the essence of all paragraphs within the Impartial Policing section and many other paragraphs throughout the agreement: namely, the CPD will *"ensure that its policies and practices prohibit discrimination on the basis of any protected class under federal, state, and local law."* The overall challenge for the CPD is to provide *"equal protection of the law to all individuals"* (¶51) and treat all individuals fairly and respectfully. This should not only ensure constitutional policing but (as shown by research) will strengthen the legitimacy of the CPD as a public institution; rebuild public trust on the streets of Chicago; increase public compliance and cooperation with the police; and reduce unnecessary injuries and deaths.

After CPD policies have been revised or newly introduced, the fundamental questions will be, "How will we know if the CPD's changes have been successful and are such changes making a difference on the street in terms of minimizing bias or discrimination?" The City and the CPD have expressed an interest in answering these questions, so we encourage them to carefully consider ways of monitoring performance and measuring operational success.

On a daily basis, police officers make decisions that may or may not reflect impartial policing, including the decision to stop a car or pedestrian; to treat various community members with equal respect and dignity; to issue a warning or citation; to conduct a search; to make an arrest; to use some level of force; and to make a

complete and accurate report of the events. In each of these decisions, there is the question of equal treatment and how to accurately assess whether actions were taken without prejudice.

For example, CPD data show that young Black males between the ages of 18 and 25 makeup only 2.4% of Chicago's adult population but account for 24.5% of all investigatory stops made by the CPD during the two-year period ending in January 2018.[65] This police response is 10 times higher than expected from population statistics. Also, Black males of all ages are the recipients of 62.3% of all force applications by the CPD between 2015 and 2019, yet comprise only 11.4% of the total Chicago population.[66] The CPD must consider—along with input from the community, appropriate benchmarks, and sound analytical techniques—whether such large disparities in police decision-making reflect bias or prejudice. We encourage the CPD to examine data on stops, uses of force, and other police decisions on a district-by-district level, given the uneven distribution of race and ethnicity in Chicago. The level of procedural justice exhibited by police officers citywide and in each district is important to ascertain.

Our own preliminary fieldwork and fieldwork by the University of Illinois at Chicago suggest that many young people of color feel disrespected and mistreated by CPD officers. We must also understand the nature and extent of the problem for other marginalized groups, including the transgender community. For example, a recent report from the National Center for Transgender Equality found systemic gaps in the policies of the largest 25 police departments that fail to protect transgender people from mistreatment and misidentification during arrests, interviews, search and seizure, and detention.[67] (The limits of Chicago's policy were also identified in this report.) But actual patterns of treatment in the community remain unknown.

For other protected classes, we hear about individual cases covered by the media. These include the shooting of an unarmed autistic man by the CPD,[68] and the accusation of sexual assault of a transgender woman of color by a CPD sergeant.[69] However, because the CPD has not provided us with data, we have no data-driven

65  *See Investigative Stop Report Data*, CHICAGO POLICE DEPARTMENT, home.chicagopolice.org/isr-data. *See also U.S. Census Data for Social, Economic, and Health Research*, IPUMS USA, www.usa.ipums.org/usa.

66  *See Use of Force Dashboard*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

67  *See Failing to Protect and Serve: Police Department Policies Towards Transgender People*, NATIONAL CENTER FOR TRANSGENDER EQUALITY (2019), www.transequality.org/police.

68  *See* Matthew Hendrickson, *CPD to Hire Officer to Improve Relations with Residents with Disabilities after High-profile Confrontations*, CHICAGO SUN-TIMES (January 3, 2020), https://chicago.suntimes.com/crime/2020/1/3/21047299/cpd-reform-consent-decree-chicago-police-disabilities.

69  *See* Adam Rhodes, *Chicago Police Plans to Tap City-wide LGBT Liaison*, MEDILL REPORTS (January 27, 2020), https://news.medill.northwestern.edu/chicago/chicago-police-plans-to-tap-city-wide-lgbt-liaison/.

understanding of the nature or extent of such problems that may arise when CPD officers interact with vulnerable or protected segments of the community.

To achieve full transparency and accountability, the CPD will need to provide data to demonstrate that claims of disproportionate mistreatment and the use of excessive force against vulnerable populations are not supported by the evidence. Given the size of the populations affected (*e.g.*, according to the U.S. Census, over 600,000 Chicagoans have a disability and over 382,000 have limited English proficiency), keeping good records on police responses to these protected classes is especially important.

To ensure impartial policing, we recommend that the CPD develop a public dashboard that provides a breakdown of key police decisions by demographic characteristics of the community member and other defining features of protected classes. The CPD is explicitly required to release demographic information about the race, ethnicity, age, and gender of a person subjected to use of force (¶583(c)).

Likewise, throughout the consent decree, the CPD is required to engage in constitutional policing that is fair to all protected classes, which can only be verified with actual data from police interactions with the public. This would include documenting efforts to de-escalate intense encounters and to engage in procedurally just actions, including "developmentally appropriate responses" to youth (¶32).

We also recommend that the CPD establish ways to "measure what matters" to the public. Our work in Chicago indicates that effective law enforcement requires public trust, which is built on the belief that police officers will treat people fairly and with dignity. Developing reliable and valid measures of community trust and perceived legitimacy is important to document progress. Equally important is the measurement of procedural justice during the CPD's encounters with community members, as the quality of police-community interactions is what drives trust and legitimacy. These encounters can be measured with contact surveys conducted by an independent survey organization and by the analysis of body-worn-camera footage, complaints, incident reports, and other police records.

In short, the challenge for the CPD going forward, in addition to making changes to policies and training programs, is to create systems of measurement and accountability that can (1) accurately monitor police behavior regarding impartial policing and other indicators of organizational performance and (2) result in self-corrections that are indicative of an evidence-driven "learning organization."

## Consent Decree ¶72

> **72.** *The Parties recognize that training is a necessary component of impartial policing. CPD will integrate the concept of impartial policing into related CPD training courses when appropriate, including, but not limited to, use of force courses, weapons training courses, and Fourth Amendment subjects courses.*

### Compliance Status

The integration of impartial-policing concepts and practices into CPD training courses is critical if we expect changes in police behavior on the streets. However, the IMT expects that the CPD will revise and update relevant policies, with input from the community, before modifying the current training curricula. The IMT will take a closer look at specific CPD training courses for the inclusion of impartial policing after the first round of policy changes has been completed.

## Consent Decree ¶74

> **74.** *Consistent with the requirements set forth in the Training section of this Agreement, CPD will incorporate the concept of impartial policing into its annual in-service training for all officers, including supervisors and command staff, by providing training on the following topics: a. CPD's anti-bias and impartial policing policies, including, but not limited to, the policies referenced in this section unless otherwise required; b. refreshers of topics covered in Procedural Justice; c. appropriate use of social media; d. cultural competency training that prepares officers to interact effectively with people from diverse communities including, but not limited to, people of color, LGBTQI individuals, religious minorities, and immigrants; e. recognizing when a person has a physical, intellectual, developmental or mental disability, including protocols for providing timely and meaningful access to police services for individuals with disabilities; and f. the specific history and racial challenges in the City of Chicago.*

### Compliance Status

Incorporating impartial policing concepts and practices into the CPD's annual in-service training for all officers is especially important. Paragraph 74 delineates some specific topics that should be covered, and the IMT will use the Analysis, Design, Development, Implementation, and Evaluation (ADDIE) model of curriculum development to evaluate the CPD's training in this area. From needs assessment and community engagement to training delivery, we will expect that the

CPD's training will be evidence-based and consistent with best practices. Procedural justice and cultural competency are critically important topics for achieving fair and respectful policing, as documented in dozens of research studies around the world. Thus, the IMT will pay particular attention to how these training sessions are planned and delivered.

The IMT will also monitor the CPD's methods for evaluating the content, delivery, and effectiveness of the CPD's training (for both ¶¶72 and 74). True "learning organizations" have valid systems of measurement and feedback loops that assess the impact of organizational decisions and allow for immediate course corrections as needed.

# III. Crisis Intervention

## Guiding Principles

The IMT assessed compliance with applicable Crisis Intervention paragraphs in accordance with the consent decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **83.** *CPD officers often serve as first responders to individuals experiencing a behavioral or mental health crisis. These individuals may exhibit symptoms of known, suspected, or perceived behavioral or mental health conditions, including, but not limited to, mental illness, intellectual or developmental disabilities, or co-occurring conditions such as substance use disorders. The Parties acknowledge that having a mental illness, an intellectual or developmental disability, or co-occurring condition does not mean an individual necessarily is in crisis, or that having a behavioral or mental health condition would necessarily be the reason for any crisis that requires police involvement. However, it may need to be considered or warrant heightened sensitivity to ensure an appropriate response. Therefore, individuals in the groups listed above will be collectively referred to as "individuals in crisis" for the purposes of this Agreement.*

> **84.** *A person may be a suspected individual in crisis based on a number of factors, including, but not limited to, self-reporting; information provided by witnesses, family members, or individuals requesting service; CPD's previous knowledge of the individual; or an officer's direct observation.*

> **85.** *CPD officers will interact with individuals in crisis with dignity and respect. The use of trauma-informed crisis intervention techniques to respond appropriately to individuals in crisis will help CPD officers reduce the need to use force, improve safety in police interactions with individuals in crisis, promote the connection of individuals in crisis to the healthcare and available community-based service systems, and decrease unnecessary criminal justice involvement for individuals in crisis. CPD will allow officers sufficient time and resources to use appropriate crisis intervention techniques, including de-escalation techniques, to respond to and resolve incidents involving individuals in crisis. To*

*achieve these outcomes, the City and CPD will implement the re-quirements set out below.*

*86. The City and CPD are committed to exploring diversion pro-grams, resources, and alternatives to arrest for individuals in cri-sis.*

# Summary of Compliance Assessments

During the reporting period, the IMT worked with CPD, the Office of Emergency Management and Communications (OEMC), and the Crisis Intervention Advisory Committee (Advisory Committee) to address issues related to policy, training, and community engagement. Additionally, the IMT received preliminary data analysis from the CPD, as well as proposed steps to meet the requirements regarding the Crisis Intervention Team program. While we believe the CPD, the OEMC, and the City have made initial progress regarding some of these reform efforts, more work is needed. This is particularly true for data reliability and Advisory Committee engagement. The IMT looks forward to continued progress on all of the requirements in the Crisis Intervention section.

While this section of the consent decree requires actions by various City entities, including the CPD, the OEMC, and the Advisory Committee, the City bears the ultimate responsibility for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all of those entities have met the corresponding level of compliance. We explain, however, the status of each entity's efforts for each applicable paragraph.

In sum, the IMT assessed the City's compliance with 12 Crisis Intervention paragraphs of the consent decree with deadlines in Year One (¶¶89, 99, 107–10, 118, 122, 131, 137, 142, and 151) and 11 foundational paragraphs (¶¶91–92, 116, 120, 121, 123, 125, 128, 129, 130, and 132). We assessed one of these paragraphs in the first reporting period (¶142), finding that the City and the Office of Emergency Management and Communications (OEMC) met Preliminary and Secondary compliance.

In the second reporting period, we determined that the City moved into Preliminary compliance for two paragraphs with deadlines in Year One (¶¶99 and 131) and maintained Preliminary and Secondary compliance for one paragraph (¶142). The City failed to reach Preliminary compliance in the remaining 9 paragraphs with deadlines in Year One (¶¶89, 107–10, 118, 122, 137, and 151). *See* Figure 25 below.

Figure 25:     Compliance Status at the End of the Second Reporting Period (February 29, 2020) for Crisis Intervention Paragraphs with Deadlines in Year One

Paragraphs in Compliance (Preliminary or Secondary)     (2)  (1)  (3)

Paragraphs with Requirements Not in Compliance (*including under assessment*)     (9)

The City had 11 new deadlines in the second reporting period. The IMT determined that the City met deadlines for two new paragraphs (¶¶99 and 131) but

missed the remaining 9 new deadlines (¶¶89, 107–10, 118, 122, 137, and 151).
The City did not meet any other underlying deadline requirements before the end
of the reporting period. *See* Figure 26 below.

Figure 26:   Total Crisis Intervention Deadlines in the Second Reporting Period: 11



Finally, we also found that the City moved into Preliminary compliance for five
foundational paragraphs (¶116, 128, 129, 130, and 132). *See* Figure 27 below.

Figure 27:   Compliance Status at the End of the Second Reporting Period (February 29, 2020)
for Foundational Paragraphs in the Crisis Intervention Section



# Crisis Intervention: ¶89

**89.** *The CIT Program, through the CIT Coordinator, will annually review and, if necessary, revise its policies and practices to ensure the program's compliance with the objectives and functions of the CIT Program.*

---

**Compliance Progress**                (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**            February 29, 2020            ☐ **Met**   ☑ **Missed**

**Preliminary:**          *Not in Compliance*
**Secondary:**           *Not in Compliance*
**Full:**                *Not in Compliance*

The City and the CPD did not meet the deadline for ¶89, because the CPD did not revise its CIT policies by the February 29, 2020 deadline. Preliminary compliance with ¶89 requires a policy that the CIT Coordinator will conduct annual reviews. The CPD did not finalize such a policy within the compliance period. Nonetheless, the CPD did make review efforts during the reporting period, and subsequent compliance levels will ultimately turn on the quality of the review process—including consideration of best practice—and the implementation of those policies through training and assessment. Here, we provide commentary on our observations of the initial review effort, which may inform the future policy and review efforts.

Overall, we believe that the CPD has taken steps towards compliance by reviewing, revising, and submitting some policies and forms for IMT review, though we note some areas for future improvement.

During the reporting period, the CPD began its revision process for policies and forms regarding officer responses to calls involving persons in mental health crisis. The CPD engaged the Crisis Intervention Advisory Committee (Advisory Committee) and solicited feedback from its members (we discuss areas for improvement with this process in our analysis of ¶99, below). Additionally, to inform its strategies, the CPD indicated they have researched national best practices and operations within other agencies, though additional discussion with CPD is necessary for the IMT to ensure that the research conducted was comprehensive.

The IMT reviewed three documents directly related to the CIT Program: (1) *Responding to Incidents Involving Persons in Need of Mental Health Treatment* (S04-20); (2) *Crisis Intervention Team Program* (Directive S05-14); and (3) *Mental Health—Crisis Intervention Report* (CPD Form 15.520). The IMT provided comments and suggestions for revising the directives so they better align with the identified objectives and functions of the CIT Program. The IMT also commented and

made suggestions on two additional, related documents: (1) *Mental Health Transportation and Related Duties Matrix* (S04-20-04) and (2) *Mental Health Incident Notice* (CPD15.521). The CPD is currently making revisions based on our feedback.

The IMT recognizes that the groundwork (such as, engaging the Advisory Committee and considering national best practices) has been time intensive. This due diligence is important and necessary to create positive, sustainable outcomes. During the next reporting period, the IMT looks forward to reviewing the summaries of the Advisory Committee's feedback and the best practices that the CPD considered. The IMT also looks forward to reviewing the policy that memorializes the CPD's requirement to annually review and, as necessary, revise policies, as well as the final drafts of the policies that were revised through that process. We will continue to work with the CPD in finalizing, reviewing, and monitoring implementation of each of the revised policies.[70]

---

[70] The City's, the CPD's, and the OEMC's comments highlight potential confusion regarding the methodologies for Preliminary compliance for ¶¶89, 137, and 151. *See* Attachment B. Ultimately, these paragraphs require the CPD and the OEMC to annually review, as necessary, revise its Crisis Intervention policies to meet the requirements of the consent decree, which include subsequent training and implementation. We believe that the CPD and the OEMC are headed in the right direction with these paragraphs, but we will confer with the Parties and revise our methodologies for Year Two to ensure that the CPD and the OEMC arrive at compliance by meeting the appropriate benchmarks.

# Crisis Intervention: ¶99

**99.** *Within 365 days of the Effective Date, the CIT Program staff, in coordination with the Education and Training Division will develop the CIT Refresher Training. The CIT Program staff will review and revise the CIT Refresher Training as necessary to ensure that Certified CIT Officers receive up-to-date training. The CIT Program will seek input from the Advisory Committee in the development of the refresher training.*

## Compliance Progress
(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:** February 29, 2020 ☑ Met ☐ Missed

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not in Compliance*
**Full:** *Not in Compliance*

The City and the CPD met the deadline for ¶99 and achieved Preliminary compliance during this reporting period. The IMT reviewed CPD's lesson plans and evaluation materials for a 16-hour CIT Refresher Training course, along with their plan to launch the training in the next reporting period.

The modules within the Refresher Training are in line with the Illinois Law Enforcement Training and Standards Board guidelines. The course also addresses a variety of topics, including policy updates, legal updates, group problem solving, community resources, self-care, and scenarios. The IMT reviewed the provided materials and while we find the materials to be of high quality overall, we made some comments and suggestions that will be important to address for ongoing compliance. Our comments, which we summarized in our written response to the City, concern data reliability, automated course evaluations, implementing best practice language, adapting to the changing needs of different communities outside of what is strictly defined by the Illinois Law Enforcement Training and Standards Board, and improving Advisory Committee participation.

Paragraph 99 requires input from the Advisory Committee in the development of the refresher training. Although there is room for improvement in the process, the CPD met this requirement within the reporting period. As part of finalizing the CIT Refresher course, the CIT Coordinator scheduled three conference calls and invited members of the Advisory Committee to participate. The CIT Coordinator asked

them to review the refresher training curriculum and provide individual comments. The IMT participated in these calls and shared our concerns with the CPD regarding the Advisory Committee's involvement.[71]

For example, the calls were scheduled during workday hours, potentially limiting members' ability to participate in providing feedback. Although the Advisory Committee members were also able to submit comments at any time, the calls with the CIT Coordinator offered members the ability to ask questions and gather information before solidifying their comments. Additionally, the calls yielded relatively few Crisis Intervention Advisory Committee (Advisory Committee) members participating (about 5–7 members on each call). Our observations regarding these areas for improvement were also reinforced through contact with some Advisory Committee members. The CPD's process therefore carries the potential for limiting feedback from all Advisory Committee members, including persons with direct lived experience and from underrepresented communities.

We are further concerned that the recommendations were not voted on by the entire Advisory Committee and note that many members were unaware of the comments that other members made during the review calls. The consent decree stipulates that the Advisory Committee provide guidance on policies, procedures, and training. As a result, those recommendations should reflect the entire Advisory Committee, rather than the process used during the reporting period.

The Advisory Committee has, however, recently undergone a transformation, and we look forward to seeing how the formal operations of the new group may reflect decisions of the full committee. The IMT understands and supports the structure of the current subcommittees, but we believe that the recommendations of the subcommittees should, at least, be brought to the full board for a vote. This relatively simple step would better match the requirements of consent decree and also bring transparency and inclusion to the process.

Overall, the content of the refresher training is of high quality, and the training course addresses the requirements of ¶97. The CPD deserves credit for this work.

---

[71]   In its comments, the City states that the "Consent Decree does not require that recommendations be voted on by the entire [Advisory Committee]." Paragraph 99, however, requires that the "CIT Program will seek input from the Advisory Committee" in the development of the refresher training." Attachment B. Paragraph 99 *does not* say that the CIT Program will seek input from a subcommittee of the Advisory Committee. Ultimately, the consent decree requires meaningful input from the Advisory Committee "with subject matter expertise and experience that will assist in identifying problems and developing solutions and interventions designed to improve outcomes for individuals in crisis who require City services." ¶128. Compliance with these paragraphs—and the consent decree—prioritizes substance over form. As a result, we welcome discussions with the City to learn more about their interpretations of this paragraph. However, the IMT did not receive sufficient evidence during the reporting period to deviate from the plain reading of the consent decree, which requires input from the Advisory Committee, rather than just a subcommittee.

As a result, the CPD is in Preliminary compliance with this paragraph. In future reporting periods, the IMT will work with the CPD in the development of subsequent refresher training courses that CIT officers are required to receive to maintain their CIT status. *See* ¶101. At such time, we will also assess whether the above-identified issues with the Advisory Committee have been mediated to achieve subsequent levels of compliance.

Finally, while we understand that the Illinois Law Enforcement Training and Standards Board has set refresher training course requirements for every entity in Illinois, agencies differ widely in needs. The IMT believes a best practice for future refresher training courses would be to tailor the course content to meet the changing needs of the City. The IMT believes a wider discussion between the CPD and the Illinois Law Enforcement Training and Standards Board is necessary to ensure that the curriculum can be adapted to maintain effective policing, reflective of the unique needs of the City. To achieve subsequent levels of compliance, the CPD should develop a system for identifying City-specific training needs and then addressing those needs via ongoing training.

# Crisis Intervention: ¶107

> **107.** *Within 180 days of the Effective Date, and quarterly thereafter, CPD will collect and analyze the number of calls for service identified as involving individuals in crisis for every watch in each district to evaluate the number of Certified CIT Officers needed to timely respond to incidents and to assess the Department's progress towards achieving the response ratio targets. The number of Certified CIT Officers on each watch in every district will be driven by the demand for crisis intervention services for the particular watch and district.*

**Compliance Progress** (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:** August 28, 2019 ☐ **Met** ☒ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD did not meet compliance with ¶107. On the last day of the reporting period, the CPD provided an initial draft of their CIT Officer Implementation Plan. *See* ¶108. The Plan, among other things, acts as the CPD's initial analysis of CIT calls for service and the number of Certified CIT Officers needed to timely respond to such calls in each district and watch.

The IMT reviewed the CIT Officer Implementation Plan and its underlying data. We found that its analysis of the needs for CIT officer services suffers from some methodological limitations. For instance, the analysis looked at the present number of CIT officers in each district/watch and the present CIT response rate in that district/watch. From that data, the CPD extrapolated how many CIT officers would be necessary to reach a 50% response rate (initial response ratio target) and a 75% response rate (secondary response ratio target). However, evaluation of the data does not support the position that response rates are directly tied to the number of CIT officers available in each district/watch, nor are response rates directly tied to the number of CIT calls. Additionally, this approach neglects other explanatory factors, including differences in the overall number of calls for service in that district/watch, which may limit the number of CIT officers' available for CIT calls.

Further, some of the implications in the Plan are not supported by the underlying data, including comments on the daily average of CIT calls for CIT officers. Therefore, we do not find that the CPD's analysis adequately responds to the requirements of ¶107. Moving forward, we will work with the CPD on meaningful metrics and methodologies to conduct the analysis required by ¶107 on a quarterly basis, as well as contribute to the CIT Officer Implementation Plan in ¶108.

# Crisis Intervention: ¶108

*108. Within 180 days of the Effective Date, CPD will develop an implementation plan ("CIT Officer Implementation Plan") based on, at a minimum, its analysis of the demand for crisis intervention services for each watch in each district. The CIT Officer Implementation Plan will identify the number of Certified CIT Officers necessary, absent extraordinary circumstances, to meet the following response ratio targets: a. a sufficient number of Certified CIT Officers to ensure that Certified CIT Officers are available on every watch in each district to timely respond to at least 50% of the calls for service identified as involving individuals in crisis, absent extraordinary circumstances ("initial response ratio target"); and b. a sufficient number of Certified CIT Officers to ensure that Certified CIT Officers are available on every watch in each district to timely respond to at least 75% of the calls for service identified as involving individuals in crisis, absent extraordinary circumstances ("second response ratio target").*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          August 28, 2019          ☐ **Met**   ☑ **Missed**

**Preliminary:**          *Not in Compliance*
**Secondary:**          *Not in Compliance*
**Full:**          *Not in Compliance*

The City and the CPD are not yet in compliance with ¶108. As noted above in our analysis of the preceding paragraphs, the CPD provided an initial draft of the CIT Officer Implementation Plan on the last day of the reporting period. The IMT reviewed the CIT Officer Implementation Plan to determine if it aligned with best practices and to ensure the plan was based on sufficient reliable data. The CPD still needs foundational data to develop a meaningful CIT Officer Implementation Plan. Additionally, the CPD will need to revise the CIT Officer Implementation Plan to ensure that it is responsive to other related requirements of the consent decree.

The CIT Officer Implementation Plan must be reviewed and approved by the IMT and the OAG before it is implemented (*see* ¶638). The IMT will continue to work with the CPD in the next reporting period on this effort.

# Crisis Intervention: ¶109

**109.** *The CIT Officer Implementation Plan will further identify the steps that are necessary to meet and maintain the initial response ratio target by January 1, 2020, and the second response ratio target by January 1, 2022 and the strategies, methods, and actions CPD will implement to make progress to timely achieve and maintain these response ratio targets.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          January 1, 2020          ☐ **Met**   ☑ **Missed**

**Preliminary:**          *Not in Compliance*
**Secondary:**          *Not in Compliance*
**Full:**          *Not in Compliance*

The City and the CPD did not meet Preliminary compliance with ¶109. As noted in our analysis of preceding paragraphs, the CPD provided their initial draft of the CIT Officer Implementation Plan on the last day of the reporting period. The IMT reviewed the Plan's substance to determine if it aligned with best practices and ensure that the plan was based on sufficient data. The CPD still needs foundational data to develop a meaningful CIT Officer Implementation Plan. Additionally, the Plan will need to undergo revision to ensure that it is responsive to other related requirements of the consent decree.

The CIT Officer Implementation Plan must be reviewed and approved by the IMT and the OAG before it is implemented (*see* ¶638). The IMT will continue to work with the CPD in the next reporting period on this effort.

# Crisis Intervention: ¶110

**110.** *Within 180 days of completing the CIT Officer Implementation Plan, and annually thereafter, CPD will submit a report to the Monitor and the Office of the Attorney General ("OAG") regarding the progress the Department has made to meet: (a) the response ratio targets ("Implementation Plan Goals") identified in the Implementation Plan and (b) the number of Certified CIT Officers identified as necessary to achieve the response ratio targets. The Monitor and OAG will have 30 days to respond in writing to CPD's progress report. The Monitor and CPD will publish CPD's report and the Monitor's and OAG's response, if any, within in 45 days of the date CPD submitted the progress report to the Monitor and OAG.*

## Compliance Progress    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**    February 29, 2020    ☐ Met    ☑ Missed

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD did not meet Preliminary compliance with ¶110. As noted in the preceding paragraphs, the CPD provided their initial draft of the CIT Officer Implementation Plan on the last day of the reporting period. The IMT reviewed the plan's substance to determine if it aligned with best practices and ensure the plan was based on sufficient data. Foundational data is still needed to develop a meaningful CIT Officer Implementation Plan. Additionally, the Plan will need to undergo revision to ensure that it is responsive to other related requirements of the consent decree.

The CIT Officer Implementation Plan must be reviewed and approved by the IMT and the OAG before it is implemented (*see* ¶638). The IMT will continue to work with the CPD in the next reporting period on this effort.

# Crisis Intervention: ¶118

*118. By January 1, 2020, CPD will require that, after responding to an incident involving an individual in crisis, the assigned CPD officer completes a CIT Report, or any similar form of documentation CPD may implement. The CIT Report, or similar documentation, at a minimum, will include: a. the nature of the incident; b. the date, time, and location of the incident; c. the subject's age, gender, and race/ethnicity; d. whether the subject is or claims to be a military veteran, if known; e. the relationship to the subject, if any and if known, of the individual calling for service; f. whether the subject has had previous interactions with CPD, if known; g. whether the subject is observed or reported to be experiencing symptoms of a mental illness, intellectual or developmental disability, co-occurring condition such as a substance use disorder, or other crisis; h. the behaviors observed during the incident, including whether the subject used or displayed a weapon; i. the name(s) and star (i.e., badge) number(s) of the assigned CPD officer(s) and whether any of the assigned officers are Certified CIT Officers; j. the name(s) and star (i.e., badge) number(s) of any supervisor responding to the scene; k. the skills, techniques, or equipment used by the responding CPD officers; l. whether a reportable use of force was documented on a Tactical Response Reports ("TRR"), or whatever similar form of documentation CPD may implement, for the incident ; m. a narrative describing the CPD officer's interaction with the subject, when no other CPD report captures a narrative account of the incident; and n. the disposition of the incident, including whether the individual was transported to municipal or community services, transported to a hospital, subject to a voluntary or involuntary commitment, or arrested.*

## Compliance Progress     (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**     January 1, 2020     ☐ **Met**  ☑ **Missed**

**Preliminary:**     *Under Assessment*
**Secondary:**     *Not in Compliance*
**Full:**     *Not in Compliance*

The City and the CPD have not yet reached any level of compliance with ¶118, though work is underway. Presently, CPD policy requires officers to complete a CIT Report only in a subset of interactions involving persons in mental health crisis. Per Directive S04-20, *Responding to Incidents Involving Persons in Need of Mental*

*Health Treatment*, officers are required to complete the CIT report if "no other department report has been completed to document the incident" or when "unusual circumstances exist." The CPD completed its initial revision of Directive S04-20 to require a CIT Report be completed on all CIT calls for service, but the CPD did not provide the final S04-20, after incorporating IMT recommendations, to the IMT before the end of the reporting period.

The IMT reviewed the current CIT Report used by the CPD and provided feedback to the CPD. In response, the CPD is revising the CIT Report to contain more detail to satisfy the requirement of ¶118(h). We also suggested that the CIT Report include more information, such as the type of any weapon or weapons and the type of any arrest (*i.e.*, felony or misdemeanor). This information will better inform diversion efforts and use-of-force analysis moving forward. The CPD included this information in the revised draft of the CIT Report. While the draft CIT report adheres to the requirements of the paragraphs, Preliminary Compliance cannot be attained until the revised directive is enacted after the full review process.

# Crisis Intervention: ¶122

***122.*** *Within 365 days of the Effective Date, and on an annual basis thereafter, the City will publish a written Crisis Intervention Plan. The development of the Crisis Intervention Plan will be based on the regular review of aggregate data and a sample of incidents conducted by CPD and OEMC. The CIT Coordinator will consider quantitative crisis-intervention data, qualitative data on officers' and community members' perception of the effectiveness of the CIT Program, CPD member feedback regarding crisis intervention-related training, actual incident information, staffing and deployment analysis of available Certified CIT officers, research reflecting the latest in best practices for police responses to individuals in crisis, and any feedback and recommendations from the Advisory Committee. OEMC will consider the response to, identification of, and dispatch of calls for service involving individuals in crisis by OEMC tele-communicators, research reflecting the latest in best practices for tele-communicator responses to individuals in crisis, and any feedback and recommendations from the Advisory Committee.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          February 29, 2020          ☐ **Met**   ☑ **Missed**

**Preliminary:**          *Not in Compliance*
**Secondary:**          *Not in Compliance*
**Full:**          *Not in Compliance*

The City is not in Preliminary compliance with ¶122. On the last day of the reporting period, the City produced a Crisis Intervention Plan to the IMT. On that same day, the City made the Crisis Intervention Plan public, before receiving the requisite IMT and OAG review or feedback. *Compare* ¶638. As we have referenced in other instances, the IMT believes that the City and its entities would be better served by aiming to follow the procedures and substance of the consent decree rather than aiming for a deadline, which will often lead to both missing deadlines and further delaying compliance.[72]

The City is not in Preliminary compliance with ¶122 because the CPD does not have reliable data to conduct the analyses required for the Crisis Intervention Plan.

---

[72]   We must also note that the Crisis Intervention Plan was difficult to find on the City's website. Even if the City had received the requisite review and feedback from the IMT and the OAG, the IMT would have had serious concerns about the transparency and accessibility of the posting.

*See* also ¶120 analysis, above. The CPD is in the process of developing and collecting the qualitative elements required by ¶122, including taking initial steps related to officer feedback on the CIT Program, incident information, research regarding best practices, and engaging the Advisory Committee.

The OEMC, in comparison, has the data to analyze trends in dispatching CIT officers to crisis calls. The OEMC has also taken initial steps to institute an audit process to assess call-takers' and dispatchers' abilities to recognize mental health crises and dispatch CIT officers. In addition, the OEMC reported that they have begun reviewing research regarding best practices and engaging the Advisory Committee. The IMT looks forward to reviewing a summary of this preliminary research, as well as feedback and suggestions provided by the Advisory Committee.

To reach Preliminary Compliance with this paragraph, the CPD will need to collect reliable data, use it to formulate their Crisis Intervention Plan, and submit it to IMT and OAG for review and approval. *See* ¶638. Further, both the CPD and OEMC need to submit a summary of their research on national best practices as well as the Advisory Committee feedback and suggestions.

# Crisis Intervention: ¶131

**131.** *Within 365 days of the Effective Date, the City will request that the Advisory Committee identify and evaluate in writing any opportunities to develop or enhance crisis response-related policies, procedures, and training of City agencies, including CPD, OEMC, and the Chicago Fire Department, and increase municipal and community resources and alternative response options, including rapid-access clinics, drop-off centers, mobile crisis teams, a central non-emergency crisis line, other pre- and post-arrest diversion efforts, and strategies targeted at children and youth. The City will also request that the Advisory Committee identify and evaluate the steps necessary to develop non-criminal justice responses to individuals in crisis, including, but not limited to, a behavioral health unit to provide alternative non-criminal justice responses to individuals in crisis. In evaluating potential community resources and strategies, the Advisory Committee will identify challenges and opportunities for improvement, if any, and make recommendations. The City will address the feedback and recommendations identified by the Advisory Committee, including identifying recommendations that it will adopt, and the plan for implementation, in the Crisis Intervention Plan. The City will respond to each of the recommendations made by the Advisory Committee. The response will include a description of the actions that CPD has taken or plans to take with respect to the issues raised in the recommendations. If the City declines to implement a recommendation, it will explain the reason(s) for declining.*

## Compliance Progress　　　(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**　　　February 29, 2020　　　☑ **Met**　　☐ **Missed**

**Preliminary:**　　*In Compliance* (NEW)
**Secondary:**　　*Not in Compliance*
**Full:**　　*Not in Compliance*

The City is in Preliminary Compliance with the requirements of ¶131 by the February 29, 2020 deadline. The City worked with the Advisory Committee and developed a set of agreed-upon recommendations regarding improving the City's crisis-response-related policies, procedures, and training.

The IMT has assessed the City's efforts to make requisite requests of the Advisory Committee. In October 2019, the Advisory Committee presented the Mayor with eighteen recommendations related to mental health response. The Mayor's Office

stated in a December 2019 press release that each of the recommendations was accepted and would be implemented. While some efforts regarding the Advisory Committee recommendations are underway, others require a longer timeline to fully implement.

In February of 2020, the Mayor's Office provided the monitoring team with an update on progress regarding the Advisory Committee recommendations. The City assigned responsibility and oversight over implementing the recommendations to the Advisory Committee, which is currently being reshaped and renamed into the Chicago Council on Mental Health Equity and its subcommittees. The City reports that some subcommittees have already met, though progress is still in its initial phase. We suggest the City further define the authority of the Chicago Council on Mental Health Equity and identify the types and scope of resources that will be given to the subcommittees to successfully implement the recommendations.

Since the City has requested, received, and provided feedback for the various Advisory Committee recommendations, it has achieved Preliminary compliance with the requirements of ¶131. However, the IMT maintains concerns regarding whether the Advisory Committee recommendations are truly representative of the full Advisory Committee membership (see our discussion above in ¶99, above). The recommendations were borne out of subcommittees which do not necessarily reflect the makeup of the full committee and were not formally reviewed by the full committee before being presented to the Mayor. While the City indicated they were planning to accept all the recommendations, a "plan for implementation" as required by ¶131 has not yet been produced.

To achieve subsequent compliance levels, the City should consider requesting the full Advisory Committee vote on all future recommendations. Additionally, a complete plan for implementation should be developed and provided to Advisory Committee to ensure the intent of Advisory Committee's recommendations is being met. The City should also define the scope of the authority and resources allocated to the subcommittees in order to be successful in their oversight responsibility.[73]

---

[73] As referenced in our analysis of ¶99, the City states that the "Consent Decree does not require that recommendations be voted on by the entire [Advisory Committee]." Attachment B. We disagree. Ultimately, the consent decree requires meaningful input from the Advisory Committee "with subject matter expertise and experience that will assist in identifying problems and developing solutions and interventions designed to improve outcomes for individuals in crisis who require City services." ¶128. Compliance with these paragraphs—and the consent decree, overall—prioritizes substance over form. As a result, we welcome discussions with the City to learn more about their interpretations of this paragraph. However, the IMT did not receive sufficient evidence during the reporting period to deviate from the plain reading of the consent decree, which requires input from the Advisory Committee, rather than just a subcommittee.

# Crisis Intervention: ¶137

***137.*** *Within 180 days of the Effective Date, CPD will review and revise its crisis intervention-related policies as necessary to comply with the terms of this Agreement. CPD will consider any recommendations or feedback provided by the Advisory Committee when revising its policies.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          August 28, 2019          ☐ **Met**    ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD have not yet reached any level of compliance with ¶137, but efforts are underway. As noted in our assessment of ¶89 above, the CPD began the revision process for policies and forms regarding officer response to calls involving persons in mental health crisis. While the IMT has not received final policies, we recognize the good-faith efforts being made by the CPD during the reporting period toward compliance with ¶137.

The CPD also received and considered recommendations and feedback from interested members of the Advisory Committee before revising its policies. Accordingly, we find that CPD has begun to comply with that specific component of ¶137.

However, as with our assessment of other paragraphs within this section, the IMT questions the Advisory Committee's process for providing comments. For example, rather than receive recommendations and feedback from the entire Advisory Committee, Advisory Committee members were asked to review the directives and provide individual comments—and within in a short period. The recommendations were not voted on as an entire group and many board members were unaware of the comments made by other board members.[74] Likewise, feedback opportunities were largely limited to email or participation in the meetings that were

---

[74] As referenced in our analysis of ¶99, the City states that the "Consent Decree does not require that recommendations be voted on by the entire [Advisory Committee]." Attachment B. We disagree. Ultimately, the consent decree requires meaningful input from the Advisory Committee "with subject matter expertise and experience that will assist in identifying problems and developing solutions and interventions designed to improve outcomes for individuals in crisis who require City services." ¶128. Compliance with these paragraphs—and the consent decree, overall— prioritizes substance over form. As a result, we welcome discussions with the City to learn more about their interpretations of this paragraph. However, the IMT did not receive sufficient evidence during the reporting period to deviate from the plain reading of the

held during workday hours, which may limit effective participation by interested Advisory Committee members.

This process presents obvious barriers. Efforts should be made to broaden participation, including providing a reasonable timeframe for thorough review and using creative efforts to engage members who may face challenges preventing their participation in proving feedback in current process. As further detailed in other paragraphs found in Section IV of the Consent Decree, the procedural operation of the Advisory Committee (and the newly developing committee) should be enhanced to ensure that recommendations are reflective of the expertise and experiences of the full committee, rather than from a select few. The timeframe should also be reasonable enough to also allow organizational leaders to bring recommendations back to their organizations to receive feedback and approval. This would strengthen transparency and legitimacy, ultimately resulting in a stronger outcome.

During the next reporting period, the IMT looks forward to reviewing the summaries of the Advisory Committee's feedback, including the CPD's explanations for which recommendations the CPD incorporated.

During the next reporting period, the IMT looks forward to reviewing evidence of how the CPD considered, adopted, or incorporated the Advisory Committee's feedback and recommendations, as necessary.

This documentation should lend credibility and transparency to the process.[75]

---

consent decree, which requires input from the Advisory Committee, rather than just a sub-committee.

[75] As referenced above, the City's, the CPD's, and the OEMC's comments highlight potential confusion regarding the methodologies for Preliminary compliance for ¶¶89, 137, and 151. *See* Attachment B. Ultimately, these paragraphs require the CPD and the OEMC to annually review, as necessary, revise its Crisis Intervention policies to meet the requirements of the consent decree, which include subsequent training and implementation. We believe that the CPD and the OEMC are headed in the right direction with these paragraphs, but we will confer with the Parties and revise our methodologies for Year Two to ensure that the CPD and the OEMC arrive at compliance by meeting the appropriate benchmarks.

# Crisis Intervention: ¶142

***142.*** *Within 90 days of the Effective Date, OEMC will ensure that all current active tele-communicators have received mental health and CIT awareness training ("OEMC Training"). OEMC will provide the OEMC Training to new tele-communicators before tele-communicators complete their training and begin answering calls independently.*

## Compliance Progress                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | ***In Compliance* (first reporting period)** |
| **Secondary:** | ***In Compliance* (first reporting period)** |
| **Full:** | ***Not In Compliance*** |

The OEMC maintained Preliminary compliance with these requirements, which it achieved in the first reporting period. As we mentioned in the first report, the OEMC achieved these levels of compliance because the IMT confirmed that 464 call takers and telecommunicators had been trained in CIT and Mental Health Awareness between February 21, 2016, and June 24, 2018. At that time, the OEMC reported three individuals had not yet received the training because they were on leave of absence. In addition, one telecommunicator hired on July 16, 2019 had not been through the training, was working under supervision, and was scheduled to attend the 40-hour training before undertaking job responsibilities without supervision.

For Full compliance, the IMT recommended that the OEMC memorialize the requirement in ¶142 into a policy, improving the likelihood that this best practice continues. By the end of the reporting period, the OEMC was still developing a draft of a policy. Additionally, upon review of relevant documents, we will provide updates in future reports regarding the training status of the individual OEMC employees, referenced above, as well as any additional employees that may have been hired after the second reporting period.[76]

---

[76]  In its comments, the City notes that it did not respond to the IMT's verbal request for records, because it did not go through the formal request process. *See* Attachment B. We note that the City has an affirmative obligation to provide evidence of compliance with the consent decree. The IMT's requests, both formal and informal, are intended to facilitate the production and review of such evidence. There are often multiple ways to prove a particular compliance effort, and while formal requests highlight the IMT's interest in reviewing particular records, the City cannot meet compliance without evidence, requested or not.

# Crisis Intervention: ¶151

**151.** *Within 180 days of the Effective Date, and annually there-after, OEMC will review and revise its intake and dispatch policies and protocols as necessary to meet the requirements of this Agreement. OEMC will consider any recommendations or feedback provided by the Advisory Committee when revising its policies.*

## Compliance Progress
(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| Deadline: | August 28, 2019 | ☐ Met | ☑ Missed |
|---|---|---|---|

| | |
|---|---|
| Preliminary: | *Not in Compliance* |
| Secondary: | *Not in Compliance* |
| Full: | *Not in Compliance* |

The City and the OEMC have not yet reached any level of compliance with ¶151, but efforts are underway. Specifically, OEMC had the same procedural issues with the review and revision process as the CPD had, as reflected in our analysis of ¶137. Likewise, the OEMC did not provide the IMT with sufficient evidence to demonstrate that it "reviewed and revised its intake and dispatch policies and protocols as necessary," after considering feedback from the Advisory Committee. ¶151. While the IMT observed that the City and the OEMC received feedback from the Advisory Committee during meetings, the City and the OEMC did not demonstrate what the feedback was, how the OEMC considered that feedback, how it revised its policies, or whether the recommendations were supported by the full Advisory Committee (rather than a subcommittee).[77]

During the next reporting period, the IMT looks forward to reviewing evidence of how the OEMC considered, adopted, or incorporated the Advisory Committee's feedback and recommendations into the OEMC's policies, as necessary.

---

[77]  As referenced above, the City states that the "Consent Decree does not require that recommendations be voted on by the entire [Advisory Committee]." Attachment B. We disagree. Ultimately, the consent decree requires meaningful input from the Advisory Committee "with subject matter expertise and experience that will assist in identifying problems and developing solutions and interventions designed to improve outcomes for individuals in crisis who require City services." ¶128. Compliance with these paragraphs—and the consent decree, overall—prioritizes substance over form. As a result, we welcome discussions with the City to learn more about their interpretations of this paragraph. However, the IMT did not receive sufficient evidence during the reporting period to deviate from the plain reading of the consent decree, which requires input from the Advisory Committee, rather than just a subcommittee.

We appreciate, however, that the OEMC demonstrated efforts to revise its policies and procedures for identifying calls with a mental health component and prioritizing CIT officer responses for these calls. The OEMC provided the IMT with revised directives, and we provided feedback to the OEMC to help bring their policies into compliance with the requirements of the consent decree.[78]

By the end of the reporting period, we have not received the final versions of those policies. Since the OEMC is the first line of defense for appropriately identifying calls with a mental health component and for subsequently dispatching CIT trained officers, it is critically important that the OEMC's final policies are reviewed by the IMT before the OEMC finalizes, trains personnel on, and implements those policies. We look forward to continuing our work with the OEMC in the next reporting period to finalize and implement the revised policies.[79]

---

[78] In the City's comments, however, the OEMC describes that it met Preliminary, Secondary, and Full compliance for ¶151. *See* Attachment B. As described, above, however, the City and the OEMC did not provide sufficient evidence for Preliminary or Secondary compliance within the reporting period. We also disagree with the OEMC interpretation of Full compliance. While the OEMC made progress toward compliance with ¶151, the OEMC did not provide sufficient evidence that it considered the feedback from the Advisory Committee or revised policies, as necessary. As a result, the IMT was unable to confirm whether the OEMC followed this process or whether the policies were sufficiently revised. Likewise, the OEMC could not have met Full compliance within the reporting period, because the OEMC did not—and could not have—implemented the revised policies and continued the requisite process on an annual basis, as required by ¶151.

[79] As referenced above, the City's, the CPD's, and the OEMC's comments highlight potential confusion regarding the methodologies for Preliminary compliance for ¶¶89, 137, and 151. *See* Attachment B. Ultimately, these paragraphs require the CPD and the OEMC to annually review, as necessary, revise its Crisis Intervention policies to meet the requirements of the consent decree, which include subsequent training and implementation. We believe that the CPD and the OEMC are headed in the right direction with these paragraphs, but we will confer with the Parties and revise our methodologies for Year Two to ensure that the CPD and the OEMC arrive at compliance by meeting the appropriate benchmarks.

# Crisis Intervention: Foundational Paragraphs

As noted in the Monitoring Plan for Year One, the IMT identified several "foundational paragraphs" within the Crisis Intervention section of the consent decree: ¶¶91–92, 116, 120, 121, 123, 125, 128, 129, 130, and 132.

\*\*\*

## Consent Decree ¶91

> **91.** *Additionally, the City and CPD will ensure that the CIT Program has sufficient, dedicated district-level resources, consistent with the needs of each district identified by the District Commander and the CIT Coordinator, and approved by the Chief of the Bureau of Patrol, as needed to carry out the overall objectives and functions of the CIT Program at the district-level, which include, but are not limited to: a. supporting officers in the district with incidents involving individuals in crisis; b. delivering CIT Program-approved roll call trainings and mental health awareness initiatives; c. establishing relationships between the district and local service providers and healthcare agencies; d. referring and, when appropriate, connecting individuals in crisis with local service providers; e. engaging with the community to raise awareness of the CIT Program and issues involving individuals in crisis; and f. providing administrative support to the coordinator of the CIT Program.*

### Compliance Status

The CPD is in the process of expanding the CIT Program to meet many of the requirements of ¶91, but the roles and functions of new resources are still being developed.

The CIT Coordinator has outlined plans for creating a new unit for each CPD district to staff with administrative personnel. These personnel would handle a variety of tasks, such as assisting with data collection; acting as a resource for calls involving persons in mental health crisis; conducting district roll-call trainings; establishing relationships with local mental health service providers; engaging with the community; and conducting follow-up with persons who frequently call 911; have regular police involvement; or represent an escalated risk for crises.

The CPD is presently calling this unit the Critical Response Unit while it is in development. The IMT recommends that the CPD consider giving the unit a different name before it is implemented. "Critical Response Unit" is misleading because the

unit does not respond to crisis or critical calls for service. The IMT submitted several unit names for their consideration that better reflect the unit's role and function.

In addition to the new unit, the CIT Coordinator plans to have a dedicated team to assist in program-wide administrative functions, including teaching and training coordination within CPD's Education and Training Division.

Collectively, these additional dedicated resources are a significant step in the right direction and will ultimately achieve the requirements of ¶91. However, at this point, the roles of these additional resources are still being formed and deployed, and the directives which memorialize the requirements of ¶91 (*e.g., Crisis Intervention Team Program*, S05-14), are still in the revision process.

During the next reporting period, we will gather additional details from the CPD on the development of these new resources, including standardized operating procedures to ensure consistency across districts—while also preserving the unit's ability to deliver district-specific service. The IMT looks forward to further discussion regarding the actual deployment of the new resources, and the anticipated learning curve that comes with any new program.

## Consent Decree ¶92

> **92.** *Certified CIT Officers are officers who receive specialized training in responding to individuals in crisis. Certified CIT Officers retain their standard assignment and duties but may also take on specialized crisis intervention duties and are prioritized to respond to calls in the field identified as involving individuals in crisis, as assigned.*

### Compliance Status

The CPD follows a conventional "Memphis Model" CIT Program in the sense that specially trained CIT officers retain their standard assignment and duties but are prioritized for responding to calls involving a mental health crisis.[80] Although the IMT has observed that this practice complies with ¶92 during ride-alongs, the requirements of ¶92 are not reflected in policy. While S04-02 (*Responding to Persons in Need of Mental Health Treatment*) states that OEMC dispatchers will prioritize CIT officers for mental health crisis calls, it does not reflect that CIT officers retain their standard assignments until dispatched as a CIT officer.

---

[80] *See Welcome to the University of Memphis CIT Center - A Resource for CIT Programs Across the Nation*, UNIVERSITY OF MEMPHIS, www.cit.memphis.edu/aboutCIT.php.

As part of their revision of CPD's directives, the IMT recommended that the language of ¶92 be included in S04-02.

## Consent Decree ¶116

**116.** *The CIT Coordinator will receive initial and refresher professional development training that is adequate in quality, quantity, type, frequency, and scope to prepare the CIT Coordinator to take on the role and responsibilities of the CIT Coordinator, in addition to the Basic CIT training.*

### Compliance Progress      (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD met Preliminary compliance with foundational ¶116. The IMT has regularly communicated with the CIT Coordinator on a variety of crisis intervention related topics regarding the implementation of the consent decree. We have found the CIT Coordinator to be knowledgeable about the roles and responsibilities of the position, the CIT Program at the CPD, and the overall concept of the CIT Model.

We have requested to review the CIT Coordinator's credentials (including résumé , training, and ongoing qualifications). We have received the CIT Coordinator's continuing education training. We are waiting to receive her résumé, and we expect it will reflect the professionalism we have experienced during our communications with the Coordinator. For ongoing compliance with this paragraph, we suggest that the CPD outline a list of credentials sufficient to ensure that future coordinators are similarly qualified, along with a list of proposed professional development training opportunities.

## Consent Decree ¶120

**120.** *CPD will collect, analyze, and report data regarding the number and types of incidents involving individuals in crisis and responses of CPD officers to such events to assess staffing and deployment of Certified CIT Officers and department-wide responses to individuals in crisis. The CIT Program will review the data contained within the submitted CIT Reports, or any similar form of documentation CPD may implement, to evaluate the overall response and effectiveness by CPD officers and identify*

> *any district-level and department-wide trends regarding re-*
> *sponses to incidents identified as involving individuals in crisis.*

## Compliance Status

The CPD does not have the capability to perform data analysis on calls for service involving persons in mental health crisis. Under the current version of Directive S04-20 (*Responding to Incidents Involving Persons In Need of Mental Health Treatment*), a CIT Report is only required in a subset of crisis calls (see our discussion of ¶118, above). Outside of the CIT Report, other avenues for determining whether an interaction contained a mental health component are unreliable. Therefore, the CPD does not have a mechanism to identify and analyze all crisis calls. Once the revised Directive S04-02 is enacted, the CPD will begin the data-analysis process, though only after ensuring that officers are routinely completing the CIT Report in accordance with the revised policy.

## Consent Decree ¶121

> ***121.*** *CPD will identify and assign a sufficient number of data an-*
> *alysts to collect and analyze data related to the CIT Program and*
> *CPD's response to incidents involving individuals in crisis.*

## Compliance Status

The CPD is making progress toward compliance with ¶121. As part of the development of the CIT Unit (see our assessment of ¶91, above), analysts within the unit will perform the data analyses required by ¶121. As we work with the CPD on the deployment of the unit, we will ensure that a "sufficient number" of analysts are assigned and utilized to conduct meaningful and reliable analyses**.**

## Consent Decree ¶123

> ***123.*** *The purpose of the Crisis Intervention Plan will be to evalu-*
> *ate the City's identification of and response to incidents involving*
> *individuals in crisis and recommend any changes to staffing and*
> *deployment, policy, or training to ensure consistency with CPD*
> *and OEMC policy, this Agreement, and best practices. CPD will*
> *implement the Crisis Intervention Plan in accordance with the*
> *specified timeline for implementation. The Crisis Intervention*
> *Plan will: a. report the number, type, and outcome of incidents*
> *involving individuals in crisis, the number of Certified CIT Officers*
> *available and on duty in each district and on each watch, the*
> *percentage of calls for service involving individuals in crisis for*
> *which Certified CIT Officers were the first officers to respond to*
> *the scene for each watch in every district, and the response times*

*for calls for service involving individuals in crisis for each watch in every district; b. evaluate the CIT Program's compliance with the objectives and functions identified above; c. identify strategies to ensure that CPD has a sufficient number of Certified CIT Officers to meet its response ratio targets for calls for service involving individuals in crisis; d. describe any additional resources, including program staff or equipment, the CIT Program needs to perform its functions; e. identify safety issues and trends regarding interactions between individuals in crisis and officers; f. identify deficiencies and opportunities for improvement in identifying and dispatching calls for service involving individuals in crisis; g. recognize and highlight CIT Program and Certified CIT Officer successes, including successful individual officer performance; h. develop response strategies for repeat calls for service involving individuals who are frequently in crisis; i. recommend any changes to crisis intervention-related strategies, policies, and procedures; j. recommend any changes to CPD and OEMC trainings related to individuals in crisis, including any case studies and teaching scenarios; and k. include a timeline and plan for implementing recommended changes.*

## Compliance Status

As indicated in our analysis of ¶122 above, on the last day of the reporting period, the City produced a Crisis Intervention Plan to the IMT, but additional work is required for the CPD to reach compliance with ¶123. The Crisis Intervention Plan cannot be completed until the CPD and the OEMC are able to conduct the analyses required by ¶¶122–23. We look forward to reviewing the City's draft Crisis Intervention Plan once it is based on reliable, valid data.

## Consent Decree ¶125

*125. The CIT Coordinator will have CPD's portion of the Crisis Intervention Plan reviewed and approved by the Chief of the Bureau of Patrol within 60 days of the plan's completion.*

## Compliance Status

As noted above, the Crisis Intervention Plan cannot be completed until the CPD and the OEMC are able to conduct the analyses required by ¶¶122–23. We look forward to reviewing the City's draft Crisis Intervention Plan once it is based on reliable, valid data.

## Consent Decree ¶128

> **128.** The City will have a crisis intervention response advisory committee ("Advisory Committee") with subject matter expertise and experience that will assist in identifying problems and developing solutions and interventions designed to improve outcomes for individuals in crisis who require City services. The Parties acknowledge that the City has formed the City-wide Mental Health Steering Committee and that the City may draw upon those resources to satisfy the requirements of this Agreement.

### Compliance Progress

(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City is in Preliminary Compliance with the requirements of ¶128. The City has convened the Advisory Committee in accordance with ¶128. The Advisory Committee comprises over 50 diverse committee members, including subject matter experts and a limited number of persons with lived experience, many of whom were part of the Mental Health Steering Committee. *See* ¶128.

We must note, however, that the City has shifted its efforts and is now focusing on addressing overall Chicago responses to persons with mental illness, as opposed to the Advisory Committee's original focus on police-based responses. As a result, the Advisory Committee is being transformed into a new committee, with a new name, to correspond with this broader approach. During this reporting period, limited information existed about the name, role, and function of the new committee, and the committee does not yet have a formal structure, set of bylaws, or objectives. While many of the members will remain the same, the new committee has not yet come into existence. Advisory Committee members continue to meet in the interim.

There is continued concern by the Coalition (*see* ¶669) regarding the proposed new name of the committee. They object, for example, to the new name including "mental health," because (1) of the potential stigma that could negatively impact community engagement, and (2) it may not be inclusive of substance use disorders and other illnesses and disabilities. The IMT believes this perspective is legitimate and warrants serious consideration.

To achieve subsequent levels of compliance with ¶128, we encourage the City to conduct an assessment regarding the appropriate number of members for the new committee and the requisite expertise or experiences of those members. The City

should ensure that the committee includes persons with lived experience and persons from underrepresented communities, and persons from the Coalition. Additionally, we recommend that the City expand methods for solicitation of feedback and ensure adequate time for review and inclusion of feedback. Finally, the City should establish procedural rules for forwarding recommendations from committee members and subcommittees to the full board for consideration. We discuss some of these issues in more depth below in our analysis of ¶129 efforts.

## Consent Decree ¶129

> **129.** *The Advisory Committee, at a minimum, will meet quarterly to review and recommend improvements to the City's overall response to individuals in crisis, with consideration to areas such as coordinated crisis response; data collection and evaluation; community engagement and awareness; service outreach and prevention; and the CIT Program.*

### Compliance Progress                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City is in Preliminary Compliance with ¶129. The Advisory Committee meets quarterly to discuss issues regarding responding to individuals in mental health crisis. The Advisory Committee has provided recommendations to the CPD and the Mayor (*see* our analysis of ¶131 above).

On the other hand, these recommendations are not formally reviewed nor voted on by the entire board before they are formalized. Rather, subcommittees deliberate and vote on recommendations. Those recommendations are then forwarded to the CPD and the Office of the Mayor. The IMT observed numerous Advisory Committee sub-committee meetings and noted that sub-committee members are not always representative of the full board, nor of the population of mental health stakeholders and persons with lived experience. The IMT recommends that sub-committee recommendations be vetted by the full Advisory Committee. Additionally, we suggest that the City increase efforts to engage people with lived experience and people from underrepresented communities. The City can do this by expanding meetings beyond traditional hours and locations, namely at the City offices, and proactively identify additional efforts to broaden engagement.[81]

---

[81] As referenced in our analysis of ¶¶99, the City states that the "Consent Decree does not require that recommendations be voted on by the entire [Advisory Committee]." Attachment B. We

As mentioned in our assessment of ¶128, the City is moving toward a new committee model. To move beyond Preliminary Compliance, this new committee should operate in a more inclusive manner by doing the following: ensuring that recommendations are reviewed and voted on by the entire committee rather than passed by smaller subcommittees, expanding outreach efforts, and maximizing feedback by ensuring sufficient time is given for review and input. As above, the City should also ensure that sub-committee members are reflective of the broader committee, particularly with respect to individuals with lived experience and people from underrepresented communities.

## Consent Decree ¶130

> **130.** *The City will request that the Advisory Committee provide guidance on crisis response-related policies, procedures, and training of City agencies, including CPD and OEMC, and assist the City in developing and expanding current strategies for responding to individuals in crisis, including reducing the need for police-involved responses to individuals in crisis and developing municipal and community resources, such as pre- and post-arrest diversion resources and alternative response options (like drop-off centers, mobile crisis teams, a central nonemergency crisis line). The City will further request that in providing the guidance detailed above the Advisory Committee will consider specific strategies for responding to children and youth when they experience a behavioral or mental health crisis.*

### Compliance Progress

(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD are in Preliminary Compliance with ¶130. During the second reporting period, the City and the CPD requested Advisory Committee member input on numerous policies, procedures, and training. The Advisory Committee

---

disagree. Ultimately, the consent decree requires meaningful input from the Advisory Committee "with subject matter expertise and experience that will assist in identifying problems and developing solutions and interventions designed to improve outcomes for individuals in crisis who require City services." ¶128. Compliance with these paragraphs—and the consent decree, overall— prioritizes substance over form. As a result, we welcome discussions with the City to learn more about their interpretations of this paragraph. However, the IMT did not receive sufficient evidence during the reporting period to deviate from the plain reading of the consent decree, which requires input from the Advisory Committee, rather than just a sub-committee.

members reviewed and provided comments and suggestions on the CPD's mental health related policies, the CPD's CIT Refresher Training (*see* ¶99 above), the OEMC's mental health related policies, and the OEMC's Mental Health Awareness Training.

While this meets the standards for Preliminary compliance with ¶130, we have concerns regarding the efficacy of the process. The IMT observed many of the Advisory Committee discussions regarding policies and training and noted that comments and suggestions came from a select few individuals rather than the broader committee. Likewise, recommendations were not voted on or being moved forward by the full Advisory Committee.

An inclusive process builds community trust and moves the City toward effective, sustainable change. For future policies, training, and strategy recommendations, the City should reconsider the recommendation process to ensure that a broad spectrum of committee members participate. The City should seek wider participation, recruiting board members with lived experience, and create opportunities for full-board participation. To do so, the City should expand efforts for wider inclusion in the committee, promote creative outreach methods, and allow reasonable timeframes for feedback regarding the submitted policies, training curricula, and other materials.

Case: 1:17-cv-06260 Document #: 854 Filed: 06/18/22 Page 160 of 459 PageID #:6894

## Consent Decree ¶132

> **132.** *The Advisory Committee will be chaired by the Mayor's Office. The Mayor's Office will invite individuals who have personally experienced a behavioral or mental health crisis, people with experience working with individuals in crisis, and experts with knowledge in law enforcement responses to individuals in crisis. At a minimum, the Mayor's Office will invite individuals from the following groups: first responders; the CIT Coordinator; OEMC; county and city hospitals, health care providers, and mental health professionals; the Cook County State's Attorney's Office; the Cook County Public Defender's Office; at least one academic research entity; community behavioral and mental health professionals; advocacy groups for consumers of behavioral and mental health services; behavioral and mental health service providers; homeless service providers; substance abuse service providers; persons with lived experiences of behavioral or mental health crises; and other similar groups.*

### Compliance Progress
(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City is in Preliminary compliance with ¶132. As required by ¶132, the Advisory Committee continues to be chaired by the Mayor's Office. Each of the individuals, organizations, and entities listed in ¶132 are represented in some capacity on the Advisory Committee.

The IMT reiterates, however, our concerns regarding the Advisory Committee's current level of participation. First, there are only a few people on the Advisory Committee who self-identify as having lived experience with behavioral or mental health crisis, who are from underrepresented communities, or who are identified as members of the Coalition. At present, such individuals are significantly underrepresented. For future operation of the Advisory Committee, we suggest the City consider increasing the participation of persons with lived experience and persons from underrepresented communities—at both full committee and subcommittee meetings—to ensure these voices can meaningfully contribute to recommendations.

Second, we are also concerned about the short period allotted for the Advisory Committee's review of policies and training and the lack of opportunities for participation outside of standard workday hours.

To achieve subsequent compliance levels, the City should consider requesting the full committee vote on all future recommendations. Additionally, a complete plan for implementation should be developed and provided to Advisory Committee to ensure the intent of their recommendations are being met.

# IV. Use of Force

## Objectives[82]

The IMT assessed compliance with applicable Use of Force paragraphs in accordance with the consent decree's corresponding objectives:

> **153.** CPD's use of force policies, as well as its training, supervision, and accountability systems, must ensure that: CPD officers use force in accordance with federal law, state law, and the requirements of this Agreement; CPD officers apply de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; when using force, CPD officers only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and any use of unreasonable or unnecessary force is promptly identified and responded to appropriately.
>
> ***
>
> **155.** CPD officers have the authority to use force, but that authority is limited by the law and Department policy. The provisions of this Agreement seek to facilitate compliance with the law and Department policy regarding the use of force to reduce the circumstances in which using force is necessary, and to ensure accountability when CPD officers use force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances.

---

[82] The Use of Force section of the consent decree includes "objectives" rather than "guiding principles."

## Summary of Compliance Assessments

In the second reporting period, the City and the CPD made strides to address the consent-decree requirements regarding use of force. This includes their significant effort during the second reporting period to complete the CPD Weapons Discipline Training Bulletin, Firearm Pointing Policy, and Force Review Unit's (FRU's) *Firearm Pointing Incident Review Standard Operating Procedure* (SOP).[83] To accompany the issuance of these policies and procedures, the CPD conducted a comprehensive communications roll out to educate members of the contents of the Weapons Discipline Training Bulletin.

In addition, the CPD also made notable progress toward revising its Use of Force Policy suite. Over several months, the CPD engaged multiple iterations of review and revision with the IMT and the OAG on these policies. The CPD implemented these revised or new policies on February 29, 2020. However, the CPD is not in Preliminary compliance with a number of paragraphs regarding the Use of Force policies, because the policies lacked the requisite community input on the front end, per ¶160, and the backend, per ¶633.

The City and the CPD recognize, however, the need for a comprehensive community engagement. In February 2020, the CPD moved toward new approaches of community engagement, including community meetings and working groups, to obtain community input on the revised Use of Force policies and others. The CPD also posted these revised policies online on February 29, 2020, for a 30-day public review and comment period.

In conjunction with updating the Use of Force policies, the CPD also developed an eight-hour Use of Force training for all CPD members to complete in 2020. The CPD commenced this training on January 27, 2020.

Finally, the CPD's Force Review Unit, which the CPD established in 2017, continues to build its foundation, staffing capacities, training, and review of use-of-force incidents. During this reporting period, the FRU completed an annual year end summary, detailing the unit's findings and recommendations related to Tactical Response Reports (TRRs) and firearm-pointing Incidents.

Our analysis in this section details how the CPD's efforts related to Use of Force comply, or do not comply, with the consent decree and the progress that the City and the CPD are making toward compliance.

---

[83] In the second reporting period, the name of the "Force Review Unit" changed to the Force Review Division. The consent decree, however, uses the name "Force Review Unit," as do some of the drafts of the CPD policies that we discuss in this report. For this reason, we continue to use "Force Review Unit" throughout this report.

In sum, the IMT assessed the City's compliance with 24 Use of Force paragraphs of the consent decree with deadlines in Year One (¶¶168–70, 187–93, 196, 218, and 222–35) and 39 foundational paragraphs (¶¶160–67, 173, 176–78, 181–87, 197–200, 202–16, and 228). We assessed 25 of the paragraphs with deadlines in the first reporting period (¶¶160–61, 168–70, 188–93, 218, 222–27, 229–35), finding that the City met Preliminary compliance for six paragraphs (¶¶168, 189, 222, 226, 229, and 231) and missed compliance for the remaining 19 paragraphs.

In the second reporting period, we determined that the City moved into Preliminary compliance for five paragraphs with deadlines in Year One (¶¶190–93 and 196), moved into Secondary compliance for two paragraphs with deadlines in Year One (¶¶170 and 188), and maintained Preliminary compliance for six paragraphs (¶168, 189, 222, 226, 229, and 231). The City did not achieve Full compliance for any paragraph, and the City failed to reach Preliminary compliance in the remaining 11 paragraphs with deadlines in Year One (¶¶169, 218, 223–25, 227, 230, 232, and 233–35). *See* Figure 28 below.

Figure 28:    Compliance Status at the End of the Second Reporting Period (February 29, 2020) for Use of Force Paragraphs with Deadlines in Year One



The City had two new deadlines in the second reporting period. The IMT determined that the City met the deadline for one new paragraph (¶196) but missed the deadline for the other (¶169). *See* Figure 29 below.

Figure 29:    Total Use of Force Deadlines in the Second Reporting Period: 2



Finally, we also found that the City moved into Preliminary compliance for eight foundational paragraphs (¶¶164, 167, 173, 176, 181, 185, 212, and 215). *See* Figure 30 below.

Figure 30:    Compliance Status at the End of the Second Reporting Period (February 29, 2020) for Foundational Paragraphs in the Use of Force Section



# Use of Force: ¶168

**168.** *Starting no later than January 1, 2019, CPD will track and analyze the frequency with which CPD officers engage in foot pursuits of persons attempting to evade arrest or detention by fleeing on foot, regardless of whether the foot pursuit is associated with a reportable use of force incident. CPD will track foot pursuits associated with reportable use of force incidents through TRRs or any similar form of documentation CPD may implement.*

---

**Compliance Progress**                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Preliminary:**          *In Compliance* **(first reporting period)**
**Secondary:**            *Under Assessment*
**Full:**                 *Not in Compliance*

The City achieved Preliminary compliance with ¶168 by establishing appropriate policies, procedures, and reporting mechanisms to track and analyze foot pursuit data. The City maintained Preliminary compliance in the second reporting period.

In the first monitoring period, the CPD began capturing foot pursuit data from both the Office of Emergency Management and Communication's (OEMC) Computer Aided Dispatch (CAD) system and the Tactical Response Report (TRR) Application.

In this reporting period, the IMT finds that the CPD maintained Preliminary compliance for ¶168 and made progress toward obtaining Secondary compliance.

To evaluate Secondary compliance with ¶168, the IMT has been reviewing the development, implementation, and evaluation of training in two areas:

1. Instruction to CPD members regarding engaging and documenting foot pursuit incidents; and

2. Instruction to OEMC and FRU personnel on tracking and analyzing foot pursuit incidents.

For instruction to CPD members, the IMT and the OAG reviewed drafts of the CPD's 2020 Use of Force in-service training lesson plan and training PowerPoint. The CPD added instruction on "Foot Pursuit and Use of Force" to this 2020 training. The training describes actions, risks, and reporting procedures for engaging in a foot pursuit. The training also introduces the CPD's foot pursuit Tableau dashboard and discusses statistics and the purpose of tracking and analyzing foot-pursuit data. The CPD began this training on January 27, 2020, and plans to train all CPD members in 2020.

The IMT also reviewed materials from the OEMC and the Force Review Unit (FRU) in the last reporting period. Specifically, the IMT reviewed OEMC's *Police Dispatch Operations Training Notice* advising its personnel of updated foot pursuit notification and documentation procedures. The training notice describes in detail the procedures for OEMC dispatchers when they are made aware of a CPD officer engaging in a foot pursuit and introduces new on-view event type "FPX" (foot pursuit cross reference) for tracking foot pursuit notifications.

The IMT also reviewed the *Force Review Unit Standard Operating Procedure* (FRU SOP), which outlines duties and procedures for the review of foot pursuits. During this reporting period, the FRU noted that all staff receive internal training on FRU processes and the CPD's foot pursuit training bulletin. The CPD has yet, however, to share training materials with the IMT demonstrating what they have done to educate their staff on the review of foot pursuits. The IMT will review FRU training related to tracking and analyzing foot pursuits during the next reporting period. The FRU's process to analyze the data it collects regarding foot pursuits should allow it to detect and evaluate potential concerns and to make qualitative and quantitative assessments. Robust analysis is required to continuously adjust training and tactics to address concerns, and to communicate trends to CPD leadership and all officers—in other words, to use the data operationally.

The CPD has also made important strides to review the quality of the foot pursuit data being captured and analyzed. In late 2019, the CPD's Office of Operational Compliance began efforts to conduct an audit to better understand the extent to which the CPD is able to obtain and analyze information regarding foot pursuits, including those associated with arrests and uses of force. To conduct this audit, the Office of Operational Compliance will analyze data from various units across the CPD, interview relevant personnel, and review relevant policies, procedures, and responsibilities. The analysis will be two-fold, focusing, first, on identifying incidents most associated with foot pursuits and, second, on reviewing samples of those incident types to assess whether the issue of potentially unreported foot pursuits merit further investigation.

The Office of Operational Compliance expects to complete this audit before fall 2020. Once this audit is complete it will help determine if the numbers captured from OEMC and through TRR data are reflective of foot pursuit activity occurring in the field.

Meanwhile, the OEMC and CPD continue to track foot pursuits and reported 745-foot pursuits during the second reporting period (September 1, 2019 to January 9, 2020). The CPD also tracked foot pursuits associated with a use of force. *See* Figure 31.

Figure 31:          Number of Foot Pursuits Reported by the OEMC and the CPD
(September 1, 2019, to January 9, 2020)[84]

| Total Foot Pursuits | 745 |
| --- | --- |
| Total Foot Pursuits with Use of Force | 174 |
| Total Foot Pursuits with Use of Force, Level 1 | 94 |
| Total Foot Pursuits with Use of Force, Level 2 | 51 |
| Total Foot Pursuits with Use of Force, Level 3 | 22 |
| Total Foot Pursuits with Use of Force, Level 4 | 7 |

The IMT reviewed available foot-pursuit data and notes that the percentage of foot pursuits ending in some level of force for the first two reporting periods remained fairly constant: 24.4% in the first reporting period and 23.5% in the second reporting period.[85] Figure 32 displays force level comparisons for the first and second reporting periods. The IMT will continue to review data on foot pursuits in future reporting periods.

Figure 32: Comparison of Use of Force Levels for Foot Pursuits

| Percentage Foot Pursuits with Use of Force | First Reporting Period (April 1, 2019 to August 31, 2019) | Second Reporting Period (September 1, 2019 to January 9, 2020) |
| --- | --- | --- |
| Level 1 | 67.7% | 54.0% |
| Level 2 | 26.0% | 29.3% |
| Level 3 | 4.7% | 12.6% |
| Level 4 | 1.7% | 4.0% |

In sum, the CPD has made notable progress toward achieving Secondary compliance, which the IMT will continue to assess moving forward. Moving forward, the IMT will evaluate Secondary compliance with ¶168 by reviewing training attendance records, pre- and post-tests, and evaluations for the 2020 in-service training, paying special attention to comprehension of the foot pursuit notification proce-

---

[84]   These are the figures that were available to the IMT at the end of the second reporting period. We note that we now have data through the end of February 29, 2020. We also note that the data for the time period reflected in this table and in Figure 31 appears to have changed between the time the IMT reviewed it at the end of the reporting period and the publication of this report. For example, the data originally showed 22 Total Foot Pursuits with Use of Force, Level 3, from September 1, 2019 through January 9, 2020. As of May 29, 2020, the data showed only 11 Total Foot Pursuits with Use of Force, Level 3, from September 1, 2019 through February 29, 2020. According to the City and the CPD, this discrepancy may be caused by looking at two different data sets. Moving forward, we will continue to work to validate and verify this data moving forward.

[85]   Foot pursuit data is not available before April 1, 2019.

dures. Ultimately, the IMT will also measure the extent to which officers and supervisors are aware of and understand the training bulletin and whether they are tracking and analyzing foot pursuit frequency by further examining the following: training, the results of the Office of Operational Compliance's audit, FRU review of compliance, and a random review of body worn camera footage for the types of incidents that often result in foot pursuits, but where no foot pursuit is reported.

# Use of Force: ¶169

**169.** *For foot pursuits associated with reportable use of force incidents, by January 1, 2020, CPD will review all associated foot pursuits at the headquarters level to identify any tactical, equipment, or training concerns.*

**Compliance Progress**       (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          January 1, 2020          ☐ **Met**   ☑ **Missed**

**Preliminary:**       *Not in Compliance*
**Secondary:**        *Not in Compliance*
**Full:**             *Not in Compliance*

The City and the CPD did not meet the January 1, 2020 deadline for identifying tactical, equipment, and training concerns, nor did it achieve Preliminary compliance for ¶169 in this reporting period. However, the CPD has made significant strides toward meeting Preliminary compliance.

To evaluate Preliminary compliance, the IMT reviewed General Order 03-02-08, *Department Review of Use of Force,* and the Force Review Unit's *Standard Operating Procedure* (FRU SOP) to assess if the CPD has the appropriate policies and procedures in place for ¶169.

On February 29, 2020, the CPD enacted and published a revised suite of Use of Force policies, including General Order 03-02-08, following multiple rounds of review with the IMT and OAG. General Order 03-02-08 adequately states that the FRU "functions in an after-action review capacity for any Level 1 or Level 2 reportable use of force associated with a foot pursuit." Further, the policy states that the FRU will "ensure any tactical, equipment, or policy concerns are identified." The CPD is currently seeking community input on the Use of Force policies pursuant to ¶160.

The FRU SOP defines the FRU's responsibilities for foot pursuits:

> [The FRU] tracks and analyzes the frequency with which CPD officers engage in foot pursuits of persons attempting to evade arrest or detention by fleeing on foot, regardless of whether the foot pursuit is associated with a reportable use of force incident to identify any tactical, equipment, or training concerns.[86]

---

[86] We note that the CPD has indicated that it is revising the SOP because this quote was included in error.

The SOP also notes that the FRU is responsible for tracking this data "to determine whether changes to CPD policy, training, practice or supervision are necessary."

The SOP provides a limited definition for the protocols for conducting reviews of foot pursuits and is currently under review by the OAG and the IMT.

The FRU and the CPD also began establishing protocols for reviewing foot pursuits. For example, the CPD formalized a process for obtaining data on reported foot pursuits by adding pursuits (foot or vehicle) to the TRR form, allowing the FRU to begin reviewing these incidents in 2019. Additionally, the FRU has included foot pursuit debriefing points as part of its operating procedures. Debriefing points are tactical, safety, or other issues identified in the course of an FRU Use of Force review. The FRU has developed an "Advisement and Recommendation Matrix" to address the most common debriefing points.[87]

This matrix includes three debriefing points regarding foot pursuits, with associated Advisements and Recommendations:

1) Foot Pursuit Issue;

2) Foot-Pursuit-Radio Communication; and

3) Foot Pursuit-Separation.

Debriefing points reinforce the CPD's foot pursuit training bulletin. Advisements and Recommendations are based on the number of incidents per individual (first incident, second incident, or two or more incidents).[88] A failure to follow the training bulletin for the three debriefings points noted above, in exigent or mitigating circumstances, results in an advisement. Absent exigent circumstances, first and second incidents result in notations in the Performance Review System, and more than two incidents result in a referral to the Education and Training Division.

According to the FRU, there were 880 total foot pursuits reported on TRRs from April 1, 2019, to January 27, 2020. The FRU reviewed 308 of these TRRs and assigned foot pursuit debriefing points to 11 of them.[89]

---

[87] An "Advisement" is an informal recommendation and referral to a Department General Order or Directive to make the member aware of proper procedure. A "Recommendation" requires the Department member to be debriefed by his or her immediate supervisor or receive additional training through the Education and Training Division.

[88] The CPD's Force Review Unit matrix defines an "incident" as each time an officer engages in a foot pursuit.

[89] The IMT commends the FRU its progress with foot pursuit reviews. However, the IMT noted inconsistencies in some reported numbers and language in the *Force Review Unit Year End Summary 2019*. These efforts are a start and point out a need for more training for CPD members in these areas.

Through the efforts described above, the CPD has established appropriate policies, procedures, and practices for the FRU's review of foot pursuits to identify tactical, equipment, or training concerns. As explained in the analysis for ¶168 above and ¶192 below, the FRU's process to identify concerns should include both detection and evaluation. To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-08 accordingly, and finalize the policy.[90]

To assess Secondary compliance, the IMT will review training and information supplied by the FRU and the outcomes of an audit conducted by the CPD's Office of Operational Compliance. The CPD noted that the FRU's quarterly and annual reports document and track data on the number of tactical, training, and equipment Advisements or Recommendations. The IMT requested to view copies of these reports and received a copy of the Force Review Unit Year End Summary on February 20, 2020.[91]

The IMT will also consider other data to verify the success of these policies and procedures. For example, the CPD's Office of Operational Compliance audit of foot pursuits will explore the feasibility of capturing various data points from TRRs to inform the FRU's review for tactical equipment and training concerns—in addition to verifying the number of pursuits. Such data points include nature of incident/radio call, officer separation, uniform/plain clothes officer, weapons position, officer injury, and length of chase. The IMT will use the outcomes of this audit as it assesses if the CPD is capturing all foot pursuits and whether the FRU and the CPD are appropriately recommending and acting on tactical, equipment, and training concerns.

---

[90] The SOP is still under review by the IMT and the OAG. In the IMT's view, this SOP is more of a living document than G03-02-08, and as a result, relates more to Full compliance than Preliminary compliance for ¶169.

[91] The IMT did not receive copies of FRU quarterly reports to review during this reporting period.

# Use of Force: ¶170

**170.** *CPD recently issued a foot pursuit training bulletin. By July 1, 2019, CPD will develop and issue a supplemental foot pursuit training bulletin that reflects best practices from foot pursuit policies in other jurisdictions. The supplemental training bulletin will be subject to review and approval by the Monitor and OAG. The supplemental training bulletin will: a. identify risks and tactical factors officers should consider prior to initiating and during the course of a foot pursuit; b. provide guidance to officers regarding radio communications during a foot pursuit; c. instruct officers to avoid, to the extent practical, separating from other officers in the course of a foot pursuit; d. provide guidance on circumstances when alternatives to a foot pursuit may be appropriate; and e. inform officers that they must follow supervisors' instructions in the course of a foot pursuit, including instructions to alter tactics or discontinue the pursuit.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Under Assessment* |

In the first reporting period, the CPD made notable progress toward Preliminary compliance for ¶170 by drafting and revising its supplemental foot pursuit training bulletin per feedback from the IMT and OAG. In this reporting period, the IMT finds that the CPD obtained Preliminary and Secondary compliance for ¶170 and made progress toward Full compliance.

To evaluate Preliminary compliance, the IMT and the OAG continued to provide feedback on the draft Foot Pursuit Training Bulletin. Figure 33 below outlines the iterations of review for the bulletin during this period.

Figure 33: Foot Pursuit Training Bulletin Reviews

| Draft, Date from CPD | Comments from IMT | Comments from OAG |
|---|---|---|
| Version 3, January 21, 2020<br>*Included modifications from feedback from August 21 OAG and August 22 IMT comments, and generalized comments regarding foot pursuits from the Coalition via email in October 2019.* | Not Applicable<br>(newer vision provided on January 30, 2020) | |
| Version 4, January 30, 2020<br>Further revised version with additional revisions from CPD senior leadership, and incorporation of additional feedback received from the Coalition. | February 14, 2020 | Verbal Comments in early February |
| Version 6[92], February 17, 2020 | February 19, 2020 | February 19, 2020 |

The CPD issued its Foot Pursuit Training Bulletin on February 28, 2020, incorporating best practices from foot-pursuit policies in other jurisdictions. While requirements (a)–(e) of ¶170 were addressed in the prior drafts, the CPD significantly enhanced the final bulletin by including information on weapon retention during a pursuit and strengthening language regarding partner separation. The latter included noting that each partner is responsible for the safety of the other.

Additionally, per the FRU's responsibility for monitoring foot pursuits and to further enhance compliance with the consent decree, the CPD added items (b) and (c) of ¶170 to its Advisement and Recommendations Matrix in 2019. The FRU review personnel use this matrix to monitor performance and determine courses of action needed (*i.e.*, tactical, safety, or other issues identified during a review). With these enhancements to the training bulletin and FRU procedures, the CPD is now in Preliminary compliance with ¶170.

Because the training bulletin now addresses all the requirements of ¶170 and has been approved by the IMT and OAG, the CPD has obtained Secondary compliance. For ¶170, we will assess training attendance and retention moving forward to determine Full compliance.[93]

To evaluate Full compliance, the IMT began reviewing the CPD's efforts to educate staff on the Foot Pursuit Training Bulletin. Upon issuance of the training bulletin, the CPD distributed an Administrative Message Center (AMC) message, notifying

---

[92] The CPD did not submit Version 5 of the training bulletin to the IMT and OAG because it made additional internal revisions before submission.

[93] The OAG's comments to this report indicate that it "disagree[s] that CPD has demonstrated that it trained all officers on foot pursuits." *See* Attachment B. We agree that the CPD has not provided sufficient evidence of this training. The methodologies for ¶170, however, do not require providing that evidence, such as training attendance records, until Full compliance.

all sworn members that they were enrolled in a mandatory eLearning self-training and requiring them to review and acknowledge receipt of the bulletin within 28 days of enrollment by March 27, 2020. To ensure members are aware of the bulletin and eLearning requirement, the AMC message was read at roll call for seven consecutive days. In IMR-3, the IMT will review eLearning completion records for the bulletin. Full compliance will require that an adequate proportion of sworn members complete the training.

Additionally, to assess Full compliance, the IMT and OAG reviewed and provided written comments on CPD's 2020 Use of Force in-service training materials, which incorporate additional training on foot pursuits. The 2020 training describes risks to be considered and sound tactics for foot pursuits, what do to if a pursuit is initiated, supervisory responsibilities, and foot-pursuit data on the Use of Force dashboard.

In addition, the IMT will assess Full compliance in this area by reviewing training attendance records, pre- and post-tests, and evaluations for the 2020 in-service training, paying special attention to comprehension of the foot pursuit actions by officers and supervisors.

In sum, in the second reporting period, the CPD achieved Preliminary and Secondary compliance and made notable progress toward achieving Full compliance, which the IMT will continue to assess in the next reporting period. In interviews with all ranks of CPD (officers to commanders) during the IMT's January 2020 site visit, it became readily apparent across all ranks that officers commonly engage in pursuits and separate from their partner. Furthermore, the IMT observed little enthusiasm for the content of the foot-pursuit training bulletin, particularly the strong recommendation against partner separation. Partner separation appears to be an accepted practice by officers, and changing this mindset at the CPD will be challenging. Thus, the IMT believes the CPD must emphasize and educate on the training bulletin's focus on officers being responsible for their partners.

# Use of Force: ¶188

**188.** *By January 1, 2019, CPD will develop a training bulletin that provides guidance on weapons discipline, including circumstances in which officers should and should not point a firearm at a person. CPD will incorporate training regarding pointing of a firearm in the annual use of force training required by this Agreement in 2019.*

## Compliance Progress  (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Under Assessment* |

While the City and the CPD did not meet the January 1, 2019 deadline for developing a Weapons Discipline Training Bulletin in the first reporting period, they made significant progress toward achieving Preliminary compliance with ¶188 through the drafting and revision of the training bulletin. In this reporting period, the IMT finds that the CPD met Preliminary and Secondary compliance for ¶188 and made notable progress toward Full compliance.

To evaluate Preliminary compliance, the IMT and the OAG continued to provide feedback on drafts of the Weapons Discipline Training Bulletin. The bulletin provides guidance on weapons discipline, including circumstances in which officers should and should not point a firearm at a person. The IMT and the OAG provided feedback to the August 21, 2019 draft (version 2) on September 7 and August 30, respectively. The CPD provided a revised draft (version 3) on September 19, 2019, for which the IMT and the OAG provided no-objection notices on September 24 and October 1, respectively. In early October, the CPD distributed the final bulletin via its eLearning system. Thus, the City and the CPD met Preliminary compliance with ¶188.

The IMT's and OAG's review and approval of the training bulletin illustrates that the training bulletin appropriately addresses all the requirements of ¶188. As a result, the City and the CPD also met Secondary compliance. For ¶188, we will assess training attendance and retention under Full compliance.

To evaluate Full compliance, the IMT began reviewing CPD training regarding firearm pointing incidents. The CPD completed its annual 2019 two-day Use of Force Training in December 2019. This training included instruction on the CPD's firearm pointing policy. The CPD's 2020 Use of Force In-Service Training includes the up-

dated Firearm Pointing Incidents Policy (issued October 1, 2019, and effective November 1, 2019), including information on Fourth Amendment case law for unreasonable firearm seizures.[94] All CPD staff are to receive this training in 2020.

Furthermore, before roll-out of the bulletin and policy, the CPD created several communications to educate members of the contents of the Weapons Discipline Training Bulletin. The communications included the following:

- a Firearm Pointing Notification Policy Key Messages/Q&A document for supervisors,

- a Firearm Pointing Notification infographic posted throughout headquarters and each district,

- a PowerPoint and video briefing for supervisors and roll calls in each district, and

- a briefing for OEMC to educate dispatchers and personnel.

The CPD's eLearning system tracks training compliance and, as of December 31, 2019, the CPD had 98.55% compliance with the video training and 98.4% compliance with the training bulletin. In the next reporting period, the IMT looks forward to further reviewing training attendance records and data, as well as progress made by CPD to educate and operationalize the Weapons Discipline Training Bulletin to determine Full compliance.

---

[94]   CPD 2020 Use of Force Lesson Plan, *Firearm Pointing Incidents: Policy*, 2020.

# Use of Force: ¶189

**189.** *CPD will clarify in policy that when a CPD officer points a firearm at a person to detain the person, an investigatory stop or an arrest has occurred, which must be documented. CPD will also clarify in policy that officers will only point a firearm at a person when objectively reasonable under the totality of the circumstances.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* **(first reporting period)** |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not in Compliance* |

As noted in our first monitoring report, the CPD met Preliminary compliance before the first reporting period by developing and issuing Department Notice D19-01, *Firearm Pointing Incidents*. On November 1, 2019, with no objections from the IMT and OAG, and following a 15-day public comment period, the CPD's final *Firearm Pointing Incidents* policy became effective.

The policy is available online in the CPD's public directive portal. The CPD also published a *Summary and Response to Public Input on Firearm Pointing Notification Policy* to clarify the policy in response to two general types of public comments (whether pointing equates to a use of force under CPD policy; and training and communication).[95]

To evaluate Secondary compliance, the IMT has been reviewing the development, implementation, and evaluation of training regarding the firearm pointing policy. The CPD's annual in-service use of force training for 2019 and 2020 provides clear instruction that officers may only point a firearm at a person when objectively reasonable under the totality of the circumstances. The training further states that when a CPD officer points a firearm at a person to detain the person, an investigatory stop or an arrest has occurred, which must be documented. The 2020 lesson plan also includes an example of a pointing incident that was considered unreasonable under the Fourth Amendment.

In IMR-3, the IMT will continue to review Secondary compliance to determine whether a sufficient number of officers are trained and whether the officers understand the firearm-pointing policy.

---

[95] *See Summary and Response to Public Input on Firearm Pointing Notification Policy*, Chicago Police Department, https://home.chicagopolice.org/policy-review/summary-and-response-to-public-input-on-firearm-pointing-notification-policy/.

# Use of Force: ¶190

**190.** *Beginning July 1, 2019, CPD officers will, at a minimum, promptly after the incident is concluded, notify OEMC of investigatory stop or arrest occurrences in which a CPD officer points a firearm at a person in the course of effecting the seizure. The notification will identify which CPD beat(s) pointed a firearm at a person in the course of effecting the seizure. The City will ensure that OEMC data recording each such notification is electronically linked with CPD reports and body-worn camera recordings associated with the incident, and all are retained and readily accessible to the supervisor of each CPD beat(s) identified in the notification.*

**Compliance Progress**  (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the first reporting period, the City and the CPD did not meet the July 1, 2019 deadline for ¶190. However, they made notable progress toward complying with ¶190 by drafting the FRU's *Firearm Pointing Incident Review SOP*, a *Firearm Pointing Incidents* policy, and a *Weapons Discipline Training Bulletin*. The CPD has also exhibited its ability to operationalize elements of the firearm pointing policy and incident review SOP by establishing practices for capturing notifications and data regarding pointing incidents.

The IMT continued to evaluate Preliminary compliance in the second reporting period. By issuing the *Firearm Pointing Incidents* policy on October 1, 2019, the City and the CPD achieved Preliminary compliance with ¶190 in the second reporting period.

To evaluate Secondary compliance, the IMT is reviewing the CPD's training regarding the firearm pointing incident policy and procedures for staff. The CPD issued the *Weapons Discipline Training Bulletin* and corresponding communication roll-out (described in our analysis for ¶188) to educate staff of the notification process for firearm pointing incidents.

Additionally, CPD's 2020 Use of Force in-service training educates officers on ¶190. The lesson plan states the following:

> Whenever a Department member points a firearm at a person
> while in the performance of his or her duties, the member will

> be required to notify OEMC. This may take the form of radio, PDT, or telephonic communication[.]

The lesson plan further describes the processes for creating a Police-Aided Dispatch event to record the incident and the radio identification/beat number and ensuring body-worn camera video is appropriately retained. The IMT will continue to review Secondary compliance to determine whether a sufficient number of officers are trained and whether officers understand firearm-pointing policies and procedures.

To evaluate Full compliance, the IMT will review training, community, and data sources, including footage from body worn cameras, pointing data, and completion records to determine whether the CPD has sufficiently implemented its policy and training and to ensure that OEMC records for firearm pointing notifications are properly linked to Police Computer Aided Dispatch reports and body-worn-camera videos. During this reporting period, the FRU acknowledged in its annual report and in conversation with the IMT that it reviews incidents where officers notify OEMC when pointing a weapon during an investigatory stop or an arrest. However, there are incidents when officers point a firearm that the FRU does not review, specifically when an associated Arrest Report or Investigatory Stop Report (ISR) could not be found or did not exist. The IMT believes there is a need to account for all firearm pointing instances that result in a notification to the OEMC.

In sum, the CPD completed notable activities for ¶190 during the second reporting period, resulting in Preliminary compliance and progress toward Secondary compliance. The IMT looks forward to evaluating progress toward Secondary and Full compliance in the next reporting period.

# Use of Force: ¶191

> **191.** *OEMC will notify an immediate supervisor of the identified beat(s) each time the pointing of a firearm is reported. Notified CPD supervisors will ensure that the investigatory stop or arrest documentation and the OEMC recordation of the pointing of a firearm are promptly reviewed in accordance with CPD policy. CPD supervisors will effectively supervise the CPD members under their command consistent with their obligations set forth in the Supervision section of this Agreement.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the first reporting period, the City and the CPD made notable progress toward complying with ¶191 by drafting a *Firearm Pointing Incidents* policy and *Weapons Discipline Training Bulletin*. In the second reporting period, the CPD met Preliminary compliance with ¶191. The CPD has also exhibited its ability to operationalize elements of the firearm pointing policy by establishing practices for capturing notifications and data related to pointing incidents.

The IMT continued to evaluate Preliminary compliance in the second reporting period. With the issuance of the Firearm Pointing Incidents Policy on October 1, 2019, and the development of the FRU's Firearm Pointing Incident Review Standard Operation Procedure (SOP), the CPD achieved Preliminary compliance with ¶191 in the second reporting period. The IMT and OAG reviewed and provided no-objection notices to the *Firearm Pointing Incident Review SOP* in first reporting period. On August 14, 2019, the CPD told the IMT and OAG that it would proceed with finalizing and implementing the SOP.

To evaluate Secondary compliance, the IMT is reviewing the CPD's training regarding the firearm pointing incident policy and procedures for officers and supervisors. The CPD issued the Weapons Discipline Training Bulletin and corresponding communication roll-out (described in the section relating to ¶188) to educate staff of the notification process for firearm pointing incidents. Additionally, the CPD's 2020 Use of Force in-service training educates officers on ¶191. The lesson plan states the following for OEMC:

> The notified OEMC dispatcher will inform the notifying beat's immediate supervisor of the event and record the notification on the appropriate PCAD event.

Further, the lesson plans state that the responsibilities and actions of supervisors for firearm pointing incidents include the following:

> The notified Department supervisor will ensure that any incident documentation completed by the notifying beat and the OEMC recordation of the pointing of a firearm are promptly reviewed in accordance with Department directive D19-01, "Firearm Pointing Incidents," and other existing Department directives outlining incident reporting.

> The notified Department supervisor will effectively supervise the members under his or her command, including identifying and adequately addressing any performance that is exceptional or that may be improved through corrective actions, including training or other non-disciplinary methods.

The IMT will continue to review the City and the CPD's efforts toward Secondary compliance to determine whether a sufficient number of officers and supervisors are trained and understand firearm-pointing policies and procedures.

# Use of Force: ¶192

**192.** *A designated unit at the CPD headquarters level will routinely review and audit documentation and information collected from all investigatory stop and arrest occurrences in which a CPD officer pointed a firearm at a person in the course of effecting a seizure. The review and audit will be completed within 30 days of each such occurrence. This review and audit will: a. identify whether the pointing of the firearm at a person allegedly violated CPD policy; b. identify any patterns in such occurrences and, to the extent necessary, ensure that any concerns are addressed; and c. identify any tactical, equipment, training, or policy concerns and, to the extent necessary, ensure that the concerns are addressed. The designated unit at the CPD headquarters level will, where applicable, make appropriate referrals for misconduct investigations or other corrective actions for alleged violations of CPD policy. At the completion of each review and audit, the designated unit at the CPD headquarters level will issue a written notification of its findings and, if applicable, any other appropriate actions taken or required to an immediate supervisor as described above.*

| Compliance Progress | (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020) |
|---|---|

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the first reporting period, the City and the CPD did not meet the July 31, 2019 deadline of ¶192. However, the CPD made notable progress toward complying with ¶192 by drafting the FRU's *Firearm Pointing Incident Review SOP*, a *Firearm Pointing Incidents* policy, and a *Weapons Discipline Training Bulletin*. In the second reporting period, the City and the CPD have met Preliminary compliance. The CPD has also exhibited its ability to operationalize elements of the firearm pointing policy and incident review SOP by establishing and building the capacities of FRU.

The IMT continued to evaluate Preliminary compliance in the second reporting period. With the issuance of the *Firearm Pointing Incidents* policy on October 1, 2019, and the development of the FRU's *Firearm Pointing Incident Review* SOP, the CPD achieved Preliminary compliance with ¶192. The IMT and the OAG reviewed and provided no-objection notices to the Firearm Pointing Incident Review SOP in the first reporting period. On August 14, 2019, the CPD shared with the IMT and OAG that it would proceed with finalizing and implementing the SOP.

To evaluate Secondary compliance, the IMT is reviewing CPD's training regarding the firearm pointing incident policy and procedures for the FRU. In 2020, the FRU developed a *Firearm Pointing Incident Review In-Service Unit Training* for FRU staff. The IMT and the OAG reviewed the draft training PowerPoint and provided feedback to the CPD on February 28 and 27, 2020, respectively. The IMT will continue to review Secondary compliance to determine whether a sufficient number of officers are trained and whether officers and the FRU understand firearm-pointing policies and procedures.

To evaluate Full compliance, the IMT will review training, community, and data sources, including footage from body worn cameras, pointing data, and FRU review schedules and completion records to determine whether the CPD has sufficiently implemented its policy and training. As explained in the analysis of ¶168 above, the IMT will also examine whether concerns are adequately identified (both detected and evaluated) and whether the processes in place "ensure that concerns are addressed" at both the organizational and individual level. Although further review is necessary, the CPD made progress toward compliance, as demonstrated by the below FRU operations and accomplishments.

From November 1, 2019, through February 26, 2020, the FRU completed 878 of 1188 Firearm Pointing Incident Report reviews. Sixty-eight percent of these reviews (599) were completed within 30 days, leaving 32% (278) completed in more than 30 days. However, 98% of incident reviews were completed within 40 days. See ¶196 for additional analysis of FRU firearm pointing review statistics.

Of the 878 incidents, 11% (95 incidents) resulted in a recommendation and 72% (632 incidents) resulted in no recommendation.[96] The most prevalent recommendation was in response to late body-worn camera activity, followed by referral to the integrity unit for when an officer fails to complete an ISR.

Paragraph 192 requires the CPD to complete three areas in its review and audit of firearm pointing incidents. During this reporting period the FRU reported activities regarding each area:

(a) *Policy violations:* From November 1, 2019, to February 26, 2020, the FRU made 127 recommendations for the 95 firearm pointing incidents (some reviews contained more than one recommendation). There were no cases generating a complaint log in 2019.

(b) *Patterns in occurrences:* The FRU assigns reviewers to review TRRs from specific districts or units to provide continuity and

---

[96] One-hundred-five incidents (12%) were not reviewed due to their being no ISR or Arrest Report and 46 incidents (5%) were duplicate incidents.

allow for the identification of patterns within those units. In addition, the FRU tracks the type of calls for service that generate firearm pointing incidents, noting the most frequent are traffic stops (21%), person with a gun (11%), and street stops (6%).

(c) *Tactical, equipment, training, or policy concerns:* As noted, the CPD issued policy and training covering the requirements for firearm-pointing incidents. The FRU also established a process for addressing these concerns, as noted in its year end summary:

"When a Tactical, Equipment or Training issue is observed, the FRU makes a recommendation which is entered into the Firearm Pointing Incident Report (FPIR). When the FPIR is approved, an email is sent to the Involved Beat's Unit Commander and Executive Officer. That Unit is then responsible for notifying the Involved Beat of the FPIR, administering the recommended actions, and entering them into the FPIR which is then closed out."

In sum, the City and the CPD completed notable activities for ¶192 during the second reporting period, resulting in Preliminary compliance. For the CPD to achieve Secondary and Full compliance, further work is necessary regarding training and operationalizing firearm pointing reviews and audits. The IMT looks forward to evaluating those efforts in the next reporting period.

# Use of Force: ¶193

> **193.** *CPD will ensure that the designated unit at the CPD head-quarters level responsible for performing the duties required by this Part has sufficient resources to perform them, including staff with sufficient experience, rank, knowledge, and expertise.*

## Compliance Progress
(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the first reporting period, the City and the CPD made notable progress toward complying with ¶193 by drafting the FRU's *Firearm Pointing Incident Review SOP*, a *Firearm Pointing Incidents* policy, and a *Weapons Discipline Training Bulletin*. In the second reporting period, the City and the CPD met Preliminary compliance with ¶193. The CPD has also exhibited its ability to operationalize elements of the firearm pointing policy and incident review SOP by establishing and building the capacities of FRU.

The IMT continued to evaluate Preliminary compliance in the second reporting period. By issuing the *Firearm Pointing Incidents* policy on October 1, 2019, and developing the FRU's *Firearm Pointing Incident Review* SOP, the CPD achieved Preliminary compliance with ¶193. The IMT and OAG reviewed and provided no-objection notices to the *Firearm Pointing Incident Review* SOP in the first reporting period. On August 14, 2019, the CPD shared with the IMT and OAG that it would proceed with finalizing and implementing the SOP.

To evaluate Secondary compliance, the IMT is reviewing the CPD's training regarding the firearm pointing incident policy and procedures for the FRU. As noted previously, the FRU developed a *Firearm Pointing Incident Review In-Service Unit Training* for FRU staff. The IMT and the OAG reviewed the draft training PowerPoint and provided feedback to the CPD on February 28 and 27, 2020, respectively. The IMT will continue to review Secondary compliance to determine whether the FRU personnel understand firearm-pointing policies and procedures.

To evaluate Full compliance, the IMT will review training, community, and data sources—including FRU quarterly and yearly reports and data on FRU staffing levels and expertise—to assess the capacities and capabilities of the FRU. As of January 2020, the CPD significantly enhanced FRU resources, with 75% of budgeted staff assigned. Staffing includes one Commander, one Lieutenant, four Sergeants, and 33 officers. Of those, one Sergeant and 10 officers are assigned to handle fire-

arm-pointing incidents. The FRU requested to add more personnel in 2020, including a fifth Sergeant and 14 additional officers. Specific to the requirement for staff to have sufficient experience, rank, knowledge, and expertise, the FRU seeks reviewers who have a minimum of 5 years within the CPD, recent patrol experience, excellent writing skills, computer proficiency, and an understanding of CPD policies. These requirements and skills are noted in the Notice of Job Opportunity (NOJO).

During the second reporting period, FRU recruiting efforts improved, which the CPD believes was influenced by a number of frontline officers applying for FRU assignments. FRU personnel are required to attend additional training beyond the CPD's mandatory annual requirements. In 2019, FRU personnel attended 62 hours of training in addition to the CPD's annual mandatory requirement. This included training on basic crisis intervention (40 hours), firearms (4 hours), ISR (2 hours), Taser (8 hours), hands-on control tactics (4 hours), and use-of-force policy and law (4 hours). The FRU also noted in conversation with the IMT that it planned to complete 108 hours of training in January and February 2020. This training includes instruction on TRR-Rs, videos, laws, control tactics, and use of force. FRU training focuses on the demands of the jobs and tools needed to do it. The IMT supports the FRU's training focus on navigating the various computer programs and accessing the camera and evidence system. The IMT looks forward to reviewing training material associated with these courses in future reporting periods.

In sum, the City and the CPD completed notable activities for ¶193 during the second reporting period, resulting in Preliminary compliance and progress toward Secondary compliance. The IMT looks forward to evaluating progress toward Secondary and Full compliance in the next reporting period.

# Use of Force: ¶196

> **196.** *The City will ensure that all documentation and recordation of investigatory stop or arrest occurrences in which a CPD member points a firearm at a person, including OEMC data, is maintained in a manner that allows the Monitor, CPD, and OAG to review and analyze such occurrences. Beginning January 1, 2020, the Monitor will analyze these occurrences on an annual basis to assess whether changes to CPD policy, training, practice, or supervision are necessary, and to recommend any changes to the process of documenting, reviewing, and analyzing these occurrences. CPD will either adopt the Monitor's recommendations or respond in writing within 30 days. Any dispute regarding the whether the Monitor's recommendations should be implemented will be resolved by the Court.*

## Compliance Progress                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**            January 1, 2020            ☑ **Met**      ☐ **Missed**

**Preliminary:**         *In Compliance* (NEW)
**Secondary:**           *Under Assessment*
**Full:**                *Not in Compliance*

Paragraph 196—along with a few other paragraphs in the consent decree—is written to highlight the IMT's actions or reviews, but ultimately relates to City responsibilities. Because the City and the CPD have the necessary policies and procedures to collect the requisite information, the City and the CPD met the January 1, 2020 deadline and are in Preliminary compliance with ¶196.

To evaluate Preliminary compliance with ¶196, the IMT reviewed the CPD's Firearm Pointing Incidents Policy and the FRU's *Firearm Pointing Incident Review* SOP. The policy and SOP outline data-retention, access, and analytics policies and procedures to ensure that all documentation and recordation of investigatory stop and arrest occurrences where a member points a firearm at a person are maintained effectively for CPD supervisors, the FRU, the IMT, and others to review. Specifically, the policy states that the Director of the Information Services Division will ensure that the OEMC data is electronically linked by a Police Computer Aided Dispatch (PCAD) event number to reports and body-worn-camera video from the incident. Furthermore, the SOP describes the CPD's procedures to include firearm pointing incidents being automatically captured in Clearnet when a pointing notification is made to the OEMC, and the FRU requirements and processes for handling a Firearm Pointing Incident Report (FPIR).

To evaluate Secondary compliance, the IMT is assessing whether the CPD has developed appropriate training for staff about documenting, recording, and maintaining data related to firearm pointing incidents. Per the *Firearm Pointing Incident Review* SOP, "All members of the FRU are required to receive a minimum of 8 hours of in-service training yearly on the United States Constitution Fourth Amendment including training on Stop and Frisk, Terry Stops, and Warrantless Searches." The FRU planned to complete this training by the end of February 2020, which the IMT was unable to confirm through compliance documentation during this reporting period.

The CPD provided the IMT and the OAG with preliminary data in February 2020 to begin reviewing and analyzing firearm pointing incidents annually. First, and before January 1, 2020, the CPD supplied raw data on the number of firearm-pointing incidents. Second, on February 11, 2020, the CPD shared its annual *Force Review Unit Year End Summary* for 2019, which includes details regarding the activities and data for firearm pointing incidents.

The report states that during 2019 the CPD generated 597 FPIRs.[97] Overall, there were 10 types of calls for service/incidents that led to 468 firearm pointing incidents and another 129 incidents that resulted from a combination of 43 different types of calls. The calls for service/incident types that generated the largest amount of firearm pointing incidents were traffic stops (162 incidents, 28%), person with a gun (80 incidents, 14%), foot pursuits (51 incidents, 9%), and street stops (40 incidents, 7%).

The report also notes that the FRU reviewed 487 (82%) of FPIR incidents by the end of 2019. Of these 487 reviewed incidents, 127 resulted in an arrest and completion of an Investigatory Stop Report (ISR), 247 resulted in an arrest without a completed ISR, 55 resulted in a completed ISR without an arrest, and 58 were not reviewed because they did not result in an arrest or an ISR. Additional data on pointing incidents since FRU began tracking these incidents area provided in Figure 34 and 35, below.

---

[97] The FRU began collecting and reviewing FPIR incidents on November 1, 2019; thus 2019 totals include incidents for the months of November and December.

Figure 34: Firearm Pointing Incident by Top Call Type

|  | 2019<br>(November 1, 2019 to December 31, 2019) | 2nd Reporting Period<br>(November 1, 2019 to February 26, 2020) |
|---|---|---|
| Total Firearm Pointing Incident Reports (FPIRs) | 597 | 1188 |
| Traffic Stops | 162 (28%) | 253 (21%) |
| Person with a Gun | 80 (14%) | 127 (11%) |
| Foot Pursuits | 51 (9%) | 62 (5%) |
| Street Stop | 40 (7%) | 69 (6%) |
| Other Event Types | 129 (22%) | 153 (13%) |

Figure 35: Firearm Pointing Incidents and Review

|  | 2019<br>(November 1, 2019 to December 31, 2019) | 2nd Reporting Period<br>(November 1, 2019 to February 26, 2020) |
|---|---|---|
| Total Firearm Pointing Incident Reports (FPIRs) | 597 | 1188 |
| Reviewed/Closed FPIRs | 487 | 878 |
| Arrest and ISR | 127 | 175 |
| Arrest | 247 | 471 |
| ISR | 55 | 117 |
| No Arrest or ISR | 58 | 115 |

During the IMT's January 2020 site visit, we learned about problems regarding body-worn cameras that will likely impact the IMT's ability to properly analyze firearm pointing incidents: (1) issues regarding the proper use of cameras, and (2) the fact that saturation teams do not have cameras.

First, there is a persistent problem with the proper use of body-worn cameras, specifically regarding activating and terminating their use. The FRU reported that, of the 1,316 TRRs reviewed in 2019, 221 had problems with body-worn camera use (141 with late camera activation, 42 with no activation, and 38 with early termination). The FRU also noted that camera use problems also appear to be more acute in districts with more violence and TRRs (*e.g.*, District 6 with 24.6% and District 11 with 28.8% of TRRs with camera issues).

The CPD took action to address these problems. Specifically, it debriefed or retrained individuals involved in the 221 incidents on body-worn camera use. Additionally, in 2020, the CPD increased the buffering time for body-worn camera time from 30 seconds to two minutes to compensate for the activation and termination

errors. Unfortunately, the extended time has become more problematic and resulted in more cases of misuse.[98]

Since this is a critical component for the IMT's annual review of firearm pointing incidents, the IMT began reviewing TRRs and body-worn camera video taken during the second reporting period to better understand the information captured in these resources and the challenges with activation and termination of the cameras.

Second, during the IMT's January 14, 2020, site visit with CPD, the FRU noted that saturation teams did not have body worn cameras. It is essential for these teams to be issued cameras given their expected role in working in districts with high rates of violent crime.

Since the Firearm Pointing Incident policy has been in effect for fewer than six months, the IMT has not had enough opportunity to assess the completion of related training and the findings and issues noted by the FRU. Secondary compliance will depend on such analysis and focus on training compliance and reducing body-worn-camera problems.

---

[98] This is based on information from the CPD during the January 14, 2020 IMT site visit meeting with the FRU. Following the site visit, the IMT requested all information demonstrating the CPD's efforts to address improper use of body-worn cameras, including but not limited to training material, e-Learning training, roll call briefings, or evidence of reprimands or other remedial steps. No further information was provided to the IMT at the conclusion of this reporting period. The City did provide the IMT with a large amount of use-of-force data in the last few days of the second reporting period. The IMT will report on these materials in the next monitoring report.

## Use of Force: ¶218

*218. CPD members must report and document any reportable use of force. Beginning January 1, 2019, a reportable use of force will be defined as any use of force by a CPD member included in any of the following three levels: a. A level 1 reportable use of force is the use of any force by a CPD member to overcome the active resistance of a subject that does not rise to a level 2 or level 3 reportable use of force. This would include force that is reasonably expected to cause pain or an injury, but does not result in injury or complaint of injury. The following techniques are level 1 reportable uses of force when applied in response to active resistance: pressure point compliance techniques; joint manipulation techniques; wristlocks; armbars; and any leg sweep, weaponless defense techniques, or takedown that does not result in injury or complaint of injury. It is not a reportable use of force for a CPD member to escort, touch, or handcuff a person with no or minimal resistance. b. A level 2 reportable use of force is the use of any force by a CPD member that includes use of a less-lethal weapon or that causes an injury or results in a complaint of an injury, but that does not rise to a level 3 reportable use of force. Force options in this level include: discharge of an OC device; discharge of a Taser; impact weapon strikes to any part of the body other than the head or neck; use of impact munitions; any physical apprehension by a canine; any reportable use of force against a handcuffed subject; and any leg sweep, weaponless defense technique, or takedown resulting in an injury or complaint of injury. c. A level 3 reportable use of force is when a CPD member does any of the following: uses any force that constitutes deadly force, such as discharging a firearm or using an impact weapon to strike a person's head or neck; uses a chokehold or other maneuver for intentionally putting pressure on a person's airway or carotid artery; uses any force that causes the death of any person; or uses any force that causes injury to any person resulting in admission to a hospital.*

### Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the first reporting period, the City and the CPD did not meet the deadline for implementing a system that classifies force in the requisite three levels by January

1, 2019. However, the CPD began efforts during the first reporting period to revise its Use of Force policies, to include General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report,* which addresses the requirements of ¶218.

The CPD has not met Preliminary compliance for ¶218 in the second reporting period. However, the CPD continued to make significant strides toward meeting Preliminary compliance.

During this reporting period, the IMT and OAG engaged in several rounds of review and comment on the CPD's Use of Force policy suite.[99] On February 29, 2020, the CPD's revised suite of Use of Force policies, to include General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, became effective. This policy outlines the three levels of reportable use of force as required by ¶218.

The CPD recognizes the need for a comprehensive community engagement process as it develops the Use of Force policies. On August 14, 2019, the CPD shared a proposed *Community Input on Policy Documents Plan*, which the IMT and the OAG reviewed and provided written comment on. At the end of the reporting period, the plan included two phases of community engagement: (1) "open space technology" meetings and (2) working groups.[100]

The CPD completed the first phase in February 2020. It held four open space technology community meetings on February 4, 5, 6, and 8, 2020, to obtain input from the community on 14 CPD policies, including its Use of Force policies (*see* ¶160 for more detail on these community meetings, including the IMT's observations). Approximately 100 people attended each of the four meetings.

The CPD began its second phase in February, with efforts to establish a Use of Force working group. The CPD solicited individuals to "take a leadership role" and express interest to join the working group by February 29, 2020, via an online survey, email, or phone.

In addition to the two-phased community engagement process, the CPD also posted all Use of Force policies online for a 30-day public review and comment period. The online public comment notes the ongoing revisions the CPD will make to the policies following input from the community, the Civilian Office of Police Accountability (COPA), the IMT, and the OAG:

---

[99] *See Use of Force Policies for Public Comment*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/policy-review/use-of-force-policies-for-public-review-and-comment/.

[100] The IMT understands that the CPD is considering additional changes to this Plan, which will occur in the third reporting period.

> Please note, these policies will be issued and go into full effect during this public comment period. We understand that these directives, when published, will require future revisions. We are currently working collaboratively with the Civilian Office of Police Accountability (COPA), the Independent Monitoring Team (IMT), and the Office of the Attorney General (OAG) to review the procedures and responsibilities established by this directive. We will also take into consideration your comments and suggestions while we work toward a more comprehensive revision of these policies. While this review process continues to identify future revisions, the actions of CPD members will be guided by the procedures set by these directives. We invite you to share your opinions and ideas and look forward to your feedback. Thank you again for your continued partnership in building a safer Chicago.[101]

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-02 accordingly, and finalize the policy.

To evaluate Secondary compliance, the IMT is reviewing the development, implementation, and evaluation of the 2020 use of force in-service training, to include the updated three levels of reportable use of force. The sixth hour of the training discusses tactical response reports (TRRs), General Order 03-02-02, and the three new levels of reportable use of force.

In addition, in early February 2020, the Education and Training Division created a document to clarify the forthcoming changes in the use of force policy. This document was created in response to expressed confusion from trainers and CPD members. The document describes the CPD's shift to three levels (from four) of reportable force, effective February 29, 2020; defines and provides examples of each level; and outlines notification requirements and procedures. It also notes that the change to "Levels 1-3 are defined for reporting, supervisor responsibilities, and review purposes; and do not affect when someone can use various force options." The CPD distributed this document during the classroom training to ensure all personnel received the same information.

In the second reporting period, the CPD made important steps toward Preliminary compliance by launching community engagement efforts to obtain input on policy G03-02-02 and other Use of Force policies. In the next reporting period, the IMT

---

[101] *See Use of Force Policies for Public Review and Comment*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/policy-review/use-of-force-policies-for-public-review-and-comment/.

will continue to monitor these community engagement activities for Preliminary compliance.

The IMT will also continue to monitor Secondary compliance with ¶218 by reviewing training attendance records, pre- and post-tests, and evaluations for the 2020 in-service training, and review completed TRRs for comprehension of the updated three levels of reportable uses of force and to evaluate if the new levels of force are impacting officer completion of the TRR form.

# Use of Force: ¶222

**222.** *A CPD supervisor will immediately respond to the scene when a level 2 or level 3 reportable use of force occurs ("responding supervisor"). CPD supervisors may, at their discretion, respond to the scene when a level 1 reportable use of force occurs, but they are not required to do so.*

**Compliance Progress**                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* **(first reporting period)** |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not in Compliance* |

In the first reporting period, the CPD met Preliminary compliance for ¶222 through General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (dated October 16, 2017).

To evaluate Secondary compliance, the IMT is reviewing the development, implementation, and evaluation of supervisory training for use of force incidents. The CPD's 2020 Use of Force In-Service Training provides instruction on "Supervisory Updates." During this section, the training notes the requirements of ¶222:

> A supervisor who has been notified of a reportable use of force incident will respond to the scene when the involved member has been involved in a Level 2 or Level 3 reportable use of force incident.

Additionally, it notes that the notified supervisor will determine if "[a]n on-scene response is necessary when notified of a Level 1 reportable use of force incident" and provides specifics regarding circumstances that would necessitate a supervisory response.

In the next reporting period, the IMT plans to review training specific to supervisors in more detail.

In late 2019, the CPD's Office of Operational Compliance began to conduct an audit to assess the extent to which CPD supervisors are responding to and reviewing use-of-force incidents in accordance with the consent decree. Specifically, regarding compliance with ¶222 for supervisor responses, the audit will examine a random, generalizable sample of use of force incidents from 2017–2019 using raw TRR and TRR-I data. The Office of Operational Compliance anticipates completing this audit during the IMR 3 reporting period.

The IMT will review the results of the audit and other information from the Education and Training Division and the FRU to determine, for Secondary compliance, whether supervisors understand their duties for responding to the scene for Level 2 and 3 reportable uses of force. Such data may include, if available, information captured by the FRU or the OEMC regarding the time the responding supervisor announces their presence on the scene.

# Use of Force: ¶223

> **223.** *For level 2 and level 3 reportable use of force incidents, the duties of the responding supervisor will include, at a minimum: a. identifying known available witnesses to the use of force to the extent reasonably possible and documenting their identities and statements in a written report, except in incidents for which the Civilian Office of Police Accountability ("COPA") receives administrative notifications and responds to the scene; b. coordinating with COPA, as appropriate; c. gathering and preserving evidence related to the use of force; d. requesting the assignment of an evidence technician to photograph persons involved in the incident, including any injuries sustained; e. ensuring that members and subjects receive appropriate medical care; f. making notifications as required by CPD policy; and g. reviewing reports regarding the incident for legibility and completeness.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the first reporting period, the CPD began working with the IMT and the OAG to revise its Use of Force policies in accordance with the consent decree, to include updating General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, which addresses the requirements of ¶223. While the City and the CPD did not meet Preliminary compliance for ¶223 in the first or second reporting periods, the CPD continued to make significant strides toward meeting Preliminary compliance.

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-02. These policies address the requirements of ¶223. To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-02 accordingly, and finalize the policy.

To evaluate Secondary compliance, the IMT is reviewing the development, implementation, and evaluation of supervisory training for use of force incidents. The CPD's 2020 Use of Force In-Service Training provides instruction on Supervisory Updates. During this section, the training notes the requirement of ¶223(a):

> For Level 2 and Level 3 reportable use of force incidents involving injury or complaint of injury for which a COPA notification is not

> required, undertake reasonable efforts to identify and interview
> additional witnesses beyond those that are known and available.

While many of the required duties in ¶223 are not new to supervisors, as pointed out in our first monitoring report, identifying and interviewing additional witnesses are new duties.

The *Force Review Unit Year End Summary* for 2019 identifies debriefing points related to reviewing supervisory duties noted in ¶223.[102] Specifically, the most pervasive issues identified by the FRU include:

- Failure to mark boxes in TRR related to locating witnesses (regarding ¶223(a));

- Failure to document injuries and alleged injuries to both Officers and Subjects (regarding ¶223(d)); and

- Failure to request Evidence Technicians to document injuries or alleged injuries to both Officers and Subjects (regarding ¶223(d)).

These errors may be indicative of a lack of understanding of or training on the required duties described in this paragraph. However, the FRU did not find significant problems with the reviewing supervisors' narratives (regarding ¶223(g)), nor is there any mention of failing to gather evidence, coordinate with COPA, seek appropriate medical care, or make appropriate notifications.

The *Force Review Unit Year End Summary* also compares supervisory performance from year to year, 2018–2019. Thus, the FRU and the IMT can assess the persistence of problems and whether progress is being made.

Furthermore, the summary provides data on the number of actions taken for these problems. In 2019, 19% of TRRs (240 of 1,316) resulted in Recommendations and Advisements to reviewing supervisors, which include 110 Recommendations and 140 Advisements.[103]

---

[102] The CPD's term for the consent decree term "Responding Supervisor" is "Reviewing Supervisor." During the second reporting period, the IMT discussed the differences in language while reviewing and revising the Use of Force policies. The CPD requested to not change its terminology because they felt it does not fully describe the expectations and duties, and it would cause confusion with existing operations. The IMT supported this, as all the responsibilities for the supervisor are properly defined and included in the policies.

[103] The IMT commends the FRU for establishing a system for these assessments and responses. However, the IMT noted inconsistencies in some reported numbers and language in the *Force Review Unit Year End Summary 2019*. These efforts are a start and point out a need for more training in these areas given the number of debriefing points, as well as a close review of FRU data tracking and analysis.

In consideration of all the above regarding training and the FRU's year-end review for 2019, the IMT commends the CPD for establishing a system to assess short-comings via debriefing points. However, the number of debriefings in 2019 show a need for further training and for better knowledge of policy and procedures. The IMT will continue to assess reviewing supervisor responsibilities in the next reporting period.

# Use of Force: ¶224

**224.** *In addition, for level 2 and level 3 reportable use of force incidents involving an injury or complaint of injury for which COPA does not have jurisdiction, the responding supervisor will undertake reasonable efforts to identify and interview additional witnesses beyond those that are known and available.*

**Compliance Progress**          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the first reporting period, the CPD began working with the IMT and the OAG to revise its Use of Force policies in accordance with the consent decree, to include updating General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, which addresses the requirements of ¶224. The City and the CPD did not meet Preliminary compliance for ¶224 in the first or second reporting periods. However, the CPD continued to make significant strides toward meeting Preliminary compliance.

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-02. These policies address the requirements of ¶224. To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-02 accordingly, and finalize the policy.

To evaluate Secondary compliance, the IMT is reviewing the development, implementation, and evaluation of supervisory training for use of force incidents. The CPD's 2020 Use of Force In-Service Training provides instruction on Supervisory Updates. The training notes the requirement of ¶224:

> For Level 2 and Level 3 reportable use of force incidents involving injury or complaint of injury for which a COPA notification is not required, undertake reasonable efforts to identify and interview additional witnesses beyond those that are known and available.

The IMT will continue to assess Secondary compliance, to include completion of the in-service training and the FRU's ongoing review of supervisory response and noted debriefing points.

# Use of Force: ¶225

**225.** *A supervisor who used force or ordered force to be used during a reportable use of force incident will not perform the duties assigned to the responding supervisor for that incident.*

<span style="color:blue">Compliance Progress</span>          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the first reporting period the CPD began working with the IMT and the OAG to revise its Use of Force policies in accordance with the consent decree, to include updating General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, which addresses the requirements of ¶225. The City and the CPD did not meet Preliminary compliance for ¶225 in the first or second reporting periods. However, the City and the CPD continued to make significant strides toward meeting Preliminary compliance.

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-02. These policies address the requirements of ¶225. To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-02 accordingly, and finalize the policy.

To evaluate Secondary compliance, the IMT is reviewing the development, implementation, and evaluation of training for use of force incidents involving supervisors. The CPD's 2020 Use of Force In-Service Training provides instruction on policy updates specific to supervisors. The training notes the requirement of ¶225:

> A supervisor who used reportable force or ordered a use of reportable force during a use of force incident will not perform the functions and responsibilities of the reviewing supervisor or approving supervisor for the incident.

The training also describes that the watch operations lieutenant or responding exempt-level supervisor will determine the appropriate supervisor to respond.

The CPD supplies regular data on the extent of supervisors using force via Tableau. From January 1, 2019, to February 24, 2020, supervisors used force 371 times, accounting for 6.6% of TRRs.[104] <span style="color:blue">Figure 36</span> provides additional data on supervisor use of force across monitoring periods. In IMR-3, the IMT will continue to assess Sec-

---

[104]   This was the data available at the end of the second reporting period, February 29, 2020.

ondary compliance, to include completion of the in-service training, data on supervisor use of force, and the FRU's ongoing review of supervisory response and noted debriefing points.

Figure 36: Comparison of Use of Force by Supervisors

| | Total (January 1, 2019 to February 24, 2020) | 1st Reporting Period (March 1, 2019 to August 31, 2019) | 2nd Reporting Period (September 1, 2019 to February 24, 2020) |
|---|---|---|---|
| Use of Force (TRR) Total | 5,641 | 2,744 | 2,227 |
| TRR by Supervisor | 371 | 194 | 131 |
| Percentage of TRR by Supervisor | 6.6% | 7.1% | 5.9% |

# Use of Force: ¶226

**226.** *CPD will continue to require the responding supervisor to document information collected and actions taken in performing his or her investigatory duties in the supervisor's portion of the TRR, or in any other similar form of documentation CPD may implement.*

## Compliance Progress                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* **(first reporting period)** |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Preliminary compliance from the first reporting period for ¶226. The CPD requires the responding supervisor to document information collected and actions taken in the supervisor's portion of the TRR. This was articulated in General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (dated October 16, 2017). In 2017, the CPD also revised its TRR form to require officers to complete a narrative that describes the force used and the circumstances necessitating the level of force. The CPD continued to make revisions to the TRR to improve its use and clarity throughout 2019.

To evaluate Secondary compliance, the IMT is reviewing the development, implementation, and evaluation of supervisory training for use of force incidents. As described in the analysis for ¶223, the *Force Review Unit Year End Summary* for 2019 identifies debriefing points related to reviewing supervisory duties. The FRU made 244 Recommendations and Advisements in 2019.[105] The report states that "the most pervasive issues that the FRU has identified relate to documentation of injuries and alleged injuries to both Officers and Subjects, as well as Evidence Technicians being requested to document those same injuries and alleged injuries to both Officers and Subjects." The requirements of ¶226 are general in nature and as such do not readily fall into the FRU's reviewing supervisors debriefing points. The closest debriefing point is "narrative deficiency" for which there were 8 instances in 2019. However, narrative deficiency was the most pervasive issue for reviewing supervisor's subordinates (involved members) in 2019, which is an issue the immediate supervisors are responsible for.

---

[105] As noted previously, the IMT noted inconsistencies in some reported numbers and language in the *Force Review Unit Year End Summary* for 2019. These efforts are a start and point out a need for more training in these areas.

The IMT is conducting a review of TRRs to assess Secondary compliance. Specifically, it is assessing supervisor understanding for completing the supervisory section of the TRR. The IMT will use this review and input from the FRU via its quarterly and annual reports to assess Secondary compliance.

# Use of Force: ¶227

**227.** *Any CPD member who becomes aware of information indicating that a reportable use of force occurred but was not reported must immediately notify his or her supervisor.*

## Compliance Progress (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the first reporting period the CPD began working with the IMT and the OAG to revise its Use of Force policies in accordance with the consent decree, to include updating General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, and General Order 03-02, *Use of Force*, which address the requirements of ¶227. The CPD did not met Preliminary compliance for ¶227 in the first or second reporting periods. However, the CPD continued to make significant strides toward meeting Preliminary compliance.

Regarding Preliminary compliance, on February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-02 and General Order 03-02, *Use of Force*. These policies address the requirements of ¶227. To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-02 accordingly, and finalize the policy.

To evaluate Secondary compliance, the IMT is reviewing the development, implementation, and evaluation of training for use of force incidents. The CPD's 2020 Use of Force In-Service Training includes instruction on *Peer Intervention/Duty to Intervene*, addressing all requirements of ¶227. Specifically, the lesson plan notes the following:

> Department members who have knowledge of the use of force against a subject in violation of this directive will submit an individual written report to a supervisor before reporting off duty on the day the member becomes aware of the misconduct.

It will be a challenge to attain Secondary compliance for ¶227. As recently as January 13, 2020, Interim Superintendent Charles Beck admitted the existence of a code of silence in the CPD.[106]

---

[106] *See* Interim Superintendent Charlie Beck, *City Club of Chicago Speech*, CITY CLUB OF CHICAGO (January 13, 2020), https://www.cityclub-chicago.org/video/2455/interim-supt-charlie-beck.

Obtaining data (if such information exists) on unreported incidents of use of force continues to be an issue for the IMT. The IMT inquired during bi-weekly conference calls whether the CPD, its Bureau of Internal Affairs, or its Law Department have data, information, or knowledge of unreported incidents. The IMT raised the issue of unreported incidents of use of force with COPA again during a January 2020 visit. COPA noted that it does not categorize cases in this manner.

The IMT identified two sources of information on unreported incidents of use of force and will continue to review and assess this information. First, the FRU identifies some unreported incidents by its review of TRRs; subsequently obtained complaints for unreported use of force and excessive force; and conducting audits of body-worn camera videos. According to the *Force Review Unit Year End Summary* for 2019, on page 17, in 2018 there were three incidents that resulted in accusations against six members for failing to report excessive force. In 2019, there were two incidents that resulted in accusations against two members for failing to report excessive force. Second, the Office of Operational Compliance's foot pursuit audit may provide further detail and data on the issue of potentially unreported uses of force that merit further investigation.

Moving forward, the IMT will continue to assess Secondary compliance, to include completion of the in-service training and the FRU's ongoing review of supervisory response and noted debriefing points.

# Use of Force: ¶229

**229.** *All reportable uses of force by CPD members must be reviewed by CPD supervisors.*

**Compliance Progress**                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* **(first reporting period)** |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not in Compliance* |

In the first reporting period, the City and the CPD met Preliminary compliance with ¶229 with General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (dated October 16, 2017)—by which the responding supervisor (or "Reviewing Supervisor," as used in the directive) must document information collected and actions taken. The City and the CPD have now met Secondary compliance in the second reporting period.

To evaluate Secondary compliance, the IMT reviewed the development, implementation, and evaluation of supervisory training for use of force incidents. The IMT noted in our first monitoring report that the CPD has engaged in a variety of activities to educate members on use of force, including reviewing supervisors' responsibilities; classroom training for supervisors in 2017 on the revised policy and completion and review of TRRs; two-day use of force in-service training in 2019; written guidance for supervisors accessible via CPD's internal network (ClearNet); and informal training from the FRU on how to properly complete TRRs and related forms.[107] The CPD continues to train CPD members that all reportable uses of force are reviewed by CPD supervisors in its 2020 use of force in-service training.

The IMT conducted interviews with supervisors (sergeants and lieutenants) in a number of districts with high levels of use-of-force incidents (6th, 8th, 11th, and 19th Districts), during site visits in July 2019 and January 2020 to inquire about training and their understanding of the expectations, policies, and requirements for reviewing reportable uses of force. Based on these interviews, our review of CPD's supervisor training strategies, and the FRU not identifying supervisor reviews as an area of concern, the IMT believes that CPD supervisors are properly trained in their duties to routinely review all reportable uses of force that are

---

[107] The City has indicated that there are additional relevant training records for the IMT to consider moving forward.

brought to their attention. We look forward to verifying whether an adequate pro-
portion of personnel have completed training on this requirement in support of
Secondary compliance with ¶229.

# Use of Force: ¶230

> **230.** *After a reportable use of force has occurred, required TRRs have been completed, and, in the case of level 2 and level 3 incidents, a responding supervisor has documented any investigatory information collected, the incident will be reviewed and evaluated by a CPD supervisor at least the rank of Lieutenant, and in all instances at least one rank level above that of the highest-ranking member who engaged in the reportable use of force, or by a command staff member, when designated ("reviewing supervisor").*

## Compliance Progress                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the first reporting period the CPD began working with the IMT and the OAG to revise its Use of Force policies in accordance with the consent decree, to include updating General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, which addresses the requirements of ¶230. The CPD did not meet Preliminary compliance for ¶230 in the first or second reporting periods. However, the CPD continued to make significant strides toward meeting Preliminary compliance.

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-02. These policies address the requirements of ¶230. To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-02 accordingly, and finalize the policy.

To evaluate Secondary compliance, the IMT is reviewing the development, implementation, and evaluation of supervisory training for use of force incidents. As noted previously, the CPD has engaged in a variety of activities to educate members on use of force, including reviewing supervisors' responsibilities (see analysis for ¶229).

Furthermore, the *Force Review Unit Year End Summary* reports no deficiencies regarding a lieutenant approving Level 2 and Level 3 use of force. The CPD's "Use of Force by Supervisor" Tableau dashboard indicates that 374 uses of force by supervisors from January 2019 through February 2020.

In the next reporting period, the IMT looks forward to further reviewing Secondary compliance for ¶230 after G03-02-02 is finalized with the requisite community input. This will include reviewing a random sample of sergeants' and lieutenants' TRRs to ensure that a supervisor of higher rank conducts the review.

# Use of Force: ¶231

> **231.** *The reviewing supervisor will conduct an investigation into the reportable use of force incident by reviewing all information reasonably available regarding the incident, including written reports, video or audio recordings, and, in the case of level 2 and level 3 reportable use of force incidents, witness statements, photographs (if available), and other evidence or information collected by the responding supervisor. After advising the subject of his or her right not to answer questions and other applicable rights, and only if the subject voluntarily consents to an interview, the reviewing supervisor will interview the subject solely about the reportable use of force. In addition, the reviewing supervisor will visually inspect the subject and document any injuries observed.*

## Compliance Progress
(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* **(first reporting period)** |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Preliminary compliance with ¶231 in the second reporting period. Specifically, the City and the CPD met Preliminary compliance with General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report,* dated October 16, 2017, which addresses the requirement that a supervisor review all information in the investigatory report, advise a subject of his or her rights, and visually inspect the subject for any injuries.

To evaluate Secondary compliance, the IMT is reviewing the development, implementation, and evaluation of supervisory training for use of force incidents. During the second reporting period, the best available evidence to the IMT to determine Secondary compliance with ¶231 is the *Force Review Unit Year End Summary* for 2019. While the report does not reference incidents for January 1, 2020, to February 29, 2020, of the reporting period, it does identify the most pervasive issue with Approving Supervisors in 2019 to be "failing to properly document the visual inspection of and Miranda warnings given to the subject involved in the TRR." There were 24 debriefing points for "no visual inspection" and 19 debriefing points for missing a *Miranda* warning. [108]

---

[108] The CPD's term for the consent decree term "Reviewing Supervisor" is "Approving Supervisor." During the second reporting period, the IMT discussed the differences in language while reviewing and revising the Use of Force policies. The CPD expressed concern with changing its terminology because they felt it does not fully describe the expectations/duties and it would

Due to the revisions to the TRR and the noted issues for Approving Supervisors in 2019 (failure to inspect and give *Miranda* rights), the IMT believes that further training is required. Thus, the CPD has yet to achieve Secondary compliance for ¶231.

Though the number of noted issues in 2019 for Approving Supervisors were minimal in comparison to the total number of TRRs (10% of TRRs resulted in Recommendations and Advisement made to the Approving Supervisor), the expectation of the rank and importance of the final senior level district review necessitate further improvements for these reviews.

Moving forward, the IMT will continue to assess Secondary and Full compliance as it relates to the issues noted above for training needs for Approving Supervisors by reviewing training materials and completion reports for Supervisors and randomly analyzing FRU and supervisory reports and recommendations via TRRs, TRR-Is, FRU reports, body-worn-camera video, in-car video, and more.

---

cause confusion with existing operations. To further clarify and align with existing operations, the CPD revised its Use of Force policies (February 29, 2020) to "Investigating Supervisor." The IMT supported this, as all of the responsibilities for the supervisor are properly defined and included in the policies.

# Use of Force: ¶232

> ***232.*** *For all reportable uses of force, the reviewing supervisor will determine, based on the information reviewed, if the use of force requires a notification to COPA and will assess whether the use of force was in compliance with CPD policy (except for incidents involving deadly force or an officer-involved death). The reviewing supervisor will also review the TRR, or any similar form of documentation CPD may implement, for sufficiency and completeness.*

**Compliance Progress**                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the first reporting period, the CPD began working with the IMT and the OAG to revise its Use of Force policies in accordance with the consent decree. This included updating General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, which addresses the requirements of ¶232. The City and the CPD did not met Preliminary compliance for ¶232 in the first or second reporting periods. However, the CPD continued to make significant strides toward meeting Preliminary compliance.

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-02. These policies address the requirements of ¶232. To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-02 accordingly, and finalize the policy.[109]

To evaluate Secondary compliance, the IMT is reviewing the development, implementation, and evaluation of supervisory training for use of force incidents. During the second reporting period, as noted in the analysis for ¶231, the best available evidence to the IMT during the second reporting period to determine Secondary compliance with ¶232 is the *Force Review Unit Year End Summary* for 2019. It notes the most prevalent debriefing point for Approving Supervisors was "failing to properly document the visual inspection of and Miranda warnings given to the subject involved in the TRR."

---

[109] In its comments, the City indicated that the City and the CPD believe that the requirements of ¶232 were contained in the 2017 version of this policy and requested that we therefore consider a Preliminary compliance determination for this paragraph. *See* Attachment B. We disagree. The 2020 version of the policy clarifies the reviewing supervisor's responsibility to review the TRR for sufficiency and completeness.

The FRU also identified narrative deficiencies for Approving Supervisors' completion of the TRR-Investigation (TRR-I) form, including failure to mark boxes within the TRR-I where narratives lack the sufficiency and completeness the consent decree requires. Furthermore, the failure to visually inspect the subject was an issue in 2018 and continued to be an issue in 2019.

The FRU made a total of 137 Advisements and Recommendations to Approving Supervisors in 2019.[110] A "Recommendation" requires that the identified member be debriefed by his/her immediate supervisor; there were 50 Recommendations to Approving Supervisors in 2019. An "Advisement" refers the member to a department directive; there 85 Advisements to Approving Supervisors in 2019.

Furthermore, the year-end summary provides data on the number of use-of-force incidents where the involved member's unit identified alleged misconduct, resulting in a complaint log number being obtained from COPA. In 2019 there were 2,876 incidents requiring a TRR, of which 13 were sent by units to COPA and obtained a complaint log number. The summary does not specify the supervisor who obtained the number. The CPD's "TRR Referred to COPA" Tableau dashboard also reports 597 of 5,715 TRRs (10.4%) from January 1, 2019 to February 29, 2020 were referred to COPA.

In the next reporting period, the IMT looks forward to the CPD's community engagement efforts to achieve Preliminary compliance for G03-02-02. Additionally, the IMT will further review Secondary and Full compliance for ¶232 by reviewing training materials and completion reports for Supervisors and randomly analyzing FRU and supervisory reports and recommendations via TRRs, TRR-Is, FRU reports, body-worn camera video, in-car video, and more.

---

[110] As noted previously, the IMT noted inconsistencies in some reported numbers and language in the *Force Review Unit Year End Summary* for 2019. These efforts are a start and point out a need for more training in these areas.

# Use of Force: ¶233

**233.** *For all reportable use of force incidents, the reviewing supervisor will: provide timely, constructive feedback, where appropriate, to the officer who engaged in the reportable use of force, the officer's supervisor, or both; recommend additional training and/or support as necessary based on the incident; take appropriate action, including referring uses of force that may violate law or CPD policy to COPA.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the first reporting period, the CPD began working with the IMT and the OAG to revise its Use of Force policies in accordance with the consent decree. This included updating General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, which addresses the requirements of ¶233. The City and the CPD did not met Preliminary compliance for ¶233 in the first or second reporting periods. However, the CPD continued to make significant strides toward meeting Preliminary compliance.

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-02. These policies address the requirements of ¶233. To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-02 accordingly, and finalize the policy.

To evaluate Secondary compliance, the IMT is reviewing the development, implementation, and evaluation of supervisory training as it relates to review responsibilities. As noted in the analysis for ¶222, the CPD's Office of Operational Compliance began efforts to conduct an audit to assess the extent to which CPD supervisors are properly responding to use of force incidents and providing timely feedback.

Specifically, regarding compliance with ¶233 for supervisor responses, the audit will examine a random, generalizable sample of use of force incidents from 2017–2019 using raw TRR and TRR-I data to determine the percentage of use of force incidents for which a reviewing supervisor provided feedback to an involved member, and the percentage of time feedback is timely provided. The Office of Operational Compliance anticipates completing this audit during the third reporting period.

The *Force Review Unit Year End Summary* for 2019 does not mention constructive feedback to officers as a debriefing point. The FRU noted on the February 19, 2020, biweekly use of force call that it is not measuring points of this nature yet because the revised policy (General Order 03-02-02) was not yet issued. The FRU noted it plans to adjust its procedures following the February 29, 2020 issuance of the revised use of force policy suite.

The requirement for the Approving Supervisor to notify COPA has been in CPD policy since 2017. The CPD's "TRR Referred to COPA" Tableau dashboard reports a total of 529 (10.6%) of 4,989 incidents in 2019 were referred to COPA. Of those, 75 incidents were referred by an Approving Supervisor.

In the next reporting period, the IMT will review the audit report and other information from the Education and Training Division and FRU to evaluate Secondary compliance, including whether supervisors understand their duties for providing timely and constructive feedback.

# Use of Force: ¶234

> **234.** *CPD will continue to require the reviewing supervisor to document in a Tactical Response Report – Investigation ("TRR-I"), or in any other similar form of documentation CPD may implement, his or her detailed assessment of compliance with CPD policy, any constructive feedback, and any required or recommended action. In addition, the reviewing supervisor will include in the TRR-I or in any other similar form of documentation CPD may implement, the identities of CPD members on scene during the incident who are reasonably believed to have relevant knowledge or information regarding the reportable use of force.*

## Compliance Progress　　　(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the first reporting period, the CPD began working with the IMT and the OAG to revise its Use of Force policies in accordance with the consent decree. This included updating General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, which addresses the requirements of ¶234. Nonetheless, the City and the CPD did not meet Preliminary compliance for ¶234 in the first or second reporting periods.

While the CPD continued to make progress toward meeting Preliminary compliance in the second reporting period, the Reviewing Supervisor responsibilities have not been fully implemented (*i.e.*, the TRR-I forms need to include constructive feedback; required or recommended action; and officers on the scene who may have knowledge regarding the reportable use of force). To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-02 accordingly, and finalize the policy.

The CPD is tracking data from TRR-Is regarding compliance with CPD policy via a "TRR Policy Compliance Decisions" Tableau Dashboard. This dashboard provides the IMT with data on this subject from January 1, 2019 to present. During this reporting period, there were 401 TRR-I reports. Reviewing supervisors indicated that 389 (97.0%) of those complied with CPD policy, while 4 (1.0%) did not. Figure 37 provides additional numbers, dating back to January 1, 2019.

Figure 37: Reviewing Supervisor Compliance Decisions

| Reviewing Supervisor TRR-I | In Compliance with CPD Policy | Not in Compliance with CPD Policy | Deadly Force |
|---|---|---|---|
| January 1, 2019 to February 20, 2020 | 3,736 (97.4%) | 54 (1.4%) | 40 (1.0%) |
| 1st Reporting Period (March 1, 2019 to August 31, 2019) | 2,686 (97.5%) | 43 (1.6%) | 27 (1.0%) |
| 2nd Reporting Period (September 1, 2019 to February 29, 2020) | 389 (97.0%) | 4 (1.0%) | 8 (2.0%) |

In the next reporting period, the IMT looks forward to further reviewing Secondary compliance for ¶234 once G03-02-02 is finalized with the requisite community input. For Full compliance, the IMT will also, among other things, conduct its own assessment of the CPD's reported compliance of TRR-Is.

# Use of Force: ¶235

**235.** *All district-level supervisory review documentation regarding a reportable use of force incident must be completed within 48 hours of the incident, unless an extension is approved by a command staff member.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the first reporting period, the CPD began working with the IMT and the OAG to revise its Use of Force policies in accordance with the consent decree. This included updating General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, which addresses the requirements of ¶235. The CPD did not met Preliminary compliance for ¶235 in the first or second reporting periods. However, the CPD continued to make significant strides toward meeting Preliminary compliance.

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-02. These policies address the requirements of ¶235. To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-02 accordingly, and finalize the policy.

As of February 29, 2020, the FRU will begin reviewing whether supervisory reviews of TRRs are completed within 48 hours. Previously, the FRU did not review incidents for this requirement of the consent decree because it was not CPD policy.

The CPD's Office of Operational Compliance is conducting an audit to assess the extent to which CPD supervisors are completing their review of use of force incidents within 48 hours.

In the next reporting period, the IMT looks forward to assessing Preliminary and Secondary compliance for ¶235 once G03-02-02 is finalized with the requisite community input.

# Use of Force: Foundational Paragraphs

As noted in the Monitoring Plan for Year One, the IMT has identified several "foundational paragraphs" within the Use of Force section of the consent decree: ¶¶160–67, 173, 176–78, 181–87, 197–200, 202–16, and 228.

***

> **160.** *CPD will establish and maintain clear channels through which community members can provide input regarding CPD's use of force policies and propose revisions or additions to those policies. CPD will regularly review the input received, including during the biennial review process.*

### Compliance Progress                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

In the first reporting period, the IMT noted CPD's prior efforts for obtaining community input on the 2015 and 2017 versions of the use of force policies. The IMT also noted that the CPD solicited community input on its Firearm Pointing policy in summer 2019.

During the second reporting period, the City and the CPD continued to recognize the need for community engagement while developing its Use of Force policies.

The IMT is assessing the completion of the Use of Force policies to align with the requirements of the consent decree, specifically as it relates the inclusion and review of community input. On August 14, 2019, the CPD shared a proposed *Community Input on Policy Documents Plan*, which the IMT and the OAG reviewed and provided written comment on. The plan outlines a timeline for identifying various stakeholder groups, conducting two phases for community engagement across the City, obtaining public input on draft policies, and presenting revised policies to the IMT and OAG for comment.

The two phases of community engagement included in the plan are: (1) "open space technology" meetings and (2) working groups, which the CPD began in February 2020. In addition, the CPD posted all Use of Force policies online on February 29, 2020, for a 30-day public review and comment period. These policies include G03-02-03, *Firearm Discharge Incidents—Authorized Use and Post-Discharge Administrative Procedures Policy*, and G03-06, *Firearm Discharge and Officer-Involved Death Incident Response and Investigation Policy*.

Members of the IMT Community Engagement Team attended all four open space technology meetings on February 4, 5, 6, and 8, 2020, which included discussions

around community policing strategies, interactions with children and youth, and use of force. The CPD prepared one-page summaries for each topic for community members to review in advance of the meetings.[111]

The Use of Force summary describes background on the consent decree requirements for CPD's Use of Force policy and policy engagement topics (ranging from assessing when use of force is authorized, mitigation principles, responsibilities for officers and supervisors for reporting use of force, and more).[112] G03-02-03 and G03-06 were specifically addressed in each meeting. The CPD sought community input on these two policies before they were enacted, per advisement of the IMT and OAG in January 2020. Following the meetings, the CPD compiled all comments received on specific subjects and developed a summary of the "Top 5" overall suggestions. Some common topics raised by community members for use of force included clear definitions for misconduct or compliance with policies, de-escalation, supervisory responsibilities regarding body-worn camera use, training, and victim assistance and engagement.

In February 2020, the CPD also discussed its plans for revising the use of force policies with its collective bargaining units and the Coalition. The Monitor has also discussed these plans with the Coalition during a regularly scheduled meeting to discuss consent decree-related topics. Furthermore, a Deputy Monitor and Associate Monitors met with the Coalition on January 15, 2020, and discussed challenges related to the timeline for 2020 in-service training and the need for community input prior to issuing revised use of force policies.

The IMT will continue to review these efforts and the completion of the Use of Force policies in the next reporting period.

---

[111] *See Community Conversations on Policies* , CHICAGO POLICE DEPARTMENT, https://home.chicagop-olice.org/community-conversations-on-policies/.

[112] *See Community Engagement in Policy Creation - Use of Force*, CHICAGO POLICE DEPARTMENT, http://home.chicagopolice.org/wp-content/uploads/2020/01/One-Page-Community-Engage-ment-Summary_Use-of-Force_14JAN20.pdf.

## Consent Decree ¶161

> **¶161** *CPD recently adopted de-escalation as a core principle. CPD officers must use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible. CPD officers are required to de-escalate potential and ongoing use of force incidents whenever safe and feasible through the use of techniques that may include, but are not limited to, the following: a. using time as a tactic by slowing down the pace of an incident; b. employing tactical positioning and re-positioning to isolate and contain a subject, to create distance between an officer and a potential threat, or to utilize barriers or cover; c. continual communication, including exercising persuasion and advice, and providing a warning prior to the use of force; d. requesting assistance from other officers, mental health personnel, or specialized units, as necessary and appropriate; and e. where appropriate, use trauma-informed communication techniques, including acknowledging confusion or mistrust, or using a respectful tone.*

### Compliance Status

(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the first reporting period the IMT noted that the CPD adopted de-escalation as a principle in October 2017, when it revised its use-of-force policy. The emphasis on the need for de-escalation is now reflected in every policy regarding use of force, whether it be a policy regarding firearms, Tasers, batons, or oleoresin capsicum (OC) spray.

In the first reporting period, the IMT also noted that the CPD should provide more clarity and direction to its CPD members on de-escalation strategies in its policies and training. During the second reporting period, the IMT provided feedback to the CPD on this matter during revisions of the use of force policies, which are reflected in the February 29, 2020 version of the policies that the CPD is seeking community input on. To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust these policies accordingly, and finalize the policies.

Regarding training on de-escalation and evaluating Secondary compliance, the IMT reviewed the CPD's 2020 Use of Force In-Service training lesson plan and Power-Point presentation. The training includes de-escalation and covers the following subjects: continual communication, tactical positioning, and time as a tactic. The

training also includes scenarios that require officers to utilize de-escalation and articulate the techniques in the TRRs afterwards.

The IMT believes that documentation of de-escalation efforts is not where it needs to be. Specifically, the FRU noted issues with officers not documenting their de-escalation tactics in their TRRs. The FRU 2019 Year-End Summary reports 7.4% of cases review from June 15, 2018 to December 31, 2019 resulted in an Advisement or Recommendation for force mitigation not being articulated. The report further identifies 135 instances where reviewers found force mitigation was not articulated.

Additionally, the IMT conducted interviews with district level supervisors in January 2020. During these interviews, supervisors noted from their reviews of TRRs that officers do not recognize and document their mitigation actions. The supervisors must coach and mentor officers to recognize de-escalation behavior.

In the next reporting period, the IMT will be looking to the follow-up actions the CPD takes for officers who have been issued Advisement and Recommendations by the FRU and whether it has an impact.

## Consent Decree ¶162

> **162.** *Consistent with CPD's commitment to preventing and reducing the need for force, CPD officers will allow individuals to voluntarily comply with lawful orders whenever safe and feasible (e.g., allowing individuals the opportunity to submit to arrest before force is used).*

### Compliance Progress
(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies. These included General Order 03-02-01, *Force Options*, which addresses the requirements of ¶162 in Section III.C.4:

> When it is safe and feasible to do so, Department members will allow individuals to voluntarily comply with lawful verbal direction (e.g., allowing individuals the opportunity to submit to an arrest before force is used).

The IMT looks forward to reviewing the feedback the CPD receives on G03-02-01 from its community engagement efforts.

## Consent Decree ¶163

**163.** *CPD officers may only use force for a lawful purpose. CPD officers are prohibited from using force as punishment or retaliation, such as using force to punish or retaliate against a person for fleeing, resisting arrest, insulting an officer, or engaging in protected First Amendment activity (e.g., lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct).*

### Compliance Progress        (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, to include General Order 03-02, *Use of Force*. This policy specifically addresses ¶163 in Section III.B.5, which prohibits using force as punishment, retaliation, or in response to the lawful exercise of First Amendment rights. The IMT looks forward to reviewing the feedback the CPD receives on G03-02-01 from its community engagement efforts.

For 2019, COPA noted five use of force instances that referenced the First Amendment including filming, speech, and criticizing officer conduct. COPA did not use punishment or retaliation as a category, so it is unclear to the IMT at this time if there are any issues in that area.

## Consent Decree ¶164

**164.** *CPD officers must only use force when it is objectively reasonable, necessary, and proportional under the totality of the circumstances.*

### Compliance Status        (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD are in Preliminary compliance for ¶164 in the second reporting period. General Order 03-02, *Use of Force*, effective October 16, 2017, addresses ¶164. Specifically, Section III states that officers must only use force when it is objectively reasonable, necessary, and proportional in light of the totality of circumstances. On February 29, 2020, the CPD published a revised version of G03-02. While this policy still requires more community input, it reiterated the language from the October 2017 version, which already complied with ¶164.

This standard is repeated throughout CPD's Use of Force policy suite usually under the heading "When Force is Authorized." This is a standard set by the U.S. Supreme Court and is in place for all of the CPD's use-of-force policies. Additionally, this is the standard that is used by the Approving Supervisor to review TRRs. This is also the standard that the FRU utilizes when it examines all Level 2 and Level 3 uses of force and a random sample of Level 1 TRRs (10%).

During the second reporting period, the IMT began reviewing data related to use-of-force incidents. COPA provided data on cases with excessive force, to include 227 cases in 2018 and 244 cases in 2019. The IMT did not receive information on the outcome of these cases.

Further, according to the CPD's "TRR Compliance Decisions" Tableau Dashboard, Approving Supervisors reviewed 3,833 TRRs and found that 97.4% complied with policy between January 1 and September 30, 2019. Data was only available for the first month of the second reporting period (September 2019). In that month, Approving Supervisors reviewed 427 TRRs and found that 97.2% complied with policy. Complying with policy could account for areas other than the use-of-force standard noted in ¶164 but would certainly include it. Based on review of TRRs, BWC video, witness statements, and other relevant incident information, both FRU and District supervisors can determine if a member's actions are in violation of policy and refer the case to COPA. We note that the figures in the FRU *Year End Summary* for 2019 do not align with the CPD's Tableau Dashboards. The City and CPD indicate that this is because the dashboard does not contain data from October–December 2019. Both data sources indicate compliance with policy. The FRU report explains that the FRU examined only 10% of Level 1 use of force incidents, which account for the vast majority of TRRs. The FRU referred a total of 4 cases to COPA in 2019.

The CPD's position both at the district level and the FRU is that officers use force that is objectively reasonable, necessary, and proportional in more than 97% of the cases. The recent policy and training bulletin changes need to be absorbed and scrutinized before an assessment of Secondary compliance can be made, which the IMT will begin evaluating in the next reporting period.

## Consent Decree ¶165

> **165.** *CPD officers are prohibited from using deadly force except in circumstances where there is an imminent threat of death or great bodily harm to an officer or another person. CPD officers are not permitted to use deadly force against a person who is a threat only to himself or herself or to property. CPD officers may only use deadly force as a last resort.*

### Compliance Progress

(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02, *Use of Force*. This policy specifically addresses all requirements of ¶165 in Section III.C:

> *The use of deadly force is a last resort that is permissible only when necessary to protect against an imminent threat to life or to prevent great bodily harm to the member or another person. . . . Deadly force may not be used . . . against a person who is a threat only to himself, herself, or property.*

COPA determines the appropriateness of deadly force. The CPD tracks data on the level of force and provides this data to the IMT via the "TRR by Force Level" Tableau dashboard. In 2019, the CPD had 44 Level 4 uses of force. Figure 38 reflects additional data on TRRs that indicated Level 4 use of force.

### Figure 38: Uses of Level 4, Deadly Force

| First Reporting Period (March 1, 2019 to August 31, 2019) | Same Period Year Before (March 1, 2018 to August 31, 2018) | Second Reporting Period (September 1, 2019 to January 22, 2020[113]) | Same Period Year Before (September 1, 2018 to January 22, 2019) |
|---|---|---|---|
| 22 | 35 | 22 | 28 |

The IMT looks forward to the CPD finalizing G03-02 with the requisite community engagement.

---

[113]   As of March 15, 2020, this data was only available through January 22, 2020.

## Consent Decree ¶166

**166.** *CPD officers are prohibited from using deadly force against fleeing subjects who do not pose an imminent threat of death or great bodily harm to an officer or another person.*

### Compliance Progress

(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02, *Use of Force*. This policy specifically addresses the requirements of ¶166 in Section III.C.4 by prohibiting the use of deadly force against a fleeing person unless the subject poses an imminent threat.

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02 accordingly, and finalize the policy.

For the second reporting period, the IMT reviewed CPD's 2020 Use of Force In-Service Training, which includes instruction on fleeing subjects, detailing the requirements of ¶166.

Foot pursuits are often closely connected to incidents with fleeing subjects, thus the IMT plans to also assess training and data related to foot pursuits for ¶166. The CPD issued a foot pursuit training bulletin in 2019 and its in-service lesson plan for 2020 emphasizes best practices in foot pursuits, which relate to fleeing suspects. The CPD's "Foot Pursuit" Tableau dashboard supplies the IMT with data on foot pursuits involving Level 4 (deadly) uses of force (Figure 39). The investigation of the use of deadly force by CPD officers and whether it was justified or not rests with COPA. The IMT has not received statistics on COPA's findings for COPA-referred and investigated incidents in 2019 through the end of the second reporting period.

### Figure 39: Foot Pursuit Incidents involving Deadly Force

| April 1, 2019[114] to January 9, 2020[115] | September 1, 2019 to January 9, 2020 |
| --- | --- |
| 12 (2.5% of total foot pursuits) | 7 (4.0% of total foot pursuits) |

Additionally, as described for ¶169, the FRU is responsible for reviewing the cause and circumstances of foot pursuits, and providing tactical and training adjustments, if needed. The FRU established an Advisement and Recommendation Matrix for necessary actions when members do not follow the foot pursuit training

---

[114] The CPD began tracking foot pursuit data on April 1, 2019.

[115] At the end of the second reporting period, only data on foot pursuits through January 9, 2020 was available from the CPD.

bulletin. The matrix covers three areas: general foot pursuits, communication protocols, and partner separation.

## Consent Decree ¶167

> **167.** *CPD officers will operate their vehicles in a manner that is consistent with CPD policy and training and with the foremost regard for the safety of all persons involved. CPD will periodically include instruction regarding sound vehicle maneuvers in its in-service training regarding use of force. As appropriate, CPD will provide supplemental training guidance regarding dangerous vehicle maneuvers that should be avoided.*

### Compliance Progress                (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The IMT assessed the following policies on motor vehicle use in determining that the City and the CPD met Preliminary compliance with ¶167 this reporting period:

- U02-01, *Department Vehicles*, revised effective February 29, 2020;

- G03-03, *Emergency Use of Department Vehicles*, effective June 1, 2003;

- G03-03-02, *Emergency Vehicle Operation – Non-Pursuit*, effective June 1, 2003; and

- G03-03-01, *Emergency Vehicle Operations-Pursuits*, effective April 9, 2019.

U02-01 was revised in order to include language from ¶167. The IMT and the OAG provided no-objection notices to the revised policy on January 31, 2020 and December 12, 2019, respectively. U02-01 was posted for a 15-day public comment period on February 10, 2020. We note that the City and the CPD did not provide evidence that the CPD received community input on the policy before posting the draft for public comment, and that no comments were received during the 15-day period.

Because the language from ¶167 that was added to U02-01 is very general, the three other, more specific policies listed above were important to our compliance assessment, particularly the policy on pursuits. In 2019, CPD updated its pursuit policy, G03-03-01, to impose a balancing test:

The initiation, continuation, and supervisory authorization of each motor vehicle pursuit must conform to the following BAL-ANCING TEST:

The necessity to immediately apprehend the fleeing suspect out-weighs the level of inherent danger created by a motor vehicle pursuit.

The policy also contains a provision that the primary pursuit vehicle must obtain approval from the assigned supervisor to continue the pursuit. The emphasis on the balancing test permeates the rule.

The CPD has achieved Preliminary compliance with ¶167 and IMT plans to assess Secondary compliance in the next reporting period after the recent pursuit amend-ments have been in effect for at least a year. To assess Secondary and Full compli-ance, the IMT will review available training regarding vehicle operations, as well as conduct a review of traffic accidents, such as officers involved in serious or multi-ple accidents and all fatal accidents. The IMT will also assess the data CPD reviews to ensure poor driving is identified and addressed, and recommended remedial actions or training, and whether those actions were fulfilled.

## Consent Decree ¶173

**173.** *Following a use of force, once the scene is safe and as soon as practicable, CPD officers must immediately request appropri-ate medical aid for injured persons or persons who claim they are injured.*

### Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD met Preliminary compliance for ¶173 in the second reporting period. General Order 03-02, *Use of Force*, effective October 16, 2017, addresses ¶173. Specifically, Section IV., "Medical Attention," requires officers to immedi-ately request appropriate medical aid for the injured person including contacting emergency medical services (EMS) from the Chicago Fire Department via the OEMC.

On February 29, 2020, the CPD published a revised version of G03-02. While this policy still requires more community input, it further clarified the language from the October 2017 version, which already complied with ¶173.

## Consent Decree ¶176

**176.** *CPD officers must recognize and act upon the duty to intervene on the subject's behalf when another officer is using excessive force.*

### Compliance Status

(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not in Compliance*
**Full:** *Not in Compliance*

The City and the CPD met Preliminary compliance for ¶176 in the second reporting period.

The City and the CPD are in Preliminary compliance for ¶176 in the second reporting period. General Order 03-02, *Use of Force*, effective October 16, 2017, addresses ¶176. Specifically, Section V. refers to the duty to intervene and report.

On February 29, 2020, the CPD published a revised version of G03-02, where it further clarified language of ¶176, specifically stating:

> A Department member who directly observes a use of force and identifies the force as excessive or otherwise in violation of this directive will, except in extraordinary circumstances, act to intervene on the subject's behalf. Such action will include, but is not limited to, verbally intervening to try to stop the violation. If the member is a supervisor, he or she will issue a direct order to stop the violation.

While the new policy still requires more community input, it further clarified the language from the October 2017 version, which already complied with ¶176.

To evaluate Secondary compliance, the IMT reviewed CPD's 2020 Use of Force In-Service Training, which includes instruction on the duty to intervene, described as peer intervention. In the next reporting period, the IMT will continue its assessment of Secondary compliance for ¶176.

## Consent Decree ¶177

**177.** *Consistent with CPD policy that force must be objectively reasonable, necessary, and proportional, CPD officers must generally not use force against a person who is handcuffed or otherwise restrained absent circumstances such as when the person's actions must be immediately stopped to prevent injury or escape or when compelled by other law enforcement objectives.*

### Compliance Progress

(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-01, *Force Options*. This policy includes exact language from ¶177 in Section II, "Policy." The CPD still needs to finalize G03-02-01 with the requisite community engagement.

In addition, the CPD's TRR form requires officer to answer the following: "was any reportable use of force used against a subject while handcuffed or otherwise in physical restraints?" If the officer answers yes, the officer is required to address it in the narrative portion of the TRR. The inclusion of this box in the TRR should result in data in future reporting periods that will guide our assessment of ¶177.

## Consent Decree ¶178

**178.** *CPD officers are prohibited from using carotid artery restraints or chokeholds (or other maneuvers for applying direct pressure on a windpipe or airway, i.e., the front of the neck, with the intention of reducing the intake of air) unless deadly force is authorized. CPD officers must not use chokeholds or other maneuvers for intentionally putting pressure on a person's airway or carotid artery restraints as take-down techniques.*

### Compliance Progress

(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02, *Use of Force*. This policy addresses ¶178 in Section III.C.1.d, "Use of Force – When Authorized," defining deadly force as including:

> application of a chokehold (applying direct pressure to a person's trachea (windpipe) or airway (front of the neck) with the intention of reducing the intake of air), carotid artery restraints (techniques that compresses the blood vessels in the neck to inhibit or restrict blood flow to carotid arteries), or other maneuvers for applying direct pressure on a windpipe or airway.

General Order 03-02-01, *Force Options*, includes additional provisions regarding carotid artery restraints and chokeholds. Section IV.C2.d.3 states, "Members will not use chokeholds or other maneuvers for intentionally putting pressure on a person's airway as a takedown technique, unless the use of deadly force is authorized." Section IV.C2.e states, "Department members will not use carotid artery restraints or any other compliance technique that compresses the blood vessels in the neck to inhibit or restrict blood flow to carotid arteries, causing the subject to lose oxygen to the brain, unless the use of deadly force is authorized."

For Preliminary compliance, the CPD must finalize G03-02 and G03-02-01 with the requisite community engagement.

To evaluate Secondary compliance, the IMT reviewed the CPD's 2020 Use of Force In-Service training, which includes instruction regarding ¶178 and chokeholds. During this reporting period, the IMT requested data on chokeholds, which the CPD has yet to supply. During the IMT's site visit on January 14, 2020, the FRU stated it has obtained a complaint log with COPA for incidents observed on video of force applied to the neck area. Moving forward, the IMT intends to review training and other related information on chokeholds, carotid artery restraints, and the application of force to or contact with a person's neck area.

## Consent Decree ¶181

**181.** *CPD will continue to require that only officers who are currently certified may be issued, carry, and use firearms.*

### Compliance Status
(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Preliminary:**          *In Compliance* (NEW)
**Secondary:**           *Not in Compliance*
**Full:**                     *Not in Compliance*

The City and the CPD are in Preliminary compliance with ¶181 with two related policies for firearm certification and use:

- U04-02, *Department Approved Weapons and Ammunition*, effective January 2, 2017 (updated version February 29, 2020), which satisfies ¶181 in Section II.D and F regarding weapons training and registration; and

- S11-03-01, *Annual Prescribed Weapon Qualification Program and Taser Recertification Policy*, effective January 16, 2016, which satisfies ¶181 in Section II, stating, "Chicago Police Department mandates that all sworn Department members must qualify with their prescribed duty weapons prior to the end of the fourth police period of the current year."

To evaluate Secondary compliance, the IMT interviewed and spoke with numerous officers and supervisors during site visits and calls during the first and second reporting periods where they demonstrated that weapon certification is a well-known requirement. In the next reporting period, the IMT will review training records to determine whether a sufficient proportion of officers have been trained on these policies.

For Full compliance, the IMT will audit firearms certification records for all officers and assess the results.

## Consent Decree ¶182

**182.** *CPD will require officers to consider their surroundings before discharging their firearms and take reasonable precautions to ensure that people other than the target will not be struck.*

### Compliance Progress
(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-03, *Firearm Discharge Incidents – Authorized Use*

*and Post-Discharge Administrative Procedures*. This policy addresses ¶182 in Section III.A-B, "Conditions on the Discharge of a Firearm*,"* specifically stating:

> Sworn members discharging a firearm will, when it is safe and feasible to do so based on the specific circumstances confronting the member:
>
> A. consider their immediate surroundings and the safety of uninvolved members of the public before discharging their firearm.
>
> B. take precautions to identify the appropriate target prior to discharging the firearm and to minimize the risk that people other than the target will be struck.

The CPD still needs to finalize G03-02-03 with the requisite community engagement.

## Consent Decree ¶183

> **183.** *CPD will require officers to issue a verbal warning prior to the use of any reportable force, including the use of firearms, when it is safe and feasible to do so.*

### Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*. This policy addresses ¶183 in Section III.C, "Conditions on the Discharge of a Firearm*,"* specifically stating:

> Sworn members discharging a firearm will, when it is safe and feasible to do so based on the specific circumstances confronting the member: consistent with the principles of Force Mitigation outlined in Department directive titled "Force Options," issue a verbal warning prior to, during, and after the discharge of a firearm.

Additionally, Section III.A.5 of G03-02-01, "Force Options, Principles of Force mitigation – Continual Communication," requires officers to provide a warning before the use of physical force, when it is safe and feasible.

To reach Preliminary compliance, the City and the CPD must receive the requisite community input on the Use of Force policies, adjust the policies accordingly, and then finalize the policies.

The IMT also reviewed the CPD's 2019 and 2020 Use of Force In-Service Training. The CPD has placed an emphasis on de-escalation, and communications when safe and feasible, in these trainings. Changes in policy and further training on de-escalation will be needed for the Use of Force training to have the desired impact.

## Consent Decree ¶184

> **184.** *When CPD officers discharge firearms, they must continually assess the circumstances that necessitated the discharge and modify their use of force accordingly, including ceasing to use their firearm when the circumstances no longer require it (e.g., when a subject is no longer a threat).*

### Compliance Progress                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*. Section II.B, "De-escalation," uses language that is nearly identical to ¶184.

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-03 accordingly, and finalize the policy.

## Consent Decree ¶185

> **185.** *CPD will continue to prohibit officers from firing warning shots.*

### Compliance Status                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not in Compliance* |

The City and the CPD are in Preliminary compliance with ¶185. General Order 03-02, *Use of Force*, effective October 16, 2017, prohibits firing warning shots in Section III.D.1, "Prohibitions on the Use of Firearms."

Furthermore, the CPD included additional details regarding prohibitions for the use of firearms, including prohibiting firing warning shots, in its February 29, 2020 revised General Order 03-02-03 Section II.D.1, "Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures."

To evaluate Secondary compliance, the IMT reviewed academy and in-service training materials on firearms and deadly force. The IMT also conducted numerous

interviews with CPD members over the past year, which indicated to the IMT that the prohibition of firing warning shots is common knowledge throughout the department. We look forward to verifying whether an adequate proportion of personnel have completed training on this prohibition in support of Secondary compliance with ¶185.

Moving forward, the IMT also looks forward to reviewing reliable data on warning shots to assess Full compliance.

## Consent Decree ¶186

**186.** *CPD officers must not fire at moving vehicles when the vehicle is the only force used against the officer or another person, except in extreme circumstances when it is a last resort to preserve human life or prevent great bodily harm to a person, such as when a vehicle is intentionally being used to attack a person or group of people. CPD will continue to instruct officers to avoid positioning themselves or remaining in the path of a moving vehicle, and will provide officers with adequate training to ensure compliance with this instruction.*

### Compliance Progress · (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-03, *Firearms Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*, which addresses the requirements of ¶186 regarding firing at or into a moving vehicle. *See* Section II.D.6, "Prohibitions on the Use of Firearms." Additionally, the CPD's TRR form specifically addresses ¶186 by requiring officers to indicate if the subject's vehicle was used as a weapon.

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-03 accordingly, and finalize the policy.

## Consent Decree ¶187

**187.** *CPD will prohibit officers from firing from a moving vehicle unless such force is necessary to protect against an imminent threat to life or to prevent great bodily harm to the officer or another person.*

### Compliance Progress · (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-03, *Firearm Discharge Incidents – Authorized Use*

*and Post-Discharge Administrative Procedures*. This policy addresses the requirements of ¶187 regarding firing from a moving vehicle in Section II.D.7, "Prohibitions on the Use of Firearms."

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-03 accordingly, and finalize the policy. Moving forward, the IMT looks forward to reviewing training records and reliable data on weapons discharged from a motor vehicle for Secondary and Full compliance.

## Consent Decree ¶197

> **197.** *CPD will continue to require that only officers who are currently certified may be issued, carry, and use Tasers.*

### Compliance Progress                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised version of Uniform and Property U04-02-02, *Control Devices and Instruments*, issued previously in January 2016. The revised policy addresses the requirements of ¶197 to require certification of Tasers in Section III, "Taser Devices*.*" Specifically, Section III.B.3 states:

> Tasers will be carried, handled, tested, and deployed only by members who have completed Department-conducted training and all required certifications and recertifications on their safe handling and discharging.

Further, this policy states that recertification will be completed annually (Section III.B.4), District station supervisors will ensure all available Tasers are issued to sworn members who are trained and certified to use the devices (Section III.C.1.a), and the CPD members who have successfully completed training are the only members authorized to wear a Taser holster (Section III.E.2. NOTE).

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust U04-02-02 accordingly, and finalize the policy. For secondary compliance, in the next reporting period, the IMT will assess training and certifications for CPD members who are issued Tasers.

## Consent Decree ¶198

> **198.** *CPD will instruct officers that Tasers can cause serious injury or death and, as a result, officers should use Tasers only after balancing relevant factors including the threat presented by the subject, the risk of injury if a Taser is used, and the seriousness of the suspected offense. Consistent with this standard, CPD officers should not use Tasers against persons who are reasonably perceived to be non-violent, unarmed, and suspected of low-level offenses, such as property-related misdemeanors, quality of life offenses, moving or traffic violations, or municipal code violations.*

### Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-04, *Taser Use Incidents*, which addresses the requirements of ¶198 in Section II.C.1.a regarding "active resisters" and Section II.C.2 regarding appropriate use of a Taser.

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-04 accordingly, and finalize the policy.

The IMT also reviewed the CPD's 2020 Use of Force In-Service Training, which adequately covers the requirements of ¶198 in a section on Taser prohibitions.

During this reporting period, the CPD provided data on the number of Taser incidents by year in its public Use of Force dashboard, and in a Tableau dashboard for the IMT (TRR by Force Option). See Figure 40 for detailed numbers on Taser use. Further, COPA reported that it reviewed 11 Taser discharges in 2019, which included 2 fatalities. The IMT looks forward to continuing to review training and data related to Taser use to assess Secondary and Full compliance.

### Figure 40: Taser Incidents, 2015 to 2020

|  | Taser Incidents | Percentage of TRRs |
|---|---|---|
| Second Reporting Period (September 1, 2019, to January 22, 2020)[116] | 77 | 4.80% |
| 2019 | 203 | 5.03% |
| 2018 | 207 | 5.24% |
| 2017 | 383 | 8.29% |
| 2016 | 474 | 9.82% |
| 2015 | 447 | 7.90% |

---

[116]   As of March 15, 2020, Taser-incident data is available through January 22, 2020.

## Consent Decree ¶199

**199.** *CPD will clarify in policy that flight alone, without any other basis for reasonable articulable suspicion or probable cause, does not justify use of a Taser against a subject.*

### Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-04, *Taser Use Incidents*. Section II.D.7 addresses the requirements of ¶199:

> Tasers will not be used on a subject whose ONLY action is flight alone, without any other basis for establishing reasonable articulable suspicion or probable cause.

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-04 accordingly, and finalize the policy.

In this reporting period, the CPD has shared data on foot pursuits that resulted in uses of force since April 2019, to include the level of force used. The CPD also supplied the IMT with data on Taser use. The IMT looks forward to reviewing this data further—and related training—to assess compliance moving forward.

## Consent Decree ¶200

**200.** *When safe and feasible to do so, CPD officers must give verbal commands and warnings prior to, during, and after deployment of a Taser. When safe and feasible to do so, CPD officers will allow a subject a reasonable amount of time to comply with a warning prior to using or continuing to use a Taser, unless doing so would compromise the safety of an officer or another person.*

### Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-04, *Taser Use Incidents*, which addresses the requirements of ¶200 in Section III.B regarding authorized manner of Taser use. Specifically, G03-02-04 states the following:

> When it is safe and feasible to do so, a member who is discharging a Taser device will:
>
> 1.     give verbal commands and warnings prior to, during, and after the discharge of the Taser, including informing other

Department members on the scene of the discharge of the Taser.

2. allow a subject a reasonable amount of time to comply with a warning prior to using or continuing the use of a Taser, unless doing so would compromise the safety of a Department member or another person.

Further, all CPD Use of Force policies require officers to give verbal warnings when it is safe and feasible.

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-04 accordingly, and finalize the policy.

## Consent Decree ¶202

> *202. CPD officers will treat each application or standard cycle (five seconds) of a Taser as a separate use of force that officers must separately justify as objectively reasonable, necessary, and proportional. CPD will continue to require officers to, when possible, use only one five-second energy cycle and reassess the situation before any additional cycles are given or cartridges are discharged. In determining whether any additional application is necessary, CPD officers will consider whether the individual has the ability and has been given a reasonable opportunity to comply prior to applying another cycle.*

### Compliance Progress            (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-04, *Taser Use Incidents*, which addresses the requirements of ¶202 in multiple sections:

- Section II.F, Justify Separate Uses of Force, requiring that each application of Taser energy be individually justified and documented as a separate use of force.

- Section III.B.5, Authorized Manner of Use, requiring the use of only one five-second energy cycle and reassessment of the situation before additional cycles are given, and consideration of whether the subject has the ability and has been given a reasonable opportunity to comply.

Additionally, CPD's TRR form requires the discharging officer to answer questions regarding the use of a Taser and additional energy cycles.

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-04 accordingly, and finalize the policy.

### Consent Decree ¶203

**203.** *CPD will require that if the subject has been exposed to three, five-second energy cycles (or has been exposed to a cumulative 15 total seconds of energy) and the officer has not gained control, officers switch to other force options unless the officer can reasonably justify that continued Taser use was necessary to ensure the safety of the officer or another person, recognizing that prolonged Taser exposure may increase the risk of death or serious injury.*

**Compliance Progress**   (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-04, *Taser Use Incidents*, which addresses all the requirements of ¶203 in Section III.B.7 in nearly identical language.

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-04 accordingly, and finalize the policy.

### Consent Decree ¶204

**204.** *CPD officers must: a. determine the necessity, objective reasonableness, and proportionality of Taser use based on the totality of the circumstances, including the subject's apparent age, size, physical and mental condition, disability, and impairment; b. not use Tasers in drive-stun mode unless the subject is an assailant and other force options are not readily available or would otherwise be ineffective; c. when practicable, avoid the use of Tasers when it is reasonably evident that a deployment may cause serious physical injury, including if the subject is elevated above the ground, if the subject is operating or riding any mode of transportation, or if the subject may be less able to catch or protect themselves in a fall; d. not use Tasers in any environment that contains potentially flammable, volatile, or explosive material; e. not use Tasers on a subject who is at a greater risk of serious injury or death from Taser use, including, but not limited to, children, pregnant individuals, and the elderly, unless the subject is an assailant and other force options are not readily available or would otherwise be ineffective; f. target the Taser in probe mode at the lower center mass and avoid the head, neck, and genitalia; g. not activate more than one Taser at a time against*

*a subject, unless an officer already attempted to use a Taser against the subject but the probes did not make contact with the subject; and h. keep Tasers in a weak-side holster.*

### Compliance Progress (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, including General Order 03-02-04, *Taser Use Incidents*, which addresses all the requirements of ¶204 in multiple sections (Section C.2.f, Section D, and Section E).

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-04 accordingly, and finalize the policy.

To evaluate Secondary compliance, the IMT will review the CPD's 2020 Use of Force In-Service Training—which provides detailed instruction on Taser prohibitions—and evaluate whether an adequate proportion of officers complete the training.

## Consent Decree ¶205

**205.** *CPD officers must request medical aid for a person subjected to a Taser application. CPD officers must place any person subjected to a Taser application in a position that does not impair respiration, as soon as it is safe and feasible to do so. CPD officers must render life-saving aid to injured persons consistent with their training until medical professionals arrive on scene. Only trained medical personnel may remove Taser probes from a subject.*

### Compliance Progress (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, which included General Order 03-02-04, *Taser Use Incidents*. G03-02-04 addresses some requirements of ¶205. Specifically, Section IV.A.1-4 refers to the post-discharge responsibilities of the discharging member, and Section II.D.3 refers to removing barbs. Also, General Order 03-02, *Use of Force*, notes that CPD members may provide appropriate medical care consistent with their training.

Neither policy, however, mandates that officers "must render life-saving aid to injured persons consistent with their training" as required by the consent decree.

The CPD is to train all officers in Law Enforcement Medial and Rescue Training (LE-MART) by January 1, 2021, pursuant to ¶174. Once this training occurs and the language of G03-02-04 is changed to include "must render aid," the CPD will likely be in Preliminary compliance.

## Consent Decree ¶206

**206.** *CPD will conduct Taser inspections on a periodic basis to perform information downloads, ensure Tasers are operable, and perform necessary maintenance or repairs.*

### Compliance Progress (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, which included Uniform and Property 04-02-02, *Control Devices and Instruments*. U04-02-02 addresses the requirements of ¶206 in Section III.K.1:

District commanders/unit commanding officers will ensure that Taser inspections are conducted on a quarterly basis. During inspections, district commanders/unit commanding officers will ensure:

a. Taser discharge data report is downloaded for each Taser assigned to the unit.

b. Taser Data Reconciliation Report (CPD-21. 969) is completed.

c. Tasers assigned to the unit are operational and any Tasers requiring maintenance or repairs are hand-carried during 2nd watch by a sworn member to the Taser Repair Center.

NOTE: If necessary, Taser inspections can be conducted more often.

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust U04-02-02 accordingly, and finalize the policy.

## Consent Decree ¶207

**207.** *CPD officers may use OC devices only when such force is objectively reasonable, necessary, and proportional under the totality of the circumstances, and consistent with the objectives above.*

### Compliance Progress (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, which included General Order 03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*. G03-02-05 addresses new requirements of ¶207 in Section II.C, describing when OC devices are authorized for use.

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-05 accordingly, and finalize the policy.

Moving forward, the IMT intends to assess data from the CPD and COPA regarding the use of OC devices.

### Consent Decree ¶208

> **208.** *CPD officers may only use OC devices for crowd dispersal when such force is necessary, objectively reasonable, and proportional to the threat presented to public safety. CPD will continue to require that the Superintendent or his or her designee provides authorization before OC devices are used for noncompliant groups, crowds, or an individual taking part in a group or crowd.*

**Compliance Progress**                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, which included General Order 03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*. G03-02-05 addresses the requirements of ¶208. Specifically, Section II.C requires the use of OC devices to be objectively reasonable, necessary, and proportional to the threat, actions, and level of resistance offered by the subject. Further, Section III.C.b requires that the use of OC spray on noncompliant groups, crowds, or an individual who is in a group or crowd necessitates the authorization of the Superintendent or his or her designee.

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-05 accordingly, and finalize the policy.

### Consent Decree ¶209

> **209.** *When safe and feasible to do so, CPD officers must issue verbal commands and warnings to the subject prior to, during, and after the discharge of an OC device. When safe and feasible to do so, CPD will require officers to allow a subject a reasonable amount of time to comply with a warning prior to using or continuing to use an OC device, unless doing so would compromise the safety of an officer or another person.*

**Compliance Progress**                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, which included General Order 03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*. G03-02-05 addresses the requirements of

¶209. Specifically, Section III.A.1-2 covers the required language for the authorized use of OC devices or other chemical agents.

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-05 accordingly, and finalize the policy.

The IMT also reviewed the CPD's 2020 Use of Force In-Service Training, which emphasizes warning as a de-escalation technique before a use of force. The IMT looks forward to reviewing Secondary compliance for the new requirements in future reporting periods after Preliminary compliance is achieved.

## Consent Decree ¶210

> **210.** *Each individual application of an OC device (e.g., each spray of an officer's personal OC device) by a CPD officer must be objectively reasonable, necessary, and proportional under the totality of the circumstances, and consistent with the objectives above.*

**Compliance Progress**          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, which included General Order 03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*. G03-02-05 addresses the requirements of ¶210. Specifically, Section II.E refers to the need to justify separate uses of force.

Further, CPD's TRR form requires that officers document the number of times they discharge an OC device.

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-05 accordingly, and finalize the policy.

## Consent Decree ¶211

> **211.** *CPD officers must assist subjects exposed to application of an OC device with decontamination and flushing when it is safe and feasible to do so. CPD officers must request the appropriate medical aid for a subject after the discharge of an OC device if the subject appears to be in any physical distress, or complains of injury or aggravation of a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, or a heart ailment).*

**Compliance Progress**          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, which included General Order 03-02-05, *Oleoresin Capsicum (OC) Devices and*

*Other Chemical Agent Use Incidents*. G03-02-05 addresses the requirements of ¶211. Specifically, the policy describes post-discharge responsibilities to include decontaminating and flushing the affected areas (Section IV.A.2), requesting medical aid, and notifying of pre-existing medical conditions (Section IV.B.2).

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-05 accordingly, and finalize the policy.

## Consent Decree ¶212

> **212.** *CPD officers may only use department-issued or approved OC devices.*

### Compliance Status                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD met Preliminary compliance for ¶212 in the second reporting period. The CPD Uniform and Property U04-02-03, *Control Devices and Instruments,* effective January 13, 2016 and updated February 29, 2020 as U04-02-02, states that "CPD members are not approved to carry or use any type of personal device different from that which is prescribed." Section IV.C.

In the next reporting period, the IMT will assess Secondary compliance by reviewing the CPD's measures to ensure officers are carrying authorized OC devices (*e.g.*, training records and periodic inspections).

## Consent Decree ¶213

> **213.** *CPD officers must not use impact weapons (e.g., baton, asp, improvised impact weapons) to intentionally strike a subject in the head or neck, except when deadly force is justified.*

### Compliance Progress                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, which included General Order 03-02-07, *Baton Use Incidents*. Section II.D.1 of G03-02-07, which describes restrictions of batons for head and neck strikes, addresses the requirements of ¶213.

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-07 accordingly, and finalize the policy.

The IMT also reviewed the CPD's 2020 Use of Force In-Service Training, which includes training on the prohibitions for impact weapon use. Moving forward, the IMT intends to review CPD and COPA data on the use of impact weapons to assess compliance.

### Consent Decree ¶214

> **214.** *When safe and feasible to do so, CPD officers must give verbal commands and warnings prior to, during, and after using an impact weapon.*

**Compliance Progress**  (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, which included General Order 03-02-07, *Baton Use Incidents*. Section III.A.1 of G03-02-07, which describes authorized use of a baton, addresses the requirements of ¶214. Specifically, the policy states that a CPD member will "give verbal commands and warnings prior to, during, and after use, including informing other Department members on the scene of the use."

To reach Preliminary compliance, the City and the CPD must receive the requisite community input, adjust G03-02-07 accordingly, and finalize the policy.

The IMT also reviewed the CPD's 2020 Use of Force In-Service Training, which includes instruction on the importance of verbal warnings as a de-escalation technique prior to use of force.

### Consent Decree ¶215

> **215.** *CPD officers must receive training on proper use of an impact weapon before being permitted to carry such weapon.*

**Compliance Progress**  (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD are in Preliminary compliance with ¶215. Uniform and Property U04-02, *Department Approved Weapons and Ammunition,* effective June 2, 2017, states the requirements of the consent decree for officer training on the use of Department-authorized weapons. Specifically, Section II.D states the following:

> Prior to being approved to carry a Department authorized weapon, all members will receive training provided by a certified

weapons instructor. Only Department members who demon-strate proficiency in the use of Department authorized weapons will be approved to carry said weapons.

For secondary compliance, in the next reporting period, the IMT will assess training and certifications for CPD members issued impact weapons.

## Consent Decree ¶216

**216.** *CPD officers must request appropriate medical aid for a subject who experiences an impact weapon strike when the subject appears to be in any physical distress or complains of injury, or when the subject sustained a strike to the head from an impact weapon or a hard, fixed object. CPD officers must render life-saving aid to the subject consistent with the officers' training until medical professionals arrive on scene.*

### Compliance Progress                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

On February 29, 2020, the CPD published a revised suite of Use of Force policies, two of which are relevant to ¶216.

First, General Order 03-02-07, *Baton Use Incidents*, addresses the requirements of ¶216 in Section IV.A.2, which describes the requirements for requesting appropriate medical aid.

Second, General Order 03-02, *Use of Force*, addresses medical attention in Section IV.A.2, which notes that members "may provide appropriate medical care consistent with their training to any individual who has visible injuries, complains of being injured, or requests medical attention."

Neither policy, however, mandates that officers "must render life-saving aid to injured persons consistent with their training" as required by ¶216.

The CPD is to train all officers in Law Enforcement Medial and Rescue Training (LE-MART) by January 1, 2021, pursuant to ¶174. To reach Preliminary compliance, this training must occur, the language of G03-02-07 must change to include "must render aid," and the City and the CPD must receive the requisite community input and adjust G03-02-07 accordingly.

## Consent Decree ¶228

**228.** *Supervisors play a critical role in ensuring that force is used legally, consistent with CPD policy, and in a manner that will promote community confidence in the Department. Supervisor reviews and investigations of uses of force are essential to identify necessary individual and departmental corrective action.*

### Compliance Progress

(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

The IMT is reviewing if the CPD has appropriate policies and procedures as it relates to supervisory review of use-of-force incidents. It has been the policy of the CPD—as articulated in General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (dated October 16, 2017)—for supervisors to play a critical role in reviewing uses of force to ensuring that force is used legally, consistent with CPD policy, and that necessary corrective actions are taken.

The FRU, which was established in 2017, has the responsibility of reviewing all Level 2 and Level 3 uses of force and 10% of Level 1 uses of force. The FRU also reviews firearm pointing incidents and foot pursuits. While the FRU has no power to discipline, it does have the ability to refer cases to COPA.

The FRU has issued a comprehensive 30-page draft SOP of how it conducts its business, which the IMT and the OAG have reviewed and commented on. The SOP was still a draft at the end of the secondary reporting period.

Furthermore, the FRU's *2019 Year-End Summary* highlights common problem areas with TRRs, TRR-Is, and TRR-Rs. The FRU also identified issues surrounding body-worn cameras (described in the analysis of ¶196).

One of FRU's responsibilities per the consent decree is to provide constructive feedback to officers and supervisors on individual force cases. The FRU created an Advisement and Recommendation matrix for correction actions. These actions are entered into a tracking system, which may result in officers being re-trained.

The FRU drives use-of-force accountability for the CPD and its supervisors. In the next reporting period, the IMT will continue to assess the CPD's progress toward Preliminary compliance, as well as begin assessing Secondary and Full compliance regarding the FRU's ability to enforce accountability, which includes whether the FRU has appropriate training and sufficient resources to perform its duties.

# V. Recruitment, Hiring & Promotions

## Guiding Principles

The IMT will assess compliance with the Recruitment, Hiring, and Promotions paragraphs in accordance with the consent decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **249.** Having a department that recruits, hires, and promotes officers who are qualified to meet the increasingly complex needs of law enforcement and that reflects a broad cross section of the Chicago community in which it serves is critical to accomplishing the following goals: running a professional police force; building community trust and confidence; increasing legitimacy and acceptance of CPD's supervision and accountability systems; and reducing perceptions of bias.

> **250.** The provisions of this Agreement are designed to ensure that CPD attracts, hires, retains, and promotes individuals who are equipped to perform their jobs safely, effectively, and in accordance with the law, CPD policy, and the terms of this Agreement. Further, this Agreement is designed to ensure that CPD promotes individuals who are capable of: providing effective supervision; guiding officers under their command on lawful, safe, and effective policing; and holding officers accountable for misconduct.

> **251.** The City and CPD's recruitment, hiring, and promotions policies and practices will show a commitment to attracting, hiring, and promoting qualified candidates at all ranks that reflect a broad cross section of the Chicago community the Department serves.

> **252.** The Parties acknowledge that the City and CPD are currently subject to the City of Chicago Police Department Hiring Plan for Sworn Titles ("Hiring Plan"), dated May 14, 2014, which may be subject to change in the future.

# Summary of Compliance Assessments

For this section of the consent decree, the City and the CPD focused on the Captain and Commander ranks during this reporting period. The City and the CPD made progress identifying and publishing the duties, eligibility criteria, knowledge, skills, and abilities for these ranks. They also worked toward increasing transparency and awareness about the promotions process.

In sum, the IMT assessed the City's compliance with two Recruitment, Hiring, and Promotions paragraphs of the consent decree with deadlines in Year One (¶¶263–64). In the second reporting period, we determined that the City moved into Preliminary compliance for one paragraph (¶263) but failed to reach Preliminary compliance with the other paragraph (¶264). *See* Figure 41 below.

Figure 41: Compliance Status at the End of the Second Reporting Period (February 29, 2020) for Recruitment, Hiring, and Promotions Paragraphs with Deadlines in Year One



The City had two new deadlines in the second reporting period. The IMT determined that the City met the deadline for one paragraph (¶263) but missed the other deadline (¶264). For the missed deadline, the City did not meet the underlying requirement before the end of the reporting period. *See* Figure 42 below.

Figure 42: Total Recruitment, Hiring, and Promotions Deadlines in the Second Reporting Period: 2



# Recruitment, Hiring, and Promotion: ¶263

*263. Within 365 days of the Effective Date, CPD will identify and publish, both internally and externally, for the ranks of Captain and Commander, the duties, eligibility criteria, knowledge, skills, and abilities considered to select qualified candidates who are effective supervisors in compliance with CPD policy and this Agreement.*

## Compliance Progress
(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | | |
|---|---|---|
| **Deadline:** | February 29, 2020 | ✓ Met ☐ Missed |

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD met Preliminary compliance with ¶263 and met the February 29, 2020 deadline. During this reporting period, the City advised that it retained an outside consultant, CPS HR Consulting, to help it meet the requirements of ¶263. The City tasked CPS HR Consulting with developing job analysis documentation to support selection decisions for the Captain and Commander positions.

In assessing compliance, the IMT reviewed documents related to CPS HR Consulting's retention: (1) the City Department of Human Resources' Task Order Proposal Request and Addenda thereof for a Master Consulting Agreement; and (2) CPS HR Consulting's Task Order Proposal.

We also reviewed several other documents related to ¶263:

- A news release announcing a command staff change;
- A CPD Human Resources memo regarding a Captain and Commander Job Analysis Survey;
- The CPD Commander Job Analysis Kick-off Meeting Agenda;
- Meeting materials from a November 21, 2019 CPS HR Consulting Focus Group;
- Updated work plans and timelines;
- Knowledge, Skills, and Abilities (KSA) rating scales;
- The Task Statement Chart and Results for Captains and Commanders; and
- The Draft Strategic Communications Plan, which the CPD did not submit until the end of the reporting period.

These records will serve as prerequisites for identifying the duties, eligibility criteria, knowledge, skills, and abilities considered to select qualified candidates who are effective CPD supervisors. But the CPD has not fully identified or established qualifications. Once fully established, these requirements should, at minimum, be

documented internally within revised position descriptions and then widely published, internally and externally, in subsequent job announcements.

While the IMT recognizes that components of the process have been set into motion before the deadline, CPD publications have depicted internal distribution that is primarily limited to persons designated to participate in only a few of the process component required by ¶263. The Draft Strategic Communications Plan proposes a strategy to develop the remaining process components.

In sum, there appear to be sufficient resources in place to identify the requisite criteria for the ranks of Captain and Commander within the next quarter. Therefore, the City and CPD have achieved Preliminary compliance with ¶263.

Moving forward, the CPD should finalize their Strategic Communications Plan, work plan, and timeline. There must be a complete description of all process components through the Captain and Commander selections. This includes completed task analysis, and the requisite eligibility criteria: knowledge, skills, and abilities considered to select qualified candidates who are effective supervisors. The CPD should then publish this eligibility criteria internally and externally and establish a feedback loop with candidates to revise and improve future processes.

# Recruitment, Hiring, and Promotion: ¶264

**264.** *Within 365 days of the Effective Date, CPD will develop strategies to increase transparency and awareness about the promotions process for the ranks of Captain and Commander, including, but not limited to, criteria for promotions and promotion decisions.*

**Compliance Progress**  (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| Deadline: | February 29, 2020 | ☐ Met | ☑ Missed |
|---|---|---|---|

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD did not reach Preliminary compliance with ¶264 or meet the February 29, 2020 deadline. As explained above, during this reporting period, the City advised that it retained an outside consultant, CPS HR Consulting, to help it meet the requirements of ¶263. The City tasked CPS HR Consulting with developing job analysis documentation to support selection decisions for the Captain and Commander positions.

In assessing compliance with ¶264, the IMT reviewed two documents related to CPS HR Consulting's retention: (1) the City Department of Human Resources' Task Order Proposal Request and Addenda thereof for a Master Consulting Agreement; and (2) CPS HR Consulting's Task Order Proposal.

We also reviewed several other documents regarding ¶264:

- A news release announcing a command staff change;
- A CPD Human Resources memo regarding a Captain and Commander Job Analysis Survey;
- The CPD Commander Job Analysis Kick-off Meeting Agenda;
- Meeting materials from a November 21, 2019 CPS HR Consulting Focus Group;
- Updated work plans and timelines;
- Knowledge, Skills, and Abilities (KSA) rating scales; and
- The Task Statement Chart and Results for Captains and Commanders.

In late January 2020, the CPD announced a department reorganization, which included a number of Commander promotions. The CPD provided the IMT with documentation of their communications to CPD members to inform them about the reorganization and promotions. This documentation included an internal message from the Interim Superintendent regarding command changes and promotions, department reorganization details, and revised organizational plans and charts.

The City also provided a Draft Strategic Communications Plan at the end of the reporting period.

The documents submitted by the CPD will serve as prerequisites for identifying the duties, eligibility criteria, knowledge, skills, and abilities considered to select qualified candidates who are effective CPD supervisors. But the CPD has not identified or established the complete array of duties, eligibility criteria, knowledge, skills, and abilities considered to select qualified candidates who are effective supervisors.

The promotional documents demonstrate that the CPD has developed and implemented some strategies to increase transparency and awareness of the promotions process for the ranks of Captain and Commander. But, importantly, the CPD has not established the criteria for promotions, and especially promotion decisions, yet.

The Draft Strategic Communications Plan, though not complete, is the CPD's most coherent official document that incorporates strategies to increase transparency and awareness about the promotions process. The criteria for promotions and promotion decisions must be clearly established in the promotional process. Once finalized, the CPD can systematically apply and continuously update, expand, and improve, the Strategic Plan. Moving into the third monitoring period, the IMT looks forward to continued conversations with the CPD on these issues.

# VI. Training

## Guiding Principles

The IMT assessed compliance with the applicable Training paragraphs in accordance with the consent decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **265.** *CPD will enhance its recruit training, field training, in-service training, and preservice promotional training so that they are sufficient in duration and scope to prepare officers to comply with CPD directives consistently, effectively, and in accordance with the law, CPD policy, best practices, and this Agreement.*

> **266.** *CPD training will reflect its commitment to procedural justice, de-escalation, impartial policing, and community policing.*

> **267.** *CPD training will convey CPD's expectations that officers perform their jobs diligently and safely, and have an understanding of, and commitment to, the constitutional rights of the individuals they encounter.*

> **268.** *The training required under this Agreement is set out in this section and, for specific topic areas, in the Community Policing, Impartial Policing, Crisis Intervention, Use of Force, Officer Wellness and Support, and Accountability and Transparency sections.*

## Summary of Compliance Assessments

The IMT assessed the City's compliance with 10 Training paragraphs of the consent decree with deadlines in Year One (¶¶270–72, 316, 320, 323, 334, 336, and 339–40) and two foundational paragraphs (¶¶280 and 284). We assessed five of these paragraphs in the first reporting period (¶¶320(a), 323, 336, and 339–40), finding that the City met Preliminary compliance for two paragraphs (¶¶320(a) and 323).

In the second reporting period, we determined that the City moved into Preliminary compliance for four paragraphs with deadlines in Year One (¶¶270–71, 320(b), and 339), moved into Secondary compliance for one paragraph (¶339), and maintained Preliminary compliance for one subparagraph (¶320(a)). The City failed to reach Preliminary compliance in the remaining six paragraphs with deadlines in Year One (¶¶272, 316, 323, 334, 336, and 340). *See* Figure 43 below.[117]

**Figure 43:** Compliance Status at the End of the Second Reporting Period (February 29, 2020) for Training Paragraphs with Deadlines in Year One



The City had seven new deadlines in the second reporting period. The IMT determined that the City met deadlines for three new paragraphs (¶¶270–71 and 320(b)) but missed the remaining four new deadlines (¶¶272, 316, 323, and 334). The City did not meet the underlying requirement for the missed deadlines before the end of the reporting period. *See* Figure 44 below.

**Figure 44:** Total Training Deadlines in the Second Reporting Period: 7



Finally, the two foundational paragraphs are still under assessment (¶¶280 and 284). *See* Figure 45 below.

**Figure 45:** Compliance Status at the End of the Second Reporting Period (February 29, 2020) for Foundational Paragraphs in the Training Section



---

[117] While we have assessed the subparts of ¶320 separately, it is included in Figure 43 as one paragraph.

# Training: ¶270

**270.** *The TOC, or other similarly-structured oversight entity, will continue to review and oversee the Department's training program and will be chaired by the First Deputy Superintendent, or other high-ranking member of CPD's command staff. The TOC will also include, in some capacity, personnel from various units of the Department that are responsible for overseeing patrol field operations; administering training; providing legal advice; coordinating and exercising supervision over disciplinary matters; managing data, technology, and information systems; overseeing and coordinating the community relations strategy; and reviewing reportable use of force incidents. It will meet at least once a month and continue to record meeting minutes.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          Monthly          [✓] **Met**     [ ] **Missed**

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**       *Not in Compliance*
**Full:**            *Not in Compliance*

The City and the CPD met Preliminary compliance for ¶270 during this reporting period and met the monthly deadline in the second reporting period.

The IMT reviewed Training Oversight Committee (TOC) records, CPD policies, training plans, lesson plans, curricula, logs, and sign-in sheets. The IMT also attended a TOC meeting to discern the compliance status of ¶270.

CPD Special Order S11-11, effective since November 8, 2017, describes the TOC and its membership, duties, and responsibilities, and requires monthly meetings. The City and CPD did not produce records (agenda, minutes, attendance logs, and supporting documents) to demonstrate it met every month as required by Special Order S11-11 (II)(E) and ¶270.

The OAG and IMT suggested amendments to S11-11, but those changes were not finalized and approved by the end of the second reporting period. Nonetheless, the CPD has achieved Preliminary compliance for this paragraph with the policy currently in place.

To demonstrate additional levels of compliance, the CPD must produce records reflecting that monthly meetings are occurring, including agendas, minutes, and supporting documents, as well as evidence that deliberations and decisions substantively reflect policy and consent decree requirements.

# Training: ¶271

> **271**. *Within 180 days of the Effective Date, and on an annual basis thereafter, CPD's Education and Training Division will, under the supervision of the TOC, conduct a needs assessment, which will, among other things identify and consider: a. information collected from use of force reviews, discipline and civilian complaints, and reports of officer safety issues; b. input from CPD members of all ranks and their respective collective bargaining units, if applicable; c. input from members of the community; d. recommendations from CPD oversight entities, including, but not limited to COPA, the Deputy Inspector General for Public Safety ("Deputy PSIG"), and the Police Board; e. changes in the law, to the Illinois Law Enforcement Training and Standards Board requirements, and to CPD policy, if any; f. court decisions and litigation; g. research reflecting the latest in training and law enforcement best practices; h. information obtained from evaluation of training courses, instructors, and FTOs; and i. member reaction to, and satisfaction with, the training they received.*

---

**Compliance Progress**　　　　(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**　　　　August 31, 2019　　　✓ **Met**　　☐ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The CPD achieved Preliminary compliance with ¶271 and met its August 31, 2019 deadline to conduct a required needs assessment.

To evaluate Preliminary compliance, the IMT reviewed, among other documents, the CPD Training Needs Assessment and the addendum to the Needs Assessment for the 2020 Training Plan. These records demonstrate that the Needs Assessment was conducted on time. The IMT also reviewed a Training Needs Assessment Standard Operating Procedure that the TOC approved on February 24, 2020.

Subparagraphs (a)–(i), however, require additional elements to be considered. Those elements were mostly met. However, the CPD needs to record and include attendee information to determine the degree of representative community participation.

For the CPD to meet additional compliance status levels, the CPD must address all subparagraphs, and the Needs Assessment must map on to the Training Plan concisely. The IMT will also assess the way training offerings correlate with both the Needs Assessment and Training Plan and that this training assessment, production, and evaluation cycle systematically reoccurs annually and is self-sustaining during the next reporting period.

# Training: ¶272

*272. Within one year of the Effective Date, and on an annual basis thereafter, the Education and Training Division will develop—and the TOC will review and approve—a written Training Plan for CPD's recruit, field, in-service, and pre-service promotional training to ensure that CPD members are trained to safely, effectively, and lawfully carry out their duties in accordance with the law, CPD policy, best practices, and this Agreement. CPD will implement the Training Plan in accordance with the specified timeline for implementation. The Training Plan will: a. identify training priorities, principles, and broad goals consistent with this Agreement; b. prioritize the needs identified during the needs assessment and identify those needs that will be addressed by the plan; c. include a plan and schedule for delivering all CPD training as necessary to fulfill the requirements and goals of this Agreement; d. identify subject areas for CPD training; e. determine the mandatory and elective courses, consistent with this Agreement, to be provided as part of the In-Service Training Program; f. develop a plan to inform officers about the In-Service Training Program, its course offerings, and its requirements; g. determine which aspects of the In-Service Training Program can be delivered in a decentralized manner, including e-learning, and which training requires more intensive, centralized delivery, to ensure effective delivery and comprehension of the material; 79 h. address any needed modification of the Field Training and Evaluation Program to fulfill the requirements and goals of this Agreement; i. identify necessary training resources including, but not limited to, instructors, curricula, equipment, and training facilities; j. determine the content, consistent with this Agreement, to be provided as part of pre-service promotional training for Sergeants, Lieutenants, Captains, and command staff; k. develop a plan to implement and utilize a centralized electronic system for scheduling and tracking all CPD training; l. develop a plan to implement and utilize a system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities; and m. identify community-based organizations that represent a broad cross section of the city to participate, as feasible, practical, and appropriate, in the development and delivery of the curriculum regarding subjects including, but not limited to, procedural justice, de-escalation, impartial policing, and community policing, and make efforts to encourage such participation by such organizations.*

## Compliance Progress        (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          February 29, 2020          ☐ **Met**   ☑ **Missed**

**Preliminary:**          *Not in Compliance*
**Secondary:**          *Not in Compliance*
**Full:**          *Not in Compliance*

The City and the CPD made substantial progress toward Preliminary compliance with ¶272, but they fell short of the February 29, 2020 deadline because the Training Plan was still only a draft at the end of the second reporting period.

In support of a finding of Preliminary compliance, the CPD submitted an initial draft of the Training Plan in October 2019. The CPD provided the IMT with additional revised drafts of the Training Plan in January and late February 2020. The IMT reviewed and commented on each of the drafts. The latest version of the Training Plan is still under collaborative review and substantively meets Preliminary compliance requirements for ¶272.

As a result, the CPD will likely reach Preliminary compliance with ¶272 once the Training Plan is finalized, approved, implemented, and administered, as specified.

# Training: ¶316

*316. The TOC will annually review the Field Training and Evaluation Program and consider best practices in this area as well as feedback and recommendations from FTOs and PPOs. Additionally, the TOC will review referrals and recommendations by the Field Training and Evaluation Review Board to the Bureau of Patrol. Based on this information, the TOC will recommend to the Superintendent the implementation of any appropriate changes to policies or procedures related to the Field Training and Evaluation Program.*

## Compliance Progress  (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**   February 29, 2020   ☐ **Met**   ☑ **Missed**

**Preliminary:**   *Not in Compliance*
**Secondary:**   *Not in Compliance*
**Full:**   *Not in Compliance*

The CPD did not achieve Preliminary compliance with this paragraph this reporting period, and therefore missed its February 29, 2020 deadline.

To evaluate compliance, the IMT reviewed Special Order S11-11 and a draft of the 2020 Training Plan. The current Training Oversight Committee (TOC) Special Order (SO S11-11) does not mandate the TOC to conduct an annual review, as required by ¶271, nor does it mention field training. Likewise, the draft 2020 Training Plan provides for a review of the Field Training and Evaluation Program annually, but no current policy binds the TOC to such a review. The CPD has submitted draft revisions to S11-11 that should cure this deficiency. The revised S11-11 also provides FTOs and PPOs with feedback opportunities.

Moving forward, the CPD should finalize revisions to S11-11. The CPD should also substantiate the TOC's annual Field Training and Evaluation Program review, demonstrating that it considered best practices and feedback from FTOs and PPOs. The TOC should further substantiate Field Training and Evaluation Program Review Board referrals and recommendations to the Bureau of Patrol, and its subsequent recommendations regarding policies and procedures.

# Training: ¶320

*320. The In-Service Training Program will require that all non-probationary police officers who are active duty and available for assignment, including supervisors and command staff, receive, at a minimum, the following amount of in-service training each year: a. 16 hours by the end of 2018; b. 24 hours by the end of 2019; c. 32 hours by the end of 2020; and d. 40 hours by the end of 2021, and in each subsequent year.*

---

**Compliance Progress**          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**320(b) Deadline:**   December 31, 2019                ☑ **Met**   ☐ **Missed**

|  | **¶320(a)** | **¶320(b)** | **¶320(c – d)** |
|---|---|---|---|
| **Preliminary:** | *In Compliance* (1st reporting period) | *In Compliance* (NEW) | *Not Yet Applicable* |
| **Secondary:** | *Not In Compliance* | *Not In Compliance* | *Not Yet Applicable* |
| **Full:** | *Not in Compliance* | *Not In Compliance* | *Not Yet Applicable* |

Because the 24-hour requirement for 2019 was established in policy, the City and the CPD achieved Preliminary compliance for paragraph ¶320(b). The CPD did not have sufficient attendance, however, to meet Secondary compliance.

In the first reporting period, we assessed compliance with ¶320(a). The CPD reached Preliminary compliance with ¶320(a) in the first reporting period, meeting the deadline by the end of 2018.

In the second reporting period, we have assessed compliance with ¶ 320(b) and concluded that the CPD reached Preliminary compliance. We reviewed and assessed CPD documents, including Special Order 11-10-01, *Training Notification and Attendance Responsibilities*. We also reviewed the TOC meeting minutes approving training hour requirements and the 2018 year-end training report. In addition to these documents, the IMT also reviewed records reflecting the number of 2019 use of force trainings sessions (since August of 2019) and the training attendance figures for mandatory in-service in 2019.

The IMT also reviewed documentation from the CPD's internal audit of the 2019 in-person mandatory training sessions attendance data. A summary of analysis document, which was finalized on January 17, 2020, details the full scope and methodology of CPD's internal audit, as well as the results. The Department's Education and Training Division provided the Auditing Unit with six electronic attendance data pulls, one for each of the courses that comprised the 2019 In-Service Training Program. From these, the Auditing Unit selected a random sample of 648

of the 24,414 records. The audit analysis document indicates that the CPD's Auditing Unit manually reviewed each of the 648 electronic attendance records by seeking to match them with a PDF bearing each member's signature from the day or days that a course was conducted. The audit concluded that the attendance data is reliable.

Special Order S11-10-01, "Training Notification and Attendance Responsibilities," establishes the minimum number of in-service training hours required for 2019, 2020, 2021, and beyond. The TOC minutes affirm a vote to require 24 hours in 2019.

The CPD did not reach Secondary compliance with ¶320. The CPD records indicate that only 87.92% of required personnel completed 2019 training requirements. Thus, according to these records, the percentage of personnel required to receive the necessary training (95%) was not attained by the CPD.

# Training: ¶323

**323.** *As part of the In-Service Training Program, mandatory and elective courses will be apportioned as follows: a. in 2018, CPD will require that each officer receive at least 16 hours of in per-son mandatory courses; b. in 2019, CPD will require that each officer receive at least 16 hours of in person mandatory courses, with the remaining 8 hours to be provided either as mandatory or elective courses, as determined by the TOC; c. in 2020, CPD will require that each officer receive at least 24 hours of in-per-son mandatory courses, with the remaining 8 hours to be pro-vided either as mandatory or elective courses, as determined by the TOC; d. starting in 2021, and every year thereafter, CPD will require that each officer receive at least 24 hours of in-person mandatory courses with the remaining 16 hours to be provided either as mandatory or elective courses, as determined by the TOC; and e. this Agreement does not require CPD to provide more than 40 hours of annual department-wide in-service train-ing.*

## Compliance Progress    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**    December 31, 2019    ☐ **Met**    ☑ **Missed**

**Preliminary:**    *Not in Compliance*
**Secondary:**    *Not in Compliance*
**Full:**    *Not in Compliance*

While the City and the CPD made significant progress in the second reporting period, they did not meet Preliminary compliance or the deadline for ¶323 in the second reporting period. While the City and the CPD created a policy to reflect the 24-hour requirement for 2019, it was still a draft at the end of the second reporting period.[118] Likewise, the City and the CPD did not meet Secondary/Training compli-ance, because evidence of training attendance was below 95%.

The IMT reviewed and assessed several CPD documents, including Special Order for Training Notification and Attendance Responsibilities (S11-10-01), the TOC meeting minutes approving training hour requirements, and the 2018 End of Year Training Report. In addition to these documents, the CPD also submitted records

---

[118]    In the first reporting period, the IMT did not find the CPD to be in compliance in the first re-porting period because the CPD did not sufficiently demonstrate that it provided the manda-tory hours of training before the end of the reporting period.

reflecting the number of 2019 use of force training sessions completed since August of 2019 and attendance reports for 2019 mandatory in-service training.

The IMT also reviewed documentation from CPD's internal audit of the 2019 in-person mandatory training sessions. A summary of analysis document, which was finalized on January 17, 2020, details the full scope and methodology of CPD's internal audit, as well as the results. The Department's Education and Training Division provided the Auditing Unit with six electronic attendance data pulls, one for each of the courses that comprised the 2019 In-Service Training Program. From these, the Auditing Unit selected its random sample of 648 of the 24,414 records. The audit analysis document indicates that upon selecting its sample, the CPD's Auditing Unit manually reviewed each of the 648 electronic records by seeking to match them with a PDF bearing each member's signature from the day(s) that a course was conducted.

For ¶320, the CPD must establish the requisite number of training hours. Special Order S11-10-01, *Training Notification and Attendance Responsibilities*, establishes the minimum number of in-service training hours required for 2019, 2020, 2021, and beyond. Likewise, TOC minutes affirm a vote to require 24 hours for 2019. The Training Plan specifies the ¶323(c) required hours but the TOC must approve the final version of the Training Plan for this to be established as policy.

On the other hand, the mandatory in-service training attendance charts for 2019 depict properly apportioned hours but only 87.92% of required department personnel received the mandated training. Secondary compliance for this paragraph requires 95% of eligible candidates receive training.

# Training: ¶334

*334. By January 1, 2020, as appropriate and tailored to the specific rank and command, pre-service promotional training will include, but not be limited to: a. an overview of CPD's department-wide crime reduction strategies; b. specific methods for developing district-level crime reduction strategies that are consistent with the principles of community policing, and tools and techniques on how best to communicate with officers on how to incorporate principles of community policing in implementing those crime reduction strategies; c. techniques for effectively guiding and directing officers and promoting effective and ethical police practices, including detecting and addressing bias-based profiling and other forms of discriminatory policing; d. de-escalation strategies and the principles of force mitigation; e. intervening on a subject's behalf when observing a use of force that is excessive or otherwise in violation of policy; f. evaluating the completeness, correctness, and sufficiency of written reports; g. monitoring, reviewing, and investigating uses of force to ensure consistency with CPD policies; h. understanding the function and proper use of supervisory tools, such as Early Intervention System ("EIS") and body-worn cameras, at each rank; i. evaluating officer performance, informally and formally as part of CPD's annual performance evaluation process; j. CPD and COPA's disciplinary system requirements and available non-punitive corrective action; k. mentoring officers and fostering career development; l. responding to allegations of officer misconduct, including, but not limited to, excessive force and racial discrimination, for purposes of documenting the complaint and reporting it to COPA; m. building community partnerships and guiding officers on how to implement this requirement; and n. CPD policy and legal updates.*

## Compliance Progress    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**        January 1, 2020        ☐ **Met**  ☑ **Missed**

**Preliminary:**      *Not in Compliance*
**Secondary:**       *Not in Compliance*
**Full:**            *Not in Compliance*

The City and the CPD have not achieved compliance with the requirements of this paragraph.

The IMT reviewed and assessed the CPD's early drafts of training course curricula for captains, lieutenants, sergeants, and exempt command staff. In addition to these documents, the IMT reviewed the CPD's curricular list, which includes a matrix designed to align to specific modules of the above-referenced curricula requirements.

The course listings were not sufficient to determine compliance. More detail about each course is required to assess whether the training is sufficiently "comprehensive" and whether the training is "adequate in quality, quantity, type, and scope," consistent with ¶334. It is not clear from the course listings and descriptions how well the courses address the requirements of the ¶334 subparagraphs. For example, it is not readily apparent that the Exempt/Command Staff courses listed for ¶334(c) address all the requirements of that subparagraph.

As a result, the City and the CPD have not achieved Preliminary compliance for this paragraph. The IMT looks forward to the CPD's continuing evolution of these training materials.

# Training: ¶336

**336.** *Within 30 days of the Effective Date, CPD will develop a formalized structure for the field training component to ensure consistency across districts. This structure will include a process for selecting which supervisors will be shadowed and guidance materials to ensure that the topics and information regarding supervisor responsibilities covered during the field training component are consistent with CPD policy and this Agreement.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD have not yet achieved compliance with the requirements of this paragraph. Although the CPD took steps towards compliance in the second reporting period, the Special Orders, draft curricula, and training guides were still in development at the close of the period.

The IMT reviewed and assessed he CPD draft documents from the Bureau of Patrol SO 19-06 on pre-service supervisory field observation days for sergeants and lieutenants. We also reviewed the draft Education and Training Division Pre-Service Supervisory Training Special Order. In addition to these documents, the IMT reviewed revised drafts for the pre-service sergeant district station supervisor observation day lesson plan and observation guide. The IMT also reviewed revised drafts for the sergeant field duties training guide as well as Watch Operations Lieutenant observation day guide and lesson plan.

The proposed Special Orders, draft curricula and training guide activities are designed to ensure consistency across districts. The proposed Bureau of Patrol SO 19-06 also establishes the selection criteria for supervisors who will provide field observation to pre-service lieutenants and sergeants.

While the submitted and reviewed documents arguably establish a structure for the field training component, the structure cannot be formalized until CPD completes document revisions. The IMT looks forward to seeing revised drafts of these materials in the next reporting period.

# Training: ¶339

> **339.** *Within 90 days of the Effective Date, CPD will require that all members who are active duty and available for assignment are provided with training on the requirements of this Agreement, together with its goals, implementation process, and timelines.*

**Compliance Progress**                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

During the second reporting period, the City and the CPD achieved Preliminary compliance and Secondary compliance.

The CPD did not reach preliminary compliance with ¶339 in the first reporting period. During that period, the CPD developed a training course to be provided through its eLearning platform. The IMT and the OAG reviewed multiple iterations of that training. However, the CPD had not yet completed a final, approved version by the end of the first reporting period.

The CPD continued to make efforts towards compliance in the second reporting period. The IMT and the OAG reviewed the proposed training to ensure it covers critical consent decree areas and is presented in a format that maximizes the student's ability to absorb the training. We recommended several content and format-enhancing revisions. The CPD received and incorporated most of the recommended revisions into an updated draft eLearning course.

For Secondary compliance, the CPD provided the IMT with copies of email messages provided to all units informing them of their enrollment and mandatory participation in the CPD eLearning training course and an email reminder to complete the mandatory course. In addition to these documents, the IMT reviewed a screenshot copy of the CPD's Tableau dashboard, indicating 97% completion of the required consent decree eLearning training.[119]

In addition to the eLearning course, CPD has provided documents that indicate the department has undertaken a number of additional efforts to educate department

---

[119] The CPD is missing, however, an explanation of this graph which is necessary to affirm its meaning. While we would appreciate more explanation of the graph moving forward, the City and the CPD still provided sufficient information to meet Secondary compliance.

members about ¶339 requirements. Those efforts include roll call briefings, department-wide messaging from the Superintendent, and the Office of Reform Management blog.[120]

---

[120] According to Chicago Department of Law Production Letter dated August 21, 2019, the CPD's Office of Reform Management maintains a blog that provides additional information to the Department about the Consent Decree and provides answers to frequently asked questions concerning the Consent Decree.

# Training: ¶340

**340.** *In connection with issuing a policy or procedure pursuant to this Agreement, CPD will ensure that: a. all relevant CPD members review their responsibilities pursuant to the policy or procedure, including the requirements that each member is held accountable for their compliance and is required to report violations of policy; b. supervisors of all ranks are informed that they will be held accountable for identifying and responding to policy or procedure violations by members under their direct command; and c. CPD can document that each relevant CPD officer or other employee has received and reviewed the policy.*

## Compliance Progress      (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD did not meet Preliminary compliance for ¶340 in the second reporting period because the CPD had not yet adopted a policy or training that incorporated the language and assurances of 340(a)–(c).

During this period, the IMT reviewed the CPD member review and tracking process for new or revised directives. The CPD provides members all directives via its eLearning platform. All members are required to indicate that they have received and reviewed the directive via eLearning. The CPD has provided the IMT with new and revised directives that have been distributed to CPD members from the months of September 2019 to December 2019. The CPD has also shared screenshots of their Department Directives Tableau dashboard which is to be used to track, monitor, and analyze compliance with ¶340(a) and (c).

In addition, the IMT reviewed and commented on the CPD's revisions to G01-03, which were finalized and made effective on May 5, 2020, after the close of the second reporting period. With those revisions, the CPD has met Preliminary compliance requirements, which will be reflected in the next reporting period. The IMT looks forward to working with the CPD as they move toward Secondary compliance, which can be demonstrated by ensuring that at least 95% of eligible candidates meet ¶340 requirements.

# Training: Foundational Paragraphs

As noted in the Monitoring Plan for Year One, the IMT has identified two "foundational paragraphs" within the Training section of the consent decree: ¶¶280 and 284.

***

## Consent Decree ¶280

> **280.** *CPD will develop, implement, and utilize a centralized electronic system for scheduling and tracking all CPD training to allow the Education and Training Division to effectively plan and manage training schedules and instructor assignments for all training.*

### Compliance Status

The Education and Training Division, in conjunction with the Information Services Division, has advised they are working toward integrating a robust software capable of accomplishing all the requirements listed in ¶280. The Department anticipates that the software will be functional by the end of the second quarter of 2020.

During a February 25, 2020 call, the CPD noted that they are still setting up systems to allow all CPD units to schedule training sessions through the new system. Although mentioned in the Training Plan, the City and the CPD have not provided substantive evidence for this paragraph yet.

## Consent Decree ¶284

> **284.** *CPD will require that all new and current Education and Training Division instructors and curriculum developers are certified by the Illinois Law Enforcement Training and Standards Board and, as appropriate to their roles, receive initial and annual refresher training on subjects including, but not limited to, effective teaching, adult-learning techniques, and curriculum development. CPD will further require that instructors are trained in the specific subject matter they are assigned to teach and are also cross-trained in other related subjects so that they are equipped to deliver effective interdisciplinary instruction. Instructor training will also include peer review.*

## Compliance Status

The CPD has submitted lesson plans, curricula, presentation decks, and training documents as evidence of compliance with this paragraph. The IMT reviewed documents that list CPD instructors who have received Illinois Law Enforcement Training and Standards Board instructor training and additional CPD instructor courses.

The IMT cannot discern from the documents, however, which instructors are certified by the Illinois Law Enforcement Training and Standards Board and whether there are new or current instructors who have not attempted or met instructor training requirements of this paragraph.

In addition, the IMT reviewed the draft Training Plan and other policies but could not identify a policy statement meeting ¶284 requirements. Preliminary compliance can be achieved with a specific policy that clearly mandates these requirements.

# VII. Supervision

## Guiding Principles

The IMT will assess compliance with the Supervision paragraphs in accordance with the consent decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *341. Effective supervisors, who lead by example and actively engage with the subordinates under their direct command, play a critical role in ensuring lawful, safe, effective, and community-centered policing. To achieve this outcome, the Parties agree to the requirements set out below.*

> *342. The provisions of this Agreement are designed to ensure that CPD supervisors provide the effective supervision necessary for members to perform their duties lawfully, safely, and effectively and for members to improve and grow professionally. Further, the provisions of this Agreement are designed to allow supervisors to spend time monitoring and training members under their direct command so as to provide adequate opportunities to prevent, promptly identify, and promptly correct adverse officer behavior. This meaningful supervision will facilitate the establishment and re-enforcement of a culture of community policing, community and officer safety, and accountability throughout the Department.*

> *343. CPD should have the staffing necessary to promote lawful, safe, effective, and community-centered policing; provide effective supervision; ensure officer safety and accountability; and implement the terms of this Agreement.*

> *344. Immediate supervisors of all ranks are responsible for supervising, managing, and overseeing, as appropriate, the day-to-day work activities of members under their direct command.*

> *345. Supervisors of all ranks are accountable for the performance of subordinate members directly observed or under their direct command.*

> *346. Effective supervisors will: a. engage in activities and conduct that support the mission and goals of the Department, including those set forth in this Agreement; b. model appropriate*

*conduct, including abiding by high standards of integrity and adhering to the United States Constitution and other laws, CPD policy, and the terms of this Agreement; and c. consistently demonstrate professionalism, courtesy, and respect towards all people with whom they interact.*

# Summary of Compliance Assessments

Overall, the IMT commends the CPD's commitment to improving supervision throughout the organization, particularly the substantial effort undertaken to develop a comprehensive plan to meet the unity of command and span of control requirements. Nonetheless, significant effort will be required to propel the organization to the next level of compliance.

The current pilot program for unity of command and span of control, for example, must be closely monitored and thoughtfully assessed. The CPD has indicated that the pilot program will continue throughout 2020, and it does not anticipate the full department-wide roll-out until 2021. Once the CPD finishes the pilot program, they will need enhanced technology to manage and track the department-wide roll-out. There are also pending labor issues that must be resolved and may cause additional delays. Additionally, the IMT urges the CPD to undertake a comprehensive staffing study to inform a staffing model that will help the CPD to meet the requirements of ¶343 and other consent decree paragraphs.

In sum, the IMT assessed the City's compliance with five Supervision paragraphs of the consent decree with deadlines in Year One (¶¶348, 360, 362, 364, and 368) and one foundational paragraph (¶¶356).[121] In the second reporting period, we have determined that the City moved into Preliminary compliance for four paragraphs with deadlines in Year One (¶¶348, 360, 364, and 368). The City failed to reach Preliminary compliance in the remaining paragraph with a deadline in Year One (¶356). *See* Figure 46 below.

Figure 46:    Compliance Status at the End of the Second Reporting Period (February 29, 2020) for Supervision Paragraphs with Deadlines in Year One

Paragraphs in Compliance (Preliminary or Secondary)    (4)
Paragraphs with Requirements Not in Compliance (*including under assessment*)    (1)

The City had five deadlines in the second reporting period. The City met deadlines for four paragraphs (¶¶348, 360, 364, and 368), but missed the remaining deadline (¶362). The City did not meet any additional underlying deadline requirement before the end of the reporting period. *See* Figure 47 below.

Figure 47:    Total Crisis Intervention Deadlines in the Second Reporting Period: 5



Met Deadline    (4)
Missed Deadline    (1)

Met by February 29, 2020    (+0)    (4)

---

[121]    The IMT did not write about any Supervision paragraphs in our last monitoring report.

Finally, the foundational paragraph is still under assessment (¶356). *See* Figure 48 below.

Figure 48:   Compliance Status at the End of the Second Reporting Period (February 29, 2020) for Foundational Paragraphs in the Supervision Section

Paragraphs in Compliance (**Preliminary** or **Secondary**)   (0)
Foundational Paragraphs that are Under Assessment   (1)

# Supervision: ¶348

**348.** *By January 1, 2020, CPD will review and, as necessary, revise its policies for supervision to ensure that such policies set out clear responsibilities for supervisors to comply with the requirements of this Agreement. CPD will inform all supervisors of their specific duties and responsibilities that are required by CPD policies, including this Agreement.*

---

**Compliance Progress**          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | | |
|---|---|---|
| **Deadline:** | January 1, 2020 | ✓ Met ☐ Missed |

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Under Assessment*
**Full:** *Not In Compliance*

The City and the CPD achieved Preliminary compliance for ¶348. The consent decree calls for numerous policies that set forth clear expectations and processes for supervisors, such as supervisor responsibilities regarding crisis intervention response and review; use of force investigation and review; and impartial policing prohibitions and actions.

On February 28, 2020, the City produced a CPD matrix, which identified all policies that the consent decree requires for specific supervisory responsibilities. Because each of these policies is subject to review and assessment in accordance with other consent decree paragraphs, the full implementation of these policies is not included in the IMT's consideration regarding the Preliminary compliance with the requirements of ¶348. Instead, consistent with prior discussions with the Parties, the IMT interprets Preliminary compliance with ¶348 to require the CPD to create a process of review and revising its policies for supervision to comply with the requirements of the consent decree and inform supervisors of their corresponding responsibilities. This is an iterative process that must continue as the City, the CPD, the OAG, the IMT, and the community continue to develop the various policies across the ten topics of the consent decree.

As reflected in the CPD matrix, the CPD sufficiently initiated this process for Preliminary compliance. The CPD also conducted several in-person supervisor briefings, identifying various supervisory roles and responsibilities associated with the consent decree, including firearm pointing and foot pursuits. Moreover, the CPD set out these Supervisor expectations in its draft General Order 01-07, *Supervisory Responsibilities*, which the CPD provided on February 28, 2020. While this policy was still in the early consultation phase of the review process by the end of the

reporting period, it reflects the CPD's efforts to begin reviewing and revising its policies for its supervisors' duties and responsibilities.[122]

Additionally, the IMT reviewed training materials relating to G01-07 and supervisor responsibilities under the consent decree, including a series of sign-in sheets showing attendance at supervisor trainings. While these sign-in sheets do not provide the IMT with a sufficient basis to determine the total extent to which those with supervisory responsibilities have received training, the CPD appears to be moving toward Secondary compliance. The IMT understands that the CPD is committed to developing a more reliable tracking system, and we look forward to monitoring those efforts.

Over the next reporting period, the IMT will continue to review policy development, data sources, and training methodologies regarding these obligations to determine the CPD's level of compliance and work towards full implementation of training. We will be particularly interested in reliable data that shows the percentage of overall supervisors who attend the required training.

---

[122] To be clear, the IMT typically requires the full implementation of policies to qualify for any level of compliance. Paragraph 348, however, describes a review and revision process that will be ongoing throughout—and hopefully after—the life of the consent decree. Likewise, many related policies, discussed throughout this report, have "Supervision" sections, which the IMT reviews and considers for Supervision purposes.

# Supervision: ¶360

**360.** *By January 1, 2020, CPD will develop a staffing model to achieve the principles of unity of command and span of control. CPD's staffing model will identify methods to implement unity of command and a span of control ratio of no more than ten officers to one Sergeant for all field units on each watch in each of CPD's patrol districts. To achieve this objective, CPD will maintain, at a minimum, one Sergeant for each sector.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          January 1, 2020          ☑ **Met**          ☐ **Missed**

**Preliminary:**          *In Compliance* (NEW)
**Secondary:**          *Not In Compliance*
**Full:**          *Not In Compliance*

The City and the CPD achieved Preliminary compliance with ¶360 by developing a comprehensive plan to address the unity of command and span of control requirements in the consent decree and launching a pilot program in the 6th District.

The IMT attended a briefing on the plan in October 2019, during which the CPD explained intention to have the 6th District launch a Unity of Command and Span of Control pilot program in January 2020. The IMT visited the 6th District on several occasions during this reporting period and conducting interviews with participating officers and supervisors to discuss the pros and cons of the new pilot program. Officers noted that they appreciated the consistency in supervisors, which enabled them to build rapport, but they also noted concerns with the disruptions to partner assignments, especially when the partners have built trust with each other. Overall, officers noted that the pilot program "doesn't feel that much different" than how officers were assigned previously. The IMT appreciates the commitment and attention to detail demonstrated by those managing the project. Before implementing the full plan, the CPD expects to continue the pilot program in the 6th District through 2020.

During the next reporting period, and over the course of the year, the IMT will continue to monitor the CPD's pilot program and to offer technical assistance in evaluating the pilot program, as appropriate.

# Supervision: ¶362

**362.** *By January 1, 2020, CPD will develop a system and protocols to allow the Department to assess, both long-term and on a day-to-day basis, whether field units on each watch in each patrol district meet the requirements for unity of command and span of control.*

**Compliance Progress**          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          January 1, 2020          ☐ **Met**  ☑ **Missed**

**Preliminary:**          *Under Assessment*
**Secondary:**          *Not In Compliance*
**Full:**          *Not In Compliance*

Since the Unity of Command and Span of Control pilot program is ongoing in the 6th District, the City and the CPD have not yet achieved Preliminary compliance with ¶362.

Currently, the CPD is using manual processes to capture the day-to-day assignment of officers to a supervisor. While the CPD believes that these processes will allow for assessment of the pilot program on a day-to-day and short-term basis, the IMT urges the CPD to procure or develop technology that will allow the CPD to automate this process. Automation will permit the CPD to effectively assess and monitor unity of command and span of control as the pilot program matures and expands to the rest of the department.

Several IMT members visited the 6th District during this reporting period and conducted interviews with participating officers and supervisors to discuss the pros and cons of the pilot program. The IMT notes that the system and protocols in ¶362 are essential to the CPD's unity of command and span of control requirements. The IMT looks forward to continued discussion regarding the pilot program in the 6th District and relevant technology in the next reporting period.

# Supervision: ¶364

**364.** *Beginning no later than January 31, 2020, CPD will begin to implement a staffing model to achieve unity of command and a span of control ratio of no more than ten officers to one Sergeant assigned to field units on each watch in each patrol district.*

**Compliance Progress**          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | | |
|---|---|---|
| **Deadline:** | January 31, 2020 | ✓ **Met**  ☐ **Missed** |

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**      *Not In Compliance*
**Full:**             *Not In Compliance*

The City and the CPD have achieved Preliminary compliance with these requirements. As indicated above, the CPD launched the Unity of Command and Span of Control pilot program in the 6th District in January 2020. This pilot program attempts to achieve a ratio of no more than 10 officers to a Sergeant assigned to field units on each watch in each patrol district. Several IMT members visited the 6th District during this reporting period and conducted interviews with participating officers and supervisors to discuss the pros and cons of the pilot program. The CPD anticipates that the pilot program will operate through the full calendar year before attempting to implement the program department-wide. As a result, the CPD has developed a staffing model that meets the technical requirement of ¶364.

The IMT cautions, however, that for the CPD to remain in Preliminary compliance, it will need to carefully monitor and refine the staffing model, as needed, to meet the requirements of this paragraph department wide.

With that in mind, the IMT notes two important developments:

1. The CPD Superintendent ordered transferring a sufficient number of supervisors to the 6th District to support the pilot program; and

2. The Fraternal Order of Police (FOP), Lodge 7, filed a corresponding grievance, which is the subject of ongoing arbitration.[123]

---

[123] Specifically, the pilot program included, among other things, changing the day off groups (DOGs) from six to three days. In response, the FOP filed, among other things, a corresponding grievance, and on February 26, 2020, an Arbitrator granted the grievance. As a result, the 6th District returned to a 6-day rotation, until changes can be negotiated and agreed to with the FOP.

Overall, the IMT appreciates the Superintendent's commitment to the pilot program. We will closely monitor developments related to the grievance and will continue to evaluate the success of the pilot program over the next reporting period.

## Supervision: ¶368

> **368.** *Beginning 365 days after the Effective Date, and annually thereafter, the Monitor will review and assess CPD's progress toward achieving unity of command and a span of control ratio of no more than ten officers to one Sergeant.*

**Compliance Progress** (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:** February 29, 2020 ☑ **Met** ☐ **Missed**

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not In Compliance*
**Full:** *Not In Compliance*

Paragraph 368—along with a few other paragraphs in the consent decree—is written to highlight the IMT's actions or reviews, but ultimately relates to City responsibilities. Because the City and the CPD provided the IMT with the requisite access to information required to assess the CPD's progress toward achieving the requisite unity of command and span of control ratio by the end of the reporting period, they met Preliminary compliance with this paragraph.

The IMT is continuing to assess the City's and the CPD's efforts to achieve Preliminary compliance with ¶368. The IMT maintained close lines of communication with the Parties and provided regular feedback during the development of the Unity of Command and Span of Control implementation plan.

This topic has been discussed regularly during bi-weekly calls, meetings, and visits. Specifically, in October 2019, the CPD presented its draft implementation plan to the OAG and the IMT. During site visits in January and February of 2020, the IMT discussed and observed the pilot in the 6th District. The CPD has also made weekly data available for the IMT's and the OAG's review.

Overall, the IMT is pleased with the CPD's commitment and progress to date, but there are substantial hurdles ahead. The most noteworthy hurdles include the following:

1. The City and the CPD must resolve pending labor issues;

2. The CPD must improve its technology to support long-term implementation of the Unity of Control and Span of Control program; and

3. The CPD must complete its department-wide staffing study to inform unity of command and span of control requirements.

Full implementation will require continued command support, staff commitment, and necessary resources. In the next reporting period, the IMT will continue to evaluate the success of this pilot program and the CPD's progress towards addressing the hurdles noted above.

# Supervision: Foundational Paragraphs

As noted in the Monitoring Plan for Year One, the IMT has identified a "foundational paragraph" within the Supervision section of the consent decree: ¶356.

\*\*\*

## Consent Decree ¶356

*356. As otherwise set out in this Agreement, CPD will ensure that it makes staffing and allocation decisions that provide for: a. the number of patrol field supervisors to ensure span of control and unity of command as required in this Part; b. the number of well-trained, qualified FTOs, as required in Part H of the Training section of this Agreement; c. the number of well-trained, qualified staff to train recruits and officers, as required in Part D of the Training section of this Agreement; d. the number of well-trained, qualified staff to conduct timely misconduct investigations, as required in the Accountability and Transparency section of this Agreement; e. the number of certified CIT Officers, as required in Part D of the Crisis Intervention section of this Agreement; and f. the number of officer assistance and wellness staff as required in the Officer Wellness and Support section of this Agreement.*

## Compliance Status

The CPD continues to make thoughtful progress towards each of the requirements of this comprehensive paragraph. The CPD continues to take steps in re-deploying staff to critical units directly associated with supporting compliance with various consent decree paragraphs. For example, the CPD deployed additional sergeants to the 6th District to support span of control requirements and to the Force Review Unit to assist in foot-pursuit and firearm-pointing investigations. The CPD also assigned additional Field Training Officers to districts to create a one-to-one ratio for new recruits. Additionally, the CPD hired experts to conduct a comprehensive staffing allocation model to identify appropriate resources throughout the department. The hired experts include partners with the University of Chicago Crime Lab, to do the analysis, and the Civic Consulting Alliance to create the standardized allocation process.

Over the next reporting period, the CPD must closely attend to the evolution of the pilot program, ensure that the training initiatives continue, and respond to the staffing and capacity needs identified by reliable data.

# VIII. Officer Wellness and Support

## Guiding Principles

The IMT assessed compliance with applicable Officer Wellness and Support paragraphs in accordance with the consent decree's "Guiding Principles." These guidelines "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **377.** *In fulfilling their duties, CPD members expose themselves to significant danger, high stress, and a wide spectrum of human tragedy. There is growing recognition that psychological and emotional wellness are critical to officers' health, relationships, job performance, and safety. The City and CPD have an obligation to help CPD members cope with the consequences that come from their service to the public.*

> **378.** *The City and CPD's obligation to CPD members includes providing adequate support systems to treat members experiencing mental health, substance abuse, and other emotional challenges.*

> **379.** *The City and CPD's obligation to CPD members also includes equipping them in a manner that enables them to do their jobs as safely as reasonably possible. CPD will ensure that the safety of its members is not jeopardized by equipment and technology that is outdated, broken, or in need of repair or replacement.*

> **380.** *The City and CPD will implement the following requirements in order to achieve a healthy, effective, and constitutionally compliant police force.*

## Summary of Compliance Assessments

In this second reporting period, the City and the CPD provided the IMT with core documents regarding Officer Wellness and Support, including a draft of the Officer Support Services Plan and foundational documents that informed that plan (a gap analysis and Officer Support Needs Assessment), policy and training materials relating to FOID card eligibility, an updated Chaplains Unit policy, and suicide prevention materials. The IMT also conducted site visits and met with key staff, including CPD Employee Assistance Program Director Dr. Robert Sobo. The IMT based its compliance assessments on the materials provided by the City and the CPD, the information obtained during its site visits and meetings, and our reviews of best practices for officer wellness and psychology. These best practices included research that was either identified by the CPD in conducting its Needs Assessment and through independent consideration of materials in the field, including recent guidance from the International Association of Chiefs of Police regarding critical incident response management.

The IMT acknowledges that the CPD's ability to meet certain consent decree requirements remains contingent on enhancing its data collection tools. As a result, delays may be an inherent biproduct of a more measured and thoughtful approach. Given this limitation, the IMT commends, overall, the continued commitment and effort by the CPD towards this critical area of reform.

In sum, the IMT assessed the City's compliance with 12 Officer Wellness and Support paragraphs of the consent decree with deadlines in Year One (¶¶382-383, 384, 387–89, 391, 401, 404, 406, 409, and 411) and two foundational paragraphs (¶¶385–86). We assessed two of these paragraphs in the first reporting period (¶¶387 and 409) and found that the City and the CPD met Preliminary compliance for ¶409.

In the second reporting period, we have determined that the City moved into Preliminary compliance for five paragraphs with deadlines in Year One (¶¶387, 391, 401, 406, and 411) and maintained Preliminary compliance for one paragraph (¶409). The City failed to reach Preliminary compliance in the remaining six paragraphs with deadlines in Year One (¶¶382–84, 388–89, and 404). *See* Figure 49 below.

Figure 49:     Compliance Status at the End of the Second Reporting Period (February 29, 2020) for Officer Wellness and Support Paragraphs with Deadlines in Year One



Paragraphs in Compliance (**Preliminary** or **Secondary**)  (6)
Paragraphs with Requirements Not in Compliance (*including under assessment*)  (7)

The City had 8 new deadlines in the second reporting period. The IMT determined that the City met deadlines for four new paragraphs (¶391, 401, 406, and 411), but missed the remaining four new deadlines (¶¶382, 388–89, and 404). The City did not meet any additional underlying requirements before the end of the reporting period. *See* Figure 50 below.

Figure 50:    Total Officer Wellness and Support Deadlines in the Second Reporting Period: 8



Finally, the City did not reach Preliminary compliance for either of the two foundational paragraphs (¶¶385–86). *See* Figure 51 below.

Figure 51:    Compliance Status at the End of the Second Reporting Period (February 29, 2020) for Foundational Paragraphs in the Officer Wellness and Support Section



# Officer Wellness and Support: ¶382

> **382.** *CPD currently offers clinical counseling services, programs regarding alcoholism and other addictions, and a peer support program to help CPD members cope with the psychological and personal toll their jobs can impose. By September 1, 2019, CPD will complete a needs assessment to determine what additional resources are necessary to ensure the support services available to CPD members comport with best practices and mental health professional standards.*

## Compliance Progress    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**    September 1, 2019    ☐ **Met**    ☑ **Missed**

**Preliminary:**    *Under Assessment*
**Secondary:**    *Not in Compliance*
**Full:**    *Not in Compliance*

The City and the CPD did not meet the September 1, 2019 deadline for ¶382. During the second reporting period, the IMT reviewed the Officer Support Needs Assessment (Needs Assessment), which it received on September 25, 2019, as well as background materials the CPD provided. Overall, the CPD has dedicated significant resources to this effort, and as explained below, we believe the CPD is making the necessary priority shift toward meeting these requirements in the upcoming Officer Support Services Plan.

In response, the IMT provided general and specific comments and recommendations regarding the Needs Assessment. The IMT made three overarching observations regarding the Needs Assessment: (1) the IMT had difficulty discerning the CPD's vision for the future of its wellness programs; (2) the IMT had difficulty understanding the foundation for the programs that the CPD intended to advance, how it would weigh factors in favor of or against particular approaches, and how the CPD would measure "success"; and (3) the IMT had trouble discerning a clear roadmap for how technology will advance programs and establishing priorities under the consent decree.

Notwithstanding our comments and recommendations, the Needs Assessment satisfied its ultimate purpose: to inform the eventual determinations and actions taken in accordance with the Officer Support Services Plan. When considering whether the CPD should dedicate resources to further revisions to the Needs Assessment or divert those resource to development of the Officer Support Services Plan, the IMT encouraged the latter and advised that the IMT would look to the Officer Support Services Plan to determine if its comments to the Needs Assessment are resolved.

The IMT looks forward to reviewing the Officer Support Services Plan and expects that our comments to the Needs Assessment will be addressed in the Officer Support Services Plan.

# Officer Wellness and Support: ¶383

*383. The needs assessment should analyze, at a minimum: a. staffing levels in CPD's Professional Counseling Division; b. the current workload of the licensed mental health professionals and drug and alcohol counselors employed by CPD; c. how long it takes CPD members requesting counseling services to be seen by a licensed mental health professional or drug and alcohol counselor; d. the professional specialties of CPD's licensed mental health professionals; e. the frequency and reasons for referrals of CPD members to clinical service providers external to CPD and the quality of those services; f. CPD member feedback, through statistically valid surveys that ensure anonymity to participants consistent with established Professional Counseling Division guidelines, regarding the scope and nature of the support services needs of CPD members and the quality and availability of services and programs currently provided through the Employee Assistance Program; g. similar mental health services offered in other large departments, including the ratio of licensed mental health professionals to sworn officers and the number of counseling hours provided per counselor per week; h. guidance available from law enforcement professional associations; i. the frequency and adequacy of CPD's communications to CPD members regarding the support services available to them; j. the frequency, quality, and demand for in-service trainings related to stress management, officer wellness, and related topics; and k. the quality of recruit training related to stress management, officer wellness, and related topics.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD did not meet the deadline for ¶383. Overall, the CPD has dedicated significant resources to this effort, and as explained below, we believe the CPD is making the necessary priority shift toward meeting these requirements in the upcoming Officer Support Services Plan.

As the IMT awaits formal production of the Officer Support Services Plan, the IMT offers two points of technical assistance. First, the International Association of Chiefs of Police (IACP) is in the process of releasing the following revised documents regarding officer mental health and wellness: (1) considerations of best

practices in establishing officer mental health and wellness programs and (2) a paper on related concepts and issues. The IMT provided the CPD with considerations contained in these two documents and encourages the CPD to consider how these proposals align with its developing Officer Support Services Plan.

Second, internalizing policies, training, and practices around employee mental health and wellness is critical within the CPD—as identified in both the consent decree and the IACP considerations. While it may be tempting to default to external resources, a key principle of iterative reform is the commitment of an organization to continuing assessment and informed refinement of its own systems and programs. This includes the agility to adapt quickly to the changing needs of the organization.

As discussed with the City, the CPD, and the OAG, the IMT will review the upcoming Officer Support Services Plan to determine whether the CPD incorporated the IMT's and the OAG's comments and recommendations from the Needs Assessment, including the subparts (a) through (k) of ¶383, as required. As we review the Officer Support Services Plan, the IMT will consider the CPD's commitment to ownership of the programs, trainings, and services it will offer or enhance, consistent with guidance and best practices specific to law enforcement personnel.

# Officer Wellness and Support: ¶384

**384.** *Within 60 days of the completion of the needs assessment, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs identified through the needs assessment required by the immediately preceding paragraph ("Officer Support Systems Plan"). CPD will implement the Officer Support Systems Plan in accordance with the specified timeline for implementation.*

## Compliance Progress     (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

Over the past reporting period, the IMT had the opportunity to closely follow and discuss the Professional Counseling Division with the CPD as it continues to integrate the findings of its Needs Assessment into the required Officer Support Systems Plan.

The CPD has made progress towards completing this requirement, but the plan is still incomplete. As referenced further below regarding ¶388, in many respects, the CPD is already ahead of the curve in addressing the dearth of consistent and tested best practices. The IMT also acknowledges the CPD's thoughtful approach to building upon the solid foundation that already exists in Chicago. The City and the CPD will need to stay on pace with its commitment towards dedicating the resources necessary to enable the Professional Counseling Division to meet this obligation.

# Officer Wellness and Support: ¶387

> **387.** *Within 180 days of the Effective Data, CPD will develop and implement a roll call training to explain and address the effects on Firearm Owners Identification ("FOID") card eligibility, if any, when a CPD member seeks or receives CPD support services, including, but not limited to, counseling and mental health treatment.*

## Compliance Progress                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not in Compliance* |

The CPD has met Preliminary compliance with ¶387, and the IMT has begun to assess the CPD's Secondary compliance efforts.

In the first reporting period, the IMT reviewed the CPD's Project Plan for researching, developing, and implementing an eLearning module and decentralized training to comply with ¶387, which did not meet ¶387's deadline or the requirements for Preliminary compliance.

In the second reporting period, however, the IMT received and reviewed the CPD's outline of the Firearm Owners Identification (FOID) roll call training. The IMT provided comments regarding that outline on November 3, 2019. On December 18, 2019, the City and the CPD produced a draft electronic training module addressing how receiving support services may affect a member's FOID card eligibility. The IMT provided initial comments on the draft training on January 17, 2020. On February 10, 2020, the CPD provided a revised version of this training.

The revised version (1) is consistent with Illinois state law; (2) clearly articulates processes undertaken by the Illinois State Police with respect to FOID card revocation and reinstatement; (3) corrects misinformation or misunderstanding about how an officer's outreach regarding wellness services may impact FOID card eligibility, if at all; and (4) provides clear direction to CPD officers regarding steps they can take to avoid revocation or seek reinstatement of their FOID cards. On February 14, 2020, the IMT provided a "no objection" notice for this training.

As a result, the CPD is in Preliminary compliance with ¶387. Over the next reporting period, the IMT looks forward to updates regarding the extent this training has been provided and corresponding feedback it receives.

# Officer Wellness and Support: ¶388

> **388.** *As a component of the Officer Support Systems Plan, by January 1, 2020, CPD will develop and implement a comprehensive suicide prevention initiative ("Suicide Prevention Initiative"). In designing the Suicide Prevention Initiative, CPD will examine similar initiatives implemented in other large departments and incorporate guidance available from law enforcement professional associations. The Suicide Prevention Initiative will be overseen by a licensed mental health professional working in conjunction with a command staff member.*

## Compliance Progress

(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:** January 1, 2020 ☐ Met ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD did not meet the January 1, 2020 deadline or achieve Preliminary compliance with ¶388 by the end of the reporting period. While there is a tremendous amount of research being conducted by medical, psychological, and other research organizations, there is currently no "best practice" approach that meets the definition of ¶730 of the consent decree to use as a benchmark against which the CPD's efforts can be measured.

Indeed, it is the CPD's approach to which many agencies turn in shaping their own programs and practices. The IMT continues to acknowledge the CPD's initiative in working towards a holistic approach to mental health and wellness, as discussed in its Needs Assessment. The CPD has also established a Suicide Prevention Working Group, comprising internal and external stakeholders and representatives, to assist in informing the CPD's Suicide Prevention Plan. The IMT acknowledges the CPD's collaborative and thoughtful work toward that end. The IMT looks forward to continued discussion and review in this area over the next reporting period.

The importance of developing effective identification, mitigation, and intervention strategies to address the risk of officer suicide cannot be understated. As departments and professional organizations around the world grapple with this concern, the IMT will look to CPD to continue its work as an active partner in these efforts. The IMT was impressed, for example, by the number of CPD personnel who recently attended a three-day symposium organized by the International Association of Chiefs of Police dedicated to the issue of officer wellness, which had considerable focus on suicide prevention. The IMT suggests that the CPD explore partnerships with the Psychological Services Section of the Major Cities Chiefs Association

to harness the expertise and experience of large agencies similarly situated to the CPD.

The IMT also notes the CPD's engagement last year of the Chicago Crime Lab to host a two-day discussion and brainstorming session around officer suicide. This brought together law-enforcement-wellness experts from around the country, including from large police departments, such as the New York, Los Angeles, Seattle, and New Orleans police departments. The IMT understands that an impressive number of recommendations were produced from that collective effort.

As the CPD further develops the Suicide Prevention Initiative, the IMT will be particularly interested in understanding the CPD's consideration of this work and how, it has factored the knowledge gained during that exercise and other programs into its suicide prevention initiatives.

# Officer Wellness and Support: ¶389

> **389.** At least annually, the Director of the Professional Counseling Division will provide a written report to the Superintendent, through his or her chain of command, that includes anonymized data regarding support services provided to CPD members, how long it takes CPD members requesting counseling services to receive them, and other metrics related to the quality and availability of these services. This report will also contain resource, training, and policy recommendations necessary to ensure that the support services available to CPD members reasonably address their identified needs and comply with the Officer Support Systems Plan.

## Compliance Progress      (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**      February 29, 2020      ☐ Met    ☑ Missed

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD did not meet the February 29, 2020 deadline and have not achieved Preliminary compliance with ¶389 by the end of the reporting period.

The CPD reports that its ability to satisfy requirements under this paragraph continues to be stalled by the lack of technology sufficient to collect and aggregate the requisite information. Presently, the CPD is using manual forms to track clinical work and weekly reports to the Superintendent. These forms, however, do not allow for analysis of core metrics required under this paragraph, nor do the weekly reports contain aggregated data concerning individual programs and unit accomplishments, activities, and training.

Thus, while the IMT appreciates the Professional Counseling Division's interim efforts toward meeting these requirements, the CPD is not yet capable of meeting Preliminary compliance with ¶389.

# Officer Wellness and Support: ¶391

> **391.** *CPD will initially increase the staffing level in its Professional Counseling Division to at least ten full-time licensed mental health professionals (or a combination of full- and part-time licensed mental health professionals capable of providing an equivalent amount of weekly clinical therapy hours) by January 1, 2020. CPD may contract with licensed mental health professionals external to CPD on an interim basis while CPD completes the process for creating these new positions and hiring individuals to fill them. Additional changes to staffing levels will be made consistent with the results of the needs assessment and Officer Support Systems Plan.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          January 1, 2020          ✓ Met     ☐ Missed

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD met Preliminary compliance with ¶391 by the January 1, 2020 deadline. In the second reporting period, the CPD hired additional clinical staff and consider additional changes to staffing levels to meet best practice standards identified in the Needs Assessment (and will be established under the Officer Support Services Plan).

The CPD has noted, however, that despite expanding clinical resources, it continues to fall short of the staffing models. The CPD also emphasized needing more sophisticated programs, which are used by comparable agencies, such the Los Angeles Police Department.

The IMT will continue to evaluate the sufficiency of staffing levels within the Professional Counseling Division as the CPD moves towards implementing the Officer Support Services Plan.

# Officer Wellness and Support: ¶401

> **401.** CPD currently offers anonymous support groups and programs for alcoholism and other addictions. CPD will ensure that a licensed mental health professional assigned to the Professional Counseling Division oversees any such programs offered by CPD, that the programs adhere to generally accepted practices in the field of addiction treatment (e.g., 12-step addiction treatment program), and that each program is reviewed at least annually by the Director of the Professional Counseling Division.

---

### Compliance Progress     (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**      February 29, 2020     ✓ **Met**    ☐ **Missed**

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**     *Not in Compliance*
**Full:**     *Not in Compliance*

Based on our review of staffing levels, interviews with Support Services personnel, and materials produced in development of the Needs Assessment, the IMT finds that the City and the CPD are in Preliminary compliance with ¶401. The IMT specifically notes that the CPD has increased the staffing of its Employee Assistance Program (EAP) to include six substance-use-disorder-treatment counselors, who work under the supervision of the Director of the Professional Standards Division. Using the peer-support model, these sworn CPD members host AA meetings, meet one-on-one with members and their families, provide frequent roll-call trainings, and respond to individual needs, as necessary.

The Alcohol Assistance Program offers both support and referral services and regularly scheduled meetings. Although this paragraph does not contain specific requirements with respect to staffing levels, the requirement of adequate staffing is implicit in ¶¶378 and 382–83. The IMT expects that the upcoming Officer Support Services Plan will indicate whether additional staffing is necessary and that the CPD will provide a roadmap for ensuring that the level of staffing dedicated to its EAP is adequate to meet demand, including substance-use-disorder treatment.

The CPD provided the IMT and the OAG with samples of a weekly report that the Professional Counseling Division provides to the Superintendent. The sample reports contain information and data about the Professional Counseling Division's programs and activities for its Mental Health, Alcohol/Substance Abuse, and Peer Support units, such as the number of classes and attendees at trainings; the number of individual programs, activities, and intakes; and the number of CPD members and family members served. From its meetings with the CPD and the OAG, the IMT understands that these weekly reports aggregate into an annual report.

The sample weekly reports are sufficient to demonstrate Preliminary compliance with ¶401's requirement that the Director of the Professional Counseling Division will review the ¶401 programs at least annually.

# Officer Wellness and Support: ¶404

**404.** *CPD will maintain a peer support program, ensuring that: a. a licensed mental health professional assigned to the Professional Counseling Division oversees and adequately manages the program; b. Peer Support Officers receive initial training in stress management, grief management, officer wellness, obligations and limitations regarding confidentiality and privacy, communication skills, common psychological symptoms and conditions, suicide assessment and prevention, dependency and abuse, and support services available to CPD members; c. Peer Support Officers are trained to recommend the services offered by the Professional Counseling Division in situations that are beyond the scope of their training; d. CPD offers Peer Support Officers the opportunity to meet at least annually to share successful strategies and identify ways to enhance the program; e. Peer Support Officers receive and comply with a written procedures manual approved by a licensed mental health professional assigned to the Professional Counseling Division; f. Peer Support Officers are offered sufficient non-monetary incentives and recognition to ensure broad recruitment of volunteers and widespread access to peer support services; and g. the scope and quantity of peer support services provided to CPD members are identified in a manner that facilitates effective management of the program and that preserves the anonymity and confidentiality of members receiving peer support services.*

---

## Compliance Progress    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          February 29, 2020          ☐ **Met**    ☑ **Missed**

**Preliminary:**       *Not in Compliance*
**Secondary:**         *Not in Compliance*
**Full:**              *Not in Compliance*

The City and the CPD are not in compliance with ¶404. The CPD's longstanding peer-support program includes about 250 part-time volunteer peer-support counselors. These volunteers are supervised by a manager who reports to the Director of the Professional Counseling Division.

Overall, the IMT remains impressed by the compassion, empathy, and support provided by the CPD members who volunteer to serve their peers through this pro-

gram. We also acknowledge that steadfast commitment of support for this program, from the executive level down, and we are encouraged by the vision that the CPD has for this program.

On the other hand, the IMT has reviewed materials submitted towards satisfaction of the requirements of this paragraph, including the Peer Support Training Manual; Peer Support Guidelines, Expectations and Requirements for a Peer Support Member; and Peer Support Confidentiality Forms. While these efforts continue to demonstrate commitment towards best practice, as defined in ¶1730 of the consent decree, at this point, these documents are insufficient to establish compliance with the requirements of this paragraph, particularly regarding the Training Manual. The IMT looks forward to continued discussion and refinement of these deliverables over the next reporting period.

# Officer Wellness and Support: ¶406

***406.*** *By January 1, 2020, CPD will develop and adopt a standard operating procedure ("SOP") outlining the roles and responsibilities of the Chaplains Unit. The Chaplains Unit SOP will identify that: a. the purpose of the Chaplains Unit is to: i. support the wellness of CPD members who voluntarily seek consultation with representatives of the Chaplains Unit; ii. make referrals to licensed mental health professionals and other service providers, when appropriate; iii. provide pastoral care to CPD members who voluntarily seek such services; iv. offer voluntary preventive programs for the purposes of supporting, encouraging, and affirming CPD members in their professional and family lives; and v. provide support in moments of crisis as requested by CPD members. b. when acting in the official capacity of a CPD Chaplain, representatives of the Chaplains Unit will refrain from actions or statements that are inconsistent with CPD policy. c. representatives of the Chaplains Unit, including CPD members and non-CPD members, will receive training regarding the roles and responsibilities of the Chaplains Unit.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          January 1, 2020          ☑ **Met**     ☐ **Missed**

**Preliminary:**          *In Compliance* (NEW)
**Secondary:**          *Not in Compliance*
**Full:**          *Not in Compliance*

The City and the CPD met the January 1, 2020 deadline and are in Preliminary compliance with ¶406. The CPD timely submitted its draft Standard Operating Procedure (SOP) 20-01 (*Chicago Police Department Chaplains Unit*) to the IMT during this reporting period. The IMT provided its initial comments on this SOP on November 20, 2019. On December 11, 2019, the CPD submitted a revised draft SOP. The IMT and the OAG ultimately provided no-object letters, and the CPD posted the SOP for public comment for 15 days.

The final SOP includes appropriate substance regarding the requirements in ¶406, including an explanation of the purpose of the unit, descriptions of services offered, and clear direction for the roles and responsibilities of members of the unit.

To assess secondary compliance, the IMT will review: (1) the training to CPD members and non-members of the unit that is required by this paragraph, and (2) the extent to which this training is completed.

# Officer Wellness and Support: ¶409

**409.** *CPD has implemented a mandatory program for members who have experienced an officer-involved firearms discharge that consists of peer group discussions and other components. CPD will ensure that this program is overseen by a licensed mental health professional assigned to the Professional Counseling Division, reflects best practices, and comports with CPD's use of force policies and training.*

## Compliance Progress     (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* **(first reporting period)** |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Preliminary compliance with ¶409 from the first reporting period. In the first reporting period, the CPD implemented a mandatory program for affected officers, which was Commission on Accreditation for Law Enforcement Agencies (CALEA) qualified. Likewise, a licensed clinical psychologist directed the program and oversaw 11 other in-house, licensed clinicians.

The IMT notes that the CPD continues to seek out and integrate emerging best practices (*see* ¶730) from professional and research organizations, including comprehensive guidance pending release by the International Association of Chiefs of Police regarding Critical Incident Stress Management.

In assessing Secondary compliance, the IMT will review the development, implementation, and evaluation of training provided to members of the unit regarding incident debriefing, peer-group discussion, and critical-incident stress management.

# Officer Wellness and Support: ¶411

> **411.** *At least annually, CPD will determine whether members who have experienced a duty-related traumatic incident have attended the mandatory counseling sessions and have completed the Traumatic Incident Stress Management Program.*

## Compliance Progress   (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**          February 29, 2020          ✓ **Met**   ☐ **Missed**

**Preliminary:**   *In Compliance* (NEW)
**Secondary:**   *Not in Compliance*
**Full:**          *Not in Compliance*

The City and the CPD met the February 29, 2020 deadline and reached Preliminary compliance in the second reporting period.

During this reporting period, the CPD submitted many reports to demonstrate partial compliance with ¶389, which further demonstrate the substantial volume of services that are provided to members by the Professional Counseling Division's clinical staff. One of these reports was the CPD Audit Unit's Review of the Traumatic Incident Stress Management Program. The Audit Unit's Review answers the questions regarding CPD directives and the support for members who have experience traumatic incidents, the number of members who have been referred to and have attended the CPD's Traumatic Incident Stress Program in the recent past, and how the consent decree requirements differ from existing CPD directives. The Audit Unit's Review is sufficient to demonstrate Preliminary compliance with ¶411,

In the next reporting period, the IMT will be looking to the CPD to provide comprehensive data that clearly: (1) identifies duty-related traumatic incidents that trigger the obligations of this paragraph, (2) links the required services to the events in question, and (3) documents completion.

# Officer Wellness and Support: Foundational Paragraphs

As noted in the Monitoring Plan for Year One, the IMT has identified two "foundational paragraphs" within the Officer Wellness and Support section of the consent decree: ¶¶385 and 386.

*** 

## Consent Decree ¶385

> **385.** *As a component of CPD's Officer Support Systems Plan, CPD will develop and implement a communications strategy. The objectives of this communications strategy will be: a. to inform CPD members of the support services available to them; b. to address stigmas, misinformation, or other potential barriers to members using these services; and c. to emphasize that supporting officer wellness is an integral part of CPD's operations.*

### Compliance Status

The IMT has reviewed new and on-going initiatives to increase channels of communication to inform members of available services, including updated brochures and promotional materials. The IMT understands that staff from the Professional Support Division regularly attend roll-call trainings to destigmatize and normalize the services available. The IMT has also reviewed survey efforts designed to identify barriers that prevent CPD officers from reaching out.

The IMT looks forward to reviewing how these efforts come together to inform a comprehensive communications strategy as part of the upcoming Officer Support Services Plan.

## Consent Decree ¶386

**386.** *As part of this communications strategy, CPD will, at a minimum: a. make information about the support services available, on a continuing basis, to members on its internal websites; b. post information, including pamphlets and posters, in each CPD facility in areas frequented by officers; c. issue wallet-sized cards to every CPD member with contact information for the CPD support services available; d. inform and remind members about the CPD support services offered, including providing handouts with contact information, at the annual use of force training required by this Agreement, during Academy training of new recruits, and at in-service trainings relating to stress management and officer wellness; e. provide training to supervisory personnel regarding available CPD officer support services and strategies for communicating with officers about these services in a manner that minimizes any perceived stigma; and f. seek to identify and correct misperceptions among CPD members about receiving counseling services.*

### Compliance Status

The IMT understands that each of the discreet subparts of the overall requirement of ¶386 will be addressed in the Officer Support Services Plan. Given the extensive resources the CPD has dedicated to the Needs Assessment and the Officer Support Services Plan, the CPD is making good progress towards implementing the requirements of this paragraph.

# IX. Accountability and Transparency

## Guiding Principles

The IMT assessed compliance with applicable Accountability and Transparency paragraphs in accordance with the consent decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *419. Holding public servants accountable when they violate law or policy is essential to ensuring legitimacy and community confidence.*

> *420. A robust and well-functioning accountability system in which CPD members are held to the highest standards of integrity is critical to CPD's legitimacy and is a priority of CPD. A culture of accountability also promotes employee safety and morale, and improves the effectiveness of CPD operations. Organizational justice also plays an important role in ensuring that CPD members have confidence in the legitimacy of the system that holds them accountable.*

> *421. In order to foster public trust and receive critically important community feedback, and promote confidence in CPD, the City and CPD will ensure the process for submitting and pursuing complaints that allege violations of CPD policy or the law by CPD members is open and accessible for all individuals who wish to file complaints.*

> *422. Meaningful community involvement is imperative to CPD accountability and transparency. Nothing in this Agreement should be construed as limiting or impeding community participation in CPD's accountability system, including the creation and participation of a community safety oversight board. OAG and the City acknowledge the significant work many of Chicago's community organizations have undertaken and are continuing to undertake, including work alongside CPD, in the area of police reform and accountability, and OAG and the City know this critical work will continue.*

> *423. The City, CPD, and COPA will ensure that all complaints of misconduct, whether from internal or external sources, are thoroughly, fairly, timely, and efficiently investigated in accordance*

*with this Agreement; that all investigative findings are sup-
ported by the appropriate standard of proof and documented in
writing; and that all CPD members who commit misconduct are
held accountable pursuant to a disciplinary system that is fair,
timely and consistent, and provides due process.*

# Summary of Compliance Assessments

During this reporting period, the IMT worked to further its understanding of the City's complex accountability systems and spent time with the CPD Bureau of Internal Affairs (BIA), the Civilian Office of Police Accountability (COPA), the Chicago Police Board, and the Office of Inspector General for the City of Chicago (OIG). Throughout the reporting period, the IMT reviewed policies, plans, and other documentation, engaging in many hours of discussion about the City's efforts. The BIA focused on clarifying policy, drafted a comprehensive Accountability Sergeants Unit Directive, and took steps toward clarifying other policies and internal roles and responsibilities. COPA focused on policies, procedures, and training, particularly regarding investigations of officer-involved shootings. The Police Board refined several policies and procedures in the second reporting period. During a site visit, the Police Board provided the IMT with a hearing overview that gave the IMT insight into how Police Board cases are tried and adjudicated. The PSIG provided the IMT with detailed information on several projects that will provide the IMT and the City with data and information as our monitoring work continues. The IMT looks forward to continued progress on all the requirements in the Accountability and Transparency section.

This section of the consent decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. We explain, however, the status of each entity's efforts.

In sum, the IMT assessed the City's compliance with 28 Accountability and Transparency paragraphs of the consent decree with deadlines in Year One (¶¶425–26, 436, 457, 478–81, 488, 493, 498, 504, 512, 522, 525–30, 532–33, 538, 540, 542, 558, 563, and 565) and 40 foundational paragraphs (¶¶429–31, 434, 441–46, 448, 450–51, 453, 455–56, 459–69, 475, 477, 484, 486–87, 497, 499, 500–01, 508, 514, 552, and 561). The IMT also added 12 additional foundational paragraphs, which were not in our Monitoring Plan for Year One to provide significant updates in the second reporting period (¶¶447, 449, 454, 472, 474, 476, 494–95, 506, 555–57).

The IMT assessed 20 paragraphs with deadlines in the first reporting period (¶¶425–26, 429, 434, 436, 441–44, 448, 455–57, 461, 478–81, 488, 493, 498, 525–26, 528, 530, 538, 542, 558, 563, and 565), finding that the City met Preliminary compliance with three paragraphs (¶¶538, 558, and 565).

In the second reporting period, we determined that the City met Preliminary compliance with five additional paragraphs (¶¶498, 525, 532–33, and 563), maintained Preliminary compliance with the two paragraphs (¶¶538 and 558), and met

Preliminary and Secondary compliance with one paragraphs (¶565). The City did not meet Full compliance for any of the paragraphs and failed to reach Preliminary compliance with the remaining 20 paragraphs with deadlines in Year One (¶¶425–26, 436, 457, 478–81, 488, 493, 504, 512, 522, 526–30, 540, and 542). *See* Figure 52 below.

Figure 52: Compliance Status at the End of the Second Reporting Period (February 29, 2020) for Accountability and Transparency Paragraphs with Deadlines in Year One



The City had 11 new deadlines in the second reporting period. The IMT determined that the City met deadlines for three paragraphs (¶¶532, 563, and 565) but missed the remaining 8 new deadlines (¶¶504, 512, 522, 526, 528–29, 533, and 540). The City met the underlying deadline requirements for one of those nine paragraphs by the end of the reporting period (¶533). *See* Figure 53 below.

Figure 53: Total Accountability and Transparency Deadlines in the Second Reporting Period: 11



Finally, the foundational paragraphs are still under assessment. *See* Figure 54 below.

Figure 54: Compliance Status at the End of the Second Reporting Period (February 29, 2020) for Foundational Paragraphs in the Crisis Intervention Section

Paragraphs in Compliance (Preliminary or Secondary) (0)
Foundational Paragraphs that are Under Assessment (40)

# Accountability and Transparency: ¶¶425–26

**425.** *The City, CPD, and COPA will ensure individuals are allowed to submit complaints in multiple ways, including: in person to COPA or at a CPD district station, by telephone, online, anonymously, and through third party representatives. To ensure broad and easy access to its complaint system, within 90 days of the Effective Date: a. the City, CPD, and COPA will make the process for filing a complaint widely available to the public, including in-person, by telephone, and online; b. the City, CPD, and COPA will make the process for filing a complaint available electronically; c .the City, CPD, and COPA will make information on filing a complaint and accompanying instructions accessible to people who speak languages other than English and will provide telephonic language interpretation services consistent with the City's and CPD's existing limited English proficiency policies and this Agreement; d. the City, CPD, and COPA will ensure individuals may submit allegations of misconduct, regardless of whether the individual is a member or perceived member of an identifiable group, based upon, but not limited to: race, ethnicity, color, national origin, ancestry, religion, disability status, gender, gender identity, sexual orientation, marital status, parental status, military discharge status, financial status, or lawful source of income; e. the City, CPD, and COPA will continue to ensure that members of the public may make complaints via telephone using free 24-hour services, including by calling 311 and being given the option to leave a voicemail for COPA or speak to a CPD supervisor, and will clearly display this information on their respective websites and other appropriate City and CPD printed materials; f. the City, CPD, and COPA will ensure that instructions for submitting complaints are available via telephone, on-line, and in-person; and g. the City and CPD will ensure that complaint filing information is prominently displayed on CPD website's homepage, including by linking to COPA's online complaint form.*

**426.** *As part of the COPA's system for processing non-confidential complaints and administrative notifications (the "intake process"), each complaint and administrative notification will be assigned a unique tracking number. This unique tracking number will be linked with all phases of the investigation and disciplinary process, through the final disposition.*

## Compliance Progress        (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

|  |  | ¶425 | ¶426 |
|---|---|---|---|
| **Preliminary:** |  | *Not in Compliance* | *Not in Compliance* |
|  | **CPD** | *Not in Compliance* | *Not in Compliance* |
|  | **COPA** | *Not in Compliance* | *Not in Compliance*[124] |
| **Secondary:** |  | *Not in Compliance* | *Not in Compliance* |
| **Full:** |  | *Not in Compliance* | *Not in Compliance* |

In the second reporting period, the IMT determined that the City did not achieve Preliminary compliance with ¶¶425 and 426.

In the first reporting period, the IMT reviewed websites and written materials and determined that the CPD's and COPA's guidance for filing complaints lacked sufficient detail to meet Preliminary compliance for ¶¶425 and 426.

The IMT suggested that the CPD provide digital communications regarding filing complaints, make its online complaint-filing process more accessible, and establish policies that direct employees to assist the public in filing complaints by phone, email, and in person. The IMT also identified ongoing concerns regarding the actual complaint process. As a result, the IMT suggested that the CPD consider developing a robust process to allow community members to engage in the complaint process by making the CPD website more user-friendly and understandable, especially for its non-English speaking community members.

While COPA's website is easy to understand and navigate, the IMT suggested that COPA clarify how people might complain on weekends and improve its process to permit anonymous complaints.

To evaluate Preliminary compliance with ¶¶425–26, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the consent decree (¶¶626–41),[125] which delineates applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires

---

[124] As referenced above, the consent decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[125] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA (Jan. 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for._.pdf. The review process in the Stipulation mirrors the review process under

policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶¶425–26 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts. Because the complaint intake process is important and complicated, the IMT considered whether the City's, the CPD's, and COPA's communications to the public about the complaint intake process are sufficiently clear.

In the second reporting period, the IMT determined that neither the CPD nor COPA achieved Preliminary compliance with ¶¶425–26. The IMT reviewed a draft of the CPD's policy #2019-U005, *Initiation, Intake, and Assignment of Log Investigations* (dated October 25, 2019). The IMT appreciates that the City and the CPD consulted with the IMT to develop policies. While #2019-U005 explains how a Log Number is assigned to and used throughout an investigation, it does not sufficiently explain that the same Log Number generated at Complaint Intake will follow the case from beginning to end, including any Police Board involvement. As currently drafted, the policy lacks sufficient details and clarity. The IMT provided the CPD with feedback on the draft policy and awaits a revised version. If the CPD determines that #2019-U005 will be an internal directive, the IMT suggests that the CPD develop a similar policy to help the public to understand the disciplinary process.

The BIA also provided the IMT with a revised version of a brochure to inform the public about the complaint-filing process, along with general information about how the BIA plans to use the brochure. The brochure is printed in English, and the IMT looks forward to learning the BIA's plans for printing the brochure in other languages. We also look forward to learning more about the BIA's plans for distributing or otherwise providing the brochure to the public. We suggest that the BIA develop a formal development and distribution plan or policy for the brochure, along with a means of electronically distributing the brochure.

COPA has not provided any information to the IMT regarding the Log Numbers that are assigned at Complaint Intake and used throughout the course of the investigation. The IMT suggest that the CPD and COPA develop directives or revise existing directives to explain how the Log Number that is generated at complaint intake will remain with the case from beginning to end and clarify whether there are any exceptions to this process.

Both the CPD and COPA have begun the process of revising their websites to provide the public with additional information about the complaint process, including how complaints are investigated and transferred between the BIA and COPA. While the CPD has made improvements, it still has work to do to make the information on its website about filing a complaint more prominent and more user-

---

¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

friendly. The IMT suggests that both the CPD and COPA provide more information on their websites about the entire administrative investigation and adjudication process, including the role of the Police Board.

The IMT suggests that the CPD and COPA each develop comprehensive plans regarding how complaints can be made and how the complaint process works. These plans should include specific details about how the CPD and COPA plan to train employees to help the community to understand the complaint process.[126]

---

[126] In the City's comments, COPA highlights an April 2020 arbitration decision (after the reporting period) regarding the Policemen's Benevolent & Protective Association of Illinois, Unit 156's collective bargaining agreements for Sergeants, Lieutenants, and Captains. *See* Attachment B. Without modifications, this decision is likely impact how the City will address anonymous complaints. The IMT is monitoring and will continue to monitor these developments, along with the City's corresponding obligations to "use its best efforts to secure modifications to the [collective bargaining agreements] consistent with the terms of this Consent Decree, or to the extent necessary to provide for the effective implementation of the provisions of this Consent Decree." ¶711.

# Accountability and Transparency: ¶436

*436. Within 90 days of the Effective Date, CPD will ensure that there are adequate policies and practices in place to encourage and protect CPD members who report potential misconduct by other CPD members. Such policies will provide, at a minimum: a. that CPD members promptly report any misconduct of which they are aware to a supervisor; b. that the supervisor document such alleged misconduct and promptly report it to COPA; and c. that all forms of retaliation, interference, intimidation, and coercion against a CPD member who reports misconduct or cooperates with an investigation of misconduct, are strictly prohibited.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

While the City and the CPD made progress toward Preliminary compliance with ¶436 in the second reporting period, the City and the CPD have not yet met Preliminary compliance.

To evaluate Preliminary compliance with ¶436, the IMT reviewed the CPD's relevant policies and documents following the policy process described in the consent decree (¶¶626–41).

In the first reporting period, the IMT reviewed the CPD's General Order 08-01-02, *Specific Responsibilities Regarding Allegations of Misconduct*, which addressed the process of reporting misconduct. The policy did not, however, mention protecting the reporting CPD member against retaliation, as required. The IMT suggested that the CPD clarify how it planned to address retaliation complaints.

In the second reporting period, the IMT reviewed the CPD's General Order G08-05, *Prohibition on Retaliation*, and a revised version of General Order G08-01-02, *Specific Responsibilities Regarding Allegations of Misconduct*. Based on this review, we determined that the CPD has made progress toward Preliminary compliance with ¶436. Because G08-01-02 and G08-05 have not yet been finalized, the City and the CPD have not yet met Preliminary compliance with ¶436.

G08-05 directly addresses the CPD's prohibition on retaliation against the public and against CPD members. It includes clear expectations and explains that the CPD intends to ensure its members are free to report misconduct without the fear of

retaliation. It also clarifies the process by which misconduct is reported from the CPD to COPA.[127]

The IMT provided written comments to the CPD on G08-05 and G08-01-02. These written comments suggested, among other things, that the CPD explicitly include language that encourages CPD members to report misconduct and enumerates additional situations in which retaliation would be prohibited.

The IMT looks forward to working with the CPD to finalize G08-05 and G08-01-02 in the third reporting period.[128]

---

[127] In the City's comments, COPA notes that COPA currently does not have a "mechanism to know whether the CPD has fulfilled its responsibility to report CPD member misconduct to COPA on any given occasion." *See* Attachment B. The IMT will continue to monitor efforts to address this issue moving forward.

[128] The OAG's comments regarding ¶436 note refer to an earlier draft of this report. *See* Attachment A ("[T]he OAG does not agree that the City has made good progress to "ensure [that] there are adequate policies and practices in place to encourage and protect CPD members who report potential misconduct by other CPD members."). The IMT believes that the IMT and the OAG are in agreement that the City is not in any level of compliance with ¶436.

# Accountability and Transparency: ¶457

*457. Within 90 days of the Effective Date, CPD will create a written policy regarding the circumstances under which BIA will retain and investigate complaints itself and under which BIA will transfer complaints to a CPD district for investigation. The policy will include as factors in that decision: consideration of the involved CPD member's complaint and disciplinary history and the seriousness of the alleged misconduct. It will be designed to ensure that all investigations are completed in a timely and thorough manner and in compliance with this Agreement.*

## Compliance Progress

(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The IMT determined that the City and the CPD have not met Preliminary compliance with ¶457 in the second reporting period.

To evaluate Preliminary compliance with ¶457, the IMT reviewed the CPD's policies following the policy process described in the consent decree (¶¶626–41).

In the first reporting period, the IMT reviewed the CPD's draft BIA standard operating procedure (BIA SOP), which addressed these requirements. We determined, however, that it lacked sufficient detail to meet compliance with ¶457. The IMT suggested that the CPD develop standalone, public-facing policies that include clear direction regarding the transfer of cases between the BIA and a CPD district.

In the second reporting period, the CPD made progress, but ultimately, still did not meet Preliminary compliance. The IMT reviewed the CPD's BIA *Accountability Sergeant Unit Directive*, which addresses the circumstances when the BIA will transfer investigations to Accountability Sergeants, including those required by ¶457. Both the IMT and the OAG indicated to the CPD that they have no objection to the Accountability Sergeants Unit Directive. Even so, this policy is insufficient to meet Preliminary compliance with ¶457. The IMT suggests that the BIA include the requirements of ¶457 in its forthcoming BIA Investigators policy and also possibly in a BIA Supervisors policy.

In the next reporting period, the IMT suggests that the CPD draft a comprehensive administrative investigative policy that provides guidance about when and in what types of situations the BIA will retain and investigate complaints itself.

# Accountability and Transparency: ¶478

***478.*** *Within 120 days of the Effective Date, CPD and COPA will each review and revise its policies regarding Preliminary investigations, including Preliminary investigations of anonymous complaints, and the process for seeking an override affidavit in the absence of a signed complainant affidavit.*

## Compliance Progress        (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| Preliminary: | | *Not in Compliance* |
|---|---|---|
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance*[129] |
| Secondary: | | *Not in Compliance* |
| Full: | | *Not in Compliance* |

The IMT determined that the City, the CPD, and COPA have not met Preliminary compliance with ¶478 in the second reporting period.

To evaluate Preliminary compliance with ¶478, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the consent decree (¶¶626–41).[130] The IMT also reviewed data sources relevant to compliance with the requirements of ¶478 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In the first reporting period, the IMT reviewed all relevant COPA and CPD policies and procedures and determined that they lacked sufficient clarity to meet Preliminary compliance with ¶478. The IMT also interviewed officers during this reporting period. The officers we spoke with did not have a full understanding of the CPD's discipline processes. The IMT suggested that the CPD create a public-facing policy that addresses the internal investigative process to alleviate any potential confusion and misinformation among CPD officers.

The IMT also reviewed several COPA policies. Some policies were clear and concise, but others lacked specific direction for COPA investigators. The IMT suggested

---

[129] As referenced above, the consent decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[130] *See also See* Stipulation Regarding the Policy and Training Review Process for COPA (Jan. 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for._.pdf.

that the CPD and COPA policies regarding affidavit overrides should mirror each other. Consistency in this area is important.

In the second reporting period, the City, the CPD, and COPA still did not establish Preliminary compliance with ¶478. The IMT reviewed COPA policy 3.1.4, *Affidavits and Affidavit Overrides*. As drafted, this policy sufficiently covers ¶478's requirements regarding affidavit overrides. But the IMT has not yet received a policy from COPA that demonstrates compliance with ¶478's requirements regarding preliminary investigations and anonymous complaints. Thus, the IMT suggests that COPA work to develop a comprehensive investigation manual or policy.

Likewise, the BIA has not yet provided the IMT with a preliminary investigative process or procedure. As we found in the first reporting period, the BIA has the basic material available to develop a preliminary administrative investigative process for BIA investigators and Accountability Sergeants. The IMT suggests that the BIA develop this administrative investigative process as a standalone procedure that applies to both BIA investigators and Accountability Sergeants in the next reporting period.[131]

---

[131] In the City's comments, COPA notes that "COPA and BIA are working together to develop correct and appropriate policy, subject to change as per resolution of ongoing arbitration and litigation around use of affidavit overrides. Parallel policies are in development." *See* Attachment B. We provide a status update on the City's obligations to "use its best efforts to secure modifications" to the collective bargaining agreements to match the terms or effectively implement "the provisions with the consent decree" in the Other Relevant Agreements section of this report. ¶711.

# Accountability and Transparency: ¶479

> **479.** *Within 120 days of the Effective Date, CPD and COPA will each adopt or review and, to the extent necessary, revise its policy establishing investigative timelines, benchmarks, and goals by which the progress of investigations will be measured.*

## Compliance Progress    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance*[132] |
| **Secondary:** | | *Not in Compliance* |
| **Full:** | | *Not in Compliance* |

The City did not meet Preliminary compliance with ¶479 in the second reporting period.

To evaluate Preliminary compliance with ¶479, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the consent decree (¶¶626–41),[133] which delineates applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶479 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In the first reporting period, the IMT did not receive documentation regarding timelines, benchmarks, and goals for the investigative process from the CPD. For COPA, the IMT reviewed documents that included investigative benchmarks but should give clearer direction for COPA investigators. These documents contained open-ended words and phrases, such as "best efforts" and "aims," which could have been made more specific.

---

[132] As referenced above, the consent decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[133] *See also See* Stipulation Regarding the Policy and Training Review Process for COPA (Jan. 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for._.pdf.

In the second reporting period, the IMT determined that the City, the CPD, and COPA still have not yet met Preliminary compliance with ¶479.

For the CPD, the BIA did not provide any additional information to the IMT regarding its compliance efforts for ¶479.

For COPA, the IMT reviewed COPA's revised policy 3.3.2, *Timeliness Benchmarks*. COPA policy 3.3.2 improved from the version that the IMT reviewed during the first reporting period. While the revised policy is a good effort, the IMT recommends that COPA marry 3.3.2 with its Investigator Manual to ensure that 3.3.2 is as detailed and effective as it can be.[134]

---

[134] In the City's comments, COPA states the following: "COPA concurs that 'best efforts' and 'aims' are insufficiently precise language to use in outlining the investigative process. Current events, including demonstrations and COVID-19, have required that COPA streamline and refine its investigative approach and its benchmarks, and policy revision will incorporate that understanding. Going forward, our project plan will include our completion date for review and modification of the investigative process." *See* Attachment B. The IMT looks forward to monitoring these efforts moving forward.

# Accountability and Transparency: ¶480

*__480.__ Within 120 days of the Effective Date, the City, CPD, and COPA will each develop a policy establishing procedures for COPA, BIA, and Accountability Sergeant's review and consideration of evidence from civil and criminal litigation.*

## Compliance Progress

(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance*[135] |
| **Secondary:** | | *Not in Compliance* |
| **Full:** | | *Not in Compliance* |

The City did not meet Preliminary compliance with ¶480 in the second reporting period. COPA made progress toward its obligations for Preliminary compliance, but the CPD did not.

To evaluate Preliminary compliance with ¶480, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the consent decree (¶¶626–41),[136] which delineates applicable consultation, resolution, workout, and public comment periods.

In the first reporting period, the IMT reviewed the City's relevant draft policy: *City Policy Regarding Procedures for COPA, BIA, and the Accountability Sergeant's Review and Consideration of Evidence from Civil and Criminal Litigation*. The policy provides clear direction regarding how and when evidence will be forwarded to COPA, BIA, OIG, or the Accountability Sergeants, but does not address important details like who makes decisions, how decisions are made, who should conduct reviews, or how reviews should be conducted to ensure that decisions are appropriate. The IMT did not receive information from the CPD regarding ¶480 requirements. The policy from the City may serve as the basis for the CPD's compliance, but it is important for the CPD to address these requirements in its own policy or refer to the City policy for direction. In comparison, the IMT reviewed COPA's policy

---

[135]   As referenced above, the consent decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[136]   *See also* Stipulation Regarding the Policy and Training Review Process for COPA (Jan. 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for._.pdf.

1.3.8, *Civil and Criminal Complaint Review*, which speaks directly to COPA's process to review and consider evidence from civil and criminal litigation.

In the second reporting period, COPA provided an updated draft of its policy 1.3.8, *Civil and Criminal Complaint Review*, which incorporates the requirements of ¶480. To reach Preliminary compliance, COPA must receive the requisite community input, adjust G03-02-08 accordingly, and finalize the policy.[137]

In comparison, the CPD did not provide the IMT with any additional information to evidence their attempts at Preliminary compliance with ¶480 in the second reporting period. The IMT suggests that the CPD include COPA procedures in an administrative investigative policy for BIA Investigators and Accountability Sergeants.

For these reasons, the IMT finds that the City has not yet met Preliminary compliance with ¶480.

---

[137] *See* Stipulation Regarding the Policy and Training Review Process for COPA (Jan. 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for._.pdf.

# Accountability and Transparency: ¶481

> **481.** The City, CPD, and COPA will ensure that if CPD, COPA, or the OIG requests the Superintendent's authorization to open an investigation concerning incidents that allegedly occurred more than five years before the date that COPA, CPD, or the OIG became aware of the allegations, the Superintendent will respond within 30 days.

## Compliance Progress

(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **City** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance*[138] |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City did not meet Preliminary compliance with ¶481 in the second reporting period.

To evaluate Preliminary compliance with ¶481, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the consent decree (¶¶626–41),[139] which delineates applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶481 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In the first reporting period, the City provided the IMT with correspondence between the CPD and COPA, which was not sufficient to establish any level of compliance. This correspondence did not include requests from the CPD or the OIG and required follow-up conversations to clarify the materials. The IMT suggested that the CPD develop a standalone policy to direct the Superintendent's actions as

---

[138] As referenced above, the consent decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[139] *See* Stipulation Regarding the Policy and Training Review Process for COPA (Jan. 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for._.pdf.

required by ¶481. The IMT also suggested that the CPD, COPA, and the OIG ensure that they have systems in place to track requests and responses to the Superintendent.

The City did not meet Preliminary compliance with ¶481 in the second reporting period. One of the ways that the City can meet Preliminary compliance with ¶481 is to ensure that the relevant city entities (the CPD, COPA, and the OIG) have policies and mechanisms in place to make requests for "the Superintendent's authorization to open an investigation concerning incidents that allegedly occurred more than five years before the date that COPA, CPD, or the OIG became aware of the allegations," and in the case that the Superintendent does not respond within 30 days, to follow up on those requests.

COPA provided data showing that, since the effective date of the consent decree, the CPD Superintendent has responded to all COPA's five-year authorization requests within 30 days of the request. This process, however, is still not in policy.

In an August 30, 2019, letter, COPA indicated that it believed that ¶481 did not apply to COPA. The IMT understands COPA's position to be that ¶481 directs the CPD Superintendent to respond to COPA's requests for authorization to investigate incidents that are more than five years old. Because COPA cannot direct the CPD Superintendent's actions, COPA believes that ¶481 is not applicable to COPA.

Nonetheless, the language of ¶481 specifically instructs COPA to "ensure . . . that the Superintendent will respond within 30 days." While COPA may not be able to cause the CPD Superintendent to respond to its requests, COPA can and should develop a policy or procedure that directs COPA employees in the process of requesting authorization to investigate these incidents and that explains to the public what COPA's process is.[140]

In comparison, the CPD did not provide the IMT with any additional information regarding ¶481 in the second reporting period.

In the next reporting period, the IMT hopes that this lack of policy at the various City entities is resolved.

---

[140] In the City's comments, COPA provided an update on its efforts regarding this paragraph. *See* Attachment B. The IMT looks forward to assessing and reporting on those efforts in the next reporting period.

## Accountability and Transparency: ¶488

*488. In addition to the general investigative requirements established in this Agreement, with respect to the investigation of officer-involved shootings and deaths, the City and CPD will ensure that: a. COPA investigators be provided the opportunity to participate in the Preliminary assessment during the immediate aftermath of an officer-involved shooting or death to the same extent as any CPD member or any other law enforcement agency investigating the incident; b. the Chief Administrator of COPA, or his or her designee, is present for the first viewing by CPD of available video or audio material related to the incident and when any audio or video material is collected and preserved at or near the scene from CPD or third-party surveillance systems. i. the requirements of subparagraph (b), above, will not apply if: (1) the Chief Administrator of COPA, or his or her designee, has been informed of the incident and is not available; and (2) COPA is not on scene and there is a public safety need to review or listen to certain available audio or video prior to the COPA arrival on scene. c. there is written documentation identifying each CPD member who viewed video evidence or listened to audio evidence at the scene; d. within 30 days of the Effective Date, CPD issues a policy providing that: i. involved and witness CPD members do not discuss the facts relating to the incident with any witness until interviewed by COPA, except to the extent necessary to ensure public safety, as instructed by counsel in relation to civil or criminal proceedings, or participating in CPD officer wellness programs; ii. COPA may extend the prohibition on discussion to the extent necessary to preserve the integrity of the investigation; and iii. in no event may this prohibition extend beyond the final disciplinary decision, if any. e. involved and witness CPD members will be separated, transported separately from the scene, and monitored to avoid contact or communications relating to the incident until released by the responding supervisor at or above the rank of Commander; f. administrative interviews of involved and witness CPD members will be audio recorded and, where possible, video recorded, with COPA investigators present, except that a member may speak with his or her attorney or union representative in private; and g. investigators will not delay interviewing involved and witness CPD members, and will conduct such interviews as soon as feasible, consistent with any applicable collective bargaining agreement. Investigators will document, and make part of the administrative investigative file, all*

*requests made on behalf of involved or witness CPD members to reschedule an interview.*

## Compliance Progress

(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | ***Not in Compliance*** |
| **CPD** | ***Not in Compliance*** |
| **COPA** | ***Not in Compliance*[141]** |
| **Secondary:** | ***Not in Compliance*** |
| **Full:** | ***Not in Compliance*** |

The City did not meet Preliminary compliance with ¶488 in the second reporting period. While the City has not met Preliminary compliance, the IMT recognizes that the CPD and COPA are both actively working toward compliance with this paragraph and that some of the challenges prohibiting compliance are currently outside of their control.

To evaluate Preliminary compliance with ¶488, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the consent decree (¶¶626–41),[142] which delineates applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶488 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In the first reporting period, the IMT reviewed the CPD BIA's and COPA's relevant policies and noted several concerns regarding investigative notification, timely responses, scene control, and investigative access. The IMT suggested that the CPD and COPA better align their policies and continue conversations with the Cook County State's Attorney Office to consider roles, responsibilities, and clear communications to develop consistent policies. Additionally, the CPD and COPA versions of the officer-involved-shooting and officer-involved-death policies should

---

[141] As referenced above, the consent decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[142] *See* Stipulation Regarding the Policy and Training Review Process for COPA (Jan. 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for.__.pdf.

refer to or mirror one another to ensure that both agencies understand and adhere to their roles in officer-involved-shooting and officer-involved-death incidents.

In the second reporting period, the IMT determined that the City, the CPD, and COPA have not achieved Preliminary compliance with ¶488.

The IMT reviewed COPA policy 3.1.10, *Major Incident Responses* (dated February 7, 2020). This policy requires significant revision to address COPA's investigative process and the investigative relationship between the CPD and COPA, including COPA's responsibility for responding to and investigating officer-involved shooting and death cases.

Additionally, the IMT understands that any solution to the PCRIA question (*see* "Officer-Involved Incident Investigations" section, above) will likely have an impact on COPA's and the CPD's policies for ¶488. We suggest that COPA revise 3.1.10 to reflect its current working relationship with the CPD, with the understanding that 3.1.10 will be a temporary policy pending resolution of the PCRIA issues.[143]

The IMT also reviewed two versions of the CPD's *Incident Scene Management Card*, which will be provided to patrol supervisors to assist in their management of Officer-Involved Shooting and Death scenes. The IMT recognizes that the Incident Scene Management Card is one way of ensuring that CPD supervisors have access to important information when at the scene, but that this Card is not a substitute for proper training and an electronic means of accessing the same contact information that is included on the Card.

The CPD also revised its General Order G03-02-03, *Firearm Discharge*, and General Order G03-06, *Officer-Involved Death* (both dated December 10, 2019) and submitted these to the IMT in the second reporting period. The IMT provided no-objections to the two General Orders **as temporary policies**, pending resolution of the PCRIA issues and future community input. The IMT recognizes that the PCRIA question is a complex issue. The CPD's General Orders G03-02-03 and G03-06 are temporary procedures that allow for proper investigation until a more permanent solution is identified and agreed upon by stakeholders.

While Preliminary compliance has not yet been met, the IMT recognizes that the CPD and COPA are both actively working toward compliance with this paragraph.

---

[143] In the City's comments, COPA provided an update on its efforts regarding this paragraph. *See* Attachment B. The IMT looks forward to assessing and reporting on those efforts in the next reporting period.

# Accountability and Transparency: ¶493

**493.** *OAG acknowledges that, in many districts, CPD has designated Accountability Sergeants whose responsibilities include receiving, processing, and investigating complaints made against CPD members, which are referred to the districts by BIA. Within 120 days of the Effective Date, CPD will develop a policy outlining the responsibilities of Accountability Sergeants, their respective Commanders, and the BIA Lieutenants responsible for supervising the Accountability Sergeant's investigations ("BIA Lieutenants"). The policy will provide, among other things, a process by which: a. within 72 hours of receiving a complaint from BIA for investigation, an immediate supervisor will be provided a summary of the complaint allegations concerning the involved CPD member; b. within seven days of the final disciplinary decision, the Commander and an immediate supervisor will be provided with the investigative findings, recommended discipline or corrective action, if any; and c. an immediate supervisor of the involved CPD member and the Accountability Sergeant will meet with the involved CPD member regarding the investigative findings, recommended discipline or corrective action, if any, unless the CPD member declines to meet.*

## Compliance Progress     (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD made strong progress toward Preliminary compliance with ¶493 in the second reporting period, but they did not meet Preliminary compliance.

To evaluate Preliminary compliance with ¶493, the IMT has reviewed the CPD's policies following the policy process described in the consent decree (¶¶626–41), which delineates applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶493 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

Paragraph 493 requires a standalone, public-facing policy that directs the Accountability Sergeants in all aspects of their work, allows department members to understand the work of the Accountability Sergeants, provides clear information to

the public, and assists the district and unit commanders who supervise the Accountability Sergeants. By the end of the first reporting period, the CPD did not have a policy addressing Accountability Sergeants.

In the second reporting period, the CPD developed an *Accountability Sergeants Unit Directive* that incorporates the requirements of ¶493. The CPD, the OAG, and the IMT worked together on the development of the *Accountability Sergeants Unit Directive*, which outlines the responsibilities of the Accountability Sergeants, their commanders, and BIA commanders who are responsible for supervising the Accountability Sergeants' investigations. The directive requires that the Accountability Sergeants provide a summary of the complaint allegations to the accused CPD member's immediate supervisor(s), notify the District or Unit Commander and the involved member's immediate supervisor of any findings and disciplinary recommendations, and meetings with the involved member and his or her supervisor to discuss the investigation and disciplinary decisions. As written, the Accountability Sergeants Unit Directive is comprehensive.

The IMT looks forward to reviewing the results of the CPD's community engagement and public comment period regarding the *Accountability Sergeants Unit Directive* in the next reporting period.

# Accountability and Transparency: ¶498

**498.** *The City and CPD will ensure that any command channel review conducted is complete within 30 days. Within 30 days of the Effective Date, CPD may draft a policy that provides, for the most serious administrative investigations, the circumstances under which up to 45 days will be provided for command channel review. The draft policy will be provided to the Monitor for review and approval.*

## Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD met Preliminary compliance with ¶498 in the second reporting period.

To evaluate Preliminary compliance with ¶498, the IMT has reviewed the City's and the CPD's policies following the policy process described in the consent decree (¶¶626–41), which delineates applicable consultation, resolution, workout, and public comment periods.

In the first reporting period, the IMT reviewed several drafts of the revised policy addressing *Command Channel Review* (Special Order 08-01-03) and worked closely with the CPD and the OAG throughout that process, which was not finished when the first reporting period ended.

In the second reporting period, the City and the CPD achieved Preliminary compliance with ¶498. The IMT reviewed and approved the CPD's Special Order S08-01-03, *Command Channel Review* (CCR), as well as the CPD BIA's related training materials.

The CPD BIA's work on the CCR Policy and CCR/Case Management System (CMS) Training should serve as a template for future CPD policy and training development. The CCR Policy provides clear direction and educates the CPD and the community about what CCR is and how it is used to adjudicate administrative cases.

Over the course of the second reporting period, the BIA completely revised its CCR/CMS training lesson plan and associated training presentation. The BIA also developed a pilot training that allowed the staff to received valuable feedback from students. The BIA then used that feedback to further refine the training materials. During our January 2020 site visit, the IMT and the OAG attended one of

the CCR/CMS trainings. The IMT was impressed that there were CMS technicians present during the training to address any minor issues with the CMS. The presence of the CMS technicians suggested that the BIA is committed to making the CMS both efficient and user-friendly.

The amount of work and level of commitment that the BIA has shown in developing the CCR Policy and the CCR/CMS training gives the IMT confidence in the BIA as it continues to work on other reform efforts in the consent decree. In Year Two, the IMT looks forward to continuing its review of the BIA's implementation and evaluation of its CCR/CMS training.

# Accountability and Transparency: ¶504

> **504.** *As soon as feasible, but by no later than January 2020, upon arriving at the final disciplinary decision, CPD and COPA will ensure that the Administrative Summary Report is provided to the involved CPD member and the Department. CPD will ensure that the Administrative Summary Report is provided to the involved CPD member's District or Unit Commander and immediate supervisor.*

---

## Compliance Progress  (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**  January 31, 2020  ☐ **Met**  ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| CPD | *Not in Compliance* |
| COPA | *Not in Compliance*[144] |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the second reporting period, the City, the CPD, and COPA did not meet Preliminary compliance with ¶504.

To evaluate Preliminary compliance with ¶504, the IMT reviewed the CPD's and COPA's policies following the policy process described in the consent decree (¶¶626–41),[145] which delineates applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶504 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In the second reporting period, the IMT reviewed COPA 3.1.3, *Final Summary Report*, which does not address ¶504. For the CPD, the City provided the IMT with one example of an *Administrative Summary Report*, which was insufficient to meet Preliminary compliance with ¶504. The City did not provide the IMT with additional details regarding the *Administrative Summary Report*, including how the

---

[144] As referenced above, the consent decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[145] *See* Stipulation Regarding the Policy and Training Review Process for COPA (Jan. 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for.._.pdf.

CPD would provide the Administrative Summary Report to the involved CPD member as well as the member's Commander and immediate supervisor. Information in the *Administrative Summary Report* is spread across seven pages and could be condensed to one or two pages. The IMT suggests that the City develop a separate policy to provide additional details around the use of the *Administrative Summary Report*, including who has access to the report and when, how the report is used, and other relevant information.[146]

---

[146] In the City's comments, COPA provided an update on its efforts regarding this paragraph. *See* Attachment B. The IMT looks forward to assessing and reporting on those efforts in the next reporting period.

# Accountability and Transparency: ¶512

*512.* *The City will ensure that within 365 days of the Effective Date, COPA and BIA have developed parallel policies regarding the mediation of misconduct complaints by non-CPD members. The policies will govern mediation of misconduct complaints involving non-CPD member complainants. The policies will specify, at a minimum, (a) the criteria for determining incidents eligible for resolution through mediation; (b) the goals of mediation, including efficiency, transparency, procedural justice, restorative justice, and strengthening public trust; (c) the steps in the mediation process; and (d) methods of communication with complainants regarding the mediation process and the opportunity to participate. Items (a) through (d) above will be consistent between the CPD and COPA mediation policies.*

| Compliance Progress | (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020) |
|---|---|

| Deadline: | February 29, 2020 | ☐ Met | ☑ Missed |
|---|---|---|---|

| Preliminary: | | *Not in Compliance* |
|---|---|---|
| | CPD | *Not in Compliance* |
| | COPA | *Not in Compliance*[147] |
| Secondary: | | *Not in Compliance* |
| Full: | | *Not in Compliance* |

The City did not meet Preliminary compliance with ¶512 in the second reporting period.

To evaluate Preliminary compliance with ¶512, the IMT reviewed the City's, the CPD's, and COPA's policies using the policy process described in the consent decree (¶¶626–41),[148] which delineates applicable consultation, resolution, workout, and

---

[147] As referenced above, the consent decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[148] *See* Stipulation Regarding the Policy and Training Review Process for COPA (Jan. 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for._.pdf.

public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶512 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In the second reporting period, the IMT reviewed documents that demonstrate progress toward a city-wide mediation policy that will apply to the CPD and COPA. The documents suggest a detailed approach to mediation. The mediation proposal has not yet been presented to the City for its approval and implementation, so the City has not yet met Preliminary compliance with ¶512.

Once approved, the CPD and COPA will need to develop their own internal policies to direct the agencies to follow the city-wide mediation policy. The IMT looks forward to following the progress of the mediation policy proposal in future monitoring periods.[149]

---

[149] In the City's comments, COPA provided an update on its efforts regarding this paragraph. *See* Attachment B. The IMT looks forward to assessing and reporting on those efforts in the next reporting period.

# Accountability and Transparency: ¶522

> *522. Within 365 days of the Effective Date, COPA, the Deputy PSIG, and BIA will create separate staffing and equipment-needs plans. Such plans will include analyses setting forth the basis for the plans' staffing requirements and equipment needs assessments. CPD will implement the staffing and equipment-needs plans in accordance with the specified timeline for implementation.*

| Compliance Progress | (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020) |
|---|---|

| Deadline: | February 29, 2020 | ☐ Met | ☑ Missed |
|---|---|---|---|

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **CPD BIA** | *Not in Compliance* |
| **Deputy PSIG** | *In Compliance* (NEW)[150] |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City did not meet Preliminary compliance with ¶512 in the second reporting period. Specifically, in the second reporting period, the City provided the IMT with documents from the Deputy PSIG, COPA, and the BIA, which were not sufficient for the City to meet Preliminary compliance with ¶522.

To evaluate Preliminary compliance with ¶522, the IMT reviewed whether COPA, the Deputy PSIG, and the BIA created separate staffing and equipment-needs plans.

For COPA, the IMT reviewed its *Staffing and Equipment Needs Overview* (dated 2/28/2020) and accompanying *COPA Staffing Model* spreadsheet (dated February 6, 2020), which appears to provide raw data to support the Overview. The Overview and Model conclude that COPA requires 42 additional personnel but do not provide information regarding the projected cost of personnel or space requirements to house those personnel. While the COPA *Staffing and Equipment Needs Overview* is a start, it is not sufficiently specific to constitute a "plan" under ¶522.

---

[150] As referenced above, the consent decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

For BIA, the City provided the IMT with several documents regarding its compliance efforts with ¶522. These documents demonstrate that the BIA is working on a Staffing and Equipment Needs Assessment, but that its assessment is in its early stages. Additionally, the documents are not BIA-specific, but instead seem to relate to the entire CPD. It appears that the CPD has devoted time to developing processes rather than conducting a BIA Staffing and Equipment Needs Assessment. As the BIA progresses toward Preliminary and Secondary compliance, we suggest that the BIA keep in mind a few considerations. For example, the BIA Equipment Request includes a request for 22 file cabinets, which seems to indicate that the BIA plans to continuing producing hard copies of documents rather than move to digital file-keeping processes. Instead, the funds requested for file cabinets should be invested in technology to digitize records for the future. While the documents that the IMT reviewed are helpful to show the cumbersome road ahead for the BIA, the BIA has not yet met Preliminary compliance with ¶522.

For the Deputy PSIG, the City provided the IMT with the Deputy PSIG's *Staffing and Needs Assessment Plan* (dated February 25, 2020). The Staffing and Needs Assessment Plan addresses most of the requirements of ¶522. While the IMT has not verified whether the *Staffing and Needs Assessment Plan* accurately describes the Deputy PSIG's staffing and equipment needs, the *Staffing and Needs Assessment Plan* is thorough, comprehensive, and sufficiently detailed to support its conclusions. While Preliminary compliance requires the other City entities to reach compliance, the Deputy PSIG has met its responsibilities for Preliminary compliance with ¶522. As it works toward Secondary compliance with ¶522, the Deputy PSIG should consider providing a timeline for implementation to demonstrate completeness and sufficiency. It may also make sense for the Deputy PSIG to tie any timeline to its budget requests.

Moving forward, the IMT looks forward to reviewing staffing and equipment needs plans for substantive compliance and implementation.

# Accountability and Transparency: ¶525

**525.** *Within 60 days of the Effective Date, the City will propose a permanent method of selecting the Chief Administrator of COPA. In creating the permanent selection method for COPA's Chief Administrator, the City will consider the views and recommendations of community stakeholders.*

## Compliance Progress (Reporting Period: Sept. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City met Preliminary compliance with ¶525 in the secondary reporting period.

To evaluate Preliminary compliance with ¶525, the IMT has reviewed the City's policies following the policy process described in the consent decree (¶¶626–41), which delineates applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶525 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In the first reporting period, the City indicated that it was in negotiations with the Grassroots Alliance for Police Accountability (GAPA) about a proposed ordinance that contains a permanent process for selecting the COPA Chief Administrator. Additionally, the City provided the IMT with a one-page memorandum that included an alternative permanent selection process for the COPA Chief Administrator, but the memorandum lacked sufficient specificity.

In the second reporting period, the IMT reviewed COPA's *Selection Method for Chief Administrator of COPA* (dated February 28, 2020), which was revised version of the memorandum that the IMT reviewed in the first reporting period. The revised Selection Method is more thorough than the previous version—it includes information about the original process for selection of the COPA Chief Administrator, the proposed new selection process, and a potential future process with GAPA described above. According to the City, the City considered its negotiations with GAPA when creating this Selection Method, and this method will remain in place until the City and GAPA complete their negotiations over the proposed permanent process for selecting the COPA Chief Administrator.

The Selection Method is sufficient to establish the City's Preliminary compliance with ¶525. Paragraph 525 requires that the City "consider the views and recommendations of community stakeholders." While a more accurate reflection of the

views and recommendations of community stakeholders is likely to be included in an ordinance change, the fact that the City at least considered these views is reflected in the changes between the first and second draft of the temporary Selection Method. The IMT suggests that the City provide it with any future versions of the Selection Method if or when the Selection Method is modified in the future. The City should also include evidence that it considered views and recommendations of community stakeholders for any future changes to this temporary Selection Method.

# Accountability and Transparency: ¶526

> ***526.*** *Within 180 days of being assigned to BIA or being hired by COPA, all new BIA personnel and COPA employees will receive initial on-boarding training that is adequate in quality, quantity, scope, and type. Within 120 days of the Effective Date, COPA and BIA will verify that all existing personnel received training that is consistent with this Agreement.*

---

**Compliance Progress**　　　　　(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**　　　　　August 30, 2019　　　□ Met　　☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **CPD BIA** | *Not in Compliance* |
| **COPA** | *Not in Compliance*[151] |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the second reporting period, the IMT determined that the City did not meet compliance with ¶526.

To evaluate Preliminary compliance with ¶526, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the consent decree (¶¶626–41),[152] which delineates applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶526 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

By the end of the first reporting period, the IMT did not have sufficient evidence to conclude that the City complied with ¶526. The IMT reviewed the CPD's BIA *Training Plan* (dated August 29, 2019), which provided a high-level overview of training for new BIA investigators but appeared to be outdated. In contrast, the IMT reviewed the COPA *Training Plan*, which provides clear expectations for COPA

---

[151] As referenced above, the consent decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[152] *See* Stipulation Regarding the Policy and Training Review Process for COPA (Jan. 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for._.pdf.

training, but not every section clarified whether the described training was for onboarding or in-service training. Additionally, the IMT had concerns with the way the COPA course material was presented and with the level of class participation.

In the second reporting period, the IMT reviewed documents provided by the BIA and COPA and determined that the City has not yet met Preliminary compliance with ¶526.

The BIA provided the IMT with its *Investigator and Accountability Sergeant Basic Training Course Description* and *Training Schedule* (dated January 2020) for its compliance assessment. We reviewed the Course Description and found it to be comprehensive and thoughtfully developed.

Through conversations with BIA instructors, the IMT understands that the BIA plans to cover the material in the Course Description in 35 classroom hours. The IMT is skeptical that 35 classroom hours will be sufficient given the amount of material that the Course Description describes. We suggest that BIA develop a lesson plan and content for each training course and then determine the number of hours necessary to cover the material.

We look forward to reviewing the course lesson plans as they are developed. While the Course Description itself is consistent with ¶526, the CPD and the BIA have not provided a policy or other document that sets the expectation that it will deliver the training required by ¶526 within 180 days of the Investigator or Accountability Sergeant being assigned to BIA. Similarly, the BIA has not provided documentation sufficient to confirm or set the expectation that existing BIA personnel have received the training contemplated by ¶526.

The IMT reviewed COPA's *Training and Professional Department Training Plan* (dated February 5, 2020). COPA's Training Plan is comprehensive and provides a good understanding of how COPA developed its training. While the Training Plan sufficiently sets expectations for new hire orientation and for COPA Academy as required by ¶526, it does not require that COPA train its new hires within 180 days of being hired. It also does not set a requirement that current personnel be trained within 120 days. The IMT looks forward to reviewing documents sufficient to establish Preliminary compliance with ¶526 for both the BIA and COPA in the next reporting period.[153]

---

[153] In the City's comments, COPA provided an update on its efforts regarding this paragraph. *See* Attachment B. The IMT looks forward to assessing and reporting on those efforts in the next reporting period.

# Accountability and Transparency: ¶527

> **527.** *Within 180 days of the Effective Date, COPA and BIA will begin providing all investigation staff members with at least eight hours of annual, comprehensive, in-service training.*

## Compliance Progress  (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | | | |
|---|---|---|---|
| **Deadline:** | | August 28, 2019 | ☐ **Met**  ☑ **Missed** |

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD BIA** | *Not in Compliance* |
| | **COPA** | *Not in Compliance*[154] |
| **Secondary:** | | *Not in Compliance* |
| **Full:** | | *Not in Compliance* |

COPA and the BIA did not meet Preliminary compliance with ¶527 in the second reporting period.

To evaluate Preliminary compliance with ¶527, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the consent decree (¶¶626–41),[155] which delineates applicable consultation, resolution, workout, and public comment periods.

In the second reporting period, the BIA provided the IMT with a comprehensive basic training plan for new BIA Investigators. The IMT looks forward to learning more about the BIA's plans regarding the eight hours of annual, comprehensive in-service training required by ¶527.

The IMT also reviewed COPA's *Training and Professional Department Training Plan* (dated February 5, 2020). COPA's Training Plan is comprehensive and explains that in-service training sessions are offered monthly for one to one and a half hours each. From the description provided in the Training Plan, these in-service training sessions appear to be voluntary.

---

[154] As referenced above, the consent decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[155] *See* Stipulation Regarding the Policy and Training Review Process for COPA (Jan. 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for._.pdf.

While COPA's in-service training course catalogue is comprehensive, it does not explain that all investigation staff members must complete at least eight hours of training annually. COPA's lesson plans appear to be limited in content to fit the allotted time frames. We suggest that COPA develop their lesson plans and then determine the amount of time required to cover the necessary content. While the Training Plan clarifies that only certain courses will be delivered each year, it does not explain how COPA will determine which courses to offer each year.

Finally, COPA's *Training Process Rollout Plan* (included as part of COPA's Training Plan) is well-thought out and includes a logical course development process to be used for each lesson plan that COPA develops.

In the next reporting period, the IMT looks forward to reviewing evidence that COPA has met Preliminary compliance with ¶527's requirement of at least eight hours of annual in-service training.[156]

---

[156] In the City's comments, COPA provided an update on its efforts regarding this paragraph. *See* Attachment B. The IMT looks forward to assessing and reporting on those efforts in the next reporting period.

# Accountability and Transparency: ¶528

*528.* *The initial and annual in-service training for COPA and BIA investigators will include instruction in: a. how to properly handle complaint intake, and the consequences for failing to take complaints; b. best practices in procedural justice, including techniques for communicating with complainants and members of the public; c. the collection of objective verifiable evidence; d. the process for seeking an override affidavit in the absence of a signed complainant affidavit; e. for COPA investigators, techniques for conducting impartial investigations of domestic violence and sexual misconduct; f. for BIA investigators, techniques for conducting impartial investigations of sexual misconduct; g. investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management; h. the challenges of law enforcement administrative investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation; i. properly weighing the credibility of witnesses against CPD members; j. using objective evidence to identify and resolve inconsistent statements; k. implicit bias; l. the proper application of the relevant standards of proof; m. relevant COPA and CPD rules, policies, and protocols including the requirements of this Agreement; n. relevant state and federal law; o. relevant CPD Rules of Conduct, including Rules 14, 21, and 22; p. the CMS; q. the applicable collective bargaining agreements; and r. how to access and use the PRS or information available on the PRS.*

## Compliance Progress     (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | | |
|---|---|---|
| **Deadline:** | August 28, 2019 | ☐ Met   ☑ **Missed** |

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **CPD BIA** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW)[157] |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

---

[157] As referenced above, the consent decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance.

The City did not meet Preliminary compliance with ¶528 in the second reporting period. Specifically, while the COPA's relevant training materials meet, and even exceed, the requirements of ¶528, the BIA's training materials still fall short of these requirements.

To evaluate Preliminary compliance with ¶528, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the consent decree (¶¶626–41),[158] which delineates applicable consultation, resolution, workout, and public comment periods.

In the first reporting period, the City provided the IMT with the CPD BIA's four-page *Training Plan*, which lacked sufficient detail. The City also provided CPD BIA training materials, but the IMT could not determine whether the materials were used for on-boarding, in-service training, or both. The IMT also reviewed the COPA *Training Plan*, which had an acceptable format and includes background information about how the *Training Plan* was developed and how it should be used. While the IMT appreciates COPA's efforts in developing the *Training Plan*, the *Training Plan* did not include all the requirements of ¶528.

In the second reporting period, the City did not meet Preliminary compliance with ¶528. First, the IMT reviewed COPA's *Training and Professional Department Training Plan* (dated February 5, 2020) to evaluate Preliminary compliance with ¶528. COPA's Training Plan is comprehensive. Its initial training course descriptions are well-thought out and appear to meet and go beyond the requirements of ¶528. For each block of instruction, the Training Plan provides the number of hours required, a course description, and the course content objectives. The Training Plan includes the same level of detail for the In-Service requirements of ¶528.

Second, the IMT reviewed the *BIA Investigator and Accountability Sergeant Basic Training Course Description*, which clarifies that Accountability Sergeants and BIA Investigators will receive the same initial and in-service training on policies, directives, protocols, and other training materials. It is unclear how long these blocks of instruction are, and it seems unrealistic that each topic could be presented in an hour-long block of instruction or shorter. Finally, many of the topics required by ¶528 and included in the Unit Directive are missing from the *BIA Investigator and Accountability Sergeant Basic Training Course Description* and the *BIA Basic Training Schedule*. The BIA has not yet produced an in-service training plan for BIA Investigators and Accountability Sergeants.

---

[158] *See* Stipulation Regarding the Policy and Training Review Process for COPA (Jan. 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for._.pdf.

The IMT looks forward to receiving clarification and reviewing additional materials to establish Preliminary compliance with ¶528 in the next reporting period.

# Accountability and Transparency: ¶529

***529.*** *Within 180 days of the Effective Date, CPD will begin providing training to all CPD members on the terms of this Agreement and COPA's and CPD's revised or new policies related to administrative investigations and discipline. To the extent appropriate and necessary based upon a CPD member's duties, and contact with members of the public and/or individuals in custody, this training will include instruction on: a. identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in an investigation; b. use of the City's anonymous reporting website; c. for CPD supervisors: i. the proper initiation of the intake process, including providing COPA's contact information and the consequences for failing to initiate the intake process; and ii. techniques for turning the initiation of a complaint into a positive police-community member interaction.*

## Compliance Progress  (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**  August 28, 2019  ☐ **Met**  ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the second reporting period, the City did not meet Preliminary compliance with ¶529. To evaluate Preliminary compliance with ¶529, the IMT reviewed the City's and the CPD's policies following the policy process described in the consent decree (¶¶626–41), which delineates applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶529 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

The IMT reviewed an agenda of a BIA Education and Training Division meeting (dated January 30, 2020). The Agenda demonstrates that the meeting took place and that the meeting participants discussed items related to ¶529. The CPD also provided the IMT with a letter (dated February 18, 2020) that demonstrates that the CPD is working toward Preliminary compliance with ¶529, but the IMT has not been provided with drafts of any policy or training materials.

The IMT looks forward to reviewing policies and training materials as required by ¶529 in the third reporting period.

# Accountability and Transparency: ¶530

*530. Within 90 days of the Effective Date, COPA and BIA will create separate initial and in-service training plans.*

## Compliance Progress
(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD BIA** | *Not in Compliance* |
| | **COPA** | *Under Assessment*[159] |
| **Secondary:** | | *Not in Compliance* |
| **Full:** | | *Not in Compliance* |

The City did not meet Preliminary compliance with ¶530 in the second reporting period. Specifically, the IMT believes that COPA has met its obligations for Preliminary compliance with ¶530. While the BIA's training materials were thoughtfully developed, the BIA still needs to provide in-service training plan, basic course lesson plans, and curricula in upcoming reporting periods.

To evaluate Preliminary compliance with ¶530, the IMT reviewed whether COPA and the CPD have allocated sufficient resources to create separate initial and in-service training plans.

In the first reporting period, the IMT reviewed COPA's detailed *Training Plan*, but it was unclear what training is provided to newly hired employees through "COPA Academy," as opposed to in-service training. Likewise, at the end of the first reporting period, the CPD had much work ahead to develop a comprehensive *BIA Training Plan* for both on-boarding and in-service training.

In the second reporting period, the IMT reviewed the CPD *BIA Investigator and Accountability Sergeant Basic Training Course Description* (dated January 2020) and COPA's *Training and Professional Department Training Plan* (dated February 5, 2020). Based on these materials, the City still has not meet Preliminary compliance with ¶530.

First, the IMT reviewed COPA's *Training and Professional Development Training Plan* and found it to be comprehensive. COPA's Training Plan includes descriptions

---

[159] As referenced above, the consent decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

of COPA's Orientation, Academy, and in-service training, along with how COPA plans to deliver each course as required by ¶530. The curricula included in COPA's Training Plan were well-thought out and detailed. The Training Plan also provides for each course the number of training hours that the course will take, a course description, and course content objectives.

The IMT believes that COPA has met their portion of the requirements under ¶530. The above chart reflects that the COPA is still "under assessment," because the Parties disagree whether the Training Plan requires OAG approval.[160] The IMT looks forward to resolving this disagreement in the following reporting period and to continued work toward Full compliance with COPA and the Parties.

Second, the *BIA Investigator and Accountability Sergeant Course Description* was comprehensive and relevant to the work that BIA Investigators and Accountability Sergeants are expected to do. It was thoughtfully developed. BIA instructors believe that the material in the Course Description can be delivered in 35 classroom hours. The IMT is skeptical, however, that this is possible, given the amount of information that the Course Description describes. The IMT suggests that BIA instructors develop the content for each course and then determine the number of hours necessary to train on that content.

The IMT looks forward to reviewing a BIA in-service training plan, basic course lesson plans, and curricula in upcoming reporting periods.

---

[160] *Compare* ¶638 *with* the Stipulation Regarding the Policy and Training Review Process for COPA (Jan. 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for.._.pdf.

# Accountability and Transparency: ¶532

*532. Within 180 days of the Effective Date, the City will draft se-lection criteria for Police Board members with the objective of identifying individuals who possess sufficient experience, judg-ment, and impartiality to perform the duties of members of the Police Board. Selection criteria may include prior work in law or law enforcement, and service with Chicago-based community and non-profit organizations. The draft selection criteria will be published on the Police Board's website for a period of 30 days for public review and comment. Following the 30-day public re-view and comment period, the City will provide the draft criteria to OAG for review and comment. The final selection criteria will be published and maintained on the Police Board's website. The City will ensure that the selection criteria are the basis for future selection of Police Board members.*

| Compliance Progress | (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020) |
|---|---|

**Deadline:** August 28, 2019    ✓ **Met**    ☐ **Missed**

**Preliminary:**  *In Compliance* (NEW)
**Secondary:**  *Not in Compliance*
**Full:**  *Not in Compliance*

In the second reporting period, the IMT reviewed the *Police Board Member Selection Criteria* (dated September 18, 2019) and determined that the City and the Police Board met Preliminary compliance with ¶532 by the deadline.

To evaluate Preliminary compliance with ¶532, the IMT has reviewed the City's and the Police Board's policies following the policy process described in the con-sent decree (¶¶626–41), which delineates applicable consultation, resolution, workout, and public comment periods.

The City ultimately presented three versions of the *Police Board Member Selection Criteria*, and the OAG and the IMT provided the City with feedback and comments on each version. The *Police Board Member Selection Criteria* eventually met the requirements of ¶532.

The IMT looks forward to evaluating the City's efforts toward Secondary compli-ance when the opportunity to select a new Police Board member arises.

# Accountability and Transparency: ¶533

*533. Within 180 days of the Effective Date, the Police Board will submit selection criteria for Police Board hearing officers to the Monitor and OAG for review and comment. The criteria will be drafted to help identify individuals who possess sufficient competence, impartiality, and legal expertise to serve as hearing officers. The selection criteria will be published on the Police Board's website. The City and the Police Board will ensure that the selection criteria are the basis for future selection of Police Board hearing officers.*

**Compliance Progress**     (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**     August 28, 2019     ☐ Met     ☑ Missed

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the second reporting period, the IMT reviewed the *Police Board Hearing Officer Selection Criteria* (dated December 10, 2019) and determined that the City and the Police Board met Preliminary compliance with ¶533. The Police Board missed the deadline, however, because it submitted the selection criteria to the IMT and the OAG for review and comment shortly after the deadline, on August 30, 2019.[161]

To evaluate Preliminary compliance with ¶533, the IMT has reviewed the City's and the Police Board's policies following the policy process described in the consent decree (¶¶626–41), which delineates applicable consultation, resolution, workout, and public comment periods.

The City ultimately presented three versions of the *Police Board Hearing Officer Selection Criteria* to the IMT. The IMT provided the City with feedback and comments on each version, and each version improved. The *Police Board Hearing Officer Selection Criteria* eventually met the requirements of ¶533.

The IMT looks forward to evaluation the City's efforts toward secondary compliance when the opportunity to select a new Police Board hearing officer arises.

---

[161] It is worth clarifying that different paragraphs require different actions by particular deadlines. The deadline for ¶533 required the Police Board to submit the selection criteria by August 28, 2019. Paragraph 532, in comparison, required the Police Board to draft the selection criteria by August 28, 2019. While the missed deadline for ¶533 was minor, the IMT does not have authority to modify or waive deadlines under the consent decree.

## Accountability and Transparency: ¶538

> **538.** *Within 90 days of the Effective Date, the City will create a policy for collecting, documenting, classifying, tracking, and responding to community input received during the Police Board's regular community meetings. The policy will outline the methods for: (a) directing community input to the appropriate responding entity, agency, or office; and (b) documenting and making public, all responses to community input.*

### Compliance Progress  (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* **(first reporting period)** |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the second reporting period, the City maintained Preliminary compliance with ¶538. The IMT was unable, however, to determine that the City met Secondary compliance.

To evaluate Secondary compliance with ¶538, the IMT reviewed the City's and the Police Board's training development, implementation, and evaluation (¶286). The IMT evaluates training materials using the "ADDIE model" of curriculum development and implementation as our evaluation standard, which typically incorporates the following elements: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.[162]

In the first reporting period, the IMT found that the City was in Preliminary compliance with ¶538 based on the City's relevant policy, *Policy Regarding Community Input Received at Police Board Public Meetings*, which was created before the May 30, 2019, deadline. The policy itself is clear and straightforward, but states that agencies will use "best efforts" to address concerns. The IMT suggested that the Police Board strengthen this language by describing or defining "best efforts" or otherwise by incorporating the other expectations into the policy. The Police Board incorporated this suggestion by adding a definition of "best efforts" to the policy on October 18, 2019, and posted the policy to the Police Board's website.

In the second reporting period, the IMT reviewed transcripts from several Police Board meetings that occurred in 2019 and 2020, but based on this information,

---

[162] ADDIE stands for "Analysis, Design, Development, Implementation, and Evaluation."

the IMT is unable to determine whether the City has met Secondary compliance with ¶538.

While it could be the case that the Police Board is both training its members on the policy and complying with the policy, the IMT did not review sufficient documentation from the second reporting period to establish that the City has met Secondary compliance.

Moving forward, the IMT looks forward to reviewing records and materials sufficient to demonstrate that the City and the Police Board have trained their relevant personnel on the City's *Policy Regarding Community Input Received at Police Board Public Meetings.* The Police Board also hosts "Community Input Reports" on its website that seem to document relevant community input to each agency and that agency's response to that input. The IMT looks forward to discussing these Reports with the City and the Police Board as they work toward Secondary and Operational compliance ¶538.

# Accountability and Transparency: ¶540

*540. Within 180 days of the Effective Date, Police Board members and hearing officers will receive initial and annual training that is adequate in quality, quantity, scope, and type and will cover, at minimum, the following topics: a. constitutional and other relevant law on police-community encounters, including law on the use of force and stops, searches, and arrests; b. police tactics; c. investigations of police conduct; d. impartial policing; e. policing individuals in crisis; f. CPD policies, procedures, and disciplinary rules; g. procedural justice; and h. community outreach..*

## Compliance Progress      (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**      August 28, 2019      ☐ **Met**    ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City has not yet met Preliminary compliance with ¶540.

To evaluate Preliminary compliance with ¶540, the IMT has reviewed the City's and the Police Board's policies following the policy process described in the consent decree (¶¶626–41), which delineates applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶540 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

While regular discussions with the Police Board indicate that the Police Board is working toward training compliance, the City did not provide the IMT with sufficient evidence of Preliminary compliance with ¶540 during the second reporting period. The IMT reviewed the City's *Plan for Training of Police Board Members and Hearing Officers*. This document included "ideas for providing Police Board members and hearing officers with training" and described the topics required by ¶540(a–h). The document did not, however, purport to be a lesson plan or training materials. Even so, the IMT has concerns that the training suggested by the plan was not sufficiently in-depth and did not allocate enough time for the proposed training sessions.

The IMT suggests that the City develop initial and annual Police Board training materials in the next reporting period.

# Accountability and Transparency: ¶542

> **542.** *Within 90 days of the Effective Date, the City will create a training policy for Police Board members and hearing officers.*

## Compliance Progress

(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City did not meet Preliminary compliance with ¶542 in the second reporting period.

To evaluate Preliminary compliance with ¶542, the IMT reviewed the City's and the Police Board's policies following the policy process described in the consent decree (¶¶626–41), which delineates applicable consultation, resolution, workout, and public comment periods.

In the first reporting period, the IMT reviewed the Police Board's one-page *Policy Regarding Training of Police Board Members and Hearing Officers*, which was not sufficiently comprehensive to provide adequate basic or ongoing training in the complexities of the work that Police Board members or hearing officers are expected to perform. Among other things, the IMT suggested that the Police Board develop a comprehensive training policy that details how the training will provide (1) adequate onboarding instruction that prepares the Police Board members and hearing officers for their duties and (2) ongoing in-service training that provides the most up-to-date, relevant law and procedures.

The City still not meet Preliminary compliance with ¶542 in the second reporting period. While regular discussions with the Police Board indicate that the Police Board is working toward training compliance, the City has not provided the IMT with any material related to ¶542 since the *Policy Regarding Training of Police Board Members and Hearing Officers*, which the IMT reviewed and found to be insufficient in the first reporting period. The IMT continues to suggest and encourage the Police Board to develop a comprehensive basic training plan and yearly update training plan that will provide Board Members and Hearing Officers with the proper level of instruction. Any training plan that meets Preliminary compliance with ¶542 will need to include the expectations of and for new board members and hearing officers and include in-depth information about COPA.

The IMT looks forward to continuing to work with the Police Board on developing a compliant training plan.

# Accountability and Transparency: ¶558

> **558.** *Within 60 days of the Effective Date, the Deputy PSIG will develop policies for regularly, and at least annually, conducting data-driven reviews and audits to measure the effectiveness of the City and CPD's accountability practices. These reviews and audits will be designed to measure whether members of the community can readily make a complaint alleging misconduct and whether such complaints are investigated and adjudicated consistently with CPD policy, this Agreement, and the law. Reviews and audits will include: a. analysis of the number of complaints received, the disposition of complaints by complaint type, the timeliness and average length of administrative investigations, and disciplinary actions taken; b. analysis of complaint trends; c. analysis of CPD's enforcement of its Rule 14, Rule 21, and Rule 22; d. analysis of the thoroughness of administrative investigations, and of the justifications for terminating investigations before the investigative findings and recommendations; e. analysis of disciplinary grievance procedures and outcomes; and f. analysis of complainant-involved mediation.*

## Compliance Progress
(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* **(first reporting period)** |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the Deputy PSIG maintained Preliminary compliance for ¶558 and began working toward Secondary compliance in the second reporting period.

In the first reporting period, the IMT found that the Deputy PSIG is in Preliminary compliance with ¶558 and met the deadline. The IMT reviewed, among other things, the Deputy PSIG's *Policy Manual,* which is a comprehensive policy and procedure manual that addresses many of the requirements of this paragraph, including the types of audits and investigations that the Deputy PSIG conducts of the CPD, COPA, and the Police Board.

To evaluate Secondary compliance with ¶558, the IMT has reviewed the Deputy PSIG's training development, implementation, and evaluation (¶286). The IMT evaluates training materials using the "ADDIE"[163] model of curriculum development and implementation as our evaluation standard, which typically incorporates

---

[163] ADDIE stands for "Analysis, Design, Development, Implementation, and Evaluation."

the following elements: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

In the second reporting period, the Deputy PSIG provided the IMT with its *Public Safety 2020 Vision Priorities Projects Report* (Report). The Report contains detailed information and explains the rationale, objectives, methodologies, and priority for each project referenced in ¶558(a), (b), (c), and (f). Further, the Report outlines audit plans for other critical topics beyond the scope of ¶558, including CompStat Effectiveness, Promotion and Merit and Selection Process, District Level Response Times, Use of Force Reporting Practices, Wrong Address Search Warrant Execution, Compliance with Welcoming City Ordinance, Civil Asset Forfeiture Policy, and CPS Related Arrests. These additional audits will be useful to the IMT in establishing baseline metrics against which the IMT can measure the City's efforts toward Secondary compliance.

The IMT also reviewed a memorandum provided by the Associate General Counsel of the Office of the Inspector General (OIG), which described the OIG's efforts regarding analysis of disciplinary grievance procedures and outcomes as required by ¶558(e). These efforts include the following:

1.  describing the disciplinary grievance procedures for sworn CPD members;

2.  determining the extent to which issued discipline for sworn CPD members was changed as a result of adjudication by binding summary opinion, arbitration, negotiated settlement, and Police Board review; and

3.  determining the factors that arbitrators identify in binding summary opinions and arbitrations as reasons for their rulings on issued discipline for sworn CPD members.

While this memorandum is insufficient to satisfy the requirements of ¶558(e) by itself, it establishes that the OIG is actively working toward meeting this requirement.

Additionally, the OIG provided the IMT with its Third Quarter 2019 and Fourth Quarter 2019 Reports in the second reporting period. The Third Quarter 2019 Report indicates that the Deputy PSIG examined a sample of 281 closed discipline cases and opened 37 of these cases for an in-depth review in the third quarter of 2019. Of the 37 cases that the Deputy PSIG reviewed in-depth, eight were from the CPD BIA and 29 were from COPA. The Deputy PSIG determined from the evidence that two of the COPA cases contained material deficiencies that affected the cases' outcomes. The Deputy PSIG recommended that both of those cases be reopened for further investigation.

The Fourth Quarter 2019 Report indicates that the Deputy PSIG examined a sample of 117 closed cases and opened 16 of these cases for an in-depth review in the fourth quarter of 2019. Of the 16 cases that the Deputy PSIG reviewed in-depth, two cases were from the BIA and 14 were from COPA. The Deputy PSIG determined that two of the COPA cases contained material deficiencies that affected the cases' outcomes and recommended that both cases be reopened for further investigation. While the number of cases that the Deputy PSIG reviewed in the fourth quarter of 2019 was substantially smaller than the number reviewed in the third quarter of 2019, both reports demonstrated that the Deputy PSIG is conducting the reviews required by ¶558(d). The IMT suggests that the Deputy PSIG set a standard number or percentage of cases to review each quarter to ensure consistency throughout the year.

In the next reporting period, the IMT suggests that the OIG continue to provide the IMT with its quarterly reports and other documentation that demonstrates its review of closed discipline investigations for 2020. Additionally, the IMT looks forward to reviewing the results of the audits and reviews detailed in the Deputy PSIG's *Public Safety 2020 Vision Priorities Projects Report and OIG Memorandum*.

# Accountability and Transparency: ¶563

**563.** *At least 60 days prior to publishing its annual audit plan, the Deputy PSIG will provide the Monitor with a draft of its audit plan for review and comment.*

## Compliance Progress
(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:** February 29, 2020    ✓ Met   ☐ Missed

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not in Compliance*
**Full:** *Not in Compliance*

The IMT determined that the City and the Deputy PSIG met Preliminary compliance with ¶563 in the second reporting period.[164]

To evaluate Preliminary and Secondary compliance with ¶563, the IMT looked to determine whether the Deputy PSIG provided the Monitor with a draft of its audit plan and received comments, as required.

In the second reporting period, the Deputy PSIG demonstrated Preliminary compliance with ¶558. The Deputy PSIG provided the IMT with its *Public Safety 2020 Vision Priorities Projects Report* (Report). The Report contains detailed information and explains the rationale, objectives, methodologies, and priority for several projects.

Further, the Report outlines audit plans for critical topics, including CompStat Effectiveness, Promotion and Merit and Selection Process, District Level Response Times; Use of Force Reporting Practices; Wrong Address Search Warrant Execution, Compliance with Welcoming City Ordinance, Civil Asset Forfeiture Policy, and CPS Related Arrests. These additional audits will be useful to the IMT in establishing baseline metrics against which the IMT can measure the City's efforts toward Secondary compliance.

The IMT looks forward to reviewing the Deputy PSIG's *2021 Audit Plan*.

---

[164] The IMT originally included this paragraph in the first reporting period, because the deadline was unclear and could have occurred any time before February 29, 2020, at the Deputy PSIG's discretion. But the Deputy PSIG had not yet finalized its annual audit plan as of the end of the first reporting period.

# Accountability and Transparency: ¶565

> **565.** At least quarterly, COPA, the Deputy PSIG, and the President of the Police Board, or his or her designee, will meet to confer and share information regarding trends and analyses of data relating to CPD. They will jointly or separately provide any resulting recommendations for changes in CPD policy or rules, in writing, to the Superintendent. Thereafter: a. the Superintendent will respond to any such recommendation within 60 days of receipt; b. the Superintendent's response will include a description of the actions that the Superintendent has taken or plans to take with respect to the issues raised in the recommendations; and c. all policy recommendations and responses to the same will be published on a City website.

| Compliance Progress | (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020) |
|---|---|

**Deadline:** Quarterly ☑ Met ☐ Missed

| | |
|---|---|
| **Preliminary:** | *In Compliance* **(first reporting period)** |
| **Secondary:** | *In Compliance* (NEW) |
| COPA | *In Compliance* (NEW) |
| Deputy PSIG | *In Compliance* (NEW) |
| Police Board | *In Compliance* (NEW)[165] |
| **Full:** | *Not in Compliance* |

The IMT determined that the City met Secondary compliance with ¶565 in the second reporting period.

In the first reporting period, the IMT found that the City met Preliminary compliance with ¶565 and met the deadline.

To evaluate Secondary compliance with ¶565, the IMT determined whether COPA, the Deputy PSIG, and the Police Board allocated sufficient resources to ensure that the meetings continue quarterly.

In the second reporting period, the IMT reviewed minutes of quarterly meetings between the Police Board President, COPA, and the Deputy PSIG from each quarter

---

[165] As referenced above, the consent decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

of 2019 and determined that the City has met Secondary compliance with ¶565. The meeting minutes were taken by the Police Board Executive Director and demonstrate that meeting participants shared information regarding trends and analyses of data regarding the CPD as required by ¶565. To date, no recommendations regarding rules or policy changes have been made to the CPD Superintendent.

The IMT looks forward to continuing to review minutes from these quarterly meetings.

# Accountability and Transparency: Foundational Paragraphs

As noted in the Monitoring Plan for Year One, the IMT has identified a number of "foundational paragraphs" in the Accountability and Transparency section of the consent decree: ¶¶429–31, 434, 441–46, 448, 450–51, 453, 455–56, 459–69, 475, 477, 484, 486–87, 497, 499–501, 508, 514, 552, and 561.

***

## Consent Decree ¶429

*429. The City will continue to ensure that a website is made available to CPD members to anonymously report officer misconduct ("anonymous reporting website") and will internally disseminate information regarding the anonymous reporting website to all CPD members. Reports made on the anonymous reporting website will not relieve CPD members of their duties under CPD Rules of Conduct 21 and 22.*

### Compliance Status

As in the first reporting period, the OIG and the Deputy PSIG continue to host a website for CPD members to anonymously report officer misconduct in the second reporting period. The IMT suggests that the City and the OIG provide unique identifiers to those who report misconduct through the website. Unique identifiers would permit those who report officer misconduct to remain anonymous, while simultaneously allowing CPD members to report misconduct without violating CPD Rules of Conduct 21 and 22.

## Consent Decree ¶430

*430. COPA will ensure that individuals who submit electronic complaints receive a copy of the information contained in the complaint via electronic mail, if an electronic mail address is provided, upon submission.*

### Compliance Status

The COPA website does not clearly communicate that COPA will provide complainants with a copy of their electronic complaints via electronic mail. Likewise, the IMT has not been provided with material that suggests that COPA does in fact provide complainants with a copy of their electronic complaint via electronic mail.

## Consent Decree ¶431

**431.** *The City and CPD will undertake best efforts to ensure that the absence of a signed complainant affidavit alone will not preclude an administrative investigation.*

### Compliance Status

The CPD and the BIA are in the process of revising and refining their Affidavit Override processes. The Deputy PSIG continues to conduct regular audits to ensure that the CPD's and COPA's Affidavit Override processes are not misused. The IMT recognizes that compliance with ¶431 requires the City to undertake "best efforts." Per ¶729, this means that the City must "in good faith, [ ] take all reasonable steps to achieve" the objectives of ¶431, including possibly pursuing changes to collective bargaining agreements or legislation.

## Consent Decree ¶434

**434.** *When CPD responds to or investigates incidents involving allegations of officer involved domestic violence, CPD will ensure that COPA is provided an administrative notification. COPA will initiate the intake process and investigate all such allegations in accordance with this Agreement.*

### Compliance Status

In the first reporting period, the IMT reviewed the CPD's Special Order 08-01-02, *Special Situations Involving Allegations of Misconduct* and the CPD's draft BIA SOP, which addressed the requirements of this paragraph. Even so, the relevant sections were difficult to locate and could use clarification.

S08-01-02 only addresses investigations involving officer-involved domestic violence in the context of orders of protection against sworn CPD Members. The CPD should develop a standalone policy that specifically addresses officer-involved domestic-violence investigations or include the investigative direction in a comprehensive BIA Investigator and Accountability Sergeant Investigative Policy. The CPD and COPA should develop procedures to ensure that each agency documents administrative notifications of officer-involved domestic violence.

In the second reporting period, the IMT did not receive any additional information regarding ¶434. The IMT looks forward to reviewing records from the CPD and COPA regarding ¶434 in the next reporting period.

## Consent Decree ¶441

> **441.** *The City will undertake best efforts to ensure that COPA has jurisdiction to conduct administrative investigations of allegations of sexual misconduct, as defined by this Agreement.*

### Compliance Status

Compliance with ¶441 will require a City ordinance change that grants COPA jurisdiction "to conduct administrative investigations of allegations of sexual misconduct."

In the second reporting period, the IMT reviewed a memorandum (dated February 28, 2020) from COPA, which included updates on COPA's efforts to properly train investigative personnel in sexual assault investigations, including trainings regarding interviewing victims of sexual assault. COPA, the CPD Special Victims Squad, and the Cook County State's Attorney's Office have developed a working group to improve the investigative and notification process among the agencies.

While the memorandum demonstrates that COPA has started to work with the Cook County State's Attorney's Office, the IMT anticipates a written agreement between the City, COPA, and the Cook County State's Attorney's Office that documents an understanding of how administrative investigations regarding sexual assault will occur pending the necessary changes to City ordinance.

## Consent Decree ¶442

> **442.** *The City will ensure COPA has appropriately trained and experienced staff to conduct sexual misconduct investigations.*

### Compliance Status

In the first reporting period, the IMT reviewed COPA's *Training Plan*, which referenced instruction for COPA investigators regarding sexual-assault investigations but did not indicate the number of hours of training dedicated to this instruction.

In the second reporting period, the IMT reviewed a COPA Memo (dated February 18, 2020) regarding training for COPA's Special Victims Squad. The memo discusses a two-day training in impartial investigations of domestic violence and sexual misconduct that was provided to COPA investigators in 2019 and planned for 2020. The IMT was not, however, provided with the training course curriculum or the 2019 attendance roster.

The IMT looks forward to reviewing COPA's training course curriculum and attendance rosters in the next reporting period.

## Consent Decree ¶443

> **443.** *Consistent with COPA's jurisdiction, after conferring about the details of a particular criminal sexual misconduct investigation involving a CPD member, COPA and BIA may jointly agree that BIA may conduct the administrative investigation into allegations of sexual misconduct when they jointly determine that doing so avoids unnecessary disruption to the complainant.*

### Compliance Status

The IMT recognizes that compliance with ¶443 will require a City ordinance change. In the first reporting period, the IMT reviewed the draft BIA SOP, which directed the CPD to use its "best efforts" (as defined in ¶729) to report sexual misconduct to COPA and was insufficient to demonstrate compliance with ¶443.

In the second reporting period, the IMT reviewed a memo from COPA (dated February 28, 2020) regarding COPA's efforts to meet compliance with ¶443. The memo describes a working group that COPA is leading, which consists of members of its Special Victims Squad, the CPD, and the Cook County State's Attorney's Office. The memo describes the working group's goals as follows: in criminal sexual misconduct investigations regarding a CPD member, the CPD will provide notice to the Cook County State's Attorney's Office before the victim interview; the CPD will notify COPA of sexual assault cases involving CPD members before interviewing the victim; and COPA will create an internal process for conducting a second interview, if necessary, for a victim or involved CPD member.

The first meeting of the working group was on November 18, 2019. While COPA indicated that notes from this meeting were included with the memo, the memo did not include these notes.

The IMT looks forward to learning more about the City's efforts in the next reporting period, including reviewing any notes from meetings held to date and information about future meetings. While the memorandum demonstrates that COPA has started to work with the Cook County State's Attorney's Office, the IMT anticipates a written agreement between the City, COPA, and the Cook County State's Attorney's Office that documents an understanding of how sexual assault administrative investigations will occur pending the necessary changes to City ordinance.[166]

---

[166] In the City's comments, COPA provided an update on its efforts regarding this paragraph. *See* Attachment B. The IMT will continue to monitor and report on developments regarding this paragraph in the next reporting period.

## Consent Decree ¶444

**444.** *Within ten days of the final disciplinary decision of each complaint of sexual misconduct against a CPD member alleging conduct against a non-CPD member, the City will provide the Deputy PSIG with the complete administrative investigative file, subject to applicable law. The Deputy PSIG will review and analyze each administrative investigative file and, on an annual basis, the Deputy PSIG will publish a report: a. assessing the quality of the sexual misconduct administrative investigations reviewed; b. recommending changes in policies and practices to better prevent, detect, or investigate sexual misconduct; and c. providing aggregate data on the administrative investigations reviewed, including: i. the volume and nature of allegations investigated, broken down by investigating agency; ii. the percentage of investigations referred to the Cook County State's Attorney's Office ("CCSAO") for criminal review; iii. the percentage of investigations criminally prosecuted; iv. the percentage of investigations closed after the Preliminary investigation; v. the percentage of investigations closed for lack of a signed complainant affidavit; and vi. the investigative findings and recommendations, including a summary breakdown of discipline recommended for investigations with sustained findings.*

### Compliance Status

In the first reporting period, the IMT noted that the BIA SOP contained a statement regarding the CPD's responsibility to report each sexual misconduct complaint to the OIG. At the end of the reporting period, the IMT had not yet seen any evidence that these complaints are transmitted to the Deputy PSIG in a timely manner.

In the second reporting period, the IMT reviewed a COPA memo (dated February 28, 2020), which indicated that COPA provided the Deputy PSIG with documentation of four sexual misconduct investigations on December 13, 2019. The memo did not specify whether the four investigative files were delivered to the Deputy PSIG within 10 days of the final disciplinary decisions, as required by ¶444.

The IMT looks forward to receiving documentation of the transmittal of these first four investigative files, as well as any other cases, in the next reporting period. The IMT suggests that the CPD develop a standalone policy to incorporate these requirements or include the requirements in a BIA Investigators and Accountability Sergeant Investigative Policy that directs the CPD provide the PSIG with the complete investigative file.

## Consent Decree ¶445

**445.** *The City will use best efforts to initiate and undertake a process with the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Office to share information on at least a quarterly basis regarding any affirmative judicial findings made during the course of criminal proceedings that a CPD member was untruthful, including any findings made at suppression hearings. Upon receipt of information from the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Office that may suggest misconduct COPA will initiate the intake process.*

### Compliance Status

In the second reporting period, the City made progress toward meeting the requirements in ¶445. The IMT reviewed COPA policy 1.3.8, *Civil and Criminal Complaint Review*, which explains that COPA will begin the complaint intake process once it receives information that suggests misconduct.

The City has not, however, provided the IMT with a policy or plan that complies with the requirement that the City "share information on at least a quarterly basis" with the Cook County State's Attorney's Office, the United States Attorney's Office, the Cook County Public Defender's Office, and the Federal Defender's Office.

The IMT suggests that the City develop a policy that requires notification of the proper authorities of any affirmative judicial findings that a CPD member was untruthful according to the requirements of this paragraph. COPA should further refine 1.3.8 to ensure that the proper authorities are notified according to this paragraph.

## Consent Decree ¶446

**446.** *In the course of investigating a complaint, the City, CPD, and COPA will ensure: a. within five business days of receipt of a non-confidential complaint COPA or BIA will send non-anonymous complainants or their representatives a written notice of receipt. The notice will include the unique tracking number assigned to the complaint. The notice will advise the complainant or his or her representative whether BIA or COPA will be investigating the complaint, and how the complainant or his or her representative may inquire about the status of the investigation. The notice will not contain any language discouraging participation in the investigation. b. within 60 days of the final disciplinary decision the complainant will be provided a copy of the Administrative Summary Report.*

### Compliance Status

In the second reporting period, the City provided the IMT with one example *Administrative Summary Report*. The IMT also reviewed and commented on COPA Policy 3.3.2, *Timeliness Benchmarks* (dated August 1, 2019), which includes specific direction to comply with some requirements of this paragraph.

The IMT suggests that the City and the CPD develop a policy or directive to direct action specifically regarding ¶446.

## Consent Decree ¶448

**¶448** *If COPA, BIA, or the district does not arrive at the investigative findings and recommendations within 180 days, COPA, BIA or an Accountability Sergeant will, thereafter, periodically, but not less than once every 60 days, attempt contact with the complainant or his or her representative to provide status updates until the investigative findings and recommendations are issued. Such contacts will be documented in the administrative investigative file. By 2020, this requirement will be satisfied by providing complainants and their representatives the ability to track the status of non-confidential unique tracking numbers from the intake process through final disposition online.*

### Compliance Status

In the first reporting period, the IMT reviewed relevant documentation from both COPA and the BIA. While the CPD had addressed some of these requirements in its BIA SOP, the IMT suggested that the CPD create a standalone policy to address

the requirements of this paragraph and to provide information to CPD members and the public.

In the second reporting period, the CPD BIA developed its *Accountability Sergeants Unit Directive*, which meets the requirements of this paragraph. The IMT also reviewed COPA Policy 3.3.2, *Timeliness Benchmarks*, which specifically directs COPA to comply with ¶448.[167] In the next reporting period, the IMT looks forward to reviewing a comparable policy for the BIA.

## Consent Decree ¶450

**450.** *CPD will develop and implement policies to ensure that a CPD member who is alleged to be involved in misconduct (the "involved member") receives notice that he or she is under administrative investigation. The policies will provide, at a minimum: a. CPD members under investigation will not receive such notice of confidential investigations, but will receive notice prior to being formally interviewed by COPA, BIA, or an Accountability Sergeant; b. such notice will comport with due process and the law, and will describe the nature of the complaint made against the involved member, and the involved member's rights, but will not contain any information that is part of a confidential investigation; and c. once a CPD member has been notified or otherwise becomes aware that he or she is the subject of an administrative investigation, the CPD member will not review the following documents and evidence related to an incident under administrative investigation, until notified by BIA that he or she is permitted to do so, or as may be required to testify as a witness in criminal or civil proceedings: i. any investigative files; ii. any reports (except for reports about the incident authored by the CPD member); or iii. any other evidence, from any source, including body and dashboard camera footage (except as permitted for purposes of completing incident reports or other documentation).*

### Compliance Status

The BIA's *Accountability Sergeant Unit Directive* incorporates some of the requirements of ¶450, but it does not include the in-depth direction and detail that ¶450

---

[167] In the City's comments, COPA provided an update on its efforts regarding this paragraph. *See* Attachment B. The IMT looks forward to assessing and reporting on those efforts in the next reporting period.

requires. The CPD has not yet provided the IMT with a comprehensive administrative investigative policy, procedure, or directive regarding ¶450.

The draft BIA SOP, which the IMT reviewed in the first reporting period, would be a good starting point for a new administrative investigative policy or procedure for the BIA and Accountability Sergeants.

## Consent Decree ¶451

> **451.** *A CPD member who reviews audio or video evidence for purposes of completing an incident report will document in writing that he or she reviewed the evidence in each relevant incident report.*

### Compliance Status

The CPD has not yet provided the IMT with any information regarding compliance with ¶451. But the IMT located CPD Special Order 03-14, Body Worn Cameras (dated April 30, 2018) in CPD's online database of directives.

S03-14 does not specifically address whether officers are permitted or prohibited from viewing the body worn camera footage if they are involved in a complaint or use of force prior to completing a narrative, interview, or report. The IMT suggests that the CPD clarify S03-14 to eliminate confusion, to incorporate the requirements of ¶451, and to adhere to current body-worn-camera policy standards.

## Consent Decree ¶453

> **453.** *If a criminal investigation of a CPD member's conduct has commenced, COPA, BIA, or the Accountability Sergeant will continue the administrative investigation, absent specific circumstances that would jeopardize the criminal investigation. In such circumstances, the determination to postpone the administrative investigation, along with the rationale for doing so, will be documented by COPA, BIA or the district in writing.*

### Compliance Status

The CPD and COPA have not yet provided the IMT with a comprehensive administrative investigative policy regarding ¶453. The draft BIA SOP, which the IMT reviewed in the first reporting period, would be a good start for the development of a BIA administrative investigative policy.

## Consent Decree ¶455

**455.** *All investigative findings will be based on the appropriate standard of proof. This standard will be clearly delineated in COPA and BIA policies, training, and procedures.*

### Compliance Status

In the first reporting period, the IMT suggested that the BIA and COPA consider making a standalone policy to ensure that all members of the department and the community understand how the BIA investigates.

In the second reporting period, the IMT reviewed BIA's *Accountability Sergeants Unit Directive*, which states that investigations are held to the "appropriate standard of proof under BIA Policy." The IMT suggests that the BIA and COPA develop the definition for "appropriate standard of proof" together to promote consistency and incorporate this definition into administrative investigative policies.

## Consent Decree ¶456

**456.** *The City will ensure that the disciplinary histories of current and former CPD members are reviewed prior to employment with COPA, or assignment within BIA or as an Accountability Sergeant.*

### Compliance Status

In the first reporting period, the IMT found that the CPD had restated the language of this paragraph verbatim in its BIA SOP. We suggested that the CPD revise or draft a policy to include additional details to remove the appearance of subjectivity surrounding standards for selection.

In the second reporting period, the IMT reviewed the CPD BIA's *Accountability Sergeants Unit Directive*, which includes standards that would disqualify candidates from serving as Accountability Sergeants. As drafted, the directive is sufficient to meet the City's obligations regarding Accountability Sergeants. Nonetheless, the IMT has suggested that the BIA review the qualifications of current Accountability Sergeants and consider revising to raise the standards in the policy. The IMT looks forward to reviewing COPA materials regarding ¶456 in the next reporting period.

## Consent Decree ¶459

**459.** *Within 30 days of receiving an allegation: a. COPA and BIA will assess the allegation to determine whether the complainant has alleged potential misconduct; and b. if potential misconduct is alleged, COPA, BIA, or the district will initiate a Preliminary investigation into the complaint.*

### Compliance Status

The IMT reviewed COPA Policy 3.3.2, *Timeliness Benchmarks* (dated August 1, 2019). Section 2 of 3.3.2 addresses ¶459.

The IMT suggests that the BIA also develop a policy that addresses ¶459.

## Consent Decree ¶460

**460.** *Preliminary investigations will take all reasonable steps to discover any and all objective verifiable evidence relevant to the complaint or administrative notification through the identification, retention, review, and analysis of all available evidence, including, but not limited to: all time-sensitive evidence, audio and video evidence, physical evidence, arrest reports, photographic evidence, GPS records, computer data, and witness interviews. All reasonable steps will be taken to preserve relevant evidence identified during the Preliminary investigation.*

### Compliance Status

COPA policy 3.1.2, *Fact Gathering*, partially addresses ¶460, but should be clearer and more comprehensive.

The IMT suggests that the BIA incorporate the requirements of ¶460 into an administrative investigative policy.

## Consent Decree ¶461

> **¶461** *Allegations of misconduct based on verbal abuse will be preliminarily investigated to determine whether it is appropriate to continue the investigation. Anonymously submitted misconduct allegations will be preliminarily investigated to determine whether it is appropriate to continue the investigation, in accordance with the applicable collective bargaining agreements in effect at the time of the allegation is made.*

### Compliance Status

From the IMT's review of relevant documentation, it is not clear how allegations of verbal abuse will be investigated—preliminarily or otherwise—or what priority these allegations will be given. While this paragraph does not state a timeline, the BIA and COPA should consider creating one. The IMT suggests that COPA incorporate ¶461 into its policy 3.1.2, *Fact Gathering*, and that the BIA incorporate the requirements of ¶461 into an administrative investigative policy.

Additionally, the IMT has reviewed the CPD's S08-01-08, *Non-disciplinary Intervention Program*, which CPD will need to revise to comply with this paragraph.

## Consent Decree ¶462

> **462.** *A signed complainant affidavit will not be required to conduct a Preliminary investigation.*

### Compliance Status

The IMT reviewed COPA Policy 3.1.4, *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement* (dated August 1, 2019), which addresses many of the requirements of ¶462. While this COPA policy is comprehensive, it does not include language that clarifies that a "signed complainant affidavit is not required to conduct a Preliminary Investigation."

The IMT suggests that COPA revise 3.1.4 to include this wording and that the BIA incorporate the requirement of ¶462 into an administrative investigative policy.

## Consent Decree ¶463

**463.** *The City, CPD, and COPA will ensure that, within 30 days of receiving a complaint, COPA, BIA, and Accountability Sergeants initiate and make reasonable attempts to secure a signed complainant affidavit, including in-person visits, phone calls, and other methods. Such attempts will reasonably accommodate the complainant's disability status, language proficiency, and incarceration status. a. If COPA, BIA, or the Accountability Sergeant is unable to obtain a signed complainant affidavit despite having made reasonable attempts to do so, COPA or BIA (for investigations conducted by both BIA and Accountability Sergeants) will assess whether the evidence collected in the Preliminary investigation is sufficient to continue the investigation. b. If the Preliminary investigation reveals objective verifiable evidence suggesting it is necessary and appropriate for the investigation to continue, BIA (for investigations conducted by BIA and Accountability Sergeants) will seek written approval for an override affidavit executed by the Chief Administrator of COPA, and COPA (for investigations conducted by COPA) will seek written approval for an override affidavit executed by the Chief of BIA. c. The Chief Administrator of COPA or the Chief of BIA will provide an override affidavit if there is objective verifiable evidence suggesting it is necessary and appropriate, and in the interests of justice, for the investigation to continue.*

## Compliance Status

In the second reporting period, the IMT reviewed the CPD BIA's *Accountability Sergeants Unit Directive*, which includes the proper procedure for obtaining an affidavit override as required by ¶463. The Accountability Sergeant affidavit override process is clearly written and provides the reader with a good understanding of why an affidavit override may be necessary and the correct process for obtaining this override.

The IMT also reviewed COPA Policy 3.1.4, *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement* (dated August 1, 2019), which addresses many of ¶463's requirements.

The IMT suggests that the BIA and COPA work together to ensure that their policies are more compatible to avoid confusion.

## Consent Decree ¶464

**464.** *In the course of conducting thorough and complete misconduct investigations, COPA, BIA, and the districts will: a. take all reasonable steps to promptly identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including officer-recorded audio or video taken with body-worn cameras or other recording devices; b. take all reasonable steps to locate and interview all witnesses as soon as feasible, including non-CPD member witnesses, and attempt to interview any complainant or witness in-person at a time and place that is convenient and accessible for the complainant or witness, when feasible; c. determine whether there are any other open administrative investigations involving the same involved member, and monitor or combine the investigation(s), as appropriate; d. audio record non-CPD member interviews subject to the interviewee's consent, or promptly prepare summaries of interviews when the interview is not recorded; e. take all reasonable steps to identify the involved and witness CPD member(s) if the complainant was unable do so; f. determine if there may have been additional misconduct beyond that initially alleged. COPA, BIA, or the district will take all reasonable steps to ensure that such identified misconduct is fully and fairly documented, classified, and investigated; g. as applicable, consider a CPD member's behavior based on the available training records and disciplinary history, including complaints in which allegations were not sustained, as permitted by law and any applicable collective bargaining agreement; and h. identify and take into account known relevant evidence gathered in parallel criminal investigation or criminal or civil litigation, if available.*

### Compliance Status

The CPD BIA's *Accountability Sergeants Unit Directive* successfully incorporates the requirements of ¶464(a), (b), (c), and (f). The directive provides Accountability Sergeants with clear direction in investigative actions and is written to ensure that the investigation is completed fairly, with concern for both the complainant and the CPD member. The IMT suggests that the CPD develop an administrative investigative policy to incorporate the requirements of ¶464(d), (g), and (h).

Likewise, COPA Policy 3.1.2, *Fact Gathering*, addresses several of the requirements of ¶464 but does not provide the in-depth direction that this paragraph requires. The IMT suggests that COPA further refine or develop 3.1.2 as a full investigative

policy which includes the detailed requirements of ¶464 and other paragraphs related to investigative procedures.

## Consent Decree ¶465

**465.** *When conducting an administrative interview of any CPD member, COPA, BIA, and the districts will: a. ask the identity of other persons with whom he or she has communicated regarding the incident in question, and the date, time, place, and content of such communication, subject to any evidentiary privilege recognized under Illinois or federal law; b. ask whether he or she has reviewed any audio or video footage of the incident in question, and, if so, the date, time, and place the video or audio was reviewed; c. ask whether he or she is aware of any media or social media coverage of the incident in question, and, if so, the content and source of such known media coverage; d. note on the record of the interview anytime the CPD member seeks or obtains information from his or her legal or union representative, as well as the length of any "off the record" discussion between the CPD member and his or her legal or union representative and ensure that the CPD member's counsel or representative does nothing to disrupt or interfere with the interview; e. document, and make part of the investigative file, all requests made on behalf of a CPD member to reschedule an interview; and f. audio record all CPD member in-person interviews.*

## Compliance Status

COPA's policies 3.1.2, *Fact Gathering*, and 3.1.2(b), *COPA Interviews*, incorporate the requirements of ¶465. The IMT looks forward to working with COPA and the OAG to finalize these policies. The IMT suggests that the BIA incorporate the requirements of ¶465 into an administrative investigative policy.

## Consent Decree ¶466

**466.** *When assessing credibility, COPA, BIA, and the districts will: a. make credibility determinations of statements made by complainants, involved CPD members, and witnesses based on independent, unbiased, and credible evidence, taking into account any known record or final determination of deception or untruthfulness in legal proceedings, administrative investigations, or other investigations; and b. critically evaluate all statements, like any other evidence, giving no automatic preference to, or discounting, any statement solely due to its source, including statements made by CPD members.*

### Compliance Status

COPA's policy 3.1.2, *Fact Gathering*, and the BIA's *Accountability Sergeants Unit Directive* are a good start to addressing the requirements of ¶466. The IMT has not received any documentation regarding this paragraph from the CPD. The IMT suggests that COPA and the BIA further address the requirements of ¶466 in comprehensive administrative investigative policies.

## Consent Decree ¶467

**467.** *For each allegation associated with a misconduct investigation, COPA, BIA, or the districts will explicitly identify and recommend one of the following findings: a. "Sustained," where it is determined the allegation is supported by a preponderance of the evidence; b. "Not Sustained," where it is determined there is insufficient evidence to prove the allegations by a preponderance of the evidence; c. "Unfounded," where it is determined, by clear and convincing evidence, that an allegation is false or not factual; or d. "Exonerated," where it is determined, by clear and convincing evidence, that the conduct described in the allegation occurred but is lawful and proper.*

### Compliance Status

In the second reporting period, the IMT reviewed COPA Policy 3.1.3, *Final Summary Report* (dated March 1, 2019), which addresses the requirements of this paragraph by appropriately defining each of the categories of investigative findings. The IMT has not yet received any documentation regarding this paragraph from the CPD.

The IMT suggests that the BIA incorporate the requirements of ¶467 into a comprehensive administrative investigative policy.

## Consent Decree ¶468

**468.** *COPA, BIA, and the districts will ensure that investigators do not: a. ask leading questions that suggest legal justifications for the CPD member's conduct during interviews of witnesses, complainants, or the involved CPD member; b. make statements that could discourage a CPD member or non-CPD member witness from providing a full account of the specific allegations; c. close an administrative investigation solely because of findings in a related criminal proceedings; d. consider findings in a related criminal investigation to solely determine whether a CPD member engaged in misconduct; e. disregard a witness's statement solely because the witness has some connection to either the complainant or the CPD member or because the witness or complainant has a criminal history; or f. close an investigation solely because the complainant seeks to withdraw the complaint or is unavailable, unwilling, or unable to cooperate with an administrative investigation. If the complainant is unable or unwilling to provide information beyond the initial complaint, the administrative investigation will continue based on the available evidence in accordance with this Agreement, applicable law, and any applicable collective bargaining agreements.*

### Compliance Status

The draft BIA SOP, which the IMT reviewed in the first reporting period, addresses many of ¶468's requirements. The IMT suggests that the BIA develop a comprehensive administrative investigative policy that incorporates the requirements of ¶468.

Likewise, COPA has incorporated many of the requirements of this paragraph into its Investigations Manual, but it is still not clear to the IMT how COPA plans to use its Investigations Manual. The IMT suggests that COPA incorporate the requirements of ¶468 into its policy 3.1.2, *Fact Gathering*, or a more comprehensive investigative policy.

## Consent Decree ¶469

**469.** *The City, COPA, and CPD recognize the negative impact of actual bias or the appearance of bias on the legitimacy of administrative investigations. For that reason, conflicts of interest in administrative investigations will be identified and prohibited. The City, COPA, and CPD will ensure the following: a. COPA, BIA, and district personnel will not be assigned to conduct any investigation that could create a conflict of interest; b. an investigation may not be conducted by any supervisor or CPD member who allegedly authorized, engaged in conduct that led to, witnessed, or otherwise allegedly participated in the incident giving rise to the complaint, or who has a conflict of interest as defined by CPD policy or this Agreement. No such person may participate in making any disciplinary recommendations with respect to the investigation; c. no CPD member who has an external business relationship or close personal relationship with an involved CPD member or witness in an administrative investigation will conduct or review the administrative investigation. No such person may participate in making any disciplinary recommendations with respect to the misconduct investigation including in the determination of any applicable grievance or appeal arising from any discipline; and d. no CPD member will participate in making any disciplinary decisions or recommendations with respect to any person to whom he or she directly reports to in his or her chain of command. In cases where CPD is unable to meet this requirement, the investigation must be transferred to OIG.*

## Compliance Status

In the second reporting period, the IMT reviewed the BIA's *Log Number Investigation Conflict Certification Form*, which is a good start toward addressing the requirements of ¶469. The IMT suggests that the BIA draft a standalone directive or policy that provides context and emphasizes the importance of the form. Wording from the draft BIA SOP, which the IMT reviewed in the first reporting period, could be incorporated into this standalone directive or policy.

COPA has not provided the IMT with any information regarding a Conflict of Interest policy or directive. The IMT suggests that COPA develop a directive or policy that incorporates the requirements of ¶469. The IMT looks forward to reviewing a policy and form regarding conflicts of interest from the BIA and COPA in the next reporting period.

## Consent Decree ¶475

>**475.** *The City and CPD will undertake best efforts to ensure that the identities of complainants are not revealed to the involved CPD member prior to the CPD member's interrogation.*

### Compliance Status

The CPD BIA *Accountability Sergeants Unit Directive* requires Accountability Sergeants to use best efforts to not reveal the identities of a complainant to the involved CPD member before the member's interrogation. The IMT suggests that the CPD include the requirements of this paragraph in the BIA Investigator policy and reference the requirements in a comprehensive administrative investigative policy. Additionally, the IMT recognizes that compliance with ¶475 requires the City to undertake "best efforts." Per ¶729, this means that the City must "in good faith, . . . take all reasonable steps to achieve" the objectives of ¶475, including possibly pursuing changes to collective bargaining agreements or legislation.

While this paragraph does not explicitly address COPA, the IMT suggests that COPA include the requirement of this paragraph in its investigative policy.

## Consent Decree ¶477

>**477.** *The City and CPD will undertake best efforts to ensure that all complaints, including anonymous complaints, can be the subject of a misconduct investigation.*

### Compliance Status

The IMT suggests that COPA incorporate the requirements of ¶477 into its policy 3.1.2, *Fact Gathering*, or a more comprehensive investigative policy. We also suggest that the BIA incorporate the requirements of ¶477 into an administrative investigative policy. Additionally, the IMT recognizes that compliance with ¶477 requires the City to undertake "best efforts." Per ¶729, this means that the City must "in good faith, . . . take all reasonable steps to achieve" the objectives of ¶477, including possibly pursuing changes to collective bargaining agreements or legislation.

## Consent Decree ¶484

**484.** *If at any time during the intake or investigation of a complaint, COPA, BIA, or Accountability Sergeants find evidence indicating criminal conduct by any CPD member, the Chief Administrator of COPA or Chief of BIA will refer the investigation to the appropriate prosecuting agency.*

### Compliance Status

BIA's *Accountability Sergeants Unit Directive* directs the Accountability Sergeant to notify the BIA Lieutenant if evidence of criminal activity is discovered during an administrative investigation. The *Accountability Sergeant Unit Directive* does not provide guidance to or requirements for BIA Lieutenants regarding further notification to the BIA Chief or the COPA Chief as required by this paragraph.

The IMT suggests that COPA address this paragraph in a comprehensive investigative policy or directive. The IMT looks forward to reviewing policies regarding ¶484 from the BIA or COPA in the next reporting period.

## Consent Decree ¶486

**486.** *The City, CPD, and COPA will ensure that CPD and COPA maintain thorough and complete administrative investigative files. Such administrative investigative files will include: a. documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the alleged misconduct. In situations in which there are no known witnesses, the file will specifically state this fact. In situations in which witnesses were present but circumstances prevented the investigator from collecting information from those witnesses, the investigative file will state the reasons why. The investigative file also will include all available identifying information for anyone who refuses to provide a statement; b. documentation of each interview conducted and the recording of those interviews, if available; c. the names of all CPD members who have been identified as witnesses to the alleged misconduct; d. COPA's, BIA's, or the district's narrative description and evaluation of the alleged misconduct, based on its review of the evidence gathered, including a determination of whether the CPD member's actions appear to be within CPD policy, procedure, regulations, orders, or other standards of conduct required of CPD members; e. in cases where material inconsistencies exist between complainant, CPD member, and witness statements, explicit identification of the inconsistencies, including a description of the evidence reviewed*

*and written credibility findings; f. if a CPD member deployed a weapon, documentation of whether the CPD member's certification and training for the weapon were current; g. all CPD member original statements, as well as any amendments or clarifications to the original statement, and any subsequent statements; and h. an explicit identification of each allegation and the recommended finding for each allegation of misconduct in an investigation.*

## Compliance Status

The IMT reviewed COPA Policy 3.1.9, *File Maintenance* (dated August 1, 2019), which provides a good description of COPA's file maintenance policy and procedure but does not address all of ¶486's requirements. While section 2 of 3.1.9 is well thought-out and describes expectations for digitization of files, the outline structure of 3.1.9 is difficult to follow. COPA should consider revising this policy so that it easier to follow.

In comparison, the BIA has not yet provided the IMT with information about how an investigative file should be developed. The IMT suggests that the BIA consider developing a standalone policy or directive that provides guidance on investigative file development and maintenance. The draft BIA SOP, which the IMT reviewed in the first monitoring period, includes language that may be helpful in the development of that policy.

## Consent Decree ¶487

**487.** *Investigators will consider all original statements, and any subsequent statements, including amended or modified statements, for purposes of determining whether a CPD member willfully made a false statement about a fact material to the incident under investigation.*

## Compliance Status

The IMT suggests that COPA incorporate the requirements of ¶487 into its policy 3.1.2, *Fact Gathering*, or a more comprehensive investigative policy, and that the BIA incorporate the requirements of ¶487. The IMT also suggests the BIA use language from the BIA SOP, which the IMT reviewed in the first reporting period, into that policy.

## Consent Decree ¶497

*497. COPA and CPD will review and revise, as necessary, the policies governing COPA and CPD to ensure the processes for prevention of CPD member collusion and witness contamination comply with the terms of this agreement.*

### Compliance Status

The IMT suggests that the BIA develop a policy that incorporates the requirements of ¶497. That policy should direct BIA members to acknowledge in writing that they have not attempted to influence any person involved in an internal investigation in which they are involved, including as the subject of the investigation, a witness, or otherwise. Similarly, the member should acknowledge in writing that they will not discuss internal investigations in which they are involved.

The IMT also suggests that COPA develop a similar policy and form that addresses collusion and witness contamination.

## Consent Decree ¶499

*499. When COPA, BIA, or the investigating district has arrived at the investigative findings and recommendations, it will promptly finalize a summary report ("Administrative Summary Report"). The Administrative Summary Report will include: a. a description of the CPD members and individuals involved in the alleged misconduct; b. the date, time, and location of the alleged misconduct; c. a description of the allegations and applicable policies; d. a narrative summary of the alleged misconduct; e. a narrative summary of the investigation; and f. the investigating body's findings and conclusions for each allegation of misconduct, including any discipline recommended..*

### Compliance Status

In the second reporting period, the City provided the IMT with one example of an *Administrative Summary Report*. The sample *Administrative Summary Report* includes some of the information that ¶499 requires, but it does not include enough of a narrative summary of the misconduct or investigative findings.

The IMT suggests that the City develop a policy or directive to direct completion of the *Administrative Summary Report*. Further, the IMT suggests that COPA closely review the requirements of ¶499 to aide in their development of an *Administrative Summary Report* policy.

## Consent Decree ¶500

**500.** *For all misconduct investigations, BIA or COPA will publish the Administrative Summary Report within 60 days of the final disciplinary decision.*

### Compliance Status

In the second reporting period, the City provided the IMT with one example of an *Administrative Summary Report*. While the *Administrative Summary Report* includes a "Date of Incident" field, it does not include a "Date of Report" field to document that the report was produced within the timeline required by ¶500.

The IMT suggests that the City develop a policy or directive to direct the BIA and COPA in the appropriate use of the *Administrative Summary Report*. Without written guidance for the *Administrative Summary Report*, the process has the potential for misuse or neglect.

## Consent Decree ¶501

**501.** *Within 60 days of the final disposition, the City will publish: the charges filed and the discipline recommended; the written decision(s), if any, related to the final disposition; and the discipline imposed. When available, the City will publish the date on which the discipline is scheduled to be imposed.*

### Compliance Status

The City did not provide any information to the IMT regarding this ¶501. The IMT reviewed one sample Administrative Summary Report during the second reporting period. If the City intends that Administrative Summary Report to address this paragraph, the IMT suggests that the CPD develop a policy to explain the Administrative Summary Report and its use.

The IMT looks forward to reviewing City material regarding ¶501 in the next reporting period.

## Consent Decree ¶508

> **508.** *The City and CPD will undertake best efforts to ensure that all administrative investigation files, disciplinary history card entries, COPA and BIA disciplinary records, and any other disciplinary record or summary of such record, are retained electronically, and indefinitely, for purposes of historical trend analysis, non-disciplinary EIS, and public transparency.*

### Compliance Status

The IMT reviewed COPA Policy 3.1.9, *File Maintenance* (dated August 1, 2019), which provides a good description of COPA's file maintenance policy and procedure. Section 2 of 3.1.9 is well thought-out and describes expectations for digitization of files. The IMT looks forward to learning more about COPA's plans for file retention in the next reporting period.

In comparison, the BIA has not provided the IMT with information about how investigative files should be developed. The IMT suggests that the BIA consider developing a standalone policy or directive that provides CPD Members with guidance on investigative file development and maintenance. The draft BIA SOP, which the IMT reviewed in the first monitoring period, includes language that may be useful for this policy.

Additionally, the IMT recognizes that compliance with ¶508 requires the City to undertake "best efforts." Per ¶729, this means that the City must, "in good faith, . . . take all reasonable steps to achieve" the objectives of ¶508.[168]

The IMT looks forward to reviewing material regarding ¶508 in the next reporting period. In particular, the IMT is interested to know the BIA's plans for transitioning to electronic files in the future, and to review policies that direct the proper compilation and maintenance of these electronic files.[169]

---

[168] We discuss the City's related efforts to modify its collective bargaining agreements with unions representing sworn police officers in the Other Relevant Agreements Section. *See* ¶711.

[169] *See also City of Chicago v. Fraternal Order of Police, Chicago Lodge No. 7*, 2020 IL 124831 (June 18, 2020) (holding that the City and Fraternal Order of Police, Lodge 7's collective bargaining agreement's requirement to destroy disciplinary and investigation records after five years violates explicit, well-defined, and dominant public policy that concerns the procedures for the proper retention and destruction of government records) (citing the Local Records Act, 50 ILCS 205/, and the State Records Act, 5 ILCS 160/).

## Consent Decree ¶514

**514.** *The City, COPA, and CPD will use best efforts to ensure that the level of discipline recommended for sustained findings is applied consistently across CPD districts and without regard for the race of the complainant or the race of the involved CPD member.*

### Compliance Status

The Advocate Section of the BIA appears to be the entity that ensures that discipline is administered fairly and equitably. The IMT has not been provided with procedures or directives related to the work of the BIA Advocate Section. Similarly, the IMT has not received any information regarding how discipline is administered. The IMT suggests that the BIA, COPA, and the Police Board develop policies and directives to ensure that discipline is fairly and equitably administered. The IMT looks forward to reviewing material regarding ¶514 in the next reporting period.

## Consent Decree ¶552

**552.** *For non-disciplinary purposes, including historical trend analysis, CPD will track, for each CPD member, for every misconduct investigation: the nature of allegations, the outcome of the investigation, and the disposition of discipline.*

### Compliance Status

The data referenced in ¶552 may be included in CPD dashboards or in the PSIG database. The IMT suggests that the CPD develop a policy or directive that addresses the requirements of this paragraph and explains how the data is made available to department members, whether the data is available to the public, and how department members' identities or identifying information will be handled.

The IMT looks forward to reviewing CPD material regarding ¶552 in the next reporting period.

## Consent Decree ¶561

**561.** *The Deputy PSIG will hire a full-time staff member respon-sible for diversity and inclusion issues, who will have specific au-thority to review CPD actions for potential bias, including racial bias, on any matter within the Deputy PSIG's statutory authority. The Deputy PSIG will regularly publish reports on diversity and inclusion issues, no less frequently than on an annual basis, which will contain findings and analysis.*

### Compliance Progress          (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the Deputy PSIG have met Preliminary compliance with ¶561.

The Deputy PSIG has hired a qualified Diversity and Inclusion Officer, who the IMT met during the second reporting period. The IMT also reviewed the job description for the Diversity and Inclusion Officer role in January 2020. The Deputy PSIG has met Preliminary compliance with ¶561.

# Accountability and Transparency:
# Paragraphs Not Required in Year One

The City has demonstrated varying levels of compliance with several paragraphs in the Accountability and Transparency section of the consent decree that were not explicitly included in our Monitoring Report for Year One. To recognize the City's efforts in these areas and provide the Court and the community with updates of those efforts, the IMT includes below a non-exhaustive summary of the City's compliance efforts beyond what was required by the Monitoring Plan for Year One: ¶¶447, 449, 454, 472, 474, 476, 494, 495, 506, and 555–57.

***

## Consent Decree ¶447

**447.** *The City and CPD will require that all COPA and BIA personnel and Accountability Sergeants communicate with complainants and involved CPD members in a professional and respectful manner.*

### Compliance Status

The BIA's *Accountability Sergeants Unit Directive* states that Accountability Sergeants will communicate with complainants and involved CPD members in a professional and respectful manner.

The IMT looks forward to reviewing policies regarding ¶447 from the BIA and COPA in the next reporting period.

## Consent Decree ¶449

**449.** *The City and CPD will notify the complainant in writing if an officer elects to file a labor grievance relating to any discipline imposed as a result of the complainant's complaint. Upon reaching the final disposition, the City and CPD will advise the complainant in writing of the final disposition.*

### Compliance Status

In the second reporting period, the City provided the IMT with an example of an *Administrative Summary Report* to demonstrate compliance with ¶449.

In the next reporting period, the IMT suggests that the City and CPD develop a policy that incorporates the requirements of ¶449.

## Consent Decree ¶454

**454.** *COPA, BIA, and the districts will conduct objective, comprehensive, and timely investigations of complaints.*

### Compliance Status

The BIA's *Accountability Sergeants Unit Directive* directs Accountability Sergeants to conduct objective, comprehensive, and timely investigations of complaints.

The IMT looks forward to reviewing policies regarding ¶454 from the BIA and COPA in the next reporting period.

## Consent Decree ¶472

**472.** *The City and CPD will ensure that the districts arrive at the investigative findings and recommendations within 90 days of the initiation of an investigation. Any request for an extension of time must be approved in writing by the appropriate District Commander.*

### Compliance Status

The IMT has reviewed the City's and the Police Board's policies following the policy process described in the consent decree (¶¶626–41), which delineates applicable consultation, resolution, workout, and public comment periods.

The IMT reviewed the BIA's *Accountability Sergeant Unit Directive* (dated February 13, 2020), which directs Accountability Sergeants to arrive at investigative findings and recommendations within 90 days of the initiation of an investigation. The Unit Directive also requires that any request for extension of time must be made and approved in writing by the District Commander.

The City and the CPD are in a strong position to reach some compliance under ¶472 in Year Two.

## Consent Decree ¶474

*474. CPD will ensure that if BIA does not arrive at the investiga-tive findings and recommendations within 180 days, or an Ac-countability Sergeant does not arrive at the investigative find-ings and recommendations within 90 days, BIA will notify, within five days of the end of the designated timeframe, the complain-ant or complainant representative, and the involved CPD mem-ber, or his or her counsel (unless such notification would compro-mise the integrity of the investigation). Such notification will in-clude the reasons for the inability to complete the administrative investigation within the designated timeframe. BIA or the Ac-countability Sergeant will update such notice every 90 days until the administrative investigation is completed.*

### Compliance Status

The BIA's *Accountability Sergeants Unit Directive* includes notification responsibil-ities for Accountability Sergeants if the investigation is not completed within the designated timeframe.

The IMT looks forward to reviewing a policy regarding ¶474's requirement for BIA investigative findings and notifications in the next reporting period.

## Consent Decree ¶476

*476. The City, CPD, and COPA will require that COPA and BIA su-pervisors regularly communicate with the investigators under their supervision, including Accountability Sergeants, to evaluate the progress of administrative investigations.*

### Compliance Status

The BIA's *Accountability Sergeants Unit Directive* directs BIA supervisors to regu-larly communicate with Accountability Sergeants to support them and to evaluate the progress of their administrative investigations.

The IMT looks forward to reviewing policies regarding ¶476 from the BIA and COPA in the next reporting period.

## Consent Decree ¶494

**494.** *CPD will require that: (a) investigations completed by Accountability Sergeants are held to the same investigative standards as those completed by BIA; (b) beginning in 2020, and by January 31, 2022, each District Commander designates at least two Accountability Sergeants who will report to the District Commander, and whose primary responsibility is receiving, processing, and investigating complaints against CPD members; (c) before a Sergeant is designated an Accountability Sergeant, his or her name will be provided by his or her District Commander to BIA for BIA's review; (d) each Accountability Sergeant is provided with the name of an contact information for the BIA Lieutenant responsible for reviewing the Accountability Sergeant's work; (e) BIA Lieutenants provide regular case-related and overall performance feedback to each of the Accountability Sergeants and his or her respective District Commander; (f) BIA Lieutenants review and approve all of the Accountability Sergeant's proposed investigative findings and disciplinary recommendations; (g) all Accountability Sergeants and BIA Lieutenants have access to the PRS or any system replacing the PRS; (h) all Accountability Sergeants have access to BIA policies, directives, protocols, and training materials; and (i) all Accountability Sergeants receive the initial and in-service training provided to BIA investigators as provided for in this Agreement.*

### Compliance Status

The IMT reviewed the CPD's policies following the policy process described in the consent decree (¶¶626–41), which delineates applicable consultation, resolution, workout, and public comment periods.

In the second reporting period, the IMT reviewed the BIA's *Accountability Sergeants Unit Directive* (dated February 13, 2020). The Unit Directive addresses each requirement of ¶494 in sufficient detail and clarifies the expectations of Accountability Sergeants with regard to the quality of their investigations, how they are selected to serve, their job description, the support that they can expect to receive from the BIA, and the training that they will receive.

The City and the CPD are in a strong position to reach some compliance under ¶494 in Year Two.

## Consent Decree ¶495

*495. Supervisory reviews of investigations will be conducted as follows: (a) Accountability Sergeants will forward the administrative investigative file through his or her chain of command to the BIA Lieutenant: (i) the Accountability Sergeant's chain of command will ensure that the proposed investigative findings and recommendations are complete, meet the requirements of law, CPD policy, and this Agreement, and that findings are supported by the appropriate standard of proof; (ii) BIA Lieutenants will review the proposed investigative findings and recommendations for accuracy and completeness, and will order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings; and (iii) whenever a higher ranking officer orders additional investigation, it will be documented in writing. (b) all investigations conducted by COPA or BIA, once complete, will be forwarded through the investigator's chain of supervision/command to the Chief Administrator of COPA or the Chief of BIA, respectively: (i) COPA and BIA will each ensure that their respective administrative investigative files are complete, meet the requirements of law, COPA and CPD policy, and this Agreement; and that findings are supported by the appropriate standard of proof; (ii) the Chief Administrator or the Chief of BIA, or his or her designee, will order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings; and (iii) whenever COPA and BIA orders additional investigation, the request and resulting investigation will be documented in writing.*

### Compliance Status

In the second reporting period, the IMT reviewed the BIA's *Accountability Sergeants Unit Directive*, which incorporates the requirements of subparagraph 495(a).

The IMT looks forward to reviewing additional policies from the BIA and COPA regarding ¶495 in the next reporting period.

## Consent Decree ¶506

**506.** *COPA, BIA, and the Accountability Sergeants will have access to the CMS as necessary to undertake their respective duties.*

### Compliance Status

The BIA's *Accountability Sergeants Unit Directive* states that Accountability Sergeants will have access to the Central Management System to undertake their responsibilities.

The IMT looks forward to reviewing policies regarding ¶506 from the BIA and COPA in the next reporting period.

## Consent Decree ¶555

**555.** *On an annual basis, the Police Board will track and publish case-specific and aggregate data about Police Board decisions. Such publications will contain and include, at minimum, the following: (a) the date on which the investigating agency (COPA, BIA, district, or OIG) received the complaint or notification for investigation; (b) the date of the Police Board hearing over which the hearing officer presided; (c) the disciplinary recommendations and/or decisions (where applicable) made by COPA, BIA, the Superintendent, and the Police Board; (d) the average time between the filing of disciplinary charges with the Police Board and the first day of hearing; (e) the average time between the filing of disciplinary charges with the Police Board and the Police Board's decision; (f) the average time between the date on which the investigating agency (COPA, BIA, district, or OIG) received the complaint for investigation and the Police Board's decision; (g) the date of the alleged misconduct; (h) the average time between the date of the alleged misconduct giving rise to the complaint or notification and the Police Board's decision; and (i) whether any Police Board decision has been appealed to any state court and, if so, the court's final judgment.*

### Compliance Status

In the second reporting period, the IMT reviewed the Police Board website and the 2017 and 2018 *Police Board Annual Reports*.

The Police Board Annual Reports and Data spreadsheet are easily located on the Police Board Website, which is intuitive and easy to navigate. These documents

are also easy to download. The Police Board website includes a Police Discipline webpage, which contains the detailed information required by ¶555(a–c), (g), and (i). The Police Discipline webpage displays a link to a spreadsheet key, which provides the user with a detailed explanation for each column of information in the Data spreadsheet. The Data spreadsheet is also comprehensive.

Finally, the 2018 *Police Board Annual Report* is improved from the 2017 *Police Board Annual Report*. The information in the 2018 *Police Board Annual Report* is well-organized and easy to understand. The IMT understands that the Police Board plans to continue reporting the information required by ¶555 in the format of the 2018 *Police Board Annual Report* in future years.

The City and the Police Board are in a strong position to reach some compliance under ¶555 in Year Two.

## Consent Decree ¶556

> **556.** *The Deputy PSIG will conduct periodic analysis and evaluations, and perform audits and reviews as authorized by Municipal Code of Chicago § 2-56-230.*

### Compliance Status

In the second reporting period, the IMT reviewed the *Inspector General Public Safety Policy Manual* (dated August. 14, 2019). The manual identifies the Deputy PSIG's mission as being dedicated to public safety oversight per Municipal Code of Chicago §§ 2-56-210 and 2-56-230. This includes inspection, evaluation, and review of the policies and programs of the CPD and COPA to enhance effectiveness, increase public safety, protect civil liberties and civil rights, and ensure CPD accountability.

The City and the Deputy PSIG are in a strong position to reach some compliance under ¶556 in Year Two.

## Consent Decree ¶557

> **557.** *The Deputy PSIG's audits and reviews will be conducted pursuant to the Association of Inspectors General Principles and Standards for Offices of Inspector General.*

### Compliance Status

In the second reporting period, the IMT reviewed the *Inspector General Public Safety Policy Manual* (dated August. 14, 2019). The manual sets the standards that

the Deputy PSIG will complete its inspections, evaluations, and reviews in a manner that comports with the *Association of Inspectors' Quality Standards for Inspections, Evaluations, and Reviews* ("Green Book").

The IMT reviewed the Green Book, which sets standards for the Offices of Inspector General and includes Quality Standards for the Offices of Inspector General, Quality Standards for Investigations, and Quality Standards for Inspections, Evaluations, and Reviews. The IMT recognizes the Deputy PSIG's written commitment to the standards of the Green Book.

The City and the Deputy PSIG are in a strong position to reach some compliance under ¶557 in Year Two.

# X. Data Collection, Analysis & Management

## Guiding Principles

The IMT assessed compliance with applicable Data Collection, Analysis, and Management paragraphs in accordance with the consent decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **566.** Data can empower CPD to engage in the type of critical self-examination essential to instilling and maintaining constitutional policing. CPD can leverage data to ensure constitutional policing by: systematically collecting enough data to have a broad-based understanding of officers' interactions with the public; auditing the data to ensure it accurately reflects those interactions; analyzing the data to identify trends or areas of concern; developing tailored support and interventions to address behavior that is or may become problematic; and assessing the effectiveness of attempts to modify officers' behavior.

> **567.** In addition to enhancing CPD's capacity for internal accountability, CPD can use data to promote accountability to the public by regularly publishing data it collects.

# Summary of Compliance Assessments

During the second reporting period, the IMT worked with the CPD to address issues regarding data management and evaluation, as well how data will be used to inform the Early Intervention System, now called the Officer Support System. Additionally, the IMT reviewed the CPD's proposed directives regarding the Performance Recognition System and the operation of the Force Review Board. While we believe the CPD has made initial progress regarding some of these reform efforts, more work is needed, particularly for implementing the Performance Recognition System. The IMT looks forward to continued progress on all the requirements in the Data Collection, Analysis, and Management section.

In sum, the IMT assessed the City's compliance with nine Data Collection paragraphs of the consent decree with deadlines in Year One (¶¶569, 577–82, 604, and 606) and two foundational paragraphs (¶¶576 and 602).[170] We assessed one of these paragraphs in the first reporting period (¶569), finding that the City and the CPD failed to meet Preliminary compliance.

In the second reporting period, we have determined that the City failed to reach Preliminary compliance with any of the paragraphs with deadlines in Year One. *See* Figure 55 below.

Figure 55:    Compliance Status at the End of the Second Reporting Period (February 29, 2020) for Data Collection Paragraphs with Deadlines in Year One

| Paragraphs in Compliance (Preliminary or Secondary) | (0) |
| Paragraphs with Requirements Not in Compliance | (9) |

The City had four new deadlines in the second reporting period (¶¶580–81, 604, and 606). The City did not meet any of these deadlines. *See* Figure 56 below.

---

[170] In our Monitoring Plan for Year One, we intended to assess several of these paragraphs together, per ¶653. After several discussions with the Parties regarding our first monitoring report and our methodologies, we have found that providing separate analysis for each paragraph—even those that are related—often helps identify any agreements and disagreements between the Parties, the relevant City entities, and the IMT. For this reason, we have provided individual updates for all paragraphs in our Monitoring Plan for Year One.



Figure 56:     Total Data Collection Deadlines in the Second Reporting Period: 4

Finally, the two foundational paragraphs are still under assessment (¶¶576 and 602). *See* Figure 57 below.

Figure 57:     Compliance Status at the End of the Second Reporting Period (February 29, 2020)
               for Foundational Paragraphs in the Crisis Intervention Section

# Data Collection, Analysis & Management: ¶569

**569.** *CPD must collect, track, and maintain all available documents related to use of force incidents, including: a. TRRs, or any other similar form of documentation CPD may implement for initial reporting of reportable use of force incidents; b. TRR-Is, or any other similar form of documentation CPD may implement to document supervisory investigation of reportable use of force incidents; c. Tactical Response Reports – Review ("TRR-Rs"), or any other similar form of documentation CPD may implement to document review or auditing of reportable use of force incidents; d. arrest reports, original case incident reports, and investigatory stop reports associated with a reportable use of force incident; e. administrative investigative files, including investigative materials generated, collected, or received by BIA, or COPA, or any similar form of documentation CPD may implement for misconduct allegations or civilian complaints; and f. all reasonably available documentation and materials relating to any reportable use of force, in-custody injury or death, or misconduct allegation, including body-worn, in-car, or known third-party camera recordings, and statements, notes, or recordings from witness and officer interviews.*

## Compliance Progress     (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

During the first reporting period, we noted that the City had not provided sufficient evidence of policies regarding collecting, tracking, and maintaining the necessary data and documents required by ¶569. During the present reporting period, we found that a substantial effort was made by the CPD to update policies and practices regarding data collection and retention. However, those policies continue to require additional revisions and must be subjected to a more rigorous community engagement input process (*see*, for instance, our assessment of ¶218 in the Use of Force section above). As such, additional work is required for the City to reach compliance with this paragraph.

While incorporating the above data management elements into policy is necessary for Preliminary compliance, to comply with the paragraph, the City and the CPD also need to ensure that the data collected is accurate. For instance, we note some data inconsistencies within the Force Review Unit data, within the dashboard data, and in comparing the two (*see, e.g.*, our assessments of ¶¶164, 168, and 169 and

in the Use of Force section above).[171] Additionally, there are data inconsistencies between the accountability data from the Bureau of Internal Affairs and the Civilian Office of Police Accountability. In upcoming reporting periods, the IMT will work closely with the City and the CPD entities to identify the cause of such disparities and address the underlying issues causing the disparities.

---

[171] In the second reporting period, the name of the "Force Review Unit" changed to the Force Review Division. The consent decree, however, uses the name "Force Review Unit," as do some of the drafts of the CPD policies that we discuss in this report. For this reason, we continue to use "Force Review Unit" throughout this report.

# Data Collection, Analysis & Management: ¶577

**577.** *CPD will create a Force Review Board ("FRB") to review, from a Department improvement perspective: (a) any level 3 reportable use of force incident, except for accidental firearms discharges and animal destructions with no human injuries, and (b) any reportable uses of force by a CPD command staff member.*

**Compliance Progress**  (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD did not reach Preliminary compliance with ¶577 in this reporting period.[172] The IMT reviewed General Order 03-02-08, *Department Review of Use of Force*, and received a briefing on 10 use of force cases that the Force Review Board reviewed. On February 29, 2020, the CPD enacted and published a revised suite of Use of Force policies, which includes General Order 03-02-08. The CPD revised these policies multiple times, incorporating feedback from the IMT and the OAG. General Order 03-02-08 creates a Force Review Board in accordance with ¶577. As noted in the Use of Force section above, these policies did not receive the requisite community input, and the CPD is currently seeking community input on the Use of Force policies. *Compare* ¶160.

The CPD deserves credit for creating the Force Review Board, which met regularly during the reporting period. While the CPD continues to need community input, in the meantime, the CPD has created strong policies for the Force Review Board's review of uses of force. When the CPD finalizes G03-02-08, following the requisite community input, it will likely be in Preliminary compliance with this paragraph of the consent decree.

In future reporting periods, we will review the Force Review Board documentation to ensure that the types of force subject to Force Review Board review in ¶577 are, in fact, reviewed by the Force Review Board.

---

[172] While this paragraph does not have a specific deadline, we originally combined it with a paragraph that does have a deadline in our Monitoring Plan for Year One. To clearly address the requirements in each paragraph, we have separated our assessments in this report.

# Data Collection, Analysis & Management: ¶578

> **578.** *For any reportable use of force incident subject to an ongoing investigation by COPA, COPA will be exclusively responsible for recommending disciplinary action relating to the incident. The purpose of FRB's review will be to: a. evaluate if actions by CPD members during the incident were tactically sound and consistent with CPD training; and b. if applicable, identify specific modifications to existing policy, training, tactics, or equipment that could minimize the risk of deadly force incidents occurring and the risk of harm to officers and the public.*

## Compliance Progress　　　　　(Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD did not reach Preliminary compliance with ¶578 in this reporting period.[173] The IMT reviewed General Order 03-02-08, *Department Review of Use of Force*, and received a briefing on 10 use of force cases that the Force Review Board reviewed. On February 29, 2020, the CPD enacted and published a revised suite of Use of Force policies, which includes General Order 03-02-08, following multiple reviews from the IMT and OAG. General Order 03-02-08 contains language substantially similar to ¶578. The policies did not receive the requisite community input, but the CPD is seeking community input on the Use of Force policies per ¶160.

The CPD deserves credit for creating the Force Review Board, which met regularly during the reporting period. While the CPD continues to need community input, in the meantime, the CPD has created strong policies for the Force Review Board's review of uses of force. When the CPD finalizes G03-02-08, following the requisite community input, it will likely be in Preliminary compliance with this paragraph of the consent decree. In future reporting periods, we will review the Force Review Board documentation to ensure reviews serve the purposes outlined in ¶578.

---

[173] While this paragraph does not have a specific deadline, we originally combined it with a paragraph that does have a deadline in our Monitoring Plan for Year One. To clearly address the requirements in each paragraph, we have separated our assessments in this report.

# Data Collection, Analysis & Management: ¶579

> **579.** *The FRB will be chaired by the Superintendent, or his or her designee, and will include, at a minimum, the Chief of the Bureau of Patrol, or his or her designee, and CPD members at the rank of Deputy Chief, or above, who are responsible for overseeing policy development, policy implementation, training, and misconduct investigations. CPD's General Counsel, or his or her designee, will also serve on the FRB.*

## Compliance Progress         (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD did not reach Preliminary compliance with ¶579 in this reporting period.[174] The IMT reviewed General Order 03-02-08, *Department Review of Use of Force*, and received a briefing on 10 use of force cases that the Force Review Board reviewed. On February 29, 2020, the CPD enacted and published a revised suite of Use of Force policies, which includes General Order 03-02-08, following multiple reviews from the IMT and OAG. General Order 03-02-08 states that the Superintendent will serve as the chairperson of the Force Review Board and includes other individuals as Force Review Board members as required by ¶579.[175] The policies did not receive the requisite community input, but the CPD is seeking community input on the Use of Force policies per ¶160.

The CPD deserves credit for creating the Force Review Board, which met regularly during the reporting period. While the CPD continues to need community input, in the meantime, the CPD has created strong policies for the Force Review Board's membership. When the CPD finalizes G03-02-08, following the requisite community input, it will likely be in Preliminary compliance with this paragraph of the consent decree. Moving forward, we will review the Force Review Board documentation to ensure an adequate representation of the individuals listed in ¶579.

---

[174] While this paragraph does not have a specific deadline, we originally combined it with a paragraph that does have a deadline in our Monitoring Plan for Year One. To clearly address the requirements in each paragraph, we have separated our assessments in this report.

[175] Following the CPD's reorganization in late January 2020, the Chief of the Bureau of Patrol position no longer exists. The Chief of the Office of Operations, or his or her designee, now serves on the Force Review Board instead.

# Data Collection, Analysis & Management: ¶580

**580.** *The FRB will review each incident within its purview promptly, which will in no event be more than 96 hours after the incident occurs. Within 30 days after its review of an incident, the FRB will issue recommendations, if appropriate, to the Super-intendent regarding any need for additional training or modifi-cations to policies, tactics, equipment, or Department practices. Upon review and approval by the Superintendent, or his or her designee, the FRB will assign each approved recommendation to a specific CPD command staff member for implementation. CPD will promptly implement each approved recommendation.*

## Compliance Progress     (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**      April 30, 2019      ☐ **Met**    ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The CPD did not meet the April 30, 2019 deadline for Force Review Board review of use of force incidents, nor did it achieve any level of compliance with ¶580 in this reporting period. To evaluate Preliminary compliance, the IMT reviewed General Order 03-02-08, *Department Review of Use of Force*, and received a briefing on 10 use of force cases that the Force Review Board reviewed.

On February 29, 2020, the CPD enacted and published a revised suite of Use of Force policies, which includes General Order 03-02-08, following multiple reviews from the IMT and OAG. General Order 03-02-08 contains language substantially similar to ¶580. The policies did not receive the requisite community input, but the CPD is currently gathering community input on the Use of Force policies per ¶160.

The CPD deserves credit for creating the Force Review Board, which met regularly during the reporting period. While the CPD continues to need community input, in the meantime, the CPD has created strong policies for the Force Review Board's review of uses of force and issuance of recommendations, as appropriate. When the CPD finalizes G03-02-08, following the requisite community input, it will likely be in Preliminary compliance with this paragraph of the consent decree.

In future reporting periods, we will review the Force Review Board documentation that reflects adherence to the actions and timelines required by ¶580. Also, while the Consent Decree requires all reviews to occur within 96 hours, we suggest that

the CPD consider how the Force Review Board will handle evidence that comes to
light more than 96 hours after an event and whether additional meetings would
be necessary if such evidence supports a change in the initial Force Review Board
findings.

# Data Collection, Analysis & Management: ¶581

*581. Beginning within 180 days of the Effective Date, CPD will publish on at least a monthly basis aggregated and incident-level data, excluding personal identifying information (e.g., name, address, contact information), regarding reportable use of force incidents via a publicly accessible, web-based data platform.*

**Compliance Progress**    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**         August 28, 2019        ☐ **Met**   ☑ **Missed**

**Preliminary:**        *Not in Compliance*
**Secondary:**         *Not in Compliance*
**Full:**            *Not in Compliance*

The CPD did not meet the August 28, 2019 deadline for publishing aggregated and incident-level data, nor did it achieve any level of compliance with ¶581 in this reporting period.

To evaluate Preliminary compliance, the IMT reviewed the CPD's publicly accessible, web-based data platform ("data dashboard") that the CPD added to their website on February 21, 2020, as well as an earlier draft of the dashboard.[176] The CPD publishes aggregated data to the dashboard, which is updated on the first day of each month with data from its "CLEAR system." This allows for timely review of use-of-force data.

While the data platform contains relevant aggregate data, it does not currently allow incident-level data to be downloaded, thereby falling short of ¶581's requirement for incident-level data. Downloadable, incident-level data makes it possible for community members to conduct analyses not provided by the CPD. In addition, this allows community members to conduct comparative analyses, as contemplated by ¶582 below.

Given these issues, we cannot find that the CPD met Preliminary compliance with the requirements of ¶581. To achieve Preliminary compliance, the CPD must ensure that the dashboard contains the incident-level data required by ¶581. For subsequent levels of compliance, the CPD should ensure that the dashboard meets the basic desires of community members. For instance, the CPD may consider conducting data dashboard tutorials for community members so that they may become familiar with the dashboard, as well as have the ability to provide feedback

---

[176] *See Use of Force Dashboard*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

to the CPD. For the casual reviewer, the CPD may consider including a list of Frequently Asked Questions to help navigate the system. The IMT hopes to also evaluate this paragraph for Secondary compliance during the next reporting period, and we look forward to discussing with the CPD how it is carrying out community engagement regarding the dashboards.

# Data Collection, Analysis & Management: ¶582

*582. The publicly accessible, web-based data platform will enable visitors to: a. identify where reportable uses of force occur through interactive maps depicting incident frequencies at a citywide, district, neighborhood, and ward level; b. identify the frequency, in the aggregate and by type, of reportable uses of force at the citywide, district, neighborhood, and ward level through graphs, charts, and other data visualizations; and c. review aggregate demographic information about the race, ethnicity, age, and gender of persons subjected to reportable uses of force at the citywide, district, neighborhood, and ward level through graphs, charts, and other data visualizations.*

## Compliance Progress                    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD did not reach Preliminary compliance with ¶582 in this reporting period.[177] The IMT reviewed the publicly accessible, web-based data platform ("data dashboard") that the CPD added to their website on February 21, 2020, as well as an earlier draft of the dashboard.[178] At present, the data platform allows community members to view select characteristics of a force event, including the month and year of the event, location, subject demographics, and use-of-force type. The platform contains an interactive map and allows users to sort and filter by force characteristics. However, the interactive functions of the platform are, in some areas, difficult to navigate and comparative analysis is not possible across multiple tabs. Additionally, age is not reviewable at the citywide, district, neighborhood, and ward level, as required by ¶582(c) (although race and gender are reviewable at these levels).

Given these issues, we cannot find the CPD to be at any level of compliance with the requirements of ¶582. To achieve Preliminary compliance, the CPD must ensure the dashboard contains all the requirements of ¶582.

For subsequent levels of compliance, the CPD should ensure that the dashboard is accessible to and understandable to community members. For instance, the CPD

---

[177] While this paragraph does not have a specific deadline, we originally combined it with a paragraph that does have a deadline in our Monitoring Plan for Year One. To clearly address the requirements in each paragraph, we have separated our assessments in this report.

[178] *See Use of Force Dashboard*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

may consider conducting data dashboard tutorials for community members so that they may become familiar with the dashboard, as well as have the ability to provide feedback to the CPD. For the casual reviewer, the CPD may consider including a list of Frequently Asked Questions to help navigate the system. The IMT will continue to evaluate the Preliminary compliance requirements during the next reporting period, and we look forward to discussing with the CPD how it is carrying out community engagement regarding the dashboards.

# Data Collection, Analysis & Management: ¶604

**604.** *Prior to full implementation of the EIS, CPD will continue to use the PRS as well as other existing tools and resources to identify patterns of conduct by officers that warrant support and intervention. Following the development and implementation of the EIS, the functions required of the automated electronic system described above may be performed by a combination of the EIS and the PRS as long as all required functions are performed and supervisors are using the system(s) as required by CPD policy. To the extent CPD continues utilizing PRS to perform any of the functions required by this Agreement, CPD will update the PRS to enhance the system's effectiveness, usability, and accuracy by no later than January 1, 2020.*

---

## Compliance Progress    (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**    January 1, 2020    ☐ Met    ☑ **Missed**

**Preliminary:**    *Not in Compliance*
**Secondary:**    *Not in Compliance*
**Full:**    *Not in Compliance*

The CPD did not meet the January 1, 2020 deadline to update the Performance Recognition System, nor did it achieve any level of compliance with ¶604 in this reporting period.

To evaluate Preliminary compliance, the IMT met with the CPD and reviewed relevant CPD documents, including proposed revisions to a CPD directive regarding the Performance Recognition System (E05-02).

Although the CPD continues to provide supervisors the ability to use the Performance Recognition System—and some supervisors continue to do so—the department-wide use of Performance Recognition System is inconsistent. Different supervisors use the system with different frequencies. CPD representatives told us that, between January and November 2019, 1,931 entries had been made into the Performance Recognition System—310 of which were made by the Force Review Unit. This leaves only 1,621 total entries from direct supervisors for an organization with about 13,000 members. Additionally, the CPD informed us that some supervisors make more entries than others do and that some officers receive more than one entry into Performance Recognition System. As a result, the CPD conceded that some officers and supervisors may go years without comments in Performance Recognition System.

The CPD has, however, taken concrete steps toward combining the functions of its Early Intervention System and Performance Recognition System, allowing supervisors to have quantitative data regarding officers' performance and qualitative evaluations of their interactions. Recently, the CPD provided the IMT with proposed revisions to its directive regarding the Performance Recognition System (E05-02), which incorporates the concepts of the broader Early Intervention System and memorializes supervisor responsibilities for making and reviewing Performance Recognition System entries.

We believe this represents a positive step toward standardizing Performance Recognition System entries. However, the CPD should ensure that the present issues regarding inconsistent use between supervisors does not carry over when implementing their enhanced approach. While a comprehensive policy should remedy some of these issues, the CPD will need to continue assessing the use of Early Intervention System and the Performance Recognition System to ensure consistent compliance.

# Data Collection, Analysis & Management: ¶606

*606. Within 365 days of the Effective Date, CPD will conduct an assessment of CPD's current information collection mechanisms and data management technology to identify: a. what data CPD currently collects and what additional data is required to be collected to comply with this Agreement; b. the manner of collection (e.g., electronic or paper); c. the frequency with which each type of data is updated; d. the quality control mechanisms in place, or the need for such mechanisms, to ensure the accuracy of data collected; e. what software applications or data systems CPD currently has and the extent to which they are used or accessed by CPD members; f. redundancies or inefficiencies among the applications and systems currently in use; and g. the extent to which the applications and systems currently in use interact with one another effectively.*

---

## Compliance Progress     (Reporting Period: Sep. 1, 2019, through Feb. 29, 2020)

**Deadline:**     February 29, 2020     ☐ **Met**    ☑ **Missed**

**Preliminary:**     *Not in Compliance*
**Secondary:**     *Not in Compliance*
**Full:**     *Not in Compliance*

The CPD did not meet the February 29, 2020 deadline to conduct the assessment of its current information collection mechanisms and data management technology, nor did it achieve any level of compliance with ¶606 in this reporting period.

To evaluate Preliminary compliance, the IMT reviewed a draft Master Consulting Agreement that the CPD provided on the final day of the reporting period. The IMT also had discussions with the CPD about the assessment required by ¶606.

The Master Consulting Agreement will act as a scope of work for an outside entity to conduct the assessment contemplated by ¶606. The draft Master Consulting Agreement provides an appreciably detailed description of the types of analyses required, as well as the general methods for such analyses (both quantitative and quantitative).

During our conversations with the CPD, before the development of the Master Consulting Agreement, we noted that the assessment described in ¶606 is extensive and that planning for it would require serious thought. The Master Consulting Agreement reflects such an approach, and the CPD deserves credit for its development.

---

While a contractor has yet to be selected and the assessment has yet to be completed, quality is more desirable than expediency. While we cannot say that the assessment was completed within the 365 days required by the consent decree, we believe the approach taken by CPD will lead to a comprehensive evaluation of the CPD's data systems, which will ultimately put the CPD into compliance. In future reporting periods, we will review the final report, as well as the appropriateness of any actions taken by the CPD in response to the report's findings.

# Data Collection, Analysis & Management:
# Foundational Paragraphs

As noted in the Monitoring Plan for Year One, the IMT identified two "foundational paragraphs" in the Data Collection, Analysis & Management section of the consent decree: ¶¶576 and 602.

*** 

## Consent Decree ¶576

> **576.** *CPD will conduct random audits of body-worn and in-car camera recordings of incidents that involved civilian interactions to assess whether CPD officers are complying with CPD policy. CPD will take corrective action to address identified instances where CPD officers have not complied with CPD policy as permitted by law, and will identify any trends that warrant changes to policy, training, tactics, equipment, or Department practice.*

### Compliance Status

The CPD is currently testing a process for randomly auditing body-worn cameras in the 19th District with a pilot program, using a computer application to randomly select videos for review. Outside of the 19th District, supervisor review of body-worn camera footage is unstandardized. This has led to concerns about the process of selecting videos to review, how many reviews are being done, and whether the selected videos are truly representative of community interactions. Additionally, as highlighted in the Inspector General's July 2019 report, compliance with the requirement to conduct body-worn-camera reviews has been inconsistent, further demonstrating the need for standardization of reporting.[179]

During the second reporting period, the IMT met with the Watch Lieutenant in the 19th District and received an overview and demonstration of the auditing process. We found the process in the 19th District to be more consistent with the requirements of ¶576 compared to the unstandardized approach taken in other districts. Upon completion of the pilot program, the CPD should conduct a comprehensive evaluation to determine (1) whether the events reviewed are representative of all events within that district and (2) the degree to which the process positively contributes to supervisory practices. If the evaluation reveals affirmative findings, the CPD should implement the audit process department-wide and provide evidence

---

[179] *See Evaluation of the Chicago Police Department's Random Reviews of Body-Worn Camera Recordings*, PUBLIC SAFETY SECTION OF THE OFFICE OF INSPECTOR GENERAL (July 2019), https://igchicago.org/wp-content/uploads/2019/07/CPDs-Random-Reviews-of-Body-Worn-Camera-Recordings.pdf.

that the process was implemented with fidelity. The CPD will then need to demonstrate that if the video indicates a need for corrective action, supervisors can take such action.

## Consent Decree ¶602

> **602.** *Prior to beginning the phased implementation of the EIS, CPD will develop and implement new or revised policies and procedures for using the EIS and, if applicable, the updated PRS and information obtained from them. The policies and procedures will address data storage, data retrieval, data analysis, reporting, pattern identification, supervisory use, intervention and support options and procedures, documentation and audits, access to the system, and confidentiality of personally identifiable information.*

### Compliance Status

During the reporting period, the CPD provided the IMT with proposed revisions to Employee Resource 05-02, *Performance Recognition System*. However, this occurred late in the reporting period, and the IMT has since provided our comments and suggestions to the directive so that it may fully reflect the requirements of ¶602 and best practices. Additionally, the CPD provided the IMT with an Early Intervention System workflow, detailing the actions required at each step of an Early Intervention System alert, as well as the personnel involved and the timeline for each step. While we will need to observe the workflow in action, it is a positive step in the CPD's development of Early Intervention System.

As ¶602 only requires the directive to be implemented "prior to beginning the phased implementation of the" Early Intervention System, and because CPD has not yet formally begun the phased implementation of Early Intervention System, the CPD has not violated the relative timeline of ¶602. In the next reporting period, we will continue to work with CPD on revising E05-02 as part of their overall rollout of Early Intervention System implementation.

# XI. Other Relevant Agreements

As we identified in our Monitoring Plan for Year One, the City has some obligations outside of the 10 topic areas, above. In many ways, these other obligations are critical to the success of the reform efforts across all 10 topic areas of the consent decree. Specifically, for Year One, the IMT assessed ¶711 as a foundational paragraph, and we provide a compliance status update below.

## Consent Decree ¶711

> **711.** Nothing in this Consent Decree is intended to (a) alter any of the CBAs between the City and the Unions; or (b) impair or conflict with the collective bargaining rights of employees in those units under the IPLRA. Nothing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate (i) the terms of the CBAs, including any Successor CBAs resulting from the negotiation process (including Statutory Impasse Resolution Procedures) mandated by the IPLRA with respect to the subject of wages, hours and terms and conditions of employment unless such terms violate the U.S. Constitution, Illinois law or public policy, or (ii) any bargaining obligations under the IPLRA, and/or waive any rights or obligations thereunder. In negotiating Successor CBAs and during any Statutory Resolution Impasse Procedures, the City shall use its best efforts to secure modifications to the CBAs consistent with the terms of this Consent Decree, or to the extent necessary to provide for the effective implementation of the provisions of this Consent Decree.

### Compliance Status

Paragraph 711 requires the City to make "best efforts to secure modifications" to its collective bargaining agreements with unions representing sworn police officers (Unions) consistent with the terms of the consent decree or to the extent necessary to implement the provisions of the consent decree. *See also* ¶710. The consent decree further provides that the City's "best efforts" in this regard should not compromise the collective bargaining process or any party's rights in that process.

Paragraph 711 also stipulates that the consent decree is not intended to alter collective bargaining agreements or to impair or conflict with the collective bargaining rights of the Unions. Likewise, ¶711 does not obligate the City or the Unions to violate the terms of their agreements, violate any bargaining obligations, or waive any rights or obligations.

411

In other words, with different parties, rights, obligations, and authorities, these collective bargaining agreements are separate from the consent decree. Nonetheless, the collective bargaining agreements can directly impact the City's efforts to comply with the consent decree. For this reason, the consent decree requires the City to "use its best efforts," under the corresponding collective bargaining processes, "to secure modifications" to the collective bargaining agreements to match the terms or "effective[ly] implement[]" the provisions with the consent decree. ¶711.

The City's most recent collective bargaining agreements with the Unions have all expired. Over the last several years—beginning before the start of the consent decree—the City has been in negotiations with the Unions for successor agreements. While negotiations continue, the City must apply the provisions of the expired agreements.

To monitor compliance with ¶711, the City, the IMT, and the OAG met on a near-monthly basis throughout the first and second reporting periods to discuss updates on the City's efforts to negotiate successor collective bargaining agreements with the four Unions:

- The Fraternal Order of Police, Chicago Lodge No. 7 (FOP);

- The Policemen's Benevolent & Protective Association of Illinois (PBPA), Unit 156 – Sergeants;

- PBPA of Illinois, Unit 156 – Lieutenants; and

- PBPA of Illinois, Unit 156 – Captains.

The Independent Monitor also met with various representatives of the Unions on several occasions during Year One. *See also* ¶671.

As reported to the IMT, during negotiations, the City has made various proposals designed to modify terms in the expired agreements consistent with the consent decree. For example, the City has proposed changes to the process for receiving and investigating complaints of officer misconduct, including complaints that are anonymous or do not have a sworn affidavit. *See, e.g.*, ¶¶421, 425, 427, 461, 462, and 477. The City has also proposed changes to indefinitely retain disciplinary records indefinitely, rather than for five years. *See* ¶508.[180]

---

[180] *See also City of Chicago v. Fraternal Order of Police, Chicago Lodge No. 7*, 2020 IL 124831 (June 18, 2020) (holding that the City and Fraternal Order of Police, Lodge 7's collective bargaining agreement's requirement to destroy disciplinary and investigation records after five years violates explicit, well-defined, and dominant public policy that concerns the procedures for the

The Unions have not accepted any of these proposed changes. Accordingly, the City and the Unions have advanced their contract disputes to "interest arbitration." The City and the PBPA are farther along in this process. Specifically, the City and the PBPAs selected a single interest arbitrator to review the City's and the PBPAs' positions regarding various contract proposals and decide on the new terms of a successor agreement. The City and the PBPAs recently completed their presentations and briefing, and the arbitrator's decision on the disputed contract terms will likely precede the IMT's next monitoring report. In comparison, the FOP only recently declared an impasse with the City in December 2019. As a result, the City and the FOP must still select an arbitrator to begin the process, which will likely include a mediation phase to potentially avoid the longer arbitration process.

In addition to interest arbitration regarding the terms of successor agreements, the City and the Unions also engage in resolving various labor issues under the terms of the expired agreements. The City and the Unions occasionally disagree on the interpretation or application of specific terms under the expired agreements. When these disputes arise, the City and the Unions have agreed to resolve them through a contractual grievance procedure, which culminates in arbitration (sometimes referred to as "issue arbitration" process that concerns new substantive terms for a success contract).

Issue-arbitration decisions can also impact the reform efforts of the consent decree. For example, in January 2019, an arbitrator issued an opinion and award regarding interpreting and applying specific terms in the City's expired agreement with the FOP. Specifically, the arbitrator considered whether CPD Bureau of Internal investigators may, after identifying objective verifiable evidence, designate themselves complainants in order to proceed with an investigation of an anonymous complaint. The arbitrator held that this practice violates the terms of the expired agreement with the FOP, which directly impacts the BIA's ability to investigate anonymous complaints.

Likewise, in January 2020, the CPD started a Unity of Command and Span of Control pilot program in the 6th District to test reform efforts under the Supervision section of the consent decree. *See, e.g.*, ¶¶360, 362, and 364. This pilot program included, among other things, changing the days-off groups from six to three. In response, the FOP filed, among other things, a grievance, alleging that the pro-

---

proper retention and destruction of government records) (citing the Local Records Act, 50 ILCS 205/, and the State Records Act, 5 ILCS 160/).

gram violated the terms of the expired agreement. On February 26, 2020, an arbitrator sustained the FOP's grievance. In response, the City and the FOP began further negotiations on the issue.[181]

These decisions reflect the importance of the City's efforts to bargain modifications to its collective bargaining agreements to comport with the language and provisions of the consent decree. Moving forward, the IMT will continue to monitor and report on the City's efforts to secure modifications that are consistent with the consent decree and that do not compromise the collective-bargaining process or any rights in that process.

---

[181] In the City's comments, COPA highlights an April 2020 arbitration decision (after the reporting period) regarding the PBPA, Unit 156's three collective bargaining agreements. *See* Attachment B. Without modifications, this decision is also likely to impact how the City will address anonymous complaints. The IMT is monitoring and will continue to monitor these developments and report on those developments in the next monitoring report.

# Conclusion and Looking Ahead to Independent Monitoring Report 3

The IMT has finished its monitoring efforts for the second reporting period (September 1, 2019 through February 29, 2020). The City did not meet many of the consent-decree requirements within the deadlines set by the City and the OAG and approved by the Court. The City, its entities, the OAG, and the IMT also continued to face various administrative obstacles to consistent and efficient record and data production. Despite existing and emerging challenges, the Parties and the IMT continue to work together to improve policies, training, and practices.

In the near future, the IMT will release several reports to reflect additional consent-decree efforts, challenges, and achievements. These will include the following reports:

- The IMT's Monitoring Plan for Year Two;

- The IMT's special report on the IMT's 2019 Community Survey; and

- The IMT's special report regarding the City's and the CPD's responses to 2020 protests and unrest.

We are encouraged by the recent city- and nation-wide attention to police reform, and we are hopeful that the reform efforts by many members of the City; the CPD; COPA; the Chicago Police Board; the OIG, including the Deputy PSIG; the OEMC; and the OIG will continue and increase. Significant and sustained efforts are necessary to achieve the goals of the consent decree.

The IMT's next semiannual report will cover the reporting period from March 1, 2020, through August 31, 2020. In Year Two, we will continue to work with the City and the OAG to address the paragraphs we assessed in the first and second reporting periods. As we will describe in our forthcoming Monitoring Plan for Year Two, we will also be assessing a commensurate number of new requirements for the third and fourth reporting periods.

# Attachment A.
# Office of the Illinois Attorney General
# Comments, June 5, 2020



# OFFICE OF THE ATTORNEY GENERAL
## STATE OF ILLINOIS

**KWAME RAOUL**
ATTORNEY GENERAL

June 5, 2020

Margaret A. Hickey
Independent Monitor
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
***Via Email*** (MHickey@schiffhardin.com)

**Re:     Comments on the Second Independent Monitoring Report
Consent Decree, *Illinois v. Chicago*, 17-cv-6260 (N.D. Ill.)**

Dear Ms. Hickey,

The Consent Decree gives the Parties—the City of Chicago and the State of Illinois, through the Office of the Illinois Attorney General (OAG)—an opportunity to comment on the Second Monitoring Report (Second Report) before it is filed with the Court. The OAG provides these comments at a time when the nation is experiencing a profound crisis of confidence in law enforcement in the wake of Minneapolis police officer Derek Chauvin's brutal suffocation of George Floyd, while other officers participated or failed to stop it. Floyd's death opened for many Chicagoans the still-fresh wound of Laquan McDonald's murder and cover up at the hands of Chicago police officers. Chicago Mayor Lori Lightfoot reacted by saying, "There but for the grace of God goes Chicago." It is with a heavy heart that we agree. The death of George Floyd and the calls to action that have followed demonstrate the "fierce urgency of now." Now is the time for the City to implement the broad-ranging reforms required by the Consent Decree.

These comments also come in the midst of the COVID-19 pandemic. Our thoughts go out to those officers who were impacted by the pandemic, and we mourn for those who lost their lives from the disease. The City's and CPD's COVID-19 efforts will likely impact the City's ability to meet Consent Decree requirements in the third monitoring period. The OAG's comments are confined

500 SOUTH SECOND STREET, SPRINGFIELD, ILLINOIS 62706 • (217) 782-1090 • TTY: (217) 785 -2771 • FAX: (217) 782-7046
100 WEST RANDOLPH STREET, CHICAGO, ILLINOIS 60601 • (312) 814-3000 • TTY: (312) 814-3374 • FAX: (312) 814-3806
1001 EAST MAIN, CARBONDALE, ILLINOIS 62901 • (618) 529-6400 • TTY: (618) 529-6403 • FAX: (618) 529-6416

to the second monitoring period, which began on September 1, 2019 and ended on February 29, 2020, before Governor Pritzker and Mayor Lightfoot implemented "stay at home" orders.

The OAG continues to closely track Consent Decree implementation. The OAG reviewed and commented on approximately 100 policies, training materials, plans, and other materials related to Consent Decree compliance in the first year, around 65 of which were in the second monitoring period. The OAG reviewed thousands of additional documents and participated in bi-weekly calls with the Monitoring Team, the City, and CPD on each major topic area in the Consent Decree. The OAG also meets regularly with the Coalition[1] and regularly reviews and responds to community feedback.

The City and CPD made some progress toward meeting the requirements of the Consent Decree in the second monitoring period. For example, CPD put in place necessary infrastructure to train officers, to improve supervision, and to clarify its promotions process. And Interim Superintendent Beck committed additional resources in key areas, such as Crisis Intervention, the Force Review Division, and Research and Development. Newly confirmed Superintendent David Brown has affirmed that implementing the Consent Decree is an urgent priority and has repeatedly emphasized that the Consent Decree is the "minimal standard" that CPD plans to exceed.[2]

There is, however, much work to be done to achieve these aspirations. According to the Monitoring Team, the City reached some level of compliance with only 27% of the paragraphs of the Consent Decree that the Monitoring Team assessed in the first year (37% of those with deadlines). And the City continues to fall behind schedule, having missed around 70% of deadlines for compliance in the first year. These delays preceded the impacts of the COVID-19 crisis, which will undoubtedly further slow the City's efforts to achieve compliance. As we stated in our comments on the first monitoring report,[3] some of these delays continue to be a result of insufficient resources devoted to policy development and document production. The City and CPD have also failed to demonstrate a commitment to culture change in use of force and transparency. They have failed to meaningfully engage community members in policy development, training, and policing strategies. And the City and CPD have done little to reform the City's largely ineffective police accountability system.

---

[1] The Coalition consists of plaintiffs in two lawsuits against the City related to police practices, as well as other civil rights and community organizations in Chicago. The Coalition has certain enforcement rights under the Consent Decree.

[2] *See* Patrick Smith, *City Council Committee Approves David Brown as Chicago Police Superintendent*, WBEZ (Apr. 20, 2020), *available at* https://www.wbez.org/stories/city-council-committee-approves-david-brown-as-chicago-police-superintendent/6afecb22-77be-4088-bc0f-e10fb52ef5a7.

[3] *See* OAG Comments on the First Independent Monitoring Report, *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/11/OAG-Comments-on-First-IMT-Report.pdf.

In the coming year, the City and CPD must:

- implement best practices in its use of force policies;
- develop and implement a comprehensive plan to meaningfully engage community members;
- commit to reform and devote the time and resources necessary to ensure that complaints of misconduct are timely and fully investigated and officers are held accountable for misconduct;
- allocate the necessary resources and staff to ensure that reform moves forward quickly, without sacrificing quality; and
- commit to a culture of transparency with the Monitor, the OAG, and the public.

Below are the OAG's comments on the state of the City's compliance efforts and the Second Report. First, the OAG summarizes the City's major compliance efforts in each area of the Consent Decree.[4] Second, the OAG outlines three key obstacles that must be overcome to achieve Consent Decree compliance. Third, the OAG offers specific feedback about the Second Report.

## Summary of the City's Compliance Efforts

### Areas with Continuing Challenges
*(1) Accountability and Transparency, (2) Impartial Policing, and*
*(3) Data Collection, Analysis, and Management*

As the OAG expressed to the City and CPD on many occasions during this period, the City and CPD's compliance efforts in ***Accountability and Transparency*** have been woefully inadequate. A fair and functional accountability system with real consequences is not only critical to Consent Decree implementation but is an important step towards CPD gaining the community's trust. Both CPD's Bureau of Internal Affairs (BIA) and the City's independent police oversight agency, the Civilian Office of Police Accountability (COPA), are far behind in implementing necessary reforms.

CPD does not currently have the capacity to implement the accountability requirements of the Consent Decree in a timely manner and has fallen far behind even the schedule it set for itself for policy development in this area. The United States Department of Justice (DOJ) characterized the City's accountability structures and systems as, in a word, "broken."[5] Fixing these systems will

---

[4] The Consent Decree is divided into 10 subject matter areas: (1) Community Policing; (2) Impartial Policing; (3) Crisis Intervention; (4) Use of Force; (5) Recruitment, Hiring, and Promotion; (6) Training; (7) Supervision; (8) Officer Wellness and Support; (9) Accountability and Transparency; and (10) Data Collection, Analysis, and Management.

[5] Department of Justice ("DOJ") Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (Jan. 13, 2017) at 53, *available at*

not happen without sustained investment. The City and CPD must make numerous policy changes, implement significant new training, and, most importantly, fundamentally change its practices. Recognizing the deep problems within CPD's investigative functions and the critical need to make significant changes quickly, the Consent Decree requires an almost complete re-write of nearly every policy used by BIA and a re-draft of several Department-wide directives—and this is supposed to have occurred within the first year. Very little of this work is complete and almost all of it is past due.[6] CPD's first-year plan to use existing BIA leadership and staff to research and draft new accountability policies—with no material outside assistance—was not realistic and did not work. Without an infusion of high-quality technical assistance, policy changes that are urgently needed will take years.

Although COPA has made more progress on training and policy development, it is still behind in meeting the requirements of the Consent Decree. COPA must ensure its policies clearly articulate its expectations for complete investigations, and it must improve the consistency and effectiveness of its training. Instead of focusing on these essential tasks, COPA spent a significant amount of the Monitor's, the City's, and the OAG's time arguing that it was exempt from the policy and training review process in the Consent Decree. After several months of negotiations, COPA agreed to allow the Monitor and the OAG to provide feedback about policy revisions and trainings at the earliest possible stage and to permit the public an opportunity to review and comment on new and revised policies. The OAG did not anticipate that COPA would initially adopt such an oppositional approach to the oversight process established by the Consent Decree. The OAG looks forward to a more collaborative relationship with COPA in achieving our shared goals of achieving constitutional policing and improving community trust in CPD.

Finally, the City systems for investigating officer-involved shootings and deaths continue to be troubling. The OAG is concerned about COPA's capacity to timely respond to and take command of the scene of an officer-involved death and about its delays in interviewing key witnesses and completing investigations. CPD also continues to be far too involved in the investigation of officer-involved deaths, which must, by law, be investigated by an outside agency. Resolving these issues will be a significant challenge in the coming monitoring periods.

In *Impartial Policing*, the City completed only one of eight policies required for compliance in the first year. CPD did not complete policies on important issues, such as language access, sexual misconduct, and accessibility for people with disabilities. Meaningful community input from people with expertise and lived experience is required for the policies in the Impartial Policing section of the Consent Decree. Although CPD delivered early drafts of several policies to the OAG and the Monitor, it only began significant community engagement on one policy. CPD has also

---

http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-POLICE-DEPT REPORT.pdf (hereinafter, "DOJ Report").

[6] COPA and CPD have only achieved some level of compliance with approximately 11% of the requirements the Monitor assessed this year.

been slow to incorporate the OAG and Monitoring Team initial feedback, all of which was delivered to CPD within the timeframes set by the Consent Decree.

In ***Data Collection, Analysis, and Management***, CPD is still far behind in two critical initiatives: (1) implementing a credible audit of body worn camera footage; and (2) assessing CPD's current information systems and data technology. In general, the OAG has significant concerns about CPD's data management. The OAG is concerned about inconsistencies across data platforms, units, and applications. CPD also fails to conduct regular evaluations of its data collection systems, including how CPD uses its data systems, how its data is managed, and how its data systems are or should be structured. CPD has indicated that it intends to contract with an independent third-party vendor to assess its information systems. CPD has made some progress implementing the Early Intervention System, which will help identify at-risk conduct by officers. CPD also created a use of force "dashboard" to share data about uses of force, but it has not yet made the underlying data publicly accessible, as is required by the Consent Decree.

## Areas with Mixed Progress
### *(1) Community Policing and (2) Use of Force*

In ***Community Policing***, the Office of Community Policing (OCP) piloted a promising new initiative to assign officers in each district to develop community relationships and solve chronic problems identified by residents. It also developed several policies, including a system for tracking performance on community policing metrics. However, much of OCP's work is still in its infancy,[7] and the OAG continues to have concerns that CPD is not doing enough to make community policing the philosophy of the whole Department, not just OCP. For example, the Consent Decree requires that the City ensure its Department-wide crime reduction strategies are consistent with the principles of community policing. The City has not reviewed key strategies and tactics—such as the use of accurate search warrants, the replacement and reform of the "gang database," and summer and holiday policing strategies—to meet this goal. In particular, the OAG has seen no evidence that these Department-wide strategies were informed by input from the communities most impacted. The City will not improve its relationship with the communities it serves, particularly communities of color, if it does not fundamentally change the way it engages with them. This is especially critical in this moment, as community trust in the police is at risk of further erosion because of many Chicagoans' concerns about police tactics used in response to citywide protests over the killing of George Floyd and systemic police violence.[8]

---

[7] For example, nearly three years after CPD agreed to accept comprehensive recommendations of the Community Policing Advisory Panel, the Department now asserts the Consent Decree only requires it to make a plan to implement those recommendations, and not to actually ensure such recommendations are in fact implemented.

[8] Dan Hinkel, *Why Chicago Police Department reform moves slowly despite cries for immediate change*, CHICAGO TRIBUNE (June 4, 2020), https://www.chicagotribune.com/news/breaking/ct-met-police-reform-chicago-20200604-7rxm2wft6zfbpjt5xnevvhdygm-story.html.

The City has made progress developing policies and trainings addressing many of the ***Use of Force*** requirements of the Consent Decree. However, CPD continues to be reluctant to change its culture as it relates to use of force and to hold officers accountable for excessive force. CPD refused to incorporate emerging national best practices into its revised policies and training. For example, CPD refused to mandate that officers use the "minimum amount of force necessary" to effect an arrest, CPD did not include special considerations for the use of force against individuals with physical, emotional, and psychological disabilities, or individuals in crisis, and CPD refused to train officers that pointing a weapon at a person unnecessarily may cause that person psychological harm and damage community trust in the police. The OAG also had to threaten to take the City to court to get CPD to agree to train officers that the unreasonable pointing of a firearm can constitute excessive force under the law.

The OAG is also concerned that the City's process for reviewing uses of force is not sufficiently focused on identifying trends or developing recommendations regarding modifications to tactics, equipment, training, and policy. For example, while the Force Review Division issued recommendations to individual members after use of force incidents, the OAG did not receive evidence of it making any written Department-wide recommendations for substantive changes to CPD policy, tactics, equipment, or training. The Force Review Division is still relatively new, and CPD can ensure it meets its obligation going forward to provide recommendations regarding trends and tactics in uses of force and firearm pointing incidents. But it must urgently change course.

**Areas with Progress:**
*(1) Recruitment, Hiring, and Promotion, (2) Training,*
*(3) Supervision, (4) Crisis Intervention, and (5) Officer Wellness and Support*

In two critical areas—Recruitment, Hiring and Promotion; and Training—CPD has made progress. In ***Recruitment, Hiring, and Promotion***, CPD has begun making improvements to its promotions process. It hired an independent consultant to conduct an analysis of its captain and commander ranks. It also ended merit promotion, which many officers perceived as unfair. The OAG looks forward to working with the City and Monitor to ensure the process that replaces merit promotion is equitable, transparent, designed to elevate supervisors who will uphold and embody constitutional policing, fosters increased diversity within the leadership ranks, and is perceived as legitimate within the Department. In ***Training***, although staffing continues to be a concern, CPD has materially increased the number of hours of training officers receive. This increase is critical because training is foundational to changing officers' behavior. Moving forward, CPD must continually assess officers' comprehension and retention of training material and adjust its training based on those assessments. CPD will also have to move aggressively to make up training time that has been lost due to the unforeseen challenge of the COVID-19 pandemic.

The City has also made efforts in Crisis Intervention and Supervision but is far from meeting the core requirements of the Consent Decree in those sections. In **Crisis Intervention**, CPD and the Office of Emergency Management & Communications continue to struggle to collect and validate the data necessary to ensure timely responses to calls involving individuals in crisis. And recruiting qualified officers to serve as certified crisis intervention officers continues to be a challenge, as the position requires specially trained officers to respond to some of the most difficult calls for service. CPD must improve its recruitment efforts because officers who are well trained to interact with people in crisis are better equipped to reduce the need to use force, save lives, and keep officers and the public safe.[9]

The **Supervision** section requires that by 2022, CPD must ensure that no more than 10 officers report to a single supervisor. CPD's existing *ad hoc* staffing provides little incentive or opportunity for supervisors to guide their subordinates or hold them accountable if they deviate from CPD policy or the law.[10] Effective supervision helps prevent officer misconduct and increases public trust and safety.[11] CPD invested significant time and resources in this monitoring period developing and rolling out a pilot program in one of its 22 police districts to implement the new staffing model. Unfortunately, an arbitration decision may delay CPD's pilot, and it is not clear that CPD has the necessary staffing to sustain the model. Moreover, CPD has done little to ensure that its policies for supervisors set out clear responsibilities for compliance with the requirements of the Consent Decree. Without these policy changes, increased supervision will mean little.

CPD has also made progress in **Officer Wellness and Support**. CPD's Professional Counseling Division is led and staffed by dedicated individuals with diverse training and backgrounds. However, CPD has yet to complete an Officer Support Systems Plan, which must include a comprehensive suicide prevention initiative, to address officers' wellness needs. CPD must prioritize finalizing this plan, which must incorporate an aggressive timeline for implementation.

### Challenges to Full and Effective Consent Decree Implementation

### Robust Community Engagement

The OAG agrees with the Monitoring Team's concerns about the absence of high-quality, targeted community engagement related to impartial policing and community policing during the monitoring period.[12] CPD relied primarily on four "Community Conversations" as its engagement strategy for policy development in this period. As the Monitoring Team highlighted, these meetings were problematic. They did not sufficiently reach those with relevant knowledge or personal experience, covered too many topics at a single time, and did not provide a comfortable

---

[9] DOJ Report at 37.
[10] *Id*. at 105.
[11] *Id*.
[12] See the introduction to the Impartial Policing section of the Monitor's Report.

environment for community members to express their true feelings. In contrast, the Transgender, Intersex, and Gender Nonconforming workgroup, convened by the Mayor's Office, provides a more promising model for community engagement. It relied on trusted community organizations to convene members, included people with lived experience and relevant expertise, and the City made changes based on the group's feedback.

Broadly, the Consent Decree calls for meaningful community engagement from a cross section of Chicagoans on a wide variety of subjects, including policy development, training, and crime reduction strategies. Consequently, the City and CPD need a comprehensive community engagement plan. At a minimum, an effective community engagement plan should:

- Identify the audiences to be engaged and strategies for reaching each audience;
- Provide multiple, varied engagement methods tailored to the intended audiences and goals of engagement and ensure that those who choose to engage are actually heard;
- Provide sufficient context so community members' feedback is informed, useful, and actionable; and
- Outline steps to consider and incorporate feedback from participants and to follow up with those who provided feedback.

An effective community engagement plan should be public and should be created in collaboration with community members and organizations, as well as the Coalition, the Monitoring Team, and the OAG. The OAG looks forward to continued discussion about this critical issue.

**Transparency**

The City and CPD have not been sufficiently forthright with the Monitoring Team, the OAG, and the public about their challenges in achieving Consent Decree compliance and broader police reform. For example, the City's and CPD's failure to provide the public with access to downloadable use of force data via CPD's web-based dashboard hinders the public's ability to obtain a clear understanding of the patterns and practices of force in the Department. And the City's and CPD's reluctance to fully involve Coalition and community members early in the process of policy development and to provide them with sufficient information about the policies under review has hindered the community's ability to provide meaningful feedback.

The City's ability and willingness to produce information related to Consent Decree implementation was again a significant challenge in the second monitoring period. The OAG and the Monitoring Team have submitted many requests for information. But the City and CPD did not devote sufficient resources to responding to requests. Again in this period, the majority of requests the Monitor and the OAG submitted did not yield a timely or complete response, and the City and CPD again supplied most responsive documents at the very end of the monitoring period.

The City continues to prioritize providing information that supports its compliance efforts over information that might yield a more unvarnished view of the state of reform efforts within the City.

For example, the City has so far not provided the IMT and the OAG with information responsive to several important inquiries, such as:

- Complete documentation of community engagement efforts;
- Information about the disciplinary and litigation history of those in key accountability functions, including those serving in BIA, in the Force Review Division, and as Accountability Sergeants in the Districts;
- Information about summer and holiday violence plans;
- Complete and timely information about collective bargaining issues and negotiations;
- Materials related to the disciplinary process, including sample verbal abuse investigative files and affidavit override forms; and
- Representative samples of Firearm Pointing Incident reviews.

Of the requests the OAG prioritized in the second monitoring period, the OAG received a complete response to approximately 30%. The City also failed to provide the OAG access to CPD systems that would allow it to directly access information responsive to its requests for information and forced the OAG to make repeated inquiries to gain access to trainings.

## A Schedule to Address Past Due Requirements

For several months, the OAG has repeatedly requested the City and CPD work with the Monitoring Team and the OAG to draft a plan to address past due requirements. The OAG recognizes that presently any plan will be complicated by the pressing needs of the COVID-19 response. But the City must develop a concrete, publicly transparent plan with new targets, and it must outline the resources it will devote to ensuring those targets and future deadlines are met. The Parties agreed to the deadlines in the Consent Decree. In order to be accountable to the public and the agreement the Parties signed and the Court approved, the City and CPD must draft a plan to get current, obtain the OAG and Monitor agreement to that plan, seek Court approval, and post it publicly. Currently, the City is pursuing its own undisclosed schedule for meeting Consent Decree requirements, which is inconsistent with the agreement it negotiated and the expectations of the public it serves.

## Additional Comments about the Second Report

We are concerned that the report obscures the extremely slow pace of the City and CPD's progress. The OAG does not see a material distinction between paragraphs with deadlines in the first year and those without deadlines. Many important requirements in the Consent Decree do not have a deadline for compliance, including critical requirements related to de-escalation, diversion, body-

worn cameras, and numerous requirements related to investigations of officer misconduct. In most cases, the paragraphs without deadlines were intended to be implemented in all due haste.

The OAG also has concerns that the Second Report does not contain analysis of the City's efforts to meet compliance with the "best efforts" provisions of the Consent Decree, which require the City to take all reasonable steps to obtain modifications to its collective bargaining agreements (CBAs) or secure legislative change. For example, the Consent Decree requires the City to make best efforts to change requirements that complaints of misconduct are accompanied by sworn affidavits and to end restrictions on the investigation of anonymous complaints. These requirements prevent COPA and CPD from investigating most misconduct complaints. The Consent Decree also requires the City to make best efforts to ensure that disciplinary records are retained indefinitely and that complainants are not revealed to officers prior to a misconduct interrogation. The report does not describe the status of the City's efforts to renegotiate its CBAs with its unions. The OAG believes its critically important for the Monitor to evaluate and publicly report on the City's efforts to meet these obligations.

Finally, the OAG does not agree with the compliance determination and narrative in some areas. For example, the OAG does not agree that the City has made good progress to "ensure there are adequate policies and practices in place to encourage and protect CPD members who report potential misconduct by other CPD members." CPD's draft policy is inadequate. Likewise, we disagree that CPD has demonstrated that it trained all officers on foot pursuits. The OAG also noted that it has not had the benefit of reviewing or hearing the City's concerns about the Second Report. If the Second Report changes substantially in response to the City's comments, the OAG will apprise the public of any additional concerns with the compliance determinations.

## Conclusion

The Consent Decree requires a tremendous amount of work from the City and CPD. While there are significant challenges ahead, they can be overcome through increased collaboration, transparency, and a stronger commitment to public accountability. The OAG looks forward to working collaboratively with the stakeholders of this Consent Decree during the third monitoring period to overcome the challenges the OAG has identified and to make continued progress on achieving sustainable reform.

For the State of Illinois,

KWAME RAOUL
Attorney General

Respectfully,

/s/ Shareese Pryor
Shareese Pryor
Chief, Civil Rights Bureau
Office of the Illinois Attorney General
100 W. Randolph, 11th Floor
Chicago, IL 60601
(312) 814-3368

/s/ Alicia Weber
Alicia Weber
Office of the Illinois Attorney General
Deputy Chief, Civil Rights Bureau
100 W. Randolph St., 11th Floor
Chicago, Illinois 60601
(312) 814-5093

cc: Tyeesha Dixon and Allan Slagel, Counsel for the City of Chicago; Dana O'Malley, General Counsel for the Chicago Police Department (via email)

# Attachment B.
# City of Chicago Comments
# June 13, 2020

**City of Chicago's Comments to**
**Second Independent Monitoring Period (IMR2) Report**

Pursuant to Consent Decree Par. 663, the City of Chicago provides the following comments to the Independent Monitoring Team's (IMT) June 2, 2020 draft *Independent Monitoring Report 2*. The City's comments follow the order of sequence in the draft report. The City looks forward to continued collaboration with IMT to continue to progress compliance in the next monitoring period. The City thanks IMT in advance for considering these comments prior to finalizing the IMR2 report.

Par. 15      The draft report indicates that CPD missed the 8/28/19 deadline for this paragraph because "CPD did not provide the command staff with community policing principles guidance for district-wide crime reduction strategies within six months of the Consent Decree's effective date." However, later the narrative states that "CPD provided district-wide guidance in an August 2019 briefing to District Commanders and staff." The City believes the August 28, 2019 was met based on the IMT's conclusion that the briefings occurred in August 2019 and respectfully requests that IMT consider reevaluation of this assessment.

Par. 39      The City believes it has achieved preliminary compliance with this paragraph and respectfully requests that IMT consider the following in its compliance assessment:

Par. 39 requires that before the 2019-2020 school year begins, CPD will develop and implement screening criteria for school resource officers (SROs). CPD complied with this requirement by including the selection criteria in policy, Special Order S04-01-02, *School Resource Officers and Investigations at Chicago Public Schools*, effective August 29, 2019. The 2019-2020 school year started 9/3/19. The City and CPD provided explanation and evidence of same in the production dated 1/14/20.

IMT's narrative recognizes that CPD developed screening criteria and suggests that CPD was nonetheless non-compliant with Par. 39 for three reasons: (1) insufficient community input; (2) the criteria do not align with national standards; and (3) insufficient evidence of consultation with Chicago Public School (CPS). The City addresses each of these issues in turn.

One, as IMT acknowledges, CPD and CPS "held a series of community meetings soliciting input from community members and stakeholders about School Resource Officer selection criteria." However, the narrative does not appear to explain why these meetings were not sufficient to achieve the threshold level of

preliminary compliance. The IMR1 report included a description of the 19 stakeholder input sessions CPD and CPS hosted and concluded that CPD "considered the input from both community meetings and SRO focus groups . . . and formulated the selection criteria for SRO officers."

Two, the draft report states that the criteria do not align with NASRO standards. Respectfully, the City and CPD do not agree this should preclude preliminary compliance. As IMT notes in the IMR1 report, CPD did "consult[] and review[] NASRO standards" to develop the criteria. However, CPD did not have the benefit of IMT's formal comments when drafting the criteria. In drafting the criteria, CPD declined to adopt some of these standards because it determined they were not applicable to large municipalities like Chicago, were not operationally feasible at the time, and/or did not align with the public input received. CPD will of course reassess this year whether additional adjustments are needed to the selection criteria for the next school year based on additional community input, best practice, and IMT and OAG input.

To the extent IMT's finding of non-compliance is informed by the fact that CPD did not incorporate IMT feedback into the selection criteria, the City respectfully believes this would not be appropriate for preliminary compliance assessment. Due to the unique construction of the Consent Decree's specific review timeline for the SRO-related materials, IMT provided recommendations for the selection criteria on 9/29/19, after the school year had already started and the policy was already effective. Therefore, CPD could not consider this feedback in establishing the 2019-2020 criteria.

Finally, IMT suggests that CPD did not provide sufficient evidence of consultation with CPS in developing the criteria. However, the IMR1 report concluded that "CPD . . . coordinated with the Chicago Public Schools to finalize the selection criteria."

Par. 40

As the draft report acknowledges, consistent with the requirements of Par. 40, CPD developed and made effective prior to the start of the school year Special Order S04-01-02, *School Resource Officers and Investigations at Chicago Public Schools*. IMT's narrative suggests that preliminary compliance was not met, however, because the policy does not reflect best practice by declining to adopt the "triad model", which dictates that in addition to a law enforcement role, SROs should serve counselor and lecturer capacities in schools. The City and CPD respectfully disagree that adopting the triad model in the 2019-2020 policy was necessary to achieve preliminary compliance.

First, as noted above, CPD was not able to incorporate IMT's 9/29/19 recommendations into the 2019-2020 policy due to the unique review process outlined in the Consent Decree for SRO-related materials.

Second, CPD and CPS believe it is critical to solicit public and stakeholder feedback on this model prior to explicitly adopting it in policy.  As discussed with IMT, the City plans to solicit feedback on this specific issue during 2020 community engagement on the policy.

Par. 42        As the draft report acknowledges, CPD developed and delivered an initial training to SROs prior to the start of the 2019-2020 school year.  A 40-hour course was developed and delivered by NASRO, and CPD and CPS delivered a supplemental day of training to address Chicago-specific issues and policies.  The report states that IMT "cannot determine Preliminary Compliance until the training aligns with this paragraph's requirements."  However, the narrative does not appear to explain which of the requirements of Par. 42 are not satisfied. The City and CPD believe all the requirements laid out in Par. 42 were addressed in the training.  Further, the City and CPD believe the 2/29/20 deadline was met, as the training was delivered to SROs prior to 9/3/19.

Second, as discussed above with regard to the SRO policy, due to the unique construction of the Consent Decree's review timeline for the training, IMT did not provide comments on the training until 12/31/19 and 1/16/19.  Therefore, CPD was not able to incorporate IMT's comments into the training delivered prior to the start of the school year (*see also* Par. 43, requiring CPD to adopt the IMT's revisions before the 2020-2021 school year).  As such, the City and CPD do not believe CPD's inability to incorporate IMT's feedback should preclude preliminary compliance.

Finally, the City believes Par. 42 contains two deadlines; because the initial training was delivered in 2019, the requirement to deliver annual refresher training has not yet ripened.  Therefore, the deadline for the refresher training would be 12/31/2020.

Par. 44        A draft MOU was provided to the Monitor for review in August 2019. CPD and CPS finalized the MOU, which was presented to the CPS Board, approved in late summer 2019, and publicly posted. The MOU addresses the services that CPD agreed to provide to designated schools from September 2019 to August 2020. The City and CPD believe the MOU and policy align and therefore would request additional explanation as to the discrepancies to which IMT is referring.

3

| Par. 63 | The City and CPD would like to note that the Coalition has been provided the draft policy for their review. This occurred after the close of IMR2. |
|---|---|
| Par. 70 | The City would like to clarify that the Coalition will not be able to participate in the interviews themselves due to the City's hiring rules. The Coalition has been informed of same. The Coalition's input during the development of the interview materials was utilized and appreciated. |
| CIT Section (General) | The City respectfully requests that IMT consider revisions (many of which are addressed below) to acknowledge effort expended, when appropriate, as in other sections of the report. The City (in particular CPD's CIT unit, OEMC, and the Mayor's Office) has invested significant time, resources and effort support this complex program in the first year of the Consent Decree. The section, at times, reflects limited avenues for compliance rather than as provided by the Consent Decree the range of acceptable or best practices. |
| Par. 89 | Par. 89 requires that the CIT Program "review and, *if necessary*, revise its policies and practices to ensure the program's compliance with the objections and functions of the CIT Program" (emphasis added). The CIT Coordinator's review process is therefore the foundation of the paragraph's requirement, and revision is only required as necessary. As the narrative indicates, CPD established a process that allowed for CIT Coordinator review, and underwent an extensive review process during the period. The City would therefore request a more detailed explanation of the methodology for preliminary compliance with this paragraph if IMT maintains that preliminary compliance has not been achieved. |
| Par. 99, 129, 131, 137 | The third paragraph states that input from the Advisory Committee was accomplished in a "minimally acceptable manner." The statement implies a measure of levels of compliance not provided for in the Consent Decree or required by IMT in other sections. Further, the reasons advanced for this conclusion do not appear supported by record evidence. For instance:

The City is not aware of the Advisory Committee members requesting different hours for subcommittee meetings, and none provided the City feedback that the hours were problematic. Moreover, the members provided the opportunity to review and submit comments anytime, not just during the meetings.

The Advisory Committee includes approximately 100 partner |

4

organizations, many of whom represent, advocate for, and are people with lived experience. To allow for such a large committee, the subcommittees were created (and only after a vote from the full committee). All Advisory Committee members were given the opportunity to participate in the subcommittee that engaged in the review process.

The Consent Decree does not require that recommendations be voted on by the entire CIAC. Indeed, this would be contrary to the principle that all views, including views of the group minority, should be considered. Moreover, the Advisory Committee itself did not seek to impose on itself such formal strictures.

Par. 107    The City respectfully submits that the narrative does not explain the reason this paragraph did not achieve preliminary compliance. It cites methodological limitations, but does not explain what those are; nor does it explain why the underlying data do not support the CPD's analysis. The City would request additional explanation of IMT's methodology for analyzing the data. This methodology is important to the City because it will affect multiple paragraphs in the section regarding response ratios.

Par. 122, 123    The City understands that the Plan was posted to the website prior to Par. 638 review. However, Par. 122 specifically provides that the plan must be published, which the City was attempting to comply with; publication prior to Par. 638 review was merely an oversight, and the City did not attempt to undermine the IMT and OAG review process in so doing. As the IMT is aware, transparency is a fundamental tenet of this administration and any implication otherwise the City believes is not founded.

Par. 142    The narrative refers to the City's failure to respond to a verbal request. However, the City understands that document requests should be made (and responded to) through the established production process. OEMC therefore was not aware that additional documentation was needed for the IMR2 analysis.

Par. 151    Please see attached comments from OEMC.

Par. 232    This requirement has been in CPD policy since 2017. The City and CPD respectfully request the IMT consider a preliminary compliance determination for this paragraph.

Par. 181    The Compliance Status does not reflect secondary compliance, as indicated in the narrative.

| Par. 228 | The IMT's narrative for Par. 205 accurately reflects CPD's position on this requirement, its relationship to LEMART training, and the anticipation of including it into the 2021 policy. |
| --- | --- |
| Par. 425, 426 | Please see attached comments from COPA. |
| Par. 436 | Please see attached comments from COPA. |
| Par. 457 | CPD believes preliminary compliance has been achieved, as the BIA Accountability Sergeant Directive, for which CPD has received no-objection letters from IMT and OAG, satisfies the requirements of this paragraph after the extensive revisions made during the review and comment process. |
| Par. 478 | Please see attached comments from COPA. |
| Par. 479 | Please see attached comments from COPA. |
| Par. 480 | Please see attached comments from COPA. |
| Par. 481 | Please see attached comments from COPA and PSIG. |
| Par. 488 | Please see attached comments from COPA. |
| Par. 498 | CPD seeks additional clarification as to the methodology applied for secondary compliance. |
| Par. 504 | Please see attached comments from COPA. |
| Par. 512 | Please see attached comments from COPA. |
| Par. 522 | Please see attached comments from COPA and PSIG. |
| Par. 526 | Please see attached comments from COPA. |
| Par. 527 | Please see attached comments from COPA. |
| Par. 528 | Please see attached comments from COPA. |
| Par. 532 | Please see attached comments from Police Board. |
| Par. 533 | Please see attached comments from Police Board. |
| Par. 538 | Please see attached comments from Police Board. |

Par. 540, 542      The report states that the City has not provided IMT with material related to the Police Board training since IMR1. However, the training has been discussed on bi-weekly calls and in email correspondence—specifically, that Police Board has identified a consulting expert to assist with the development of these materials.

Par. 561      Please see attached comments from PSIG.

Par. 430      Please see attached comments from COPA.

Par. 443      Please see attached comments from COPA.

Par. 448      Please see attached comments from COPA.



# OEMC – IMR2 Response

<mark>Para. 151</mark>. *Within 180 days of the Effective Date, and annually there-after, OEMC will review and revise its intake and dispatch policies and protocols as necessary to meet the requirements of this Agreement. OEMC will consider any recommendations or feed-back provided by the Advisory Committee when revising its policies.*

## IMT Score

**Preliminary:** *Not in Compliance*
**Secondary:** *Not in Compliance*
**Full:** *Not in Compliance*

## IMT Comments

Though steps towards compliance have been made and are ongoing, the City did not reach a level of compliance by the August 28, 2019 deadline or the end of the second reporting period.

During this reporting period, the OEMC began revising its policies and procedures about prioritizing CIT officer responses for calls involving mental health crises. The OEMC minimally engaged the Advisory Committee and solicited feedback from interested members (we discuss our concerns regarding the procedural operation of Advisory Committee in ¶¶137, above). The OEMC provided the IMT with revised directives, and we provided feedback to the OEMC to help bring their policies into compliance with the requirements of the consent decree.

We appreciate the OEMC's efforts to date in conducting initial revisions. At the close of this reporting period, however, revisions are ongoing, and we do not believe the policies are ready to be finalized or implemented. We look forward to continuing our work with the OEMC in the next reporting period to finalize and implement their revised policies.

## OEMC Response

The OEMC respectfully disputes that it has not met compliance targets for paragraph 151 concerning the annual review and revision of intake and dispatch policies related to this agreement.

In the spring of 2019, training staff from the OEMC met with Commander (then Lieutenant) Ursitti of CPD, a member of the Crisis Intervention Advisory Committee (Advisory Committee), to review three OEMC intake & dispatch policies related to CIT, to ensure that their content and terminology were in compliance with best practice and aligned with CPD policy. Two policies were found to be in compliance as written. The third policy was revised after this review, further reviewed internally, and finalized and distributed to OEMC telecommunicators via training notice in June 2019. A table of these policies and their issuance dates is detailed below:

# OEMC – IMR2 Response

| POLICY NUMBER | SUBJECT | DATE ISSUED |
|---|---|---|
| TNG 11-002P | CIT PROCEDURE AND CAD ENHANCEMENT | 4-Mar-11 |
| SOP 11-001 | CHICAGO POLICE DEPARTMENT MENTAL HEALTH PROGRAM-CRISIS INTERVENTION TEAMS | 8-Mar-11 |
| TNG 19-011 | CIT EVENT-ORANGE COLOR | 6-Jun-19 |

On July 2, 2019, the coordinator for the Advisory Committee requested these policies for review at its July 8th meeting, which the OEMC provided on July 5th. TNG 11-002P and TNG 19-011 were reviewed by the Advisory Committee and found to be in compliance with CIT best practice. SOP 11-001 was not reviewed at that meeting. The Advisory Committee Coordinator made OEMC aware that it had not yet reviewed the third policy on December 4th, 2019, and OEMC training staff answered questions and considered feedback on this policy via teleconference with the Advisory Committee at their monthly meeting on Monday, December 9th.  These policies were provided to the IMT at their request, and the OEMC received written feedback from the IMT on February 2nd (SOP 11-001) and March 16th, 2020 (TNG 11-002P and TNG 19-011).

The OEMC disputes the characterization that it minimally engaged the Advisory Committee, when it provided policies to the Committee on multiple occasions and made subject matter experts available to the Committee when it did not provide feedback after an initial review.

Further, the OEMC seeks clarity on how the IMT found the OEMC to not be in compliance with paragraph 151 even given its accounting of our efforts. The IMT issued updated methodologies for its compliance reviews in December of 2019. Under these revised methodologies, detailed compliance with paragraph 151 is defined as follows:

- *Preliminary Compliance* - The CPD [OEMC] reviewed its crisis intervention-related policies and considered any recommendations or feedback from the CIT Advisory Committee
- *Secondary Compliance* - After considering the recommendations and feedback from the CIT Advisory Committee, the CPD [OEMC] sufficiently revised and issued its intervention-related policies
- *Full Compliance* - Training Methodology; the CPD [OEMC] implemented its revised crisis intervention-related policies

The plain language reading of this methodology implies that the OEMC need only perform an internal review of its policies, make a good faith effort to solicit feedback from the Advisory Committee, and take any feedback into consideration, to meet preliminary compliance. All of these tasks were performed prior to paragraph 151's initial deadline of August 28, 2019. All three policies were also revised or deemed in cimpliance ahead of the August 28, 2019 deadline, two with consideration of feedback from the Advisory Committee, and the third without consideration only because the Advisory Committee did not issue feedback during that timeframe. As described above, the OEMC sought feedback from the Advisory Committee for this third policy and made revisions for same ahead of the end of the second review period.



## OEMC – IMR2 Response

Under this methodology, the OEMC should be found to be, at a minimum, in preliminary compliance as of the August 28, 2019 initial deadline, and in secondary compliance as of the end of the second review period. The OEMC believes that it could also be found to be in secondary compliance ahead of the August 29, 2019 deadline, as the only reason feedback from the Advisory Committee was not considered for the third policy was because feedback was not given, despite the OEMC providing all three policies to the Committee for that purpose. The OEMC also believes it should be found to be in full compliance as of the second review period, as all three policies were revised or deemed in compliance, with Advisory Committee feedback considered, and issued via training notices ahead of the end of the review period, with telecommunicators practicing the policies during the course of their duties.

The IMT seems to have found the OEMC to not be in compliance because it had not reviewed and provided feedback on the policies ahead of the initial August 28, 2019 deadline. Because it had substantive recommendations for the OEMC on these policies, the OEMC has undergone revising these policies and they are currently in draft form. However, this standard is not in our opinion in keeping with the plain language reading of this paragraph, and instead seems to base all levels of compliance on the clause "..*as necessary to meet the requirements of this Agreement.*" Because the IMTs had substantive recommendations, the IMT seems to imply that any previous series of reviews and revisions did not meet the standards of this clause. This standard contradicts the plain language reading of paragraph 151 in its entirety and of the IMTs own written methodology for assessing compliance, which imply the IMT's charge is to ensure the OEMC took the necessary steps and made good faith effort to revise its policies, not that the IMT is to assess the finished product. If IMT approval of the finished product is the standard of meeting compliance, the IMT should state so, and that standard should only apply to full compliance. If, as the IMTs review implies, the OEMC must review policies internally, ensure that both the Advisory Committee and the IMT review and provide feedback, consider that feedback, and revise, issue, and implement prior to even meeting preliminary compliance, then the OEMC is unclear as to what further steps it could take for it to go further in meeting secondary or full compliance, whatever additional standards for those levels of compliance may be.



CIVILIAN OFFICE OF POLICE ACCOUNTABILITY

INTEGRITY • TRANSPARENCY • INDEPENDENCE • TIMELINESS

FROM:       Sydney Roberts, COPA Chief Administrator
            Kevin Connor, COPA General Counsel
            Karlo Flowers, COPA Deputy Chief Administrator
            Kylie R. Byron, COPA Attorney

DATE:       June 12, 2020

RE:         Response to IMR2 Draft – Accountability/Transparency

Initial Matter: We appreciate the Independent Monitoring Team's decision to review each entity within the City, as a party to the Consent Decree, upon its own merits and advances, particularly since those elements of the City are often positioned adversely to one another. We also appreciate the IMT's understanding that 2020 has been a vastly different, and more complex, year than initially anticipated. Just as COPA rallies to meet its new challenges, COPA's responses reflect that effort, and the needs that have arisen alongside the effort.

**Part IX: Accountability and Transparency**

425: COPA, to this point, has permitted anonymous reporting of police misconduct via telephone. A recent arbitration decision in PBPA's favor, however, requires that COPA cease opening Complaint Register files and investigating "truly" anonymous complaints (complaints where the complainant's identity is unknown and whom we cannot contact, rather than simply complaints where the complainant prefers not to give complete information but can nevertheless be identified).

The arbitration decision stated that the City cannot act on a truly anonymous complaint unless the complaint gives rise to suspicion of medical necessity or criminal behavior. COPA and BIA have agreed to log anonymous complaints, and Administratively Close those complaints, using the signifier "Complainant Unknown" and, in the notes, referencing the arbitration decisions. COPA has sent notice of this change and its impact on investigative operations to all impacted staff.

COPA is currently in the process of amending the website complaint portal to allow for receipt of anonymous complaints. We will also be including informative text directing the complainant to our FAQs, which will highlight the bar to investigation of anonymous complaints, so that civilians are aware of its impact.



Going forward, COPA will continue development of its website to meet this goal, and will continue working with Carminati Consulting to modify the CMS system to permit designation of "Complainant Unknown" status for record-keeping purposes.

426: COPA has provided IMT with a copy of its Intake Policy, and will continue to do so as policies are updated. The Log Number, which is unique and sequential based on the year of receipt of the complaint, enables a civilian to track a case through the entire process.

Going forward, COPA would like to conference with the IMT to get more specificity on the changes COPA would have to make to be fully in compliance with this paragraph. Following that meeting, COPA will meet with Carminati to develop a project plan for compliance, which we will submit to the IMT.

436: COPA concurs, and notes only that at this point COPA has no mechanism to know whether CPD has fulfilled its responsibility to report CPD member misconduct to COPA on any given occasion. This is particularly concerning when incidents spark large volumes of complaints.

478: COPA and BIA are working together to develop correct and appropriate policy, subject to change as per resolution of ongoing arbitration and litigation around use of affidavit overrides. Parallel policies are in development.

Going forward, COPA will continue to hold bi-weekly meetings with BIA to develop those policies. We propose starting with a Memorandum of Agreement as to how COPA and BIA will collaborate. Such agreement will specify that, going forward, resulting GOs will incorporate the tenets of the Agreement.

COPA will draft a project plan identifying completion dates for the proposed policy enhancements.

479: COPA concurs that "best efforts" and "aims" are insufficiently precise language to use in outlining the investigative process. Current events, including demonstrations and COVID-19, have required that COPA streamline and refine its investigative approach and its benchmarks, and policy revision will incorporate that understanding.

Going forward, our project plan will include our completion date for review and modification of the investigative process.

480: COPA notes only that, while the City is Not In Compliance, the IMT narrative indicates that COPA is in preliminary compliance with the requirements of 480.

481: COPA is amending policy to include guidelines directing COPA investigators, and, if



necessary, administrators to follow up with the CPD Superintendent when COPA is not in receipt of a response to an authorization request within 30 days, and to reach out biweekly to the CPD Superintendent regarding that request.

COPA is also identifying technical solutions to facilitate COPA's efforts to monitor the Superintendent's compliance. COPA's project plan will include a completion date for these policy changes.

488: There is currently a MOA before the Superintendent which reflects enhanced coordination between COPA and CPD regarding on-scene response, on-scene investigative activities, coordination of interviews, and acquisition of records.

COPA has sent the Superintendent a letter to remind him to move forward with signature of the MOA, but as of this response, COPA's on-scene responses are being carried out in accordance with the MOA.

Going forward, COPA will continue communication with the Superintendent to ensure signature of the MOA, and COPA will provide a Staffing Feasibility study with its project plan.

504: COPA and BIA have had a preliminary meeting on coordinating this effort and on the report format for completed misconduct investigations.

Going forward, we will continue our dialogue with BIA and with the IMT regarding the roles and responsibilities of each Agency with respect to notification and development of parallel summary reports.

512: The mediation project is ongoing at Hillard Heinze.

522: COPA's staffing model has been provided, but staffing needs and procedures have so vastly changed that COPA cannot provide the specificity IMT requires at this time. COPA also notes that across the country, attitudes towards police funding and budgeting are shifting, and that while COPA does not foresee a significant budgeting change upcoming, COPA remains aware that possibilities once considered unlikely must now be accounted for.

526: COPA concurs, with the understanding that the format of training going forward is shifting rapidly, particularly with regards to classroom forensics and class participation. Going forward, COPA anticipates enhancing its training plan and policy to specifically require that all new hires begin COPA Academy training within 180 days of hire, or at the earliest otherwise viable date. Further, as new training is developed at COPA, it will be made clear that Investigators are to complete new trainings within 120 days. COPA will enforce these requirements by requiring Investigators maintain training logs of training attended, including signed statements that they



attended training. Training logs will be submitted bi-monthly to COPA's training officer, who will verify that training was correctly attended in compliance with COPA policies.

Upon hiring, the Director of Training will develop a Training Project Plan to establish completion dates incorporating the changes and enhancements requested.

527: Similarly, COPA will require training logs detail mandatory in-service training. COPA currently denotes Mandatory trainings via Outlook calendar invite, and keeps track of attendance. Investigators will maintain training logs, much the same way attorneys maintain CLE certifications. Training Logs will be submitted to COPA's Training Officer, who will ensure that each investigator has met their eight-hour in-service yearly requirement. COPA will facilitate the completion of the eight hour in-service training requirement by assigning investigators groups separate from their team structure. These training groups ensure that when a training is conducted, COPA is not down an entire team or teams for the duration of the training session.

As a note, COPA has completed nine hours of mandatory in-service training through June 4th. Those nine hours include 1.5 hours on the FOP Collective Bargaining Agreement, 4.5 hours on CPD Rules and Directives, 1.5 hours on Evidence Collection, and 1.5 hours on Domestic Violence incidents.

Going forward, COPA will continue completing lesson plans. Six additional hours of in-service training will be completed by the end of July 30th; specifically: Lockup Procedures (1.5 hours on 6/18), Jurisdiction (1.5 hours on 7/16), Consent Decree Overview and Policy (1.5 hours on 7/23), and Affidavit Overrides (1.5 hours on 7/30).

528: COPA appreciates IMT's acknowledgment of COPA's work on this paragraph.

530: COPA appreciates IMT's review of COPA's Training Plan.

558: COPA is currently investigating the cases noted as containing material deficiencies.

**Foundational:**

430: IMT suggests that COPA should provide complainants who file electronically with a copy of their electronic complaint. COPA concurs. This website feature will be part of the project plan to be discussed with Carminati and submitted to IMT.

443: COPA's request to observe statements was refused by the oversight group. COPA is currently working to determine how to proceed with the requirements of 443 given CPD and CCSAO's objection to COPA's presence at statements. COPA is also consulting with the Child Advocacy Center for greater access to forensic interviews.



<u>448</u>: COPA's upcoming Unified Policy will include a Respect and Professionalism Policy. This will be developed as part of our Policy Project Plan, to be submitted to IMT for approval.

# Office of Inspector General Comments, IMR-2 Draft

## Paragraph 481

Paragraph 481 requires that CPD's Superintendent respond to any requests from BIA, COPA, or OIG to investigate an incident more than five years old within 30 days. The obligation rests with the Superintendent and therefore CPD, with "[t]he City, CPD, and COPA" to "ensure" the Superintendent's timely response.

OIG is found "Not in Compliance," despite having no explicit obligations under this paragraph, and in the absence of any finding by the IMT that OIG failed to ensure timely responses to any requests for authorization to investigate. In consonance with the plain language of Paragraph 481, the IMT's methodologies indicate only a review of CPD's policy and training.

The IMT correctly notes that, in IMR-1, it "suggested" that OIG "ensure that they have systems in place to track requests and responses to the Superintendent." The requirements of the consent decree, however, cannot simply be expanded by "suggestions," and moreover, the IMT's "suggestion" was non-specific. The IMT suggests in the current draft that OIG "can and should develop a policy or procedure that directs…OIG employees in the process of requesting authorization to investigate these incidents…" While OIG appreciates this suggestion and will consider it, it does not in fact bear on the content of the paragraph, which has to do with the timeliness of the Superintendent's response to requests for authorization; furthermore, by way of context for OIG operations, OIG has not had occasion to request authorization from the Superintendent to investigate allegations more than five years old during the effective period of the consent decree.

## Paragraph 522

The IMT notes that the Deputy PSIG's responsive submission to Paragraph 522 "accurately describes the Deputy PSIG's staffing and equipment needs," and that the submission is "thorough, comprehensive, and sufficiently detailed to support its conclusions." The IMT finds, however, that the Deputy PSIG is not in compliance with the requirements of Paragraph 522. This finding apparently rests on the observation that the Deputy PSIG's submission "does not provide a timeline for implementation, as required." In fact, Paragraph 522 applies no such requirement to the Deputy PSIG. The paragraph's sole mention of a timeline is in a sentence which, in specific contrast to the rest of the paragraph, applies only to CPD: "CPD will implement the staffing and equipment needs plans in accordance with the specified timeline for implementation." As the IMT is aware, the Deputy PSIG has no final expenditure authority, and any "timeline for implementation" rests solely and depends entirely upon the City's annual budget process.

# POLICE BOARD – IMR2 Response

*Para. 532. Within 180 days of the Effective Date, the City will draft selection criteria for Police Board members with the objective of identifying individuals who possess sufficient experience, judgment, and impartiality to perform the duties of members of the Police Board. Selection criteria may include prior work in law or law enforcement, and service with Chicago-based community and non-profit organizations. The draft selection criteria will be published on the Police Board's website for a period of 30 days for public review and comment. Following the 30-day public review and comment period, the City will provide the draft criteria to OAG for review and comment. The final selection criteria will be published and maintained on the Police Board's website. The City will ensure that the selection criteria are the basis for future selection of Police Board members.*

## IMT Comments

In the second reporting period, the IMT reviewed the Police Board Member Selection Criteria (dated September 18, 2019) and determined that the City and the Police Board have met Preliminary compliance with ¶532.

To evaluate Preliminary compliance with ¶532, the IMT has reviewed the City's and the Police Board's policies following the policy process described in the consent decree (¶¶626–41), which delineates applicable consultation, resolution, workout, and public comment periods.

The City ultimately presented three versions of the Police Board Member Selection Criteria, and the OAG and the IMT provided the City with feedback and comments on each version, which eventually met the requirements of ¶532.

The IMT looks forward to evaluation the City's efforts toward secondary compliance when the opportunity to select a new Police Board member arises.

## POLICE BOARD Response

The Police Board respectfully disagrees that this deadline was missed. The City drafted criteria prior to August 28, 2019. The draft was sent to the IMT via email by Tyeesha Dixon on August 23, 2019. Because the 180-day deadline in Paragraph 532 above applies only to the drafting itself, not any of the other requirements, it does not seem accurate to report that the deadline was missed.

(A draft of the Police Board member selection criteria was shared with the OAG on 9/17/2019; this was a revised draft based on comments from the IMT. A draft of the criteria was published on the Board's website for public comment on 10/31/2019, after the IMT and OAG reviewed and commented on the draft. However, as noted above, the plain language of Paragraph 532 does not require these steps to be completed within 180 days.)

# POLICE BOARD – IMR2 Response

**Para. 533**. *Within 180 days of the Effective Date, the Police Board will submit selection criteria for Police Board hearing officers to the Monitor and OAG for review and comment. The criteria will be drafted to help identify individuals who possess sufficient competence, impartiality, and legal expertise to serve as hearing officers. The selection criteria will be published on the Police Board's website. The City and the Police Board will ensure that the selection criteria are the basis for future selection of Police Board hearing officers.*

## IMT Comments

In the second reporting period, the IMT reviewed the Police Board Hearing Officer Selection Criteria (dated December 10, 2019) and determined that the City and the Police Board met Preliminary compliance with ¶533.

To evaluate Preliminary compliance with ¶533, the IMT has reviewed the City's and the Police Board's policies following the policy process described in the consent decree (¶¶626–41), which delineates applicable consultation, resolution, workout, and public comment periods.

The City ultimately presented three versions of the Police Board Hearing Officer Selection Criteria to the IMT. The IMT provided the City with feedback and comments on each version, and each version improved and eventually met the requirements of ¶533.

The IMT looks forward to evaluation the City's efforts toward secondary compliance when the opportunity to select a new Police Board hearing officer arises.

## POLICE BOARD Response

The Police Board respectfully disagrees that this deadline was missed. The Police Board drafted criteria on June 20, 2019, and posted the draft on its website for public comment from June 26 through August 22, 2019.

The 180-day deadline in Paragraph 533 above applies only to the drafting and submission of the criteria to the IMT and OAG, not any of the other requirements.

**Para. 538**. *538. Within 90 days of the Effective Date, the City will create a policy for collecting, documenting, classifying, tracking, and responding to community input received during the Police Board's regular community meetings. The policy will outline the methods for: (a) directing community input to the appropriate responding entity, agency, or office; and (b) documenting and making public, all responses to community input.*

## IMT Comments

In the second reporting period, the City maintained Preliminary compliance with ¶538. The IMT was unable, however, to determine that the City met Secondary compliance.

To evaluate secondary compliance with ¶538, the IMT reviewed the City's and the Police Board's training development, implementation, and evaluation (¶286). The IMT evaluates training materials using the "ADDIE model" of curriculum development and implementation as our evaluation standard, which typically incorporates the following elements: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

In the first reporting period, the IMT found that the City was in Preliminary compliance with ¶538 based on the City's relevant policy, Policy Regarding Community Input Received at Police Board Public Meetings, was created before the May 30, 2019, deadline. The policy itself is clear and straightforward, but states that agencies will use "best efforts" to address concerns. The IMT suggested that the Police Board strengthen this language by describing or defining "best efforts" or otherwise by incorporating the other expectations into the policy.

In the second reporting period, the IMT reviewed transcripts from several Police Board meetings that occurred in 2019 and 2020, but based on this information, the IMT is unable to determine whether the City has met secondary compliance with ¶538. The transcripts that the IMT reviewed did not document whether community input was directed to "the appropriate responding entit[ies], agenc[ies], or office[s]." ¶538.

While it could be the case that the Police Board is complying with its policy and training its members on its policy, any documentation that the IMT reviewed was insufficient to establish that the City and the Police Board have met secondary compliance.

Moving forward, the IMT recommends that the Police Board maintain a list of community input from each meeting and document the follow-up with CPD, COPA, and other city agencies/offices regarding specific concerns voiced at meetings.

## POLICE BOARD Response

In response to the IMT's suggestion to strengthen the language regarding "best efforts," the Police Board added a definition of "best efforts" to the policy on October 18, 2019, and posted the updated policy to the Board's website immediately thereafter.

# POLICE BOARD – IMR2 Response

The Police Board respectfully requests that the IMT re-evaluate whether the Police Board has met secondary compliance, as there was available on the Board's website relevant documents that it appears the IMT did not review or consider. Since June 2019 the Police Board has posted on its website alongside the transcripts "Community Input Reports" that document to which agency the community input was directed and includes the response of the agency.

The IMT recommends that the Police Board maintain a list of community input from each meeting and document the follow-up with CPD, COPA, and other city agencies/offices regarding specific concerns voiced at meetings. The Police Board respectfully notes that the Board has been doing this since June 2019—see the "Community Input Reports" posted on the Board's website alongside the meeting transcripts.

Independent
Monitoring Team | Chicago Police
Department
Consent Decree