Aaron Burden, )
                                          )      Case No. 22 C 46
            Plaintiff, )
                                            )      Judge John Z. Lee
v. )
                                            )      Magistrate Young B. Kim
The City of Chicago, and )
Chicago Police Officers Albert Torres (#13067), )
Mohammad Baker (#19740), )
Andrew Kats (#17577), Angelo Dicera (#14902), )
And J.Doe Officers 1-5, )
                                      )
                     Defendants. )

## DEFENDANT CITY OF CHICAGO'S ANSWER TO PLAINTIFF'S COMPLAINT

Defendant City of Chicago ("City") by and through its attorney, Celia Meza, Corporation Counsel, for its answer to Plaintiff's Complaint, Affirmative Defenses and Jury Demand, state as follows:

### INTRODUCTION

1.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to address deprivations of Plaintiff's rights under the Constitution of the United States.

**ANSWER:**    **Defendant City admits this action is brought pursuant to 42 U.S.C § 1983 and Illinois State law, but denies the remaining allegations contained in this paragraph.**

### JURISDICTION

2.     The jurisdiction of the court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983; the Judicial Code, 28 U.S.C. §1331 and §1343 (a); the Constitution of the United States; and this Court's supplementary jurisdiction powers, 28 U.S.C. § 1367.

**ANSWER:**    **Defendant City admits jurisdiction is proper.**

### VENUE

3. Venue is appropriate under 28 U.S.C. § 1391(b), as all defendants reside in this judicial district. In addition, all parts of the events giving rise to the claim occurred in this judicial district.

**ANSWER: Defendant City admits venue is proper.**

## PARTIES

4. Plaintiff Aaron Burden (hereinafter "Plaintiff" or "Mr. Burden") is a United States Citizen who resides in the Northern District of Illinois.

**ANSWER: Defendant City lacks knowledge or information sufficient to form a belief as to the truth or falsity of the whether plaintiff is a citizen and lives in the Norther District of Illinois.**

5. Defendant City of Chicago is an Illinois municipal corporation located within this judicial district and which maintains its own law enforcement agency, the Chicago Police Department.

**ANSWER: Defendant City admits it is an Illinois municipal corporation and that the Chicago Police Department is an agency within the City of Chicago, but denies the remaining allegations contained in this paragraph.**

6. Defendant Officers Torres, Baker, Kats, Dicera, and J. Doe Officers 1-5 were at all times relevant to this Complaint duly appointed and sworn law enforcement officers for the Defendant City of Chicago.

**ANSWER: Defendant City admits that Officers Torres, Baker, Kats and Dicera, at all times relevant hereto were employed by the City of Chicago as Chicago Police Officers. Defendant City makes no answer for any unidentified or unnamed defendants.**

7. When Defendant Officers engaged in the conduct alleged in this Complaint, they were acting in the course and scope of their employment, while on duty, and as agents of Defendant City of Chicago.

**ANSWER: Defendant City admits that at all times relevant to the events at issue in this case, Officers Torres, Baker, Kats and Dicera were acting within the scope of their employment. Defendant City denies the remaining allegations contained in this paragraph. Defendant City makes no answer for any unidentified or unnamed defendants.**

8. At all times material to this Complaint, Defendant Officers were acting under color of state law.

**ANSWER: Defendant City admits that at all times relevant to the events at issue in this case, Officers Torres, Baker, Kats and Dicera were acting under color of law. Defendant**

**City denies any alleged wrongdoing. Defendant City makes no answer for any unidentified or unnamed defendants.**

9.     This action is brought against Defendant Officers in their individual capacities.

**ANSWER:    Defendant City admits Plaintiff brings claims against named officers Torres, Baker, Kats and Dicera in their individual capacity. Defendant City makes no answer for any unidentified or unnamed defendants.**

## FACTS

### Background

10.     Plaintiff Aaron Burden has resided in the Chicago area since 2015.

**ANSWER:    Defendant City lacks knowledge or information sufficient to form a belief as to the truth or falsity of the whether plaintiff lives in Chicago, Illinois.**

11.     Since 2017, Mr. Burden has been stopped, searched, subjected to verbal abuse, and detained by Chicago police on at least eighteen (18) separate occasions.

**ANSWER:    Defendant City denies that this paragraph truly and accurately describes Plaintiffs many traffic stops and moving violations, and therefore denies the allegations of this paragraph.**

12.     It is an all too familiar pattern. Mr. Burden, a Black man, attempts to go about his daily life – walking down the street, riding his bike, stopping at a gas station, driving his car to work with his wife – and Chicago Police Officers target him, handcuff him, use excessive force against him, and berate him, sometimes with threats and racist language.

**ANSWER:    Defendant City denies the allegations contained in this paragraph.**

13.     The unlawful conduct levied against Mr. Burden does not occur in a vacuum – rather, each incident described in this Complaint was caused by the policies, practices, customs, and usages of the Chicago Police Department; a failure to properly train and discipline officers, the maintenance and encouragement of a code of silence within the department, and systemic racially discriminatory, boa-based policing.

**ANSWER:    Defendant City denies the allegations contained in this paragraph.**

14.     The acts perpetrated against Mr. Burden span years, but the city of Chicago's unconstitutional through line of deliberate indifference to its well documented constitutional failings remains in force every day, up to and including the present, causing the continuing constitutional and state law violations against Mr. Burden.

**ANSWER:    Defendant City denies the allegations contained in this paragraph.**

The Chicago Police Department's Repeated Harassment and Violation of Aaron Burden

15. On July 8, 2017. Officer Thomas Spratte, barreling down a road near Mr. Burden's home, nearly hit Mr. Burden while he rode his bike. When Burden gained the officers attention, Spratte stated to Mr. Burden, "why do you gotta act like a child," and yelled that "no one gives a shit" that there were witnesses to his nearly hitting Mr. Burden with the car. He then referred to Mr. burden as a "fucking pussy" before driving away.

**ANSWER: Defendant City denies that this paragraph truly and accurately describes Plaintiffs actions, the officer's statements, or interaction with Plaintiff on July 8, 2017, and therefore denies the allegations of this paragraph. Answering further, Defendant City denies Officer Spratte called Plaintiff a "fucking pussy."**

**Answering further, Plaintiff filed his complaint on January 4, 2022, this incident is barred by the statute of limitations and contained in Defendant City's motion to dismiss.**

16. Officer Spratte also stated "do you think that scares us?... nothing's going to happen" when Mr. Burden stated that he planned to make a complaint, consistent with the culture of impunity enabled and caused by the City of Chicago's deficient training and discipline mechanisms and the department's code of silence.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

**Answering further, Plaintiff filed his complaint on January 4, 2022, this incident is barred by the statute of limitations and contained in Defendant City's motion to dismiss.**

17. On April 30, 2018, as Mr. Burden stood on the street in his neighborhood, enjoying a Spring day, Officers Bernadette Kelly and Gabriela Santana descended upon him, wholly lacking any reasonable suspicion or probable cause.

