IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Aaron Burden, | |
| Plaintiff, | No. 22-cv-46 |
| v. | Hon. Judge John Z. Lee |
| The City of Chicago, and Chicago Police Officers Albert Torres (#13067), Mohammad Baker (#19740), Andrew Kats (#17577), Angelo Dicera (#14902), and J. Doe Officers 1-5, | Hon. Mag. Judge Young B. Kim |
| Defendants. | JURY TRIAL DEMANDED |

## FIRST AMENDED CIVIL COMPLAINT

Plaintiff AARON BURDEN, by and through his undersigned attorneys, brings the following First Amended Civil Complaint (the "Complaint") against Defendants The City of Chicago, Albert Torres (#13067), Mohammad Baker (#19740), Andrew Kats (#17577), Angelo Dicera (#14902), and J. Doe Officers 1-5 (collectively, "Defendants"), and in support thereof states as follows:

### INTRODUCTION

1.      This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to address deprivations of Plaintiff's rights under the Constitution of the United States.

### JURISDICTION

2.      The jurisdiction of the court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983; the Judicial Code, 28 U.S.C. §1331 and §1343(a); and this Court's supplementary jurisdiction powers, 28 U.S.C. § 1367.

## VENUE

3.      Venue is proper under 28 U.S.C. § 1391(b), as all defendants reside in this judicial district. In addition, the events giving rise to the claim occurred in this judicial district.

## PARTIES

4.      Plaintiff Aaron Burden ("Plaintiff" or "Mr. Burden") is a citizen of Illinois who resides in the Northern District of Illinois.

5.      Defendant City of Chicago (sometimes, the "City") is an Illinois municipal corporation located within this judicial district and which maintains its own law enforcement agency, the Chicago Police Department (sometimes, the "CPD").

6.      Defendant Officers Albert Torres (#13067), Mohammad Baker (#19740), Andrew Kats (#17577), Angelo Dicera (#14902), and J. Doe Officers 1-5 (collectively, the "Defendant Officers") were at all times relevant to this Complaint duly appointed and sworn law enforcement officers for the Defendant City of Chicago.

7.      When Defendant Officers engaged in the conduct alleged in this Complaint, they were acting in the course and scope of their employment, while on duty, and as agents of the Defendant City of Chicago.

8.      At all times material to this Complaint, Defendant Officers were acting under color of state law.

9.      This action is brought against Defendant Officers in their individual capacities.

## FACTS

10.     Mr. Burden has resided in the Chicago area since 2015.

11.     Since 2017, he has been stopped, searched, subjected to verbal abuse, and detained by Chicago police on at least eighteen (18) separate occasions.

12.     It is an all too familiar pattern. Mr. Burden, a Black man, attempts to go about his daily life—walking down the street, riding his bike, stopping at a gas station, driving his car to work with his wife—and Chicago Police Officers target him, handcuff him, use excessive force against him, and berate him, sometimes with threats and racist language.

13.     The unlawful conduct levied against Mr. Burden does not occur in a vacuum—rather, each incident described in this Complaint was caused by the policies, practices, customs, and usages of the Chicago Police Department including: its failure to properly train and discipline officers; the maintenance and encouragement of a "code of silence" within the department; and systemic racially discriminatory, bias-based policing.

14.     The acts perpetrated against Mr. Burden span years, but the City's deliberate indifference to these well-documented constitutional violations has been consistent and remains in force up to and including the present, causing continuing constitutional and state law violations against Mr. Burden.

## The CPD's Repeated Harassment of Aaron Burden and Violation of His Rights

15.     **Incident No. 1:** On July 8, 2017, Officer Thomas Spratte, barreling down a road near Mr. Burden's home, nearly hit Mr. Burden while he rode his bike. When Mr. Burden gained the officer's attention, Officer Spratte stated to Mr. Burden, "why do you gotta act like a child," and yelled that "no one gives a shit" that there were witnesses to his nearly hitting Mr. Burden with the car. Before driving away, he then referred to Mr. Burden as a "fucking pussy[.]"

16.     When Mr. Burden stated that he planned to make a complaint, Officer Spratte responded, "[d]o you think that scares us?... nothing's going to happen." This misconduct and response were consistent with the culture of impunity caused and enabled by the City of Chicago's deficient training and discipline mechanisms and the CPD's code of silence.

17.     **Incident No. 2:**  On April 30, 2018, as Mr. Burden stood on a street in his neighborhood, enjoying a Spring day, Officers Bernadette Kelly and Gabriela Santana descended upon him, wholly lacking any reasonable suspicion or probable cause.

18.     Officers Kelly and Santana turned on their vehicle's squad lights, and screamed for Mr. Burden to put his hands up. Mr. Burden complied, reasonably fearing that if he asserted his rights or questioned the officers he would be shot and killed.

19.     Despite repeated pleas from Mr. Burden for the officers to remove the tightened handcuffs cutting into his wrists, Officers Santana and Kelly mocked him repeatedly and told him there were only Black people in Englewood to "fuck with"—causing Mr. Burden fear, humiliation, and emotional distress. Officers Kelly and Santana then proceeded to search his car, including opening the console and trunk, all without probable cause. These actions were consistent with the Chicago Police Department's systemic, *de facto* policy of policing based on racial profiling and racial animus.

20.     Shocked and panicked from the interaction, Mr. Burden called 911 and was instructed to go to the 7th District police station to file a report. Upon arriving, however, Desk Sergeant Fenton laughed at Mr. Burden and told him he wouldn't take a complaint—part and parcel of the Chicago Police Department's code of silence and deeply entrenched failure to discipline wrongdoing.

21.     Mr. Burden filed a complaint with the City's Civilian Office of Police Accountability ("COPA") against Officers Kelly and Santana for their misconduct, and against Desk Sergeant Fenton for his refusal to take Mr. Burden's complaint.