**ANSWER: Defendant City denies Officers Kelly and Santana lacked reasonable suspicion or probable cause to stop Plaintiff. Defendant City denies the remaining allegations contained in this paragraph.**

**Answering further, Plaintiff filed his complaint on January 4, 2022, this incident is barred by the statute of limitations and contained in Defendant City's motion to dismiss.**

18. Officers Kelly and Santana turned on their vehicle's squad lights, and screamed for Mr. Burden to put his hands up. Mr. Burden complied, reasonably fearing that if he asserted his rights or questioned the officers he would be shot and killed.

**ANSWER: Defendant City denies that this paragraph truly and accurately describes the interaction between Plaintiff and Officers Kelly and Santana, and therefore denies the allegations of this paragraph. Answering further, Defendant City lacks knowledge or information sufficient to form a belief as to the truth or falsity of what Plaintiff feared.**

**Answering further, Plaintiff filed his complaint on January 4, 2022, this incident is barred by the statute of limitations and contained in Defendant City's motion to dismiss.**

19.     Despite repeated pleas from Mr. Burden for the officers to remove the tightened handcuffs cutting into his wrists, Officers Santana and Kelly mocked him repeatedly and told him there were only Black people in Englewood to "fuck with," causing fear, humiliation, and emotional distress. Officer Kelly and Santana then proceeded to search his car without probable cause, opening the console and trunk. These actions were consistent with the Chicago Police Department's systemic, de facto policy of policing based on racial profiling and animus.

**ANSWER:     Defendant City denies the allegations contained in this paragraph.**

**Answering further, Plaintiff filed his complaint on January 4, 2022, this incident is barred by the statute of limitations and contained in Defendant City's motion to dismiss.**

20.     Shocked and panicked from the interaction, Mr. Burden called 911 and was instructed to go to the 7th District to file a report. Upon arriving, however, Desk Sergeant Fenton laughed at Mr. Burden and told him he wouldn't take a complaint – part and parcel of the Chicago Police Department's code of silence and deeply entrenched failure to discipline wrongdoing.

**ANSWER:     Defendant City denies the allegations contained in this paragraph.**

**Answering further, Plaintiff filed his complaint on January 4, 2022, this incident is barred by the statute of limitations and contained in Defendant City's motion to dismiss.**

21.     A COPA investigation confirmed that Officers Kelly and Santana handcuffed, detained, and searched Mr. Burden's vehicle without proper probable cause, in violation of the Fourth Amendment, and that Sergeant Fenton had in fact refused to take the complaint.

**ANSWER:     Defendant City denies that this paragraph truly and accurately describes the COPA investigation and findings, and therefore denies the allegations of this paragraph.**

**Answering further, Plaintiff filed his complaint on January 4, 2022, this incident is barred by the statute of limitations and contained in Defendant City's motion to dismiss.**

22.     A mere two weeks later, Officer Barrios from the same District continued the Chicago Police Department's torment of Mr. Burden by targeting him and yelling "fuck you" in his face repeatedly while he was in front of his home.

**ANSWER:     Defendant City denies the allegations contained in this paragraph.**

**Answering further, Plaintiff filed his complaint on January 4, 2022, this incident is barred by the statute of limitations and contained in Defendant City's motion to dismiss.**

23.     Later, on April 22, 2019, Mr. Burden requested police assistance after he had been assaulted by a stranger on the train, bur officers laughed at him and refused to help him.

**ANSWER:     Defendant City denies the allegations contained in this paragraph.**

**Answering further, Plaintiff filed his complaint on January 4, 2022, this incident is barred by the statute of limitations and contained in Defendant City's motion to dismiss.**

24.     The very next day, Officers Lonnie Felters and Michael Bennett pulled Mr. Burden over without probable cause and Felters told him he "looked like a terrorist." (Mr. Burden occasionally wears a headscarf and was doing so on the date of this interaction.) This interaction, like the others, confirms the ongoing pattern of officers, upon information and belief exclusively from district 7, physically and verbally targeting Mr. Burden, increasing his anxiety, depression, and causing severe emotional distress.

**ANSWER:     Defendant City denies that this paragraph truly and accurately describes the interaction between Plaintiff and Officers Lonnie Felters and Michael Bennett, and therefore denies the allegations of this paragraph. Defendant City denies that Officers Felters and Bennett did not have probable cause to stop Plaintiff. Defendant City denies the remaining allegations contained in this paragraph.**

**Answering further, Plaintiff filed his complaint on January 4, 2022, this incident is barred by the statute of limitations and contained in Defendant City's motion to dismiss.**

25.     A later COPA investigation again confirmed misconduct, finding that Chicago police officer Felters had engaged in bias-based policing, and called Mr. Burden a terrorist, (consistent with the city's policies, practices, customs, and usages of unconstitutional policing based on racial and other bias), and that officers Felters and Bennett improperly seized him by conducting a traffic stop with justification and failed to properly document the traffic stop.

**ANSWER:     Defendant City denies that this paragraph truly and accurately describes the COPA investigation and findings, and therefore denies the allegations of this paragraph.**

**Answering further, Plaintiff filed his complaint on January 4, 2022, this incident is barred by the statute of limitations and contained in Defendant City's motion to dismiss.**

26.     On July 19, 2019, Chicago police officers Hasenfang and Chulumovich targeted Mr. Burden in his neighborhood pulled him over, detained him, and searched his person and vehicle while mocking him – all without any probable cause, as sustained by a COPA investigation.

**ANSWER:     Defendant City denies that this paragraph truly and accurately describes the interaction between Plaintiff and Officers Hasenfang and Chulumovich, and therefore denies the allegations of this paragraph. Defendant City denies that this paragraph truly and accurately describes the COPA investigation and findings, and therefore denies the**

**allegations of this paragraph. Defendant City denies Officers Hasenfang and Chulumovich acted without probable cause.**

**Answering further, Plaintiff filed his complaint on January 4, 2022, this incident is barred by the statute of limitations and contained in Defendant City's motion to dismiss.**

27.    As of 2015, Officer Hasenfang had a minimum of 97 misconduct allegations against him, with only two sustained.

**ANSWER:    Defendant City denies the allegations contained in this paragraph.**

**Answering further, Plaintiff filed his complaint on January 4, 2022, this incident is barred by the statute of limitations and contained in Defendant City's motion to dismiss.**

28.    As a result of this ongoing harassment, Mr. Burden limited, and continues to limit, his time outside of the home, often opting to walk instead of drive for fear that he'll be subjected to racist harassment or violence by the Chicago Police Department. Mr. Burden's crippling distress and fear of the police has put significant strain on his marriage, as symptoms of PTSD often limited Mr. Burden's ability to engage in everyday activities.

**ANSWER:    Defendant City lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.**

29.    On May 28, 2020, as the global COVID-19 pandemic was in full swing, Mr. Burden garnered the courage to leave his home and go to the store. Too afraid of the Chicago Police to drive, Mr. Burden went to the store on foot. As he approached his neighborhood convenience store, more than five officers jumped out of an unmarked police vehicle and detained him, again racially profiling, and targeting Mr. Burden.