22.     The COPA investigation of Officers Kelly and Santana's conduct toward Mr. Burden confirmed that the Officers handcuffed detained Mr. Burden and searched his vehicle, all

without proper probable cause and in violation of the Fourth Amendment.  The same COPA investigation found that Sergeant Fenton had in fact refused to take Mr. Burden's complaint.

23.     **Incident No. 3:**  A mere two weeks later, Officer Barrios from the same District continued the Chicago Police Department's torment of Mr. Burden by targeting him and yelling "fuck you" in his face repeatedly while he was in front of his home.

24.     **Incident No. 4:**  Subsequently, on April 22, 2019, Mr. Burden requested police assistance after he had been assaulted by a stranger on a train, but officers laughed at him and refused to help him.

25.     **Incident No. 5:**  The very next day, Officers Lonnie Felters and Michael Bennett pulled Mr. Burden over without probable cause and Officer Felters told Mr. Burden he "looked like a terrorist." (Mr. Burden occasionally wears a headscarf, and was doing so on the date of this interaction.)

26.     Like the other incidents alleged in this Complaint, this interaction reflects the ongoing pattern of CPD officers--all or most of them from District 7--physically and verbally targeting Mr. Burden. These incidents increased Mr. Burden's anxiety and depression and caused him severe emotional distress.

27.     Mr. Burden submitted another COPA complaint, this time against Officers Felters and Bennett. Once more, the investigation confirmed misconduct, finding that one of these Chicago police officers had called Mr. Burden a terrorist and engaged in bias-based policing, which is consistent with the City's policies, practices, customs, and usages of unconstitutional policing based on racial and other biases.  The investigation also found that both officers (a) improperly seized Mr. Burden by conducting a traffic stop without justification and (b) failed to properly document the traffic stop.

28.  **Incident No. 6:**  On July 19, 2019, Chicago police officers Hasenfang and Chulumovich targeted Mr. Burden in his neighborhood, pulling him over, detaining him, and searching his person and vehicle, while mocking him—all without any probable cause.

29.  Before he targeted Mr. Burden, Officer Hasenfang already had, as of 2015, a minimum of 97 misconduct allegations against him, but with only two sustained.

30.  Mr. Burden filed another COPA complaint and, for the third time in approximately 15 months, the investigation concluded that Mr. Burden's rights had been violated by members of the Chicago Police Department.

31.  **Incident No. 7:**  As a result of the ongoing police harassment, Mr. Burden began to limit—and to this day he continues to limit—his time outside of the home.  When he does leave home, Mr. Burden has often opted to walk instead of drive for fear that he'll be subjected to racist harassment or violence by the Chicago Police Department. Mr. Burden's crippling distress and fear of the Chicago police has put significant strain on his marriage, as symptoms of PTSD often limited Mr. Burden's ability to engage in everyday activities.

32.  On May 28, 2020, as the global COVID-19 pandemic was in full swing, Mr. Burden garnered the courage to leave his home and go to the store. Too afraid of the Chicago Police to drive, Mr. Burden went to the store on foot. As he approached his neighborhood convenience store, more than five officers jumped out of an unmarked police vehicle and detained him, again racially profiling and targeting Mr. Burden.

33.  The officers, as a group, intentionally refused to turn on their body worn cameras ("BWC") and Defendant Officers Torres and Baker proceeded to hold Mr. Burden on the street and place him in handcuffs so tightly that his wrists began to bleed. One Defendant Officer

punched Mr. Burden in the ribs. The officers searched his person and verbally berated him, all while refusing to wear masks and potentially exposing Mr. Burden to a deadly virus.

34. Mr. Burden also complained then that the handcuffs were too tight and Defendant Officers made no action to remedy the issue, though Mr. Burden was crying from the pain and trauma.

35. These officers' actions in singling out Mr. Burden using generalized allegations of "robberies in the area" evince policing based on discriminatory motive and intent. Among other things, White individuals in the area were not similarly profiled and harassed.

36. A COPA investigation confirmed that the officers (a) turned off their BWCs and (b) stopped Mr. Burden without probable cause.

37. Officer Baker, has, at minimum, nine misconduct complaints against him, only two of which were sustained.

38. Officer Torres has at a minimum four use of force reports—a greater volume of use force reports than 91% of other Chicago police officers.

39. **Incident No. 8:** The harassment and rampant Fourth and Fourteenth Amendment violations of Mr. Burden continued on January 5, 2021. Mr. Burden parked his car near a gas station pump and briefly went inside the station, leaving his blinkers on.

40. As he exited the gas station, Defendant Officers Kats, Dicera and J. Doe Officers swarmed Mr. Burden, violently grabbed him by the hair, and proceeded to handcuff him, slamming him onto the hood of a squad car. The Defendant Officers handcuffed Mr. Burden so tightly it broke the skin of his wrist.

41.     These Officers put him in the squad car and drove him to the District 7 police station, where Defendant Dicera informed Mr. Burden that he was being arrested for "obstruction of identification," an apparent reference to 720 ILCS 5/31-4.5, "Obstructing Identification."

42.     Mr. Burden, however, did not furnish a false or fictitious name or other personally identifiable information, was not previously lawfully detained or arrested, and there was not good cause to believe he was a witness to a criminal offense. As such, none of the statute's requirements were met. 720 ILCS 5/31-4.5.

43.     These Officers wholly lacked any reasonable suspicion or probable cause to detain and arrest Mr. Burden.

44.     Officer Dicera has at a minimum five misconduct complaints against him, zero of which were sustained.

45.     **Incident No. 9:**  Mr. Burden was again harassed by Chicago Police on March 21, 2021, just over two months after the immediately prior incident. On that date, Mr. Burden was parked outside his home when J. Doe Officers demanded his identification and then, without lawful justification, proceeded to handcuff him, search his wallet, and seize his Firearm Owners Identification ("FOID") card. While Mr. Burden was not arrested this time, he has since attempted to retrieve his FOID card from the Chicago Police Department, but it has not complied and instead has denied any wrongdoing.