**ANSWER:    Defendant City admits on May 28, 2020, there was a global pandemic. Defendant City lacks knowledge or information sufficient to form a belief as to the truth or falsity of why Plaintiff decided to walk on May 28, 2020. Defendant City denies that five officers jumped out of an unmarked vehicle detaining him, racially profiling him, and targeting him. Defendant City denies the allegations contained in this paragraph are a true and accurate depiction of Plaintiffs actions and interaction with officers on May 28, 2020.**

30.    The officers, as a group, intentionally refused to turn on their BWC and Defendant Officers Torres and Baker proceeded to hold Mr. Burden on the street and placed him in handcuffs so tightly that his wrists began to bleed. One Defendant Officer quickly punched Mr. Burden in the ribs. The officers searched his person and verbally berated him, all while refusing to wear masks and potentially exposing Mr. Burden to a deadly virus.

**ANSWER:    Defendant City denies that officers refused to turn on their body worn cameras. Defendant City denies that Officers Torres and Baker placed Plaintiff in handcuffs so tightly that his wrists began to bleed and that an officer punched Plaintiff. Defendant City**

denies the allegations contained in this paragraph are a true and accurate depiction of Plaintiffs actions or interaction with officers.

31.    Mr. Burden also complained then that the handcuffs were too tight and Defendant Officers made no action to remedy the issue, crying from the pain and trauma.

**ANSWER:    Defendant City denies the allegations contained in this paragraph.**

32.    A COPA investigation confirmed that the officers turned off their BWC and stopped him without probable cause.

**ANSWER:    Defendant City denies that this paragraph truly and accurately describes the COPA investigation and findings, and therefore denies the allegations of this paragraph.**

33.    The harassment and rampant Fourth and Fourteenth Amendment violations continued on January 5, 2021. Mr. Burden parked his car near a gas station pump as he briefly went inside, leaving his blinkers on. As he exited the gas station, Defendant Officers Kats and Dicera and J. Doe Officers swarmed him, violently grabbed him by the hair and proceeded to handcuff him, slamming him onto the hood of a squad car.

**ANSWER:    Defendant City denies the allegations contained in this paragraph are a true and accurate depiction of Plaintiffs actions or interaction with officers.**

34.    Officers handcuffed Mr. Burden so tightly it broke the skin of his wrist.

**ANSWER:    Defendant City denies the allegations contained in this paragraph.**

35.    Defendant Officers put him in the squad car and take him to the 7th District police station.

**ANSWER:    Defendant City denies the allegations contained in this paragraph.**

36.    Officer Dicera informed Mr. Burden that he was being arrested for "obstruction of identification," upon information and belief a reference to 720 ILCS 5/31-4.5, "Obstructing identification."

**ANSWER:    Defendant City admits Officer Dicera informed Plaintiff that he was under arrest for obstruction of identification.**

37.    Mr. Burden, however, did not furnish a false or fictious name or other personally identifiable information, was not previously lawfully detained or arrested, and nor was there good cause to believe he was a witness to a criminal offense, meaning that none of the statute's requirements were met. 720 ILCS 5/31-4.5.

**ANSWER:    Defendant City denies the allegations contained in this paragraph are a true and accurate depiction of Plaintiffs actions or interaction with officers.**

38.     The officers wholly lacked any reasonable suspicion or probable cause to detain and arrest Mr. Burden.

**ANSWER:     Defendant City denies the allegations contained in this paragraph.**

39.     Mr. Burden was again harassed by Chicago Police on March 21, 2021, just two months after the last incident. Mr. Burden was parked outside his home when J. Doe officers demanded his identification, and then without lawful justification, proceeded to handcuff him, search through his wallet, and seize his FOID card. While Mr. Burden was not arrested this time, he has since attempted to retrieve his FOID card from CPD, but they have denied any wrongdoing.

**ANSWER:     Defendant City denies the allegations contained in this paragraph. Answering further, Defendant City lacks knowledge as to whether Plaintiff has attempted to retrieve his FOID card from CPD.**

40.     These stops and detentions have been cruel and shocking even as they have been avoidable; Mr. Burden has filed multiple COPA complaints and both the Chicago Police Department, and the 7th district police station have been on notice for years of the ongoing verbal and physical harassment of Mr. Burden.

**ANSWER:     Defendant City denies the stops and detentions were cruel, shocking and could have been avoided. Defendant City admits Plaintiff has filed multiple COPA complaints, and denies the remaining allegations contained in this paragraph.**

41.     These and other numerous detentions have occurred primarily on the South Side of Chicago in District 7, most recently in March of 2021.

**ANSWER:     Defendant City denies the detentions occurred in the 7th district. Defendant City lacks knowledge as to the location of "other numerous detentions."**

42.     These detentions have upended Mr. Burden's life and are such a regular occurrence that Mr. Burden frequently recognizes individual Defendant Officers, who recognize him then proceed to stop, detain, and continue their ongoing harassment.

**ANSWER:     Defendant City denies the Defendant Officers recognize Plaintiff, proceed to stop, detain and harass Plaintiff. Answering further, Defendant City lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.**

43.     In February, 2021, Mr. Burden, through his counsel, sent a litigation hold letter to the City of Chicago's Federal Civil Rights Litigation Division, the Chicago Police Department, and other city agencies. An attorney for the City of Chicago confirmed that in addition to the aforementioned stops and incidents with the police, Mr. Burden has been stopped on at least right other occasions, during which, on information and belief, he was not issued stop receipts, as required. Despite repeated FOIA requests from counsel, the City, via its constituent agency the Chicago Police Department, has failed to turn over any records related to these stops.

**ANSWER: Defendant City admits Plaintiff's counsel sought a legal hold and that an Assistant Attorney found additional traffic violations and stops, but denies Plaintiff was not issued stop receipts. Answering further, Defendant City denies Plaintiff has fully and or accurately stated the process of requesting and receiving information requested via FOIA request and; therefore, denies the remaining allegations contained in this paragraph.**

44.     Mr. Burden is constantly surveilled and harassed by police, he has been followed by police several times without arrest, in addition to the many instances in which Mr. Burden has been arrested or otherwise seized.

**ANSWER:     Defendant City denies the allegations contained in this paragraph.**

45.     During Mr. Burden's interactions with Chicago police officers, he has been subjected to brutal, disrespectful, humiliating and inhumane treatment. Mr. Burden has repeatedly told Defendant Officers that he was being targeted and harassed for being Black. Mr. Burden has been shoved onto the hood of vehicles, had his hair violently pulled, and been punched in the ribs, among other degrading and physically and emotionally damaging treatment.

**ANSWER:     Defendant City denies the allegations contained in this paragraph.**

46.     Defendant Officers were on duty at all times relevant to this Complaint and engaged in this complained of conduct in the course and scope of their employment.

**ANSWER:     Defendant City admits that Defendant Officers were on duty and acting within the course and scope of their employment, but denies the wrongdoing alleged in this paragraph.**

47.     As a direct and proximate result of the acts or omissions of one of more Defendant Officers alleged above, Mr. Burden suffered damages including, but not limited to humiliation, mental anguish, emotional distress, and physical injury.

**ANSWER:     Defendant City denies the allegations contained in this paragraph.**

48.     Mr. Burden has been traumatized by his constant harassment and surveillance, and by these repeated violations of his dignity and liberty. He suffers from anxiety, stress, and depression, and has symptoms of PTSD any time he thinks of these incidents or sees police on the streets.