46.     **Incident Nos. 10-17:** An attorney for the City of Chicago has confirmed that in recent years, in addition to the nine incidents with the police alleged above, Mr. Burden has been stopped on at least eight other occasions.  During these additional eight stops, the Chicago police failed to issue Mr. Burden stop receipts, as required. Despite one or more FOIA requests from Mr. Burden's counsel, the City and CPD failed to turn over any records related to these stops.

## Overview of Defendants' Harassment and Abuse of Mr. Burden

47.     These detentions and stops have occurred primarily on the South Side of Chicago in District 7, most recently in March of 2021, as alleged above.

48.     These incidents have upended Mr. Burden's life and are such a regular occurrence that Mr. Burden frequently recognizes individual Defendant Officers, who recognize him and proceed to stop and detain him, continuing their ongoing harassment.

49.     Mr. Burden is constantly surveilled and harassed by police. He has been followed by police several times without arrest, in addition to the many instances in which Mr. Burden has been arrested or otherwise seized.

50.     During Mr. Burden's interactions with Chicago police officers, he has been subjected to brutal, disrespectful, humiliating and inhumane treatment. Mr. Burden has repeatedly told Defendant Officers that he was being targeted and harassed for being Black. Mr. Burden has been shoved onto the hood of vehicles, had his hair violently pulled, and been punched in the ribs, among other degrading and physically and emotionally damaging treatment.

51.     Defendant Officers were on duty at all times relevant to this Complaint and engaged in the complained of conduct in the course and scope of their employment.

52.     The foregoing detentions and stops are not only cruel and shocking, but also entirely avoidable. Mr. Burden has filed multiple COPA complaints, and COPA investigations have sustained various of these complaints.  Indeed, the Chicago Police Department, including its District 7 police station, have been on notice for years of the Chicago police officers' ongoing physical and verbal harassment of Mr. Burden.

53.     Moreover, in February 2021, Mr. Burden, through his counsel, sent a litigation hold letter to the City of Chicago's Federal Civil Rights Litigation Division, the Chicago Police

Department, and other City agencies.

The Substantial Resulting Harms to Mr. Burden

54.     As a direct and proximate result of the acts or omissions of one or more Defendant Officers alleged above, Mr. Burden suffered damages including, but not limited to, physical injury humiliation, mental anguish, and emotional distress.

55.     Mr. Burden has been traumatized by this constant harassment and surveillance, and by the repeated violations of his person, dignity and liberty. As a result of the foregoing incidents, he suffers from anxiety, stress, night terrors and depression, and has symptoms of PTSD when he thinks of these incidents or sees police on the streets.

56.     Mr. Burden has been to therapy to address the trauma inflicted by these repeated violations, and he has been prescribed medication for the resulting anxiety and night terrors.

The City's and CPD's Use of Racially Discriminatory and Bias-based Policing

57.     CPD polices in a racially discriminatory manner. Ample publicly available data supports this allegation. For example, an Illinois Department of Transportation study showed that Chicago police stopped Black individuals for purported traffic infractions at a rate approximately seven times more frequently than white individuals.[1] Similarly, Chicago police searched Black individuals' vehicles almost three times as frequently as the vehicles of white individuals.[2]

58.     Similarly, the Illinois Department of Transportation found that in 2020, Black

---

[1] "Illinois Traffic and Pedestrian Stop Study: 2020 Annual Report Traffic Stops Part II," Illinois Department of Transportation, 200 https://idot.illinois.gov/Assets/uploads/files/Transportation-System/Reports/Safety/Traffic-Stop-Studies/2020/FINAL--Illinois%20Traffic%20and%20Pedestrian%20Stop%20Study%202020%20-%20Part%20II%20Traffic--6-24-21.pdf

[2] *Id.*

individuals were subjected to pedestrian stops by Chicago police approximately nine times more frequently than were white individuals.[3]

59.     The American Civil Liberties Union of Illinois reported in 2015 that Black individuals are subjected to police stops at a rate substantially higher proportionally than are their white counterparts.[4]

60.     CPD's discriminatory actions extend to hiring as well, with a report by the Office of the Inspector General of the City of Chicago showing that Black applicants to the force were offered progression in the application process proportionately less than members of other races and ethnic groups, who increased their proportionate representation from the application stage to later rounds of hiring.[5]

61.     Racially discriminatory policing is evident in use of force data as well. Reports concerning publicly available data, and studies compiled by journalistic outlet The Intercept, show that Chicago police use force against Black individuals at a rate grossly disproportionate to the

---

[3] "Illinois Traffic and Pedestrian Stop Study: 2020 Annual Report Pedestrian Stops Part II," Illinois Department of Transportation, 46 https://idot.illinois.gov/Assets/uploads/files/Transportation-System/Reports/Safety/Traffic-Stop-Studies/2020/FINAL--Illinois%20Traffic%20and%20Pedestrian%20Stop%20Study%202020%20-%20Part%20II%20Pedestrian--6-24-21.pdf.

[4] "Stop and Frisk in Chicago," ACLU of Illinois, 8 https://www.aclu-il.org/sites/default/files/wp-content/uploads/2015/03/ACLU_StopandFrisk_6.pdf.

[5] "OIG Finds That the Chicago Police Department's Multi-Stage Hiring Process Reduces Representation of Minority Candidates from Initial Application to Point of Hire," Office of the Inspector General for the City of Chicago, https://igchicago.org/2021/07/08/oig-finds-that-the-chicago-police-departments-multi-stage-hiring-process-reduces-representation-of-minority-candidates-from-initial-application-to-point-of-hire/.

population demographics of the City.[6] Similarly, racially discriminatory policing in the context of

uses of force is evidenced by the DOJ's 2017 report on the Chicago Police Department.[7]

62.     For its part, the City's Police Accountability Task Force noted that "CPD's own

data gives validity to the widely held belief the police have no regard for the sanctity of life when it

comes to people of color."