**ANSWER:     Defendant City lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.**

49.     Mr. Burden has been to therapy to address the trauma inflicted by these repeated violations, and he has been prescribed medication for the resulting anxiety and night terrors that he suffers from.

**ANSWER:    Defendant City lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.**

<u>The City of Chicago and CPD's Failure to Train on Reasonable Use of Force</u>

50.    In a January 13, 2017 report by the Department of Justice ("DOJ") summarizing its findings of a year-long investigation of the CPD ("DOJ Report"), the DOJ concluded that CPD "engaged in a pattern or practice of unconstitutional use of force."

**ANSWER:    Defendant City admits the DOJ report states on page 23, "Nonetheless, we found reasonable cause to believe that CPD has engaged in a pattern or practice of unreasonable force in violation of the Fourth Amendment and that the deficiencies in CPD's training, supervision, accountability, and other systems have contributed to that pattern or practice." Defendant City denies all other allegations contained in this paragraph. The City denies all facts and inferences not specifically admitted herein.**

51.    The DOJ Report explains that this pattern of unlawful conduct stems from the fact that CPD officers "do not receive the quality or quantity of training" necessary to make proper decisions regarding the degree of force that is appropriate in any given situation. As the DOJ Report observed, "CPD has not provided officers with adequate guidance to understand how and when they may use force, or how to safely and effectively control and resolve encounters to reduce the need to use force. "

**ANSWER:    Defendant City denies the DOJ quote that Chicago police officers "do not receive the quality or quantity of training" is a true and accurate depiction of the quote in the DOJ report, which states on page 10 "Both at the outset and through the duration of their careers, CPD officers do not receive the quality or quantity of training necessary for their jobs." Defendant City admits page 5 of the DOJ report states "CPD has not provided officers with adequate guidance to understand how and when they may use force, or how to safely and effectively control and resolve encounters to reduce the need to use force." Defendant City denies all other allegations contained in this paragraph. The City denies all facts and inferences not specifically admitted herein.**

52.    The DOJ Report notes that one Chicago Police Academy training on use of force "consisted of a video made decades ago, which was inconsistent with both current law and CPD's own policies." The impact of this woefully inadequate training was apparent when an interview of graduates from the Chicago Police Academy revealed that "only one in six [graduates]…came close to properly articulating the legal standard for use of force."

**ANSWER:    Defendant City denies the DOJ is a true and accurate depiction of the DOJ report quote on page 10. Defendant City admits on page 10 of the DOJ report states "For example, we observed an Academy training on deadly force—an important topic, given our findings regarding CPD's use of force—that consisted of a video made decades ago, which was inconsistent with both current law and CPD's own policies. The impact of this poor training was apparent when we interviewed recruits who recently graduated from the Academy: only one in six recruits we spoke with came close to properly articulating the legal**

standard for use of force." **Defendant City denies all other allegations contained in this paragraph. The City denies all facts and inferences not specifically admitted herein.**

53.     The City of Chicago and CPD fail to provide adequate continuing training on the use of force. According to the DOJ Report, a review of hundreds of use of force incidents by CPD "revealed CPD officers engaging in dangerous tactics that indicate they do not remember or were never taught basic police skills" governing the use of force. This "lack of continuing training has a direct connection of the improper use of force in patrol and other field assignments."

**ANSWER:     Defendant City admits page 100 of the DOJ report states, "As discussed in the Force Section of this Report, our review of CPD force, including hundreds of force incidents and several video recorded incidents of CPD uses of force, revealed CPD officers engaging in dangerous tactics that indicate they do not remember or were never taught basic police skills." Defendant City admits page 100 of the DOJ report states, "Consistent with our review, interviewees were unanimous in their belief that the lack of continuing training has a direct connection to the improper use of force in patrol and other field assignments." Defendant City denies all other allegations contained in this paragraph. The City denies all facts and inferences not specifically admitted herein.**

54.     The City of Chicago and CPD also fail to require officers to accurately report uses of force, which means there is no opportunity to meaningfully assess whether or how training should be modified to improve outcomes in the future.

**ANSWER:     Defendant City denies the allegations contained in this paragraph.**

55.     Changes to CPD use of force training initiated after the release of the DOJ Report have not addressed key deficiencies. The training does not adequately explain the proper constitutional standard for determining if use of force is reasonable. And it fails to provide any in-depth analysis or discussion of use of force "examples" from which officers could learn why certain use of force are constitutional and others are not.

**ANSWER:     Defendant City denies the allegations contained in this paragraph.**

56.     Complaints of excessive force against CPD officers underscore the inadequacies in use of force training. In the years following the release of the DOJ Report, members of the public have continued to file-at alarming rates-complaints of CPD officers using excessive force by shoving, pulling, punching, choking, and slamming citizens during the course of a stop or arrest.

**ANSWER:     Defendant City denies the allegations contained in this paragraph.**

57.     Further, even though de-escalation and force mitigation principles are purported to be key features of CPD's "revised" use of force policy, the new training "provides[s] minimal discussion of the reasons and tools for de-escalation and force mitigation," according to Chicago's Civilian Office of Police Accountability. Indeed, the tone, rhetoric, and demeanor of the trainers charged with implementing CPD's new training module have given the impression that there is no need to change CPD's culture around use of force incidents.

**ANSWER:      Defendant City denies the allegations contained in this paragraph.**

58.      The City of Chicago and CPD are and have been on notice of these ongoing deficiencies in use of force training. As recently as June 2020, the independent monitor overseeing the federal consent decree to reform the CPD reported that the Department was not complying with its obligation to implement training that would ensure reasonable and constitutional use of force as called for by CPD policy.

**ANSWER:      Defendant City denies the allegations contained in this paragraph.**

59.      In his June 5, 2020 letter to the independent monitor commenting on the monitor's report, the Attorney General of Illinois concluded that "CPD continues to be reluctant to change its culture as its relates to use of force and to hold officers accountable for excessive force" and that the Department has not made "substantive changes to CPD policy…or training" in response to use of force incidents.

**ANSWER:      Defendant City admits the June 5, 2020 letter from Office of Attorney General, Kwame Raoul, to the independent monitor, Margaret A Hickey, states on page 6, "The City has made progress developing policies and trainings addressing many of the Use of Force requirements of the Consent Decree. However, CPD continues to be reluctant to change its culture as it relates to use of force and to hold officers accountable for excessive force." Defendant City denies all other allegations contained in this paragraph. The City denies all facts and inferences not specifically admitted herein.**

60.      This failure by the City to adequately train its officers on reasonable use of force despite knowledge that CPD officers engage in a pattern or practice of excessive force amounts to deliberate indifference to violations of constitutional rights.

**ANSWER:      Defendant City denies the allegations contained in this paragraph.**

The City of Chicago and CPD's Failure to Discipline and Failure to Address the "Code of Silence"

61.      CPD teaches its officers not to violate the "code of silence." Officers are instructed that "Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after the situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

**ANSWER:      Defendant City denies the allegations contained in this paragraph.**

62.      The City of Chicago has known about and encouraged this code of silence in the CPD at all times relevant to this Complaint and has not taken action to address it.