### The City of Chicago and CPD's Failure to Train on Reasonable Use of Force

63.     The City of Chicago and CPD fail to provide adequate continuing training on the

use of force.

64.     Indeed, the United States Department of Justice ("DOJ"), in a January 13, 2017

report summarizing the findings of its year-long investigation of the CPD (the "DOJ Report"),

concluded that CPD "engages in a pattern or practice of unconstitutional use of force."

65.     The DOJ Report explains that this pattern of unlawful conduct stems from, without

limitation, the fact that CPD officers "do not receive the quality or quantity of training" necessary

to make proper decisions regarding the degree of force that is appropriate in any given situation.

As the DOJ Report observed, "CPD has not provided officers with adequate guidance to

understand how and when they may use force, or how to safely and effectively control and resolve

---

[6] "Chicago Police Are 14 Times More Likely to Use Force Against Young Black Men Than Against Whites," Andrew Fan, *The Intercept*, https://theintercept.com/2018/08/16/chicago-police-misconduct-racial-disparity/.

[7] "Investigation of the Chicago Police Department," United States Department of Justice, 15, https://perma.cc/JZ6Q-659Y. ("Our investigation found also that CPD has tolerated racially discriminatory conduct that not only undermines police legitimacy, but also contributes to the pattern of unreasonable force. The pattern or practice of unreasonable force, coupled with the recurrence of unaddressed racially discriminatory conduct by officers further erodes community trust and police effectiveness.")

encounters to reduce the need to use force."

66.     The DOJ Report notes that one Chicago Police Academy training on use of force "consisted of a video made decades ago, which was inconsistent with both current law and CPD's own policies."

67.     The impact of this woefully inadequate training was apparent when an interview of graduates from the Chicago Police Academy revealed that "only one in six [graduates] ... came close to properly articulating the legal standard for use of force."

68.     According to the DOJ Report, a review of hundreds of CPD use of force incidents "revealed CPD officers engaging in dangerous tactics that indicate they do not remember or were never taught basic police skills" governing the use of force. This "lack of continuing training has a direct connection to the improper use of force in patrol and other field assignments."

69.     The City of Chicago and CPD also fail to require officers to accurately report uses of force, which means there is no opportunity to meaningfully assess whether or how training should be modified to improve outcomes in the future.

70.     Changes to CPD use of force training initiated after the release of the DOJ Report have not addressed key deficiencies. The training does not adequately explain the proper constitutional standard for determining if use of force is reasonable. And it fails to provide any in-depth analysis or discussion of use of force "examples" from which officers could learn why certain uses of force are constitutional and others are not.

71.     Complaints of excessive force against CPD officers underscore the inadequacies in use of force training. In the years following the release of the DOJ Report, members of the public have continued to file—at alarming rates—complaints of CPD officers using excessive force by, without limitation, shoving, pulling, punching, choking, and slamming citizens during the course of

a stop or arrest.

72.     Further, even though de-escalation and force mitigation principles are purported to be key features of CPD's "revised" use of force policy, according to COPA, the new training "provide[s] minimal discussion of the reasons and tools for de-escalation and force mitigation[,]" Indeed, the tone, rhetoric, and demeanor of the trainers charged with implementing CPD's new training module have given the impression that there is no need to change CPD's culture around use of force incidents.

73.     The City of Chicago and CPD are and have been on notice of these ongoing deficiencies in use of force training.  As recently as June 2020, the independent monitor overseeing the federal consent decree to reform the CPD reported that the Chicago Police Department was not complying with its obligation to implement training that would ensure reasonable and constitutional use of force.

74.     In a June 5, 2020 letter to the same independent monitor, commenting on the monitor's report, the Attorney General of Illinois concluded that "CPD continues to be reluctant to change its culture as it relates to use of force and to hold officers accountable for excessive force," and that, in response to use of force incidents, the Chicago Police Department has not made "substantive changes to CPD policy ... or training[.]"

75.     This failure by the City to adequately train its officers on reasonable use of force—despite knowledge that CPD officers engage in a pattern or practice of excessive force—amounts to deliberate indifference to violations of constitutional rights.

### The City and CPD's Failure to Address and Eliminate the "Code of Silence"

76.     CPD teaches its officers not to violate the "code of silence."  Officers are instructed that "Blue is Blue.  You stick together.  If something occurs on the street that you don't think is

proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

77. The City of Chicago has known about and encouraged this code of silence in the CPD at all times relevant to this Complaint, and has not taken action, or action sufficient, to address it.

78. For example, in 2012, in the case of *Obrycka v. City of Chicago*, No. 07-cv-2372 (N.D. Ill.), a federal jury found that the City "had a widespread custom or practice of failing to adequately investigate and/or discipline its officers and/or of a police code of silence."

79. Likewise, the 2017 DOJ Report observed that both the City of Chicago and CPD were aware of the code of silence within CPD, for example:

    a. "Mayor [Rahm Emanuel] has acknowledged that a 'code of silence' exists in the CPD, and his opinion is shared by current officers and former high-level CPD officials interviewed during our investigation."

    b. "[A]ttempts to hold officers accountable are also frustrated by police officers' code of silence. The City, police officers, and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence."

80. In April 2016, as part of her duties as chair of Mayor Emanuel's Police Accountability Task Force, current-Mayor of Chicago Lori Lightfoot concluded: "[T]he code of silence is not just an unwritten rule, or an unfortunate element of police culture past and present. The code of silence is institutionalized and reinforced by CPD rules and policies that are also

baked into the labor agreements between the various police unions and the City."