**ANSWER:      Defendant City denies the allegations contained in this paragraph.**

63.    For example, in 2012, in the case of Obrycka v. City of Chicago, No. 07-cv-2372 (N.D. Ill.), a federal jury found that the City of Chicago "had a widespread custom or practice of failing to adequately investigate and/or discipline its officers and/or of a police code of silence."

**ANSWER:    Defendant City admits in 2012 the jury in Obrycka v. City of Chicago, No. 07-cv-2372 (N.D. Ill.) found in favor of Plaintiffs first claim, holding "On Plaintiff's claims that Defendant City of Chicago had a persistent widespread custom or practice that was the moving force behind Defendant Abbate's conduct in the bar when he physically beat Plaintiff on February 19, 2007." Defendant City denies all other allegations contained in this paragraph. The City denies all facts and inferences not specifically admitted herein.**

64.    The 2017 DOJ Report observed that both the City of Chicago and CPD were aware of the code of silence within CPD:

  a. "Mayor [Rahm Emanuel] has acknowledged that a 'code of silence" exists in the CPD, and his opinion is shared by current officers and former high-level CPD officials interviewed during our investigation."
  b. "[A]ttempts to hold officers accountable are also frustrated by police officers' code of silence. The City, police officers, and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence.

**ANSWER:    Defendant City admits the DOJ report states on page 75, "The Mayor has acknowledged that a "code of silence" exists within CPD, and his opinion is shared by current officers and former high-level CPD officials interviewed during our investigation." Defendant City admits the DOJ report states on page 8 "Investigative fact-finding into police misconduct and attempts to hold officers accountable are also frustrated by police officers' code of silence. The City, police officers, and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence." Defendant City denies all other allegations contained in this paragraph. The City denies all facts and inferences not specifically admitted herein.**

65.    In April 2016, as part of her duties as chair of the mayor's Police Accountability Task Force, current-Mayor of Chicago Lori Lightfoot concluded: "[T]he code of silence is not just an unwritten rule, or an unfortunate element of police culture past and present. The code of silence if institutionalized and reinforced by CPD rule and policies that are also baked into the labor agreements between the various police unions and the City."

**ANSWER:    Defendant City admits the Task Force Recommendations for Reform states on page 70 "The Task Force has found that the code of silence is not just an unwritten rule, or an unfortunate element of police culture past and present. The code of silence is institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City." Defendant City denies all other**

**allegations contained in this paragraph. The City denies all facts and inferences not specifically admitted herein.**

66.     In January 2020, Chicago's Interim Police Superintendent Charlie Beck explicitly acknowledged a code of silence in the CPD, noting that "of course" there is such a code in the CPD.

**ANSWER:     Defendant City denies that this paragraph truly and accurately describes Chicago's Interim Police Superintendent Charlie Becks statements and therefore denies the allegations of this paragraph.**

67.     In October 2020, Chicago's Police Superintendent David Brown again acknowledged a code of silence in the CPD, conceding that there is a valid criticism of "this big culture of protecting each other" and that the criticism of the culture is "accurate".

**ANSWER:     Defendant City denies that this paragraph truly and accurately describes Chicago Police Superintendent David Browns October 2020 statements and therefore denies the allegations of this paragraph.**

68.     The Code of Silence was active and at work in Officers' handling of Mr. Burden in multiple ways, including but not limited to:

      a.  Failing to activate body cameras on multiple occasions;
      b.  Causing Defendant Officers to use excessive force and other constitutional violations without fear of rebuke or consequence;
      c.  Causing Officer Spratte to remark that he had no fear of a COPA investigation;
      d.  Causing Officers to fail to intervene in the face of their colleagues' unconstitutional actions; and
      e.  Causing CPD's failure to provide complete records of Mr. Burden's stops in response to FOIA requests and interactions with Corporation Counsel.

**ANSWER:     Defendant City denies the allegations contained in this paragraph.**

69.     The City of Chicago has failed to discipline Chicago officers and institute adequate disciplinary systems.

**ANSWER:     Defendant City denies the allegations contained in this paragraph.**

70.     The DOJ Report noted that CPD's disciplinary mechanism contained "numerous entrenched, systemic policies and practices that undermine police accountability," and concluded that the City of Chicago's discipline system "lacks integrity" and "does not effectively deter misconduct."

**ANSWER:     Defendant City admits the DOJ report states on page 8, "We discovered numerous entrenched, systemic policies and practices that undermine police accountability, as described below." Defendant City admits section G of the DOJ report on page 80 is titled**

**"The City's Discipline System Lacks Integrity and Does Not Effectively Deter Misconduct."
Defendant City denies all other allegations contained in this paragraph. The City denies all
facts and inferences not specifically admitted herein.**

71.     The DOJ Report also noted that police disciplinary investigators rarely "ask probing
questions" of police officers when potential misconduct is at issue. This failure to ensure adequate
discipline naturally works in tandem with the code of silence to shield officers from accountability
and leads to misconduct like the excessive force and failure to intervene alleged here.

**ANSWER:     Defendant City admits the DOJ report states on page 64, "Investigators rarely
asked officers probing questions about their accounts of officer involved shootings or the
alleged misconduct." Defendant City denies all other allegations contained in this paragraph.
The City denies all facts and inferences not specifically admitted herein.**

72.     At the time Defendant Officers used excessive force and committed other violations
of Mr. Burden, the City of Chicago's policymakers knew that CPD's policies and customs for
discipling and controlling, its officers were inadequate and caused police misconduct.

**ANSWER:     Defendant City denies the allegations contained in this paragraph.**

73.     Despite this knowledge, policymakers failed to act to remedy these problems.

**ANSWER:     Defendant City denies the allegations contained in this paragraph.**

## COUNT I
### Unreasonable Seizure against Defendant Officers
### (42 U.S.C. § 1983 and the Fourth Amendment)

74.     Plaintiff re-alleges paragraphs 1-73 as though fully set forth herein.

**ANSWER:     Defendant City reasserts its answers contained in foregoing paragraphs and
incorporates their answers herein, as though fully stated.**

75.     On or about May 28, 2020, January 5, 2021 and March 21, 2021 Defendant Officers
Baker, Torres, Kats, and Dicera, and J. Doe Officers stopped and detained Plaintiff without
probable cause that Plaintiff had committed, was committing or was going to commit any criminal
act.

**ANSWER:     Defendant City denies the allegations contained in this paragraph.**

76.     Plaintiff was also stopped without probable cause on several previous occasions,
which now could be considered time-barred, but these acts, when paired with other Defendant
Officers' prior stops of Plaintiff and caused by the continuous customs and practices of the
Defendant City as described in Plaintiff's Monell and Equal Protection claims, constitute a
continuing violation and continuing harm under the law and are thus ripe for this Court's
consideration.

**ANSWER: Defendant City denies Plaintiff was stopped without probable cause. Defendant City admits most of the incidents alleged in Plaintiffs complaint are time barred, but denies the remaining allegations contained in this paragraph. See Defendant City of Chicago's Partial Motions to Dismiss and Defendant Officers Motion to Dismiss ECF 23 and 25.**

77.     This conduct of Defendant Officers, alleged above, constituted unreasonable seizures in violation of the Fourth Amendment to the United States Constitutes.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

78.     The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Plaintiff.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

79.     Defendant Officers were acting under the color of state law and in the scope of their employment at the times of these constitutional violations.