81.    In January 2020, Chicago's then-Interim Police Superintendent Charlie Beck explicitly acknowledged that "of course" there is a code of silence in the CPD.

82.    In October 2020, Chicago's then-Police Superintendent David Brown again acknowledged a code of silence in the CPD, conceding that there is a valid criticism of "this big culture of protecting each other" and that the criticism of the culture is "accurate."

83.    The Code of Silence was active and at work in Officers' wrongful handling of Mr. Burden in multiple ways, including but not limited to:

    a.    Failing to activate body cameras on multiple occasions;

    b.    Failing to provide documentation of stops as required;

    c.    Causing Defendant Officers to use excessive force and other constitutional violations without fear of rebuke or consequence;

    d.    Causing Officer Spratte to remark that he had no fear of a COPA investigation;

    e.    Causing CPD Officers to fail to intervene to protect Mr. Burden in the face of their colleagues' constitutional violations; and

    f.    Causing CPD to fail to provide complete records of Mr. Burden's stops in response to one or more FOIA requests and requests to the City's Corporation Counsel.

### The City and CPD's Failure to Discipline Police Officer Misconduct

84.    The City of Chicago and its CPD have failed to discipline Chicago police officers and institute adequate disciplinary systems.

85.    The DOJ Report noted that CPD's disciplinary mechanisms contained "numerous entrenched, systemic policies and practices that undermine police accountability," and concluded that the City of Chicago's discipline system "lacks integrity" and "does not effectively deter

misconduct."

86.     The DOJ Report also noted that when potential misconduct is at issue police disciplinary investigators rarely "ask probing questions" of police officers.

87.     This failure to ensure discipline is imposed and is adequate naturally works in tandem with the code of silence to shield officers from accountability and leads to misconduct like the excessive force, failure to intervene and other police misconduct alleged here.

88.     COPA's disciplinary recommendations are often subject to approval by other entities, such as the Superintendent of Police and the Police Board, an intermediary oversight entity which retains the ability to rule on COPA recommendations.

89.     Further, when COPA does impose discipline, this discipline is insufficiently severe to deter future misconduct.

90.     At the time the Defendant Officers used excessive force and committed other violations against Mr. Burden, the City of Chicago's policymakers knew that CPD's policies and customs for disciplining and controlling its officers were inadequate and caused police misconduct.

91.     Despite this knowledge, policymakers failed to act to remedy these problems, again reflecting deliberate indifference to violations of constitutional rights.

## COUNT I
### Unreasonable Seizure against Named Defendant Officers
### (42 U.S.C. § 1983 and the Fourth Amendment)

92.     Plaintiff re-alleges paragraphs 1-91 as though fully set forth herein.

93.     On or about May 28, 2020, January 5, 2021, and March 21, 2021, Defendant Officers Baker, Torres, Kats, and Dicera, and J. Doe Officers stopped and detained Plaintiff without probable cause that Plaintiff had committed, was committing or was going to commit any criminal act.

94. Plaintiff was also stopped without probable cause on several previous occasions, and these acts, when paired with other stops of Plaintiff, and as caused by the continuous customs and practices of the Defendant City described in Plaintiff's Monell claims (Count VI) and Equal Protection claims (Count IV), constitute a continuing violation and continuing harm under the law and are thus proper [grounds for relief and] for this Court's consideration.[8]

95. The conduct of Defendant Officers, alleged above, constituted unreasonable seizures in violation of the Fourth Amendment to the United States Constitution.

96. The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Plaintiff.

97. Defendant Officers were acting under color of state law and in the scope of their employment at the times of these constitutional violations.

98. The actions of Defendant Officers directly and proximately caused Plaintiff to suffer, without limitation, severe emotional distress, mental anguish, and financial loss.

WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment in his favor and against Defendant Officers and award compensatory damages, costs and attorney's fees. Plaintiff also seeks punitive damages against Defendant Officers as well as any other relief that this Court deems just and equitable.

## COUNT II
### Excessive Force against Defendant Officers
### (42 U.S.C. § 1983 and the Fourth Amendment)

---

[8] "The continuing violation doctrine is ... applicable when the state actor has a policy or practice that brings with it a fresh violation each day." *Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006); "To trigger the continuing violation doctrine in the context of an Equal Protection claim, a plaintiff "must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy." *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 309 (2d Cir. 2020).

99.     Plaintiff re-alleges paragraphs 1-91 as though fully set forth herein.

100.     On or about May 28, 2020, Defendant Officers Baker and Torres applied handcuffs too tightly and did not act when Mr. Burden complained.  These acts and omissions were without lawful justification.

101.     On January 5, 2021, Defendant Officers Kats and Dicera pulled Mr. Burden's hair, punched him in the ribs, and slammed him against a police car, without lawful justification to do so.

102.     The conduct of Defendant Officers, alleged above, constituted unreasonable uses of force in violation of the Fourth Amendment to the United States Constitution.

103.     The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Plaintiff.

104.     Defendant Officers were acting under color of state law and in the scope of their employment at the times of these constitutional violations.

105.     The actions of Defendant Officers directly and proximately caused Plaintiff to suffer, without limitation, physical injury, severe emotional distress, mental anguish, damage to reputation, and loss of liberty.

WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment in his favor and against Defendant Officers and award compensatory damages, costs and attorney's fees. Plaintiff also seeks punitive damages against Defendant Officers as well as any other relief that this Court deems just and equitable.

### COUNT III
### Illegal Seizure of Property against J. Doe Officers
### (42 U.S.C. § 1983 and the Fourth Amendment)

106.     Plaintiff re-alleges paragraphs 1-91 as though fully set forth herein.

107. On or about May 31, 2021, J. Doe Officers stopped and detained Plaintiff without probable cause and seized his Firearm Owners Identification Card.

108. J. Doe Officers have refused to return this important piece of property, which was unreasonably seized pursuant to the unconstitutional stop and detention.