**ANSWER: Defendant City admits Defendant Officers were acting under the color of law and within the scope of their employment, but denies the wrongdoing alleged in this paragraph.**

80.     The actions of Defendant Officers directly and proximately caused Plaintiff to suffer, without limitation, severe emotional distress, mental anguish, and financial loss.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

### COUNT II
### Excessive Force against Defendant Officers
### (42 U.S.C.§1983 and the Fourth Amendment)

81.     Plaintiff re-alleges paragraphs 1-73 as though fully set forth herein.

**ANSWER: Defendant City reasserts its answers contained in foregoing paragraphs and incorporates their answers herein, as though fully stated.**

82.     On or about May 28, 2020, Defendant Officers Baker and Torres applied handcuffs too tightly and did not act when Mr. Burden complained, and without lawful justification.

**ANSWER: Defendant City denies that this paragraph truly and accurately describes the incident in question and therefore denies the allegations of this paragraph.**

83.     On January 5, 2021, Defendant Officers Kats and Dicera pulled his hair, punched him in the ribs, and slammed him against a police car without lawful justification to do so.

**ANSWER: Defendant City denies that this paragraph truly and accurately describes the incident in question and therefore denies the allegations of this paragraph.**

84.     The conduct of Defendant Officers, alleged above, constituted unreasonable uses of force in violation of the Fourth Amendment to the United States Constitution.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

85.     The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Plaintiff.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

86.     Defendant Officers were acting under color of state law and in the scope of their employment at the times of these constitutional violations.

**ANSWER: Defendant City admits Defendant Officers were acting under the color of law and within the scope of their employment, but denies the wrongdoing alleged in this paragraph.**

87.     The actions of Defendant Officers directly and proximately caused Plaintiff to suffer, without limitation, severe emotional distress, mental anguish, damage to reputation, and loss of liberty.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

**COUNT III**
**Illegal Seizure of Property against J. Doe Officers**
**(42 U.S.C. § 1983 and the Fourth Amendment)**

88.     Plaintiff re-alleges paragraphs 1-73 as though fully set forth herein.

**ANSWER: Defendant City reasserts its answers contained in foregoing paragraphs and incorporates their answers herein, as though fully stated.**

89.     On or about May 31, 2021, J. Doe Officers stopped and detained Plaintiff without probable cause and seized his Firearm Owners Identification Card.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

90.     Officers have refused to return this important piece of property, which was unreasonable seized pursuant to the unconstitutional stop and detention.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

91. The conduct of Defendant Officers, alleged above, constituted an unreasonable seizure in violation of the Fourth Amendment to the United States Constitution.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

92. The actions of Defendant Officers directly and proximately caused Plaintiff to suffer, without limitation, severe emotional distress and financial loss.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

93. The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Plaintiff.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

94. Defendant Officers were acting under color of state law and in the scope of their employment at the times of these constitutional violations.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

95. The actions of Defendant Officers were the direct and proximate cause of the injuries that Plaintiff sustained as a result of Defendant Officers' violations of Plaintiff's constitutional rights, alleged above.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

### COUNT IV: Violation of Equal Protection
### Against Defendant Officers
### (42 U.S.C. §1983 and the Fourteenth Amendment)

96. Plaintiff re-alleges paragraphs 1-73 as though fully set forth herein.

**ANSWER: Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

97. The Fourteenth Amendment to the United States Constitution, enforceable under 42 U.S.C. §1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §1.

**ANSWER: Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

98. This count pleads "class of one" and race-based discrimination Equal Protection claims in the alternative.

**ANSWER:     Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

99.     Under the Equal Protection Clause of the Fourteenth Amendment, a Plaintiff may also allege an actionable claim based on arbitrary, irrational, and with personal animus toward Plaintiff.

**ANSWER:     Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

100.     Officers' actions toward plaintiff – most often in the 7th Police District – evince a pattern of arbitrary, irrational conduct motivated by personal animus.

**ANSWER:     Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

101.     These violations are continuing in nature; Plaintiff has been stopped by police minimum of 18 times since his move to Chicago in 2015.

**ANSWER:     Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

102.     Officers intentionally treated Plaintiff differently than similarly situated individuals, and departed from norm or common practice, acted with animus, and acted with discriminatory motive with no rational basis for doing so.

**ANSWER:     Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

103.     Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on race and/or color is presumptively unconstitutional and subject to heightened scrutiny.

**ANSWER:     Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

104.     Plaintiff Aaron Burden is Black and thus a member of a protected class.

**ANSWER:     Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

105.     Plaintiff was repeatedly targeted based on Individual Defendants and CPD's harbored racial animus ad racial profiling. Defendant Officers stopped and detained Plaintiff without probable cause or reasonable suspicion, and used excessive force against him, in flagrant violation of the Fourth Amendment, violating Plaintiff's equal protection rights.

**ANSWER:** **Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

106. Upon information and belief, similarly situated White individuals were not and are not repeatedly profiled and stopped by Defendant Officers without probable cause.

**ANSWER:** **Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

107. Officers mentioned in this complaint acted with intent to treat Plaintiff disparately on the basis of Plaintiff's race and presumed religion, violating Plaintiff's Fourteenth Amendment right of equal protection guaranteed under the U.S. Constitution, and thus violating his rights guaranteed under 42 U.S.C. §1983.

**ANSWER:** **Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

108. Upon information and belief, Officers, including Defendant Officers, treat Black individuals differently than White individuals, evinced in their policing of Plaintiff.

**ANSWER:** **Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

109. Officers, including Defendant Officers, acted with intent to treat Plaintiff disparately on the basis of his race, violating their Fourteenth Amendment right of equal protection guaranteed under the U.S. Constitution, and thus violating his rights guaranteed under 42 U.S.C. §1983.

**ANSWER:** **Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

110. The actions of the officers were willful and wanton, and were undertaken intentionally with malice, willfulness, and reckless indifference to Plaintiff's rights.

**ANSWER:** **Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

111. Defendant Officers were acting under color of state law and in the scope of their employment at the times of these constitutional violations.

**ANSWER:** **Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

112. These actions, alleged above, directly and proximately caused severe emotional distress to Plaintiff including, but not limited to, depression, crippling fear and anxiety, an inability

to leave his home, panic attacks, loss of liberty, loss of property, and other ongoing severe physiological impacts.

**ANSWER:** **Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

## COUNT V: FAILURE TO INTERVENE
### Against Defendant Officers
### (42 U.S.C. §1983)

113.   Plaintiff re-alleges paragraphs 1-73 as though fully set forth herein.

**ANSWER:** **Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

114.   Defendant Officers all were present and failed to intervene to stop the violations of Plaintiff's Fourth and Fourteenth Amendment Rights.

**ANSWER:** **Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

115.   Defendant Officers all had a reasonable opportunity to intervene and prevent the unreasonable detentions of Plaintiff and unreasonable use of force against him. Each of the Defendant Officers failed to take even the most basic action to stop the violations of Plaintiff's body and rights.