109. The conduct of J. Doe Officers, alleged above, constituted an unreasonable seizure in violation of the Fourth Amendment to the United States Constitution.

110. The actions of J. Doe Officers directly and proximately caused Plaintiff to suffer, without limitation, severe emotional distress and financial loss.

111. The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Plaintiff.

112. J. Doe Officers were acting under color of state law and in the scope of their employment at the times of these constitutional violations.

113. The actions of J. Doe Officers were the direct and proximate cause of the injuries that Plaintiff sustained as a result of J. Doe Officers' violations of Plaintiff's constitutional rights, alleged above.

WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment in his favor and against J. Doe Officers and award compensatory damages, costs and attorney's fees. Plaintiff also seeks punitive damages against J. Doe Officers as well as any other relief that this Court deems just and equitable.

## COUNT IV
### Violation of Equal Protection against Named Defendant Officers
### (42 U.S.C. § 1983 and the Fourteenth Amendment)

114. Plaintiff re-alleges paragraphs 1-91 as though fully set forth herein.

115. The Fourteenth Amendment to the United States Constitution, enforceable under

42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

116.    This count pleads "class of one" and race-based discrimination Equal Protection claims in the alternative. The "class of one" allegations relate to all named Defendant Officers (Torres, Baker, Kats and Dicera), while race-based claims apply to Defendant Officers Baker and Torres only.

117.    Under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff may also allege an actionable claim based on arbitrary and irrational actions motivated by personal animus toward Plaintiff.

118.    The named Defendant Officers' actions towards Plaintiff—all or most of which occurred in the 7th Police District—evince a pattern of arbitrary and irrational conduct motivated by personal animus.

119.    These violations are continuing in nature; since Plaintiff moved to Chicago in 2015, he has been wrongfully stopped and/or detained by Chicago police a minimum of 17 times.

120.    The named Defendant Officers intentionally treated Plaintiff differently than similarly situated individuals, and departed from norm or common practice, acted with animus, and acted with discriminatory motive with no rational basis for doing so.

121.    Under the Equal Protection Clause of the Fourteenth Amendment, governmental discrimination based on race and/or color is presumptively unconstitutional and subject to heightened scrutiny.

122.    Plaintiff Aaron Burden is Black and thus a member of a protected class.

123.    As alleged above, Plaintiff was repeatedly targeted based on race, including with racially discriminatory comments.  CPD officers both harbored racial animus and engaged in racial

profiling toward Plaintiff.[9]

124.    Defendant Officers Torres and Baker stopped and detained Plaintiff based on generalized allegations of "robberies in the area," without probable cause or reasonable suspicion, unlike similarly situated White individuals, and while using excessive force against Plaintiff. Defendant Officers Torres and Baker did so in flagrant violation of the Fourth Amendment, violating Plaintiff's equal protection rights.

125.    Similarly situated White individuals were not and are not repeatedly profiled and stopped by Defendant Officers without probable cause.

126.    Defendant Officers Baker and Torres acted with intent to treat Plaintiff disparately on the basis of his race and presumed religion, violating Plaintiff's Fourteenth Amendment rights of equal protection guaranteed under the U.S. Constitution, and thus violating his rights guaranteed under 42 U.S.C. § 1983.

127.    Chicago Police Officers, including Defendant Officers, treat Black individuals differently than White individuals, as evinced in their policing of Plaintiff and the statistical documentation referenced above.

128.    Officers, including Defendant Officers Torres and Baker, acted with intent to treat Plaintiff disparately on the basis of his race, violating his Fourteenth Amendment rights of equal protection guaranteed under the U.S. Constitution, and thus violating his rights guaranteed under 42 U.S.C. § 1983.

129.    The Chicago Police Department has a widespread practice of operating in a racially

---

[9] *See Mehta v. Vill. of Bolingbrook*, 196 F. Supp. 3d 855, 865 (N.D. Ill. 2016) (concluding that actions by a police department arguably outside of a statute of limitations may be used to show discriminatory animus as to later incidents by the same police department within the statute of limitations).

discriminatory manner.

130.    The actions of the Defendant Officers Torres, Baker, Dicera, and Kats were willful and wanton, and were undertaken intentionally with malice, willfulness, and reckless indifference to Plaintiff's rights.

131.    Defendant Officers were acting under color of state law and in the scope of their employment at the times of these constitutional violations.

132.    These actions, alleged above, directly and proximately caused severe emotional distress to Plaintiff, including, but not limited to, depression, crippling fear and anxiety, an inability to leave his home, panic attacks, loss of liberty, loss of property, and other ongoing severe physiological impacts.

WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment in his favor and against Defendant Officers and award compensatory damages and costs. Plaintiff also seeks punitive damages as well as any other relief that this Court deems just and equitable.

## COUNT V
### Failure To Intervene against Defendant Officers
### (42 U.S.C. § 1983)

133.    Plaintiff re-alleges paragraphs 1-91 as though fully set forth herein.

134.    Defendant Officers all were present and failed to intervene to stop the violations of Plaintiff's Fourth and Fourteenth Amendment Rights.

135.    Defendant Officers all had a reasonable opportunity to intervene and prevent the unreasonable detentions of Plaintiff and unreasonable uses of force against him. Each of the Defendant Officers failed to take even the most basic action to stop the violations of Plaintiff's body and rights.

136.    The conduct of Defendant Officers directly and proximately caused Plaintiff to

23

suffer, without limitation, pain and suffering, humiliation, emotional distress, and mental anguish.

137.     The misconduct described in this Count was willful and wanton and undertaken with malice, willfulness, reckless indifference and conscious disregard for Plaintiff's rights and safety.

138.     Defendant Officers were acting under color of state law and in the scope of their employment at the times of these constitutional violations.