**ANSWER:** **Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

116.   The conduct of Defendant Officers directly and proximately caused Plaintiff to suffer, without limitation, pain and suffering, humiliation, emotional distress, and mental anguish.

**ANSWER:** **Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

117.   The misconduct described in this Count was willful and wanton and undertaken with malice, willfulness, and reckless indifference and conscious disregard for Plaintiff's rights and safety.

**ANSWER:** **Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

118.   Defendant Officers were acting under color of state law and in the scope of their employment at the times of these constitutional violations.

**ANSWER:** **Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

119.    These actions, alleged above, directly and proximately caused severe emotional distress to Plaintiff including, but not limited to, depression, crippling fear and anxiety, an inability to leave his home, panic attacks, loss of liberty, loss of property, and other ongoing severe physiological impacts.

**ANSWER:** **Defendants have moved to dismiss this count; therefore, they make no answer. See ECF 23.**

**COUNT VI: Monell: Failure to train, failure to discipline, fostering of a code of silence, and bias-based policing**
**Against the City of Chicago**
**(42 U.S.C. § 1983)**

120.    Plaintiff re-alleges paragraphs 1-73 as though fully set forth herein.

**ANSWER:** **Defendant City has moved to dismiss this count; therefore, they make no answer.  See ECF 25.**

121.    The City of Chicago, through the Chicago Police Department has a de facto policy and widespread practice of engaging in racially biased policing and violating the constitutional rights of protected classes of people.

**ANSWER:** **Defendant City has moved to dismiss this count; therefore, they make no answer.  See ECF 25.**

122.    The 2017 United States Department of Justice investigation of the CPD concluded, among other things, that in response to "discriminatory views and intolerance with regard to race, religion, gender, and national origin in public social media forums," CPD fails to take appropriate steps to prevent or respond to this animus. https://www.justice.gov/opa/file/925846/download at 147.

**ANSWER:** **Defendant City has moved to dismiss this count; therefore, they make no answer.  See ECF 25.**

123.    Additionally, the 2016 report of the mayoral Chicago Police Accountability Task Force ("PATF") contained both similar and parallel conclusions. Among other startling findings, it concluded that there are "daily, pervasive transgressions" regarding Fourth Amendment violations, specifically targeting Black and Latino communities in Chicago.

**ANSWER:** **Defendant City has moved to dismiss this count; therefore, they make no answer.  See ECF 25.**

124.    Additionally, in 2015, the American Civil Liberties Union of Illinois found that "Chicago has failed to train, supervise and monitor law enforcement in minority communities for decades, resulting in a failure to ensure that officers' use of stop and frisk is lawful."

**ANSWER:    Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

125.    Despite clear, actual notice of these findings, CPD and the City did not and have not subsequently implemented any changes in CPD policy, procedure, or training in order to remedy or otherwise address officers' widespread practice of racially biased policing and social media use, despite the one sentence agreement to do so in the federal consent decree agreed to by the City with the State of Illinois, entered by District Judge Robert Dow in January, 2019 in State of Illinois v. City of Chicago, 17-cv-6260, https://perma.cc/2H6E-ASB8 (Consent Decree)

**ANSWER:    Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

126.    Directly relevant to the facts of this case, and the CPD's code of silence, the Independent Monitoring Team's Special Report: The City of Chicago's and the Chicago Police Department's Responses to Protests and Unrest under the Consent Decree (May 2020 – November 2020) released on July 20, 2021, found that there have been an unprecedented number of complaints to COPA regarding officers concealing their identities and the identities of fellow officers, and the use of racial and derogatory slurs in policing. State of Illinois v. City of Chicago, 17-cv-6260, https://perma.cc/F25M-77C2 at 8.

**ANSWER:    Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

127.    The City of Chicago's failure to act despite the known consequences of inadequate use of force training, inadequate discipline, bias-based policing, and a pervasive code of silence-namely, widespread constitutional violations by CPD officers - constituted deliberate indifference to the rights of persons with whom CPD came into contact.

**ANSWER:    Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

128.    Defendant Officers' violations of Plaintiffs Fourth and Fourteenth Amendment rights were the highly predictable consequences of the City's failure to train, failure to discipline, failure to eliminate CPD's code of silence, and pattern of racial biased policing.

**ANSWER:    Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

129.    The City's failure to train, failure to discipline, failure to address CPD's code of silence, and bias-based policing constitute de facto policies that caused Defendant Officers to

unreasonably seize and use excessive force against Burden and fail to intervene to prevent the constitutional violations.

**ANSWER:    Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

130.    The City's actions and lack thereof well-recognized deficiencies in its policing apparatus constitute deliberate indifference to the problems they pose.

**ANSWER:    Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

131.    The City's unconstitutional policies, practices, customs, and usages caused all violations of Mr. Burden's rights mentioned herein by named and unnamed officers, constituting a continuing violation of his constitutional rights and operating to toll the status of limitations for events occurring prior to the expiry of the operative SOLs and making the City itself liable for these violation.

**ANSWER:    Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

**COUNT VII: Continuing Tort: Assault and Battery**
**Against Defendant Officers**
**(Illinois State Law Claim)**

132.    Plaintiff re-alleges paragraphs 1-73 as though fully set forth herein.

**ANSWER:    Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

133.    The actions of Defendant Officers constituted unjustified, unreasonable, and offensive physical contact again Plaintiff.

**ANSWER:    Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

134.    The conduct of Defendant Officers also caused Plaintiff to perceive an imminent battery.

**ANSWER:    Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

135.    Defendants' actions were taken pursuant to and caused by continuing municipal policies and practices of failing to discipline, failure to supervise, engaging in racially biased policing, and maintaining and abetting a code of silence.

**ANSWER: Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

136. Under Illinois law, the cause of action for continuing torts accrues at the time the last injurious act occurs or the conduct is abated.

**ANSWER: Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

137. The date of the last injurious act occurred on March 21, 2021.

**ANSWER: Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

138. The actions of Defendant Chicago Police Officers proximately caused Plaintiff's injuries, including, but not limited to, pain from officers severely pulling his hair, abrasions and cuts on his wrists, pain, suffering, emotional harm, and anguish.

**ANSWER: Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

139. The actions of Defendant Chicago Police Officers were willful and wanton and committed within the scope of their employment. Defendant City of Chicago is therefore liable under respondeat superior.

**ANSWER: Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

### COUNT VIII: Continuing Tort: Intentional Infliction of Emotional Distress
### Against Defendant Officers
### (Illinois State Law Claim)

140. Plaintiff re-alleges paragraphs 1-73 as though filly set forth herein.

**141. ANSWER: Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

142. Plaintiff Burden was subjected to the intentional infliction of emotional distress on no fewer than 18 occasions.

**ANSWER: Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

143. Under Illinois law, the case of action for continuing torts accrues at the time the last injurious act occurs or the conduct is abated.

**ANSWER:  Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

144.    The date of the last injurious act occurred on March 21, 2021.

**ANSWER:  Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

145.    The actions of Defendant Officers spanning from 2017 to present, as alleged above, were extreme and outrageous. By and with these actions, Defendant Officers intended to cause or recklessly disregard the probability that they would cause severe emotional distress to Plaintiff.