139.     These actions, alleged above, directly and proximately caused severe emotional distress to Plaintiff, including, but not limited to, depression, crippling fear and anxiety, an inability to leave his home, panic attacks, loss of liberty, loss of property, and other ongoing severe physiological impacts.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor, and against Defendant Officers, for compensatory damages, punitive damages, attorney's fees and costs, and any other relief that the Court deems just and equitable.

### COUNT VI:
### *Monell:* Failure to Train, Failure to Discipline, Fostering of a Code of Silence, and Bias-Based Policing against the City of Chicago
### (42 U.S.C. § 1983)

140.     Plaintiff re-alleges paragraphs 1-91 as though fully set forth herein.

141.     The City of Chicago, through the Chicago Police Department, has a de facto policy and widespread practice of engaging in racially biased policing and violating the constitutional rights of protected classes of people.

142.     The 2017 United States Department of Justice investigation of the CPD concluded, among other things, that in response to "discriminatory views and intolerance with regard to race, religion, gender, and national origin in public social media forums," CPD failed to take appropriate steps to prevent or respond to this animus.

https://www.justice.gov/opa/file/925846/download at 147.

143.    Additionally, the 2016 report of the mayoral Chicago Police Accountability Task Force contained both similar and parallel conclusions. Among other startling findings, it concluded that there are "daily, pervasive transgressions" involving Fourth Amendment violations, specifically targeting Black and Latino communities in Chicago.

144.    Additionally, in 2015, the American Civil Liberties Union of Illinois found that "Chicago has failed to train, supervise and monitor law enforcement in minority communities for decades, resulting in a failure to ensure that officers' use of stop and frisk is lawful."

145.    Despite clear, actual notice of these findings, the City and its CPD have not subsequently implemented any meaningful changes in CPD policy, procedure, or training in order to remedy or otherwise address officers' widespread practice of racially biased policing, despite the City having plainly agreed to do so in a federal consent decree with the State of Illinois, entered by United States District Court Judge Robert Dow in January 2019, in *State of Illinois v. City of Chicago*, 17-cv-6260, https://perma.cc/2H6E-ASB8 (Consent Decree). This consent decree was a painstakingly negotiated result of input from the Illinois Attorney General, various community groups, the public, and City stakeholders.

146.    CPD has failed to consistently meet benchmarks set forth in the foregoing consent decree.

147.    Directly relevant to the facts of this case, and the CPD's code of silence, the Independent Monitoring Team, attorneys responsible for monitoring compliance with the referenced consent decree, released a Special Report: The City of Chicago's and the Chicago Police Department's Responses to Protests and Unrest under the Consent Decree (May 2020 – November 2020) on July 20, 2021, which found that there have been an unprecedented number of

complaints to COPA regarding officers concealing their identities and the identities of fellow officers, and the use of racial and derogatory slurs in policing. State of Illinois v. City of Chicago, 17-cv-6260, https://perma.cc/F25M-77C2 at 8.

148.    The City of Chicago's failure to act despite the known consequences of inadequate use of force training, inadequate discipline, bias-based policing, and a pervasive code of silence—namely, widespread constitutional violations by CPD officers—constituted deliberate indifference to the rights of Plaintiff and other persons with whom CPD came into contact.

149.    Defendant Officers' violations of Plaintiffs Fourth and Fourteenth Amendment rights were the highly predictable consequences of the City's failure to train, failure to discipline, failure to eliminate CPD's code of silence, and pattern of racially biased policing.

150.    COPA's disciplinary investigations move at a snail's pace and impose inadequate discipline, and even when COPA does recommend discipline it is often subject to the whim of other stakeholders such as the Police Superintendent and the Police Board, which intervenes when the COPA and the CPD Superintendent do not agree on disciplinary recommendations, or when the Superintendent recommends discharge of an officer from service.

151.    On the rare occasions that COPA does sustain a complaint, its disciplinary recommendations are insufficient to deter future misconduct, leading officers to commit constitutional violations without fear of real consequences. It is not uncommon for serious violations of the constitution to result in merely days of suspension or other inadequate results.

152.    The City's failure to train, failure to discipline, failure to address CPD's code of silence, and bias-based policing constitute de facto policies that caused all officers involved in this matter to unreasonably seize Plaintiff, otherwise violate his rights, and fail to intervene to prevent these constitutional violations.

26

153.     The City's actions and inactions in response to well-recognized deficiencies in its policing apparatus constitute deliberate indifference to the problems they pose in that, among other things, they create a culture and status quo in which the rights of Chicagoans are regularly violated without consequence.

154.     The City's unconstitutional policies, practices, customs, and usages caused all violations of Mr. Burden's rights mentioned herein by named and unnamed officers, constituting a continuing violation of his constitutional rights and operating to toll the statute of limitations for events occurring prior to any expiry of the operative statutes of limitations, and making the City itself liable for these violations.

WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment in his favor and against The City of Chicago and award compensatory damages, attorney's fees, and costs, as well as any other relief that this Court deems just and equitable.

**COUNT VII**
**Continuing Tort: Assault and Battery against Defendant Officers**
**(Illinois State Law Claim)**

155.     Plaintiff re-alleges paragraphs 1-91 as though fully set forth herein.

156.     The actions of Defendant Officers constituted unjustified, unreasonable, and offensive physical contact against Plaintiff.

157.     The conduct of Defendant Officers also caused Plaintiff to perceive an imminent battery.

158.     Defendants Officers' actions were taken pursuant to, and were caused by, continuing municipal policies and practices of failing to discipline, failing to supervise, engaging in racially biased policing, and maintaining and abetting a code of silence.

159.     Under Illinois law, a cause of action for continuing torts accrues at the earlier of the

time the last injurious act occurs or Defendants' misconduct is abated.

160.     The date of the last injurious act occurred on March 21, 2021.

161.     The actions of Defendant Officers proximately caused Plaintiff's injuries, including, but not limited to, pain from officers severely pulling his hair, abrasions and cuts on his wrists, pain, suffering, emotional harm, and anguish.