**ANSWER:  Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

146.    These actions, alleged above, include, inter alia and without limitation, unreasonably detaining, arresting, and using excessive force against Plaintiff without lawful justification; using racist language stating that Black people only exist in Englewood to "fuck with"; and stating that no one "gave a fuck" about their nearly running him over with a vehicle.

**ANSWER:  Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

147.    These actions, alleged above, directly and proximately caused severe emotional distress to Plaintiff including, but not limited to, depression, crippling fear and anxiety, an inability to leave his home, panic attacks, and other ongoing severe physiological impacts.

**ANSWER:  Defendant City has moved to dismiss this count; therefore, they make no answer.  See ECF 25.**

148.    The actions of Defendant Chicago Police Officers were willful and wanton and committed within the scope of their employment. City of Chicago is therefore liable under respondeat superior.

**ANSWER:  Defendant City has moved to dismiss this count; therefore, they make no answer.  See ECF 25.**

**COUNT IX: Respondeat Superior**
**Against the City of Chicago**
**(Illinois State Law Claim)**

149.    Plaintiff re-alleges paragraphs 1-73 as though filly set forth herein.

**ANSWER:  Defendant City has moved to dismiss this count; therefore, they make no answer.  See ECF 25.**

150. Defendants Officers and other agents and employees of the City of Chicago involved in the assault, battery, and intentional infliction of emotional distress against Plaintiff described herein were acting in the scope of their employment and as agents of their employer and City of Chicago.

**ANSWER: Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

151. As noted, these torts constitute continuing violations of Plaintiff's rights enabled and caused by the City of Chicago's unconstitutional policies, practices, customs, and usages.

**ANSWER: Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

152. The City of Chicago is liable for the acts of its agents and employees, and is therefore liable for Intentional Infliction of Emotional Distress, Assault and Battery, and any other state law claim arise out of the occurrences that are the subject of this Complaint.

**ANSWER: Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

153. As a direct and proximate cause its employees, including Defendant Officers, unlawful acts, which occurred within the scope of their employment activities, Plaintiff was damaged, including lasting mental anguish, reputational damage, emotional trauma, panic attacks, paralyzing fear of the police, other physiological suffering, and various devasting consequences that continue to impact his life.

**ANSWER: Defendant City has moved to dismiss this count; therefore, they make no answer. See ECF 25.**

**COUNT X: Indemnification**
**Against the City of Chicago**
**(Illinois State Law Claim - 745 ILCS 10/9-102)**

154. Plaintiff re-alleges paragraphs 1-73 as though fully set forth herein.

**ANSWER: Defendant City reasserts its answers contained in foregoing paragraphs and incorporates their answers herein, as though fully stated.**

155. In Illinois, municipalities are directed to pay for any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities. 745 ILCS 10/9-102.

**ANSWER: Defendant City denies Plaintiff has fully and or accurately stated the law; therefore, Defendant denies the allegations contained in this paragraph.**

156.    Defendant Officers committed the acts alleged above under color of law, while on duty, and in the scope of their employment by Defendant City of Chicago.

**ANSWER:    Defendant City denies the Defendant Officers committed the act alleged above. Answering further, Defendant City admits the Defendant Officers acted under the color of law and within the scope of their employment but denies any wrongdoing.**

157.    This misconduct described in this Complaint was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Plaintiff.

**ANSWER:    Defendant City denies the allegations contained in this paragraph.**

158.    As a direct and proximate cause of Defendant Officers' unlawful acts, which occurred within the scope of their employment activities, Plaintiff was damaged, including lasting mental anguish, emotional trauma, damage to reputation, paralyzing fear of going outside, physical injuries, and various devasting consequences that continue to impact his life.

**ANSWER:    Defendant City denies the allegations contained in this paragraph.**

159.    As such, Defendant City of Chicago is liable to Plaintiff for any award of compensatory damages and costs that arise from the actions of Defendant Officers.

**ANSWER:    Defendant City denies Plaintiff has fully and or accurately stated the law; therefore, Defendant denies the allegations contained in this paragraph.**

## JURY DEMAND

Defendant City hereby requests a trial by jury.

## AFFIRMATIVE DEFENSES

1. Defendant City is not liable to Plaintiff for any federal claim for which its employees or agents are not liable to Plaintiff. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

2. Defendant City cannot be held liable for punitive or exemplary damages in any Section 1983 action brought against it directly or indirectly by the injured party or a third party. *City of Newport et al. v. Fact Concerts, Inc.*, 435 U.S. 247 (1981).

3. To the extent Plaintiff failed to mitigate any of his claimed injuries or damages, any verdict or judgment obtained by Plaintiff must be reduced by application of the principle that Plaintiff had a duty to mitigate his claimed injuries and damages, commensurate with the degree of failure to mitigate attributed to Plaintiff by the jury in this case.

4. As to any state law claims made by Plaintiff, Defendant City is not liable because the decision as to what action to take with regard to Plaintiff was a discretionary decision for which Defendant City and its employees are immune from liability. 745 ILCS 10/2-201.

5. To the extent any employee or agent of Defendant City was acting within the scope of his or her employment, that employee or agent is not liable for his or her acts or omissions in the execution or enforcement of the law, unless such act or omission constitutes willful and wanton conduct. 745 ILCS 10/2-202.

6. Defendant City is not liable to Plaintiff for any state law claims for which its employees or agents are not liable to Plaintiff. 745 ILCS 10/2-109.

7. As to Plaintiff's state law claims, Defendant City is not liable to pay attorney's fees as "the law in Illinois clearly is that absent a statute or contractual agreement 'attorney fees and the ordinary expenses and burdens of litigation are not allowable to the successful party.'" *See Kerns v. Engelke*, 76 Ill.2d 154, 166 (1979) (citations omitted).

8. Indemnification is not a cause of action, but a theory of recovery. The indemnification provision does not create direct liability on the part of the City or its employees, but creates liability on the City to indemnify after a judgment has been recovered against an employee. See *Arnolt v. City of Highland Park*, 52 Ill. 2d 27 (1972); *Glover v. City of Chicago*, 106 Ill. App. 3d 1066, 107 (1982).

9. Plaintiff fails to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). *See* Defendant City's Motions to Dismiss and Defendant Officers Motion to Dismiss, ECF No. 23 and 25.


DATED: April 19, 2022

Respectfully submitted,

Celia Meza
Corporation Counsel for the City of Chicago

BY:   */s/ Danielle Alvarez Clayton*
Assistant Corporation Counsel III

Caroline Fronczak, Deputy Corporation Counsel
Raoul Mowatt, Assistant Corporation Counsel III
Mitchell Paglia, Assistant Corporation Counsel III
2 N LaSalle Street Suite 420
Chicago, IL 60602
(312) 744-2784 (Alvarez)
Danielle.Clayton@CityofChicago.org

**CERTIFICATE OF SERVICE**

      I hereby certify that on April 19, 2022, I served the foregoing document upon all counsel of record by filing a copy with the Clerk of the Northern District of Illinois using the Court's electronic filing system.

*/s/ Danielle Alvarez Clayton*
Assistant Corporation Counsel III