162.     The actions of Defendant Officers were willful and wanton and committed within the scope of their employment. Defendant City of Chicago is therefore liable under *respondeat superior*.

WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment in his favor and against Defendant Officers and award compensatory damages, punitive damages, and the costs of the action, and any other relief that this Court deems just and equitable.

## COUNT VIII
### Continuing Tort: Intentional Infliction of Emotional Distress against Defendant Officers (Illinois State Law Claim)

163.     Plaintiff re-alleges paragraphs 1-91 as though fully set forth herein.

164.     Plaintiff Burden was subjected to the intentional infliction of emotional distress on no fewer than 17 occasions.

165.     Under Illinois law, a cause of action for a continuing tort accrues at the time the last injurious act occurs or Defendants' misconduct is abated.

166.     The date of the last injurious act occurred on March 21, 2021.

167.     The actions of Defendant Officers spanning from 2017 to present, as alleged above, were extreme and outrageous. By these actions, Defendant Officers intended to cause, or recklessly disregarded the probability that they would cause, severe emotional distress to Plaintiff.

168.     These actions, alleged above, include, *inter alia* and without limitation,

unreasonably detaining and arresting Plaintiff; using excessive force against him without lawful justification; using racist language toward Plaintiff; stating that Black people only exist in Englewood to "fuck with"; and stating that no one "gave a fuck" about Defendant Officers nearly running Mr. Burden over with a vehicle.

169.    As noted, this tort constitutes continuing violations of Plaintiff's rights that were enabled and caused by the City of Chicago's unconstitutional policies, practices, customs, and usages.

170.    These actions, alleged above, directly and proximately caused severe emotional distress to Plaintiff, including, but not limited to, depression, crippling fear and anxiety, an inability to leave his home, panic attacks, and other ongoing severe physiological impacts.

171.    The actions of Defendant Officers were willful and wanton and committed within the scope of their employment.  Defendant City of Chicago is therefore liable under *respondeat superior*.

WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment in his favor and against Defendant Officers and award compensatory damages and costs. Plaintiff also seeks punitive damages as well as any other relief that this Court deems just and equitable.

## COUNT IX
### *Respondeat Superior* against the City of Chicago
### (Illinois State Law Claim)

172.    Plaintiff re-alleges paragraphs 1-91 as though fully set forth herein.

173.    Defendants Officers, and other agents and employees of the City of Chicago involved in the assault, battery, and intentional infliction of emotional distress against Plaintiff described herein, were acting in the scope of their employment and as agents of their employer, the City of Chicago.

174. As noted, these torts constitute continuing violations of Plaintiff's rights that were enabled and caused by the City of Chicago's unconstitutional policies, practices, customs, and usages.

175. The City of Chicago is liable for the acts of its agents and employees, and is therefore liable for Intentional Infliction of Emotional Distress, Assault and Battery, and the other state law claims arising out of the occurrences that are the subject of this Complaint.

176. Defendant Officers' unlawful acts occurred within the scope of their employment activities.

177. As a direct and proximate result of these actions, Plaintiff was damaged, including suffering lasting mental anguish, reputational damage, emotional trauma, panic attacks, paralyzing fear of the police, other physiological suffering, and various devastating consequences that continue to impact his life.

WHEREFORE, Plaintiff Burden demands judgment against the City of Chicago for compensatory damages, punitive damages, costs, and such other and additional relief as this Court deems equitable and just.

## COUNT X
### Indemnification against the City of Chicago
### (Illinois State Law Claim — 745 ILCS 10/9-102)

178. Plaintiff re-alleges paragraphs 1-91 as though fully set forth herein.

179. In Illinois, municipalities are obligated to pay for any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities. 745 ILCS 10/9-102.

180. Defendant Officers committed the acts alleged above under color of law, while on duty, and in the scope of their employment activities by Defendant City of Chicago.

181.     The misconduct described in this Complaint was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Plaintiff.

182.     As a direct and proximate result of Defendant Officers' unlawful acts, Plaintiff was damaged, including suffering lasting mental anguish, emotional trauma, damage to reputation, paralyzing fear of going outside, physical injuries, and various devastating consequences that continue to impact his life.

183.     As such, Defendant City of Chicago is liable to Plaintiff for any award of compensatory damages and costs that arise from the actions of Defendant Officers.

WHEREFORE, should Defendant Officers be found liable for any of the claims alleged in this Complaint, Plaintiff demands that, pursuant to 745 ILCS 10/9-102, Defendant Chicago pay to Plaintiff the amount of any judgment obtained against Defendant Officers as a result of this action.

## JURY DEMAND

Plaintiff demands trial by jury on all claim so triable.

Respectfully submitted,

/s/Daniel Massoglia

*One of Plaintiff's Attorneys*

Daniel Massoglia
First Defense Legal Aid
601 S. California Ave.
Chicago, IL 60612
P: 708-797-3066

31

E: *daniel@first-defense.org*

<u>Of Counsel</u>:
Stephen J. Siegel
Serena G. Rabie
Novack and Macey LLP
100 N. Riverside Plaza
Chicago, IL 60606
P: 312-419-6900
E: *ssiegel@novackmacey.com*
    *srabie@novackmacey.com*

## **CERTIFICATE OF SERVICE**

I, Daniel Massoglia, hereby certify that I have caused this document to be served on all counsel of record via email on May 9, 2022 by filing it with the Clerk of Court's CM/ECF system, which generates electronic notice to all parties.

Respectfully submitted,

/s/ Daniel E. Massoglia

*One of Plaintiff's Attorneys*

Daniel Massoglia
First Defense Legal Aid
601 S. California Ave.
Chicago, IL 60612
P: 708-797-3066
E: *daniel@first-defense.org